SHORT RECORD
18-1800
Filed 4/16/2018

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

| | | |
|---|---|---|
| MARY MADISON, | ) | |
| | ) | |
| Petitioner, | ) | Petition for Review |
| V. | ) | |
| | ) | No. |
| SECRETARY of the DEPARTMENT OF LABOR, | ) | |
| | ) | |
| | ) | |
| Respondent. | ) | |

## PETITION FOR REVIEW

Mary Madison hereby petitions the court for review of the decisions of the Secretary of Labor

as delegated to the Administrative Review Board in its "Order Denying Motion for Reconsideration"

dated March 9, 2018;  its "Final Decision and Order Dismissing Appeal" entered on February 15, 2018

in the case of Madison v. Kenco Logistics, ARB Case No. 18-018; ALJ Case No. 2016-FDA-004 and

its "Decision and Order Granting Respondent's Motion for Summary Decision on Reconsideration,

Canceling Hearing and Dismissing Claim" issued November 22, 2017 Case No. 2016-FDA-00004.

Copies of the orders are attached hereto. This petition is timely filed pursuant to 21 U.S.C.

§399d(b)(5)(A), Food, Drug and Cosmetic Act as amended, §§402 and 1012 entitled "Employee

Protections" of the Food Safety Modernization Act (FSMA) and 29 CFR 1987.110(a)(b)(c) and 29 CFR

1987.112 of the Procedures for Handling Retaliation Complaints under §402 of the FDA Food Safety

Modernization Act  within 60 days of the Secretary's decision entered on February 15, 2018.

Dated: 4/16/2018

Respectfully submitted

Jordan T. Hoffman
ARDC No. 6195896
Jordan TraVaille Hoffman, P.C.
2711 E. New York Street, Suite 205
Aurora, Illinois 60502
(888) 958-4529

## CERTIFICATE OF SERVICE

The undersigned attorney, hereby certifies that on April 16, 2018 I submitted a copy of

the foregoing Petition to Show Cause via U.S. Mail to:

By: _____

     Jordan T. Hoffman, Her Attorney
     Jordan T. Hoffman
     ARDC # 6195896
     2711 E. New York St., Suite 205
     Aurora, IL 60502
     (888) 958-4529
     jthoffmanlaw@gmail.com

Director
Directorate of Whistleblower
Protection Programs
U S Department of Labor, OSHA
Room N 4618 FPB
200 CONSTITUTION AVE NW
WASHINGTON DC 20210

Regional Administrator
Region 5
U. S. Department of Labor, OSHA
Room 3244
230 South Dearborn Street
CHICAGO IL 60604

Administrative Review Board
U. S. Dept. of Labor
Suite S-5220, FPB
200 Constitution Ave., N.W.
WASHINGTON DC 20210

Associate Solicitor
Division of Fair Labor Standards
Office of the Solicitor
U.S. Department of Labor
200 Constitution Avenue, N.W., Room N-2716
WASHINGTON DC 20210

Counsel for Whistleblower Programs
Division of Fair Labor Standards
Office of the Solicitor
U.S. Department of Labor
200 Constitution Ave, NW, Room N-2716
WASHINGTON DC 20210

Chicago Regional Solicitor
Regional Solicitor
U. S. Department of Labor
Room 844
230 South Dearborn Street
CHICAGO IL 60604

SERVICE SHEET continued Page: 2

Mary Madison
9758 S. Charles
CHICAGO IL 60643

Tim Crouse
Reg. Supervisory Investigator
USDOL, OSHA, Room 3244
230 South Dearborn Street
CHICAGO IL 60604

Julia P Argentieri, Esq.
Jody Wilner Moran, Esq.
Jackson Lewis, P.C.
150 N. Michigan Ave., Suite 2500
CHICAGO IL 60601

**U.S. Department of Labor**      Administrative Review Board
200 Constitution Avenue, N.W.
Washington, D.C. 20210



IN THE MATTER OF:

MARY MADISON,                         ARB CASE NO.  18-018

      COMPLAINANT,              ALJ CASE NO.  2016-FDA-004

    v.                                 DATE:     MAR  0 9 2018

KENCO LOGISTICS,

      RESPONDENT.


BEFORE:     THE ADMINISTRATIVE REVIEW BOARD

Appearances:

*For the Complainant*:
    **Jordan TraVaille Hoffman, Esq.; Aurora, Illinois**

*For the Respondent:*
    **Jody Wilner Moran, Esq. and Julia P. Argentieri, Esq.;** *Jackson Lewis P.C.,*
    **Chicago, Illinois**

**Before:     Joanne Royce,** *Administrative Appeals Judge,* **and Leonard Howie III,**
*Administrative Appeals Judge*


## ORDER DENYING MOTION FOR RECONSIDERATION

On December 17, 2017, Complainant Mary Madison, filed a Petition requesting the Administrative Review Board to review a Department of Labor Administrative Law Judge's Decision and Order Granting Respondent's Motion for Summary Decision on Reconsideration, Cancelling Hearing, and Dismissing Claim (D. & O.), issued on November 22, 2017, in this case arising under the whistleblower protection provisions of the FDA Food Safety Modernization Act, 21 U.S.C.A. § 399d (Thomas Reuters 2013) (FDA).    On February 15, 2018, the Administrative Review Board issued a Final Decision and Order Dismissing Appeal (F. D. & O.).    The Board held that Madison failed to file a timely petition for review and failed to establish grounds supporting equitable tolling of the limitations period.    On March 1, 2018,

Madison filed a Motion for Reconsideration. Finding no grounds justifying reconsideration, we **DENY** the motion.

The ARB generally applies a four-part test to determine whether the movant for reconsideration has demonstrated: (i) material differences in fact or law from that presented to the [ARB] of which the moving party could not have known through reasonable diligence, (ii) new material facts that occurred after the [ARB]'s decision, (iii) a change in the law after the [ARB]'s decision, and (iv) failure to consider material facts presented to the ARB before its decision.[1] Madison has satisfied none of the four parts.

In support of her Motion, Madison avers that the Boards F. D. & O. states that:

> "Respondent Kenco Logistics avers that Madison knew that the ALJ had issued the D. & O., as early as December 1, 2017, five days before the due date for the petition for review, but failed to act diligently by either requesting an extension of time to file her petition or timely filing the petition in the remaining five days." (FD & O Pp.2-3). However, that is patently false. December 1, 2017 represents the date that **Madison's counsel was copied on** an email between April Cook, the paralegal for Judge Sellers and Respondent's counsel in which they discuss a corporate address for **the decision** to be sent to Kenco's Corporate Counsel and that **they copied Madison's counsel on an email** as the email address used by Ms. Cook was missing a "t" in Madison's counsel's address.

Motion for Reconsideration at 1 (emphasis added). The Board's decision is not predicated on the fact that Madison's counsel **read** the decision on December 1, 2017; only that he **had notice** of the decision. Having notice that the Administrative Law Judge had issued "**the decision,**" an attorney, exercising the necessary due diligence and knowing of the 14-day deadline for filing a petition for review, would not simply have waited around hoping for the decision to be delivered in time for the filing of a timely petition. Instead, he would have contacted the Judge and requested a copy of the decision. Madison's counsel failed to do so, and thus, failed to act with due diligence.

Furthermore, Madison failed to even address the alternative grounds for the Board's decision, i.e., that Madison failed to file the petition for review within 14 days of the date a second copy was mailed to Madison's counsel.

---

[1]    *Friedman v. Columbia Univ.*, ARB No. 12-089, ALJ No. 2012-ERA-008 (ARB Jan. 22, 2014).

Accordingly, failing to demonstrate grounds for reconsideration, Madison's Motion for Reconsideration is **DISMISSED.**

**SO ORDERED.**

**JOANNE ROYCE**
**Administrative Appeals Judge**

**LEONARD J. HOWIE III**
**Administrative Appeals Judge**

## ADMINISTRATIVE REVIEW BOARD
## CERTIFICATE OF SERVICE

**CASE NAME** :  *Mary Madison v. Kenco Logistics*

**ARB CASE NO.:**  **18-018**

**ALJ CASE NO. :**  **2016-FDA-00004**

**DOCUMENT**  :  **ORDER**

A copy of the above-referenced document was sent to the following persons on

MAR 0 9 2018

*Juanetta Walker*

**CERTIFIED MAIL:**

Mary Madison
9758 S. Charles
Chicago, IL  60643

Jordan TraVaille Hoffman, Esq.
2711 E. New York Ave., Suite 205
Aurora, IL  60502

Scott Simmons, Esq.
Miller and Martin PLLC
832 Georgia Ave., Suite 1000
Chattanooga, TN  37402

Kenco Logistics
1125 West Sycamore Road
Manteno, IL  60950

Tom Crouse
Reg. Supervisory Investigator
USDOL, OSHA, Room 3244
230 South Dearborn Street
Chicago, IL  60604

Julia P. Argentieri, Esq.
Jody Wilner Moran, Esq.
Jackson Lewis, P.C.
150 N. Michigan Avenue, Suite 2500
Chicago, IL 60601

**REGULAR MAIL**

Regional Administrator
Region 5
U.S. Department of Labor/ OSHA
Room 3244
230 South Dearborn Street
Chicago, IL 60604

Associate Solicitor
Division of Fair Labor Standards
Office of the Solicitor
U.S. Department of Labor
200 Constitution Avenue, N.W. Room N2716
Washington, D.C. 20210

Chicago Regional Solicitor
Regional Solicitor
U.S. Department of Labor
Room 844
230 South Dearborn Street
Chicago, IL 60604

Director
Director of Whistleblower Protection Programs
U.S. Department of Labor/OSHA
Room N-4618, FPB
200 Constitution Avenue, N.W.
Washington, DC 20210

John P. Seller, III
Administrative Law Judge
Office of Administrative Law Judges
36 E. 7th Street, Suite 2525
Cincinnati, Ohio 45202

Hon. Stephen R. Henley
Chief Administrative Law Judge
Office of Administrative Law Judges
800 K Street, N.W., Suite 400
Washington, DC  20001-8001

U.S. POSTAGE PITNEY BOWES

$ 003.92⁰

ZIP 20212
02.1M
0001140302 MAR 09 2018

7014 0150 0001 0904 5434

## U.S. Department of Labor

Administrative Review Board
200 Constitution Avenue, N.W.
Washington, D.C. 20210-0001

**Official Business**
Penalty for Private Use, $300
4004

CLOSED

Jordan TraVaille Hoffman, Esq.
2711 E. New York Ave, Suite 205
Aurora, IL 60502

60502?3540 R007

**U.S. Department of Labor**     Administrative Review Board
200 Constitution Avenue, N.W.
Washington, D.C. 20210



IN THE MATTER OF:

MARY MADISON,                          ARB CASE NO. 18-018

          COMPLAINANT,         ALJ CASE NO. 2016-FDA-004

     v.                          DATE:   FEB 1 5 2018

KENCO LOGISTICS,

          RESPONDENT.


BEFORE:     THE ADMINISTRATIVE REVIEW BOARD

Appearances:

*For the Complainant*:
    Jordan TraVaille Hoffman, Esq.; Aurora, Illinois

*For the Respondent:*
    Jody Wilner Moran, Esq. and Julia P. Argentieri, Esq.; *Jackson Lewis P.C.,*
    Chicago, Illinois

Before:     Joanne Royce, *Administrative Appeals Judge,* and Leonard Howie III,
*Administrative Appeals Judge*


## FINAL DECISION AND ORDER DISMISSING APPEAL

On December 17, 2017, Complainant Mary Madison, filed a Petition requesting the Administrative Review Board to review a Department of Labor Administrative Law Judge's Decision and Order Granting Respondent's Motion for Summary Decision on Reconsideration, Cancelling Hearing, and Dismissing Claim (D. & O.), issued on November 22, 2017, in this case arising under the whistleblower protection provisions of the FDA Food Safety Modernization Act, 21 U.S.C.A. § 399d (Thomas Reuters 2013) (FDA). The Secretary of Labor has delegated authority to issue final agency decisions under the FDA to the Administrative Review Board.[1] A

---

[1]     Secretary's Order No. 2-2012 (Delegation of Authority and Assignment of Responsibility to the Administrative Review Board), 77 Fed. Reg. 69,378 (Nov. 16, 2012).

party must file a petition for review within fourteen days of the date of the ALJ's decision.[2]  The date of the postmark, facsimile transmittal, or electronic communication transmittal will be considered to be the date of filing; if the petition is filed in person, by hand-delivery or other means, the petition is considered filed upon the date the petition is received.[3]

Madison filed her petition for review more than fourteen days after the ALJ issued his Order.  Nevertheless, "the Board's authority includes the discretionary authority to review interlocutory rulings in **exceptional** circumstances . . . ."[4]  The period for filing a petition for review with the ARB is not jurisdictional and therefore is subject to equitable modification.[5]  In determining whether the Board should toll a statute of limitations, we have recognized four principal situations in which equitable modification may apply:  (1) when the defendant has actively misled the plaintiff regarding the cause of action; (2) when the plaintiff has in some extraordinary way been prevented from filing his action; (3) when the plaintiff has raised the precise statutory claim in issue but has done so in the wrong forum, and (4) where the defendant's own acts or omissions have lulled the plaintiff into foregoing prompt attempts to vindicate his rights.[6]  But the Board has not found these situations to be exclusive, and an inability to satisfy one is not necessarily fatal to Madison's claim.[7]  Nevertheless, we hold that Madison has failed to demonstrate entitlement to equitable tolling here.

Madison bears the burden of justifying the application of equitable tolling principles.[8]  Accordingly, we ordered Madison to show cause, why the petition should not be dismissed as untimely.  In response, Madison avers that the ALJ originally served his decision on Madison's counsel at an incorrect address.  When the ALJ became aware of the error, on December 1, 2017, the ALJ re-served the decision addressed correctly.  Madison claims that her petition for review was timely because it was filed on December 17, 2017, within fourteen days of the date when her counsel **received** the decision at the correct address on December 6, 2017.

In reply to Madison's response, Respondent Kenco Logistics avers that Madison knew that the ALJ had issued the D. & O. as early as December 1, five days before the due date for the petition for review, but failed to act diligently by either requesting an extension of time to file her

---

[2]    29 C.F.R. § 1987.110(a)(2017).

[3]    *Id.*

[4]    Secretary's Order No. 2-2012 at 77 Fed Reg. 69,379 at ¶ 5(c)(66) (emphasis added).

[5]    *Accord Hillis v. Knochel Bros.*, ARB Nos. 03-136, 04-081, 04-148; ALJ No. 2002-STA-050, slip op. at 3 (ARB Oct. 19, 2004); *Overall v. Tennessee Valley Auth.*, ARB No. 98-011, ALJ No. 1997-ERA-053, slip op. at 40-43 (ARB Apr. 30. 2001).

[6]    *Selig v. Aurora Flight Sciences,* ARB No.10-072, ALJ No. 2010-AIR-010, slip op. at 3 (ARB Jan. 28, 2011).

[7]    *Id.* at 4.

[8]    *Accord Wilson v. Sec'y, Dep't of Veterans Affairs*, 65 F.3d 402, 404 (5th Cir. 1995) (complaining party in Title VII case bears burden of establishing entitlement to equitable tolling).

petition or timely filing the petition in the remaining five days. Further Kenco argues that even if the time for filing was tolled until the ALJ served the second copy of the decision, Madison's petition for review was untimely because it was not filed within 14 days of the date on which the decision was served.

The Board has consistently held that "equitable tolling is generally not appropriate when a complainant is represented by counsel because counsel is "presumptively aware of whatever legal recourse may be available to [his or her] client.'"[9] Thus, attorney error does not constitute an extraordinary factor because "'[u]ltimately, clients are accountable for the acts and omissions of their attorneys.'"[10]

Furthermore, "extraordinary circumstances" is a very high standard that is satisfied only in cases in which even the exercise of diligence would not have resulted in timely filing.[11] Madison's counsel was informed no later than December 1, 2017, that the ALJ had issued his decision. He had five days of the original fourteen in which to act and two legitimate choices— he could either file the petition for review or he could file a motion for an enlargement of time to file the petition for review—he did neither. Instead, he unilaterally decided, without consulting the Board, that (1) Madison was entitled to toll the due date for filing because the original decision was sent to the wrong address, and (2) that he had fourteen days from the date he received the decision, rather than fourteen days from the date the ALJ issued it, to file the petition.[12] Counsel was incorrect on both counts. Had Madison's counsel contacted the Board and explained the reasons for requiring an enlargement of time, it is likely that the Board would have granted the request, but he failed to ask for such an enlargement and thereby has failed to establish due diligence.

---

[9]      *Nevarez v. Werner Enters.*, ARB No. 18-005, ALJ No. 2013-STA-012, slip. op. at 2-3 (ARB Dec. 14, 2017) (*quoting Brown v. Synovus Fin. Corp.*, ARB No. 17-037, ALJ No. 2015-SOX-018, slip op. at 3 (ARB May 17, 2017)). See also *Sysko v. PPL Corp.*, ARB No. 06-138, ALJ No. 2006-ERA-023, slip op. at 5 (ARB May 27, 2008)(*quoting Mitchell v. EG&G*, No. 1987-ERA-022, slip op. at 8 (Sec'y July 22, 1993)).

[10]     *Id.* (*quoting Higgins v. Glen Raven Mills, Inc.*, ARB No 05-143, ALJ No. 2005-SDW-007, slip op. at 9 (ARB Sept. 29, 2006)).

[11]     *Romero v. The Coca Cola Co.*, ARB No. 10-095, ALJ No. 2010-SOX-021, slip op. at 5 (ARB Sept. 30, 2010). *Accord Stoll v. Runyon*, 165 F.3d 1238, 1242 (9th Cir. 1999)("complete psychiatric disability" during the entirety of the limitations period); *Alvarez-Machain v. United States*, 107 F.3d 696 (9th Cir. 1996) (incarceration in a foreign country for the entirety of the limitations period).

[12]     *Accord Bohanon v. Grand Trunk W. R.R.*, ARB No. 16-048, ALJ No. 2014-FRS-003, slip op. at 3 (ARB Apr. 27, 2016)(Attorney who erroneously filed petition for review within 14 days of receipt, rather than 14 days of issuance of the ALJ's decision, demonstrated at most garden variety mistake, rather than the required extraordinary circumstances.).

CONCLUSION

Accordingly, because Madison failed to timely file her petition for review and has not established grounds for equitable tolling, we **DISMISS** her appeal.

**SO ORDERED.**

JOANNE ROYCE
**Administrative Appeals Judge**

LEONARD J. HOWIE III
**Administrative Appeals Judge**

## ADMINISTRATIVE REVIEW BOARD
## CERTIFICATE OF SERVICE

CASE NAME   :   *Mary Madison v. Kenco Logistics*

ARB CASE NO.:   18-018

ALJ CASE NO. :   2016-FDA-00004

DOCUMENT   :   ORDER

A copy of the above-referenced document was sent to the following persons on

FEB 1 5 2018

_____.

*Juanetta Wacker*

**CERTIFIED MAIL:**

Mary Madison
9758 S. Charles
Chicago, IL  60643

Jordan TraVaille Hoffman, Esq.
2711 E. New York Ave., Suite 205
Aurora, IL  60502

Scott Simmons, Esq.
Miller and Martin PLLC
832 Georgia Ave., Suite 1000
Chattanooga, TN  37402

Kenco Logistics
1125 West Sycamore Road
Manteno, IL  60950

Tom Crouse
Reg. Supervisory Investigator
USDOL, OSHA, Room 3244
230 South Dearborn Street
Chicago, IL  60604

Julia P. Argentieri, Esq.
Jody Wilner Moran, Esq.
Jackson Lewis, P.C.
150 N. Michigan Avenue, Suite 2500
Chicago, IL 60601

## REGULAR MAIL

Regional Administrator
Region 5
U.S. Department of Labor/ OSHA
Room 3244
230 South Dearborn Street
Chicago, IL 60604

Associate Solicitor
Division of Fair Labor Standards
Office of the Solicitor
U.S. Department of Labor
200 Constitution Avenue, N.W. Room N2716
Washington, D.C. 20210

Chicago Regional Solicitor
Regional Solicitor
U.S. Department of Labor
Room 844
230 South Dearborn Street
Chicago, IL 60604

Director
Director of Whistleblower Protection Programs
U.S. Department of Labor/OSHA
Room N-4618, FPB
200 Constitution Avenue, N.W.
Washington, DC 20210

John P. Seller, III
Administrative Law Judge
Office of Administrative Law Judges
36 E. 7th Street, Suite 2525
Cincinnati, Ohio 45202

Hon. Stephen R. Henley
Chief Administrative Law Judge
Office of Administrative Law Judges
800 K Street, N.W., Suite 400
Washington, DC  20001-8001

US POSTAGE >> PITNEY BOWES

$ 003.12⁰
ZIP 20212
02 1W
0001404302 FEB 15 2018

7014 0150 0001 0504 9319

**U.S. Department of Labor**

Administrative Review Board
200 Constitution Avenue, N.W.
Washington, D.C. 20210-0001

**Official Business**
Penalty for Private Use, $300
4004

Jordan TraVaille Hoffman, Esq.
2711 E. New York Ave, Suite 205
Aurora, IL 60502

60502$9848 R007

**U.S. Department of Labor**     Office of Administrative Law Judges
　　　　　　　　　　　　　　　　　36 E. 7th St., Suite 2522
Cincinnati, Ohio 45202

(513) 684-3252
(513) 684-6108 (FAX)



**Issue Date: 22 November 2017**

Case No.: 2016-FDA-00004

*In the Matter of:*

**MARY MADISON,**
　　　Complainant,

v.

**KENCO LOGISTICS,**
　　　Respondent.

## DECISION AND ORDER GRANTING RESPONDENT'S MOTION FOR SUMMARY DECISION ON RECONSIDERATION, CANCELLING HEARING, AND DISMISSING CLAIM

This matter arises under the employee-protection provisions of § 402 of the Food, Drug, and Cosmetic Act, § 1012, as amended by the FDA Food Safety and Modernization Act, Section 402 of Public Law 111-353, 21 U.S.C. § 399d (hereinafter the "Act" or "FDA"). The regulations implementing the Act are at 20 C.F.R. Part 1987. The Act provides whistleblower-protection for employees of entities engaged in the manufacture, processing, packing, transporting, distribution, reception, holding, or importation of food. 21 U.S.C. § 399d (a).

### PROCEDURAL HISTORY

Mary Madison (the "Complainant") filed a complaint against Kenco Logistics (the "Respondent") on September 10, 2013, alleging that she was terminated in reprisal for raising food-safety concerns. On February 17, 2016, the Regional Supervisory Investigator of the Occupational Safety and Health Administration dismissed the Complainant's complaint. By letter dated March 21, 2016, the Complainant requested a hearing before an Administrative Law Judge. Thereafter, this case was assigned to the undersigned for hearing and decision.

This matter was previously scheduled for hearing on September 13, 2017, in Chicago, Illinois. By e-mail received on August 11, 2017, Kenco Logistics (the "Respondent") filed a Motion for Summary Decision ("Respondent's MSD"). The same day, also by e-mail, the Respondent filed a Motion to Extend the Deadline for Pre-Hearing Exchanges and Re-Set The Hearing Pending Ruling on Respondent's Motion for Summary Decision. On August 14, 2017, the Complainant filed a Motion to Strike and Objection to Evidence. On August 16, 2017, I issued an Order Denying Respondent's Motion for Summary Decision, as there was insufficient time for the Complainant to respond to, and for the undersigned to rule on, the merits of the

Respondent's motion prior to the hearing. Moreover, in the order dated August 16, 2017, I denied the Respondent's request to re-set the hearing date.

Thereafter, on August 18, 2017, the Complainant filed a Motion to Strike and Objection to Evidence and, on August 21, 2017, the Respondent filed a response.[1] Shortly thereafter, on August 23, 2017, the Respondent filed an Unopposed Motion for a Short Extension of the Hearing Dates. Moreover, on August 23, 2017, the Respondent requested reconsideration of my August 16, 2017, decision denying its Motion for Summary Decision. By Order dated September 23, 2017, I issued an Order continuing the hearing until December 11, 2017. On October 2, 2017, the Complainant filed a Response to Respondent's Motion for Summary Decision ("Complainant's Response").

## FACTUAL BACKGROUND AND ARGUMENTS OF THE PARTIES

The Respondent is a logistics company with corporate headquarters in Chattanooga, Tennessee. (Respondent's MSD at 3.) Beginning in April 2013, the Respondent managed the warehouse logistics services for a Mars warehouse located in Manteno, Illinois. (*Id.*) The Respondent hired the Complainant on May 13, 2013, and she worked there as a Quality Engineer for less than three months. (*Id.*; Dep. at 37.)

The Complainant alleges that the Respondent terminated her for reporting that there had been numerous complaints that the men's bathroom had feces and urine on the floor and that ServiceMaster, the service provider for the Respondent's facility in Manteno, did not properly clean the bathroom. (Complaint's Response at 9, 30.) According to the Complainant, the deficiencies in ServiceMaster's performance posed a serious risk to the health and safety of the Respondent's employees and to the public. (*Id.* at 10.) Moreover, the Complainant alleges that the Respondent sabotaged her efforts to bring the facility into compliance with the Act. (*Id.*) Finally, the Complainant asserts that she raised numerous issues with the management that corresponded to her role as Quality Engineer, and she emphasizes that failing to address those issues violated the Act and other health and safety laws. (*Id.* at 30.) The Complainant argues that

---

[1] In its Motion to Strike, counsel for the Complainant alleged that the Respondent acted in bad faith by relying on a deposition transcript from the Complainant's parallel lawsuit in federal district court. As discussed in the Order dated March 29, 2017, I granted the parties an extension of sixty (60) days to finish discovery and conduct the Complainant's deposition for both this case and the parallel case pending in federal district court, which involves similar facts. Counsel for the Complainant was aware that the Respondent was deposing the Complainant and was also aware that the discovery deadlines in both cases were aligned. Moreover, in the cover letter attached to its Amended Notice of Plaintiff's Deposition, the Respondent listed both this case number and the case number of the Complainant's case in federal district court and informed the Complainant that it "intends to take your deposition in the above-referenced matters. In addition to your pending federal lawsuit, this deposition will also cover claims at issue in your pending appeal with the Department of Labor." The record reveals that counsel for the Complainant was copied on the letter. The Respondent argues that it would be duplicative to depose the Complainant a second time in this matter, adding unnecessary cost to this litigation. The Respondent's argument has merit. As counsel for the Complainant knew about the deposition before it occurred and requiring as second deposition would cause undue delay and expense, counsel for the Complainant's motion to strike the deposition is **DENIED.** The Complainant's deposition and corresponding exhibits are admitted into the record.

she was subjected to retaliation and discrimination for doing her job, and that the Respondent's reasons for terminating her were pretext for such retaliation and discrimination.[2] (*Id.*)

The Respondent does not dispute that it is a covered entity under the Act. (Respondent's MSD at 10.) The Respondent also does not contest that it hired the Complainant to work as a Quality Engineer to bring its warehouse into compliance with applicable food-safety regulations. It argues that the Complainant never engaged in protected activity, however. Moreover, the Respondent asserts that she had a hostile and uncooperative attitude and that there were consistent problems with her work performance. (Respondent's MSD at 1-2.) According to the Respondent, after identifying performance problems in the Complainant's first two months of employment, it placed her on a performance improvement plan ("PIP"). (*Id.* at 2.) The Respondent asserts that she demonstrated no marked improvement in her work performance while on the PIP, and, therefore, it terminated her employment on August 9, 2013. (*Id.*) In the Respondent's view, the Complainant never reported an alleged violation of the Act, and therefore never engaged in protected activity. Moreover, the Respondent argues that the Complainant's identification of compliance issues was not a contributing factor in her termination. (*Id.* at 3.) Rather, the Respondent argues that it would have terminated the Complainant for her inability to work effectively with others even absent any alleged protected activity. (*Id.*)

## SUMMARY DECISION STANDARD

The standard for summary decision under the Rules of Practice and Procedure for Administrative Hearings Before the Office of Administrative Law Judges is similar to the standard that governs summary judgment in federal courts under Fed. R. Civ. P. 56. *Saporito v. Central Locating Services, Ltd.*, ARB No. 05-004, slip op. at 4 (Feb. 28, 2006). An administrative law judge "shall grant summary decision if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to summary decision as a matter of law. The judge should state on the record the reasons for granting or denying the motion." 29 C.F.R. § 18.72(a) (2015). A material fact is one whose existence affects the outcome of the case. *Reddy v. Medquist, Inc.*, ARB No. 04-123, slip op. at 4 (Sep. 30, 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The nonmoving party creates a genuine issue of fact by producing sufficient evidence to require a hearing to resolve the parties' differing versions. (*Id.*)

The party moving for summary judgment has the burden of establishing the "absence of evidence to support the nonmoving party's case." *Celotex v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The regulations provide that a party may accomplish this by citing to materials in the record, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "[s]howing that the materials cited do not establish

---

[2] The Complainant also alleges that her supervisor, Kelvin Walsh, and the Respondent discriminated against her based on her race and sex and treated her differently from other similarly situated nonblack managers. That claim is not the subject of this litigation; rather, it is the subject of a parallel lawsuit filed by the Complainant in the U.S. District Court for the Central District of Illinois.

the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." 29 C.F.R. § 18.72(c)(i)-(ii) (2015).

Once the moving party meets its burden, the burden shifts to the non-moving party to set forth specific facts showing there is a genuine issue for trial. *Anderson*, 477 U.S. at 250. In deciding on the motion, I must view the evidence in the light most favorable to the non-moving party. *Lee v. Schneider Nat'l, Inc.*, ARB No. 02-102, slip op. at 2 (Aug. 23, 2003).

APPLICABLE LAW

In 2011, Congress amended the Food, Drug, and Cosmetic Act, 21 U.S.C. § 1021, through passage of the Food Safety and Modernization Act, a bill designed to comprehensively reform food safety laws. *See* Pub. L. No. 111-353, 124 Stat. 3885 (2011) (codified as amended at 21 U.S.C. § 301, *et seq*.). Section 1012 of the Food, Drug, and Cosmetic Act provides protection for an employee from retaliation because the employee has engaged in protected activity pertaining to a violation or alleged violation of the Food, Drug, and Cosmetic Act or any order, rule, regulation, standard, or ban under the Food, Drug, and Cosmetic Act. The provision of the Food Safety and Modernization Act relevant to this case provides that:

> No entity engaged in the manufacture, processing, packing, transporting, distribution, reception, holding, or importation of food may discharge an employee or otherwise discriminate against an employee with respect to compensation, terms, conditions, or privileges of employment because the employee, whether at the employee's initiative or in the ordinary course of the employee's duties (or any person acting pursuant to a request of the employee)-
>
> > (1) provided, caused to be provided, or is about to provide or cause to be provided to the employer, the Federal Government, or the attorney general of a State information relating to any violation of, or any act or omission the employee reasonably believes to be a violation of any provision of this Act [21 USCS §§ 301 et seq.] or any order, rule, regulation, standard, or ban under this Act [21 USCS §§ 301 et seq.], or any order, rule, regulation, standard, or ban under this Act [21 USCS §§ 301 et seq.];
> >
> > (2) testified or is about to testify in a proceeding concerning such violation;
> >
> > (3) assisted or participated or is about to assist or participate in such a proceeding; or
> >
> > (4) objected to, or refused to participate in, any activity, policy, practice, or assigned task that the employee (or other such person) reasonably believed to be in violation of any provision of this Act [21 USCS §§ 301 et seq.], or any order, rule, regulation, standard,

or ban under this Act [21 USCS §§ 301 et seq.].

21 U.S.C. § 399d(a).

The regulations implementing the Act provide that a "determination that a violation has occurred may be made only if the complainant has demonstrated by a preponderance of the evidence that protected activity was a contributing factor in the adverse action alleged in the complaint." 29 C.F.R. § 1987.109(a). A contributing factor is "any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision." *Williams v. Domino's Pizza*, ARB No. 09-092, slip op. at 6 (ARB Jan. 31, 2011); *Marano v. Dep't of Justice*, 2 F.3d 1137, 1140 (Fed. Cir. 1993). If the Complainant satisfies her burden, then the burden shifts to the Respondent to demonstrate "by clear and convincing evidence that it would have taken the same adverse action in the absence of any protected activity." 29 C.F.R. § 1987.109(b).

These are the same burdens set forth in the whistleblower provisions of the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("AIR 21"). 49 U.S.C. § 42121(b)(2)(B)(iii) and (iv) (2014); *Palmer v. Canadian National Railway/Illinois Central Railroad Co.*, Case No. 16-035, slip op. at 39, n. 166 (ARB Sept. 30, 2016) (*en banc*). In order to prevail on her case, the Complainant must show by a preponderance of the evidence that she engaged in a protected activity, that the Respondent took an adverse action against her, and that her protected activity was a contributing factor in the adverse action. *Palmer, supra*, slip op. at 52. If the Complainant satisfies these elements, then the burden shifts to the Respondent to show by clear and convincing evidence that it would have taken the same adverse action regardless of the Complainant's protected activity. (*Id.*) Thus, under the Act, the Respondent can prevail if it demonstrates either: (1) that the Complainant cannot establish one of the three aforementioned elements; or (2) that it would have taken the same action it did regardless of her protected activity.

<u>Summary of the Relevant Evidence</u>

The Complainant testified by video deposition on May 24, 2017, and by continued deposition on June 16, 2017 (hereinafter "Dep."). The Respondent hired the Complainant to work as a Quality Engineer at its Mars warehouse in Manteno, Illinois. The Complainant testified that she interviewed with Paula Hise, Kenco's Vice President of Operations, and Kelvin Walsh, former General Manager of Kenco's Manteno facility, and received an offer the same day she interviewed. (Dep. at 33, 35-36; MSDX[3] B at 1; MSDX C at 1.) The Complainant agreed that her employment began on May 13, 2014, and ended on August 9, 2013. (Dep. at 37.)

At her deposition, the Complainant agreed that the Quality Engineer, as described in the second sentence of the job description, "works with the Kenco site and senior management, KMS best practices and customer quality to develop, implement and maintain best practices for meeting FDA regulatory requirements, key quality system processes, quality engineering methodologies, systems and practices to meet the operating system's continuous improvement

---

[3] "MSDX" refers to exhibits A-C that were attached to the Respondent's Motion for Summary Decision.

strategies," (RDX 3;[4] Dep. at 42.) She further agreed that the Quality Engineer position was a new position at the Respondent's Manteno location, and she was the only individual in that position. (Dep. at 42-45.) Moreover, the Complainant agreed that a major part of her role as the Quality Engineer was to identify things that needed to be remediated and create processes to help remediate them. (Dep. at 65.)

The Complainant testified that, to the best of her recollection, her position reported to the manager and "had a dotted line to corporate." (Dep. at 41.) She also testified that she reported to Ms. Hise. (Dep. at 33.) Later on during her deposition, she agreed that she reported to Kevin Walsh throughout her employment. (Dep. at 66.) On his declaration, Mr. Walsh testified that he hired the Complainant and directly supervised her during her employment. (MSDX B at 1.)

ServiceMaster was the Respondent's third-party cleaning vendor. On May 21, 2013, the Complainant wrote an e-mail to Brian Davis, Director of Procurement, with a copy to Kevin Moses, in which she stated that the "services that ServiceMaster" was providing were "less than acceptable." (Bate Stamp at 1622; MSDX B at 1742.) Her e-mail stated that she was scheduled to meet with ServiceMaster at 11:30 a.m. She then added: "There are ears that are listening with baited breath and to avoid conflict and ill will, my conversation was limited:)." (*Id.*) At her deposition, she explained that the main issue with ServiceMaster was that there was fecal matter in the bathroom, raising the possibility "that they would use the same mop from the fecal matter that they used to clean the bathroom and use that mop throughout the whole facility," which she stated caused "cross-contamination" and a public-health and safety issue. (Dep. at 91-93; Declaration of Mary Madison.)

Edith McCurry, former "HR Administrator assisting the HR/Office/Accounting Manager" for the Respondent's Manteno facility, also stated that an employee reported to her "that there was an infestation of flies in the men's bathroom." (Declaration of Edith McCurry).[5] In her opinion, the "infestation was an off shoot of the poor sanitation and exposed human waste in the men's bathroom." (*Id.*) Mr. Szplett also stated that "[e]mployees had been complaining about the sanitary conditions of the bathrooms" and the bathroom "consistently had feces on the floor of the men's bathroom." (Declaration of Leonard Szplett).

On May 21, 2013, the Complainant, Mr. Walsh, Mike Mazello and two people from ServiceMaster met to discuss the deficiencies in ServiceMaster's services. (Dep. at 89-90.) The Complainant agreed that she prepared and signed a Memorandum of Understanding ("MOU"), dated May 22, 2013, following her meeting with ServiceMaster on May 21, 2013. (RDX 5 at 1-2; Dep. at 135-137.) She agreed that she received a letter, dated May 24, 2013, written from Tim McGrath at ServiceMaster to the Complainant, regarding the MOU dated May 22, 2013. (Dep. at 137-139; RDX 5 at 3.) The letter stated the following:

---

[4] "RDX" refers to the Respondent's Deposition Exhibits, which were numbered, attached to, and referenced during the Complainant's depositions on May 24, 2017, and June 16, 2017.
[5] I note that the Declaration of Edith McCurry and the Declaration of Leonard Szplett contain many identical statements, which creates the appearance that they may have been drafted by counsel for the Complainant. While I have considered this factor in reviewing their declarations, I also note that both individuals signed their declarations under penalty of perjury.

This is in response to the MOU we received from you May 22. We thank you for meeting with us this week and pointing out your expectations regarding our housekeeping and sanitation services that ServiceMaster is providing for Kenco. It is now and always has been our desire and intention to work with you as partners and share the same concerns for your facility as you do. Since 1999 at the opening of your facility, we have been there trying to provide all the services that have been asked of us. We are proud of our record and reputation at Kenco and in our community at large and as we are aware that no business is perfect we are willing and desirous to correct any deficiencies that might on occasion arise if given the opportunity.

You currently receive on a daily basis a performance report filled out by the housekeepers that describe the task being performed and the frequency of these tasks. In addition I will include CLEANING DETAILS, HOUSEKEEPER/SANITIZER RESPONSIBILITIES, also a sample CLEANING QUALITY INDICATOR that we will perform monthly and return to you.

In response to our meeting, we have discussed the areas of concern with our employees and have assigned specific responsibilities to address the glass, the garbage cans and the dusting of the ledges in the hallways. Our supervisor has already washed the walls in the hallways and some of the marks do not remove without damaging the paint. I would suggest that the wall washing be added to the schedule on a quarterly basis. As for the darkness of the grout on the edges of the hallway floors I would ask for some time to work on that as is requires special tools and chemicals.

(Dep. at 137-139; RDX 5 at 3.)

On May 23, 2013, merely two days after the meeting with ServiceMaster, and one day after the date of the MOU, the Complainant sent a letter to Mr. Davis stating that it was her belief that ServiceMaster was "seriously not interested in retaining their contract with us," adding that "[a]s to date there has not been improvement in the areas discussed that could have been easily rectified." (RDX 5 at 5; Dep. at 142, 147.) She further added:

So!!!!!!!!!!!!

When you come, it is my belief that you will not be 'skeered' to give them the real business of seeing the door!!

(RDX 5 at 5; Dep. at 145.) The Complainant testified that she wrote that because ServiceMaster had still not purchased a new bucket and mop. (Dep. at 142-144.) Mr. Davis responded by e-mail on May 23, 2013, writing:

> Easy now… give them an opportunity to improve and let's keep in
> mind they have a pretty long history with the site and that the
> previous 3PL may have operated with a different set of
> expectations; I'd like to keep the relationship in a "collaborative"
> mode more than a "confrontational" mode as much as possible.
> Let's make a solid effort to work with them to effect change first.

(RDX 5 at 4; Dep. at 144.)

In response to Mr. Davis's directive, the Complainant sent Mr. Davis the following e-mail on May 23, 2013:

> YEP, GOTCHA…… Realizing their relationship it is a definite
> given that have to "PIP" time; but honestly It is my belief they are
> not going to make [it], as they have not done any differently. Easy
> fix things like clean the glass!!!!!!!!!!!!!!!! So we have to be ready
> when Mars come for their audit in the next 45-60 days and …………
> we are a little under the GUN!!

(RDX 5 at 4; Dep. at 148.) At her deposition, she explained that in referring to "PIP" in her e-mail, she meant that that ServiceMaster should have been put on a PIP. (Dep. at 149-152.)

According to the Complainant, on June 24, 2013, Mr. Walsh told her to "relax" her "standards." (Dep. at 114; Declaration of Mary Madison.) She testified that the conversation with Mr. Walsh took place in Mr. Walsh's office and, in her view, "the gist of the conversation, at some point …was like I just need you – you know -- in short, to relax your standards." She stated that Mr. Walsh told her if there were "any problems or repercussions" he would take responsibility. She testified that she told him that she "could not do that… because they were not my standards to relax, it was a compliance issue." (Dep. at 339.) When asked which standards Mr. Walsh told her to "relax," she replied, "[t]he bathrooms" and later clarified that to mean "sanitation" and cleanliness of the facility. (Dep. at 108, 113, 341-342.) She testified that after she "reported" the conversation, "things became progressively worse." (Dep. at 337-338.)

In her continued deposition, when questioned further about which standards Mr. Walsh told her to relax, the Complainant offered the following testimony:

> A: … The standards that I had always purported to be followed
> were those of compliance to the FDA standards, the Codex
> Alimentarius, state and public health law.
> Q: And so which of those was he telling you not to comply with?
> A: I'm not sure, but any one of them.
> Q: Well, what did he tell you then?
> A: He told me –
> Q: He told you you need to relax your standards with regard to
> what? How did that even come up in conversation?

8

> A: I don't know why he brought that up in conversation because it was really inappropriate.
>
> Q: And he did talk to you about relaxing your standards any other time besides that meeting?
>
> A: No. Because after that, I went straight to Ms. Paula and Kevin Moses and I told them that this is what occurred.
>
> Q: Right. And then you got a response from Paula. We already talked about that in the last deposition. You got a response from Paula as well?
>
> A: Right.

(Dep. at 342-344.) The Complainant testified that she interpreted the conversation with Mr. Walsh as meaning that she was "supposed to not be either concerned—as concerned and/or perhaps just turn a blind eye to the situation." (Dep. at 346.) She stated that she said, "No," when asked whether Mr. Walsh ever again asked her to relax her standards. (*Id.*)

The Complainant testified that she complained to Mr. Moses, Ms. Hise, Ms. McCurry, and Mr. Szplett about her conversation with Mr. Walsh. (Dep. at 114-115.) She stated that when she told Ms. Hise about it, Ms. Hise told her that she "shouldn't be asked" to relax her standards. (Dep. at 114-115.) She could not recall what Ms. McCurry and Mr. Szplett told her after she told them about Mr. Walsh telling her to relax her standards. (*Id.*) She stated that she told Mr. Moses that Mr. Walsh had asked her to relax her "standards and not follow the law." (Dep. at 107.) In response, she stated that Mr. Moses said that he would "see what he could do" and he "tried to schedule some meetings." (Dep. at 108.) She agreed that, thereafter, Mr. Moses scheduled conference calls involving both of them and Mr. Walsh. (Dep. at 109.)

In his declaration, Mr. Walsh stated that while the Complainant "often complained about ServiceMaster's cleaning services," at no time did he "perceive her to be complaining about a violation of the Food Safety Modernization Act." (MSDX B at 2.) Mr. Walsh stated that he never told the Complainant "not to follow the law." (MSDX B at 3.)

The Complainant further agreed that, on June 25, 2013, she received an e-mail from Paula Hise, the Vice President of Operations, which stated the following:

> Mary, I just ran into Brian in the hallway. We had a quick chat about this. Before sending any documentation to ServiceMaster related to the outcomes of your pending meeting, let's run it by Ann first. It's always a good idea to have our legal counsel review any documentation. We are getting to a relatively serious point with the supplier.
>
> Kelvin and I also discussed the ten-day requirement on remediation. It may be that they won't be able to remediate every open item within ten days. Our expectation from them should be a written plan addressing our specific concerns with specific dates as to when each issue will be resolved, hopefully most within a ten-

day period, but some items could take longer to remediate, and we
need to be open to that possibility.

(RDX 5 at 7; Dep. at 160-161.)

The Complainant agreed that she responded to Ms. Hise's directive by writing the
following e-mail:

> That's great a letter is being composed and it can be forwarded so
> that when we have the meeting it can be given out! We will then
> meet with them on Thursday afternoon and it is hopeful that a plan
> of action can be implemented. Not exactly sure what can't be
> cleaned in the ten (10) day time frame, as a good majority of it has
> been launched.

(RDX 5 at 6; Dep. at 162.)

Thereafter, the Complainant agreed that she received the following e-mail from Ms. Hise
on June 26, 2013:

> Hi, Mary,
>
> We may have our wires crossed here. We assumed that you would
> draft a letter <u>after</u> your meeting with ServiceMaster to confirm the
> actions and timelines jointly agreed upon during the meeting, but
> before circulating the letter, please run it past Ann first.

(Dep. at 163; RDX 5 at 6.)

The Complainant testified that she drafted and sent a letter to Mr. McGrath at
ServiceMaster on June 27, 2013, at the direction of Mr. Walsh. (RDX 5 at 13-14; Dep. at 163.)
The letter included, *inter alia,* the following statement from the Complainant to ServiceMaster:
"*Therefore, be it known as a matter of concern this continued egregious conduct is unacceptable
and it must cease and desist immediately.*" (RDX 5 at 14; Dep. at 165) (emphasis in original).
Moreover, she wrote, "As the goodwill and business reputation of Kenco/Mars can be adversely
affected and damaged by not fulfilling the current quality mandates that can result in serious
illness and even death, therefore, prompting unwarranted litigious exchanges." (RDX 5 at 14;
Dep. at 165.) She explained that, in the letter, she "just drafted re-expectations about what was
going on." (Dep. at 163.)

When asked if anyone reviewed the letter before she sent it to ServiceMaster, she replied,
"I gave it to Kelvin." (Dep. at 164.) Again, when asked, "When you drafted this letter, before
you actually sent it off to Timothy McGrath at ServiceMaster, did anybody at Kenco review it
first, or did you provide it to people after you sent it?" the Complainant responded, "I'm not sure.
I did whatever Kelvin told me to do in regards to this letter." When questioned further regarding
whether she had anyone at Kenco review the letter, she replied, "I'm sure—I can't really say."

10

(Dep. at 166.) In her continued deposition, when asked, yet again, whether she gave it to anyone to review, she stated, "The only person that I probably would have shown it to would have been either Mr. Walsh or Mr. Moses, but I can't—I don't recall that detail of the situation." (Dep. at 308-310.)

In response to the Complainant's letter to ServiceMaster, Mr. Davis wrote to Mr. Walsh on the same day, June 27, 2013, and stated the following:

> Please see attached, and whatever you do please do not let Mary threaten the supplier with "litigious exchanges" again… The last thing we need is a lawsuit brought by overzealousness.

(RDX 5 at 11.) At her deposition, the Complainant explained that she "was just trying to get compliance with the mandates, and the reality of the situation is that if someone had gotten sick, it would have affected the goodwill of all the company…" (Dep. at 168.)

On the following day, June 28, 2013, Ms. Hise wrote the following e-mail to the Complainant:

> Hi Mary,
> Here would be my suggestion for closing this issue. I do not believe that any correspondence other than your MOU has been sent to Kenco to ServiceMaster documenting infractions. With that said, I believe you have a copy of the Kenco contract with ServiceMaster? If not, you can obtain one from Len, who should have a copy of it. I would suggest that you create a simple spreadsheet. Column A describes what services they are currently obligated to perform. Column B should be the services we want them to perform. Once you have that on paper, then let's the three of us get together for a quick call to review and make sure we're all in agreement. Then we can provide that document to ServiceMaster, and they can evaluate what any additional costs may be.
>
> Sound okay?

(RDX 5 at 17-18; Dep. at 170-171.)

The Complainant agreed that she sent a seven-paragraph e-mail to Ms. Hise on June 28, 2013, regarding the MOU with ServiceMaster. (RDX 5 at 16-17; Dep. at 172.) Consistent with that statement, Ms. Hise stated that on or about June 28, 2013, the Complainant sent her an e-mail "suggesting in part that she felt she had been asked to relax her standards." (MSDX C at 1.) Specifically, the e-mail reveals that the Complainant wrote, *inter alia*, "We are merely discussing basic health and sanitation rules and principles. The general populous of people here are in an at-risk class for communicable disease. The cleanliness of the restrooms, garbage cans, and eating areas are below par. In addition, Kelvin stated that the standards should be relaxed relating to

what is required for compliance as that is not Mars focus." (RDX 5 at 16.) Moreover, the Complainant wrote that her "concern progressively arose out of being asked to relax" her "standards to accommodate the current state of affairs and to quintessentially document things in fashion that will achieve these results." (*Id.*) She added, "First, this has taken me aback that it would be asked of me to do such a thing when it is so simple to just do the correct thing, the correct way, the first time." (*Id.*)

Ms. Hise stated that she "immediately" responded to the Complainant's concerns and explained to the Complainant that she "was not being asked to relax her standards; that she was being asked to adjust her approach and work in a more collaborative and team-oriented matter." (*Id.*) Ms. Hise also declared that she spoke with Mr. Walsh and "confirmed that on no occasion had Walsh asked Madison to relax her standards related to legal compliance." (*Id.* at 2.) The record reveals that Ms. Hise replied to the Complainant on Sunday, June 30, 2013, via e-mail, and wrote the following:

> Mary,
>
> I understand and appreciate your position and am grateful for your passion on the subject—truly. I firmly believe we are all (you, me, Brian Davis, Kelvin, the site management staff) on the same team and we have the same goals and objectives, although the way we pursue those goals and objectives might be a bit different. Further, everyone is coming from different perspectives –Brian from a risk management and supplier management perspective, Kelvin and I from an operational perspective, you from the Quality perspective. I'm confident we will get to where we need to be, but what we have to do is work together as a team, understanding that as GM, Kelvin is ultimately responsible for the overall facility operations, feel confident that we can voice our different opinions to one another, but then move forward together to execute the agreed upon direction. *No one is, or should be asking you, to relax your standards on cleanliness.* All we are asking is that we modify the approach with which we work with ServiceMaster. Part of our guiding principles is that we "Cultivate mutually beneficial partnerships with customers, associates and suppliers". So, we want to protect the supplier relationship if we can.
>
> We are both so busy—If you are still concerned about our direction in this area, then let's me, you and Kelvin get on the phone to discuss. We can accomplish in a short call much more than we can accomplish sending lengthy e-mails.

(RDX 5 at 15-16; Dep. at 173-174.)

The record further shows that Ms. Hise wrote an e-mail to Mr. Walsh on June 30, 2013, and stated, "I'm just keeping you in the loop. All I can say is that we need to keep an eye on that

90[-]day introductory period window. I hate to go there this early in the game, but man, she is wearing us out... (RDX 5 at 15; Dep. at 174.) Thereafter, on the same day, Mr. Walsh replied, "All I can say is I'll keep trying with her. She is really too valuable for us not to try. It's a good thing I have thick skin, LOL." (RDX 5 at 15.) At her deposition, when asked about this e-mail exchange, the Complainant testified that Mr. Walsh "didn't try" with her and his e-mail was "a farce." (Dep. at 175-177.)

The record reveals that Mr. Davis, Director of Procurement, e-mailed the Complainant on June 28, 2013, and noted that if it was necessary to change the level of service or performance expectations of ServiceMaster, or if it was deemed necessary to better define existing requirements, "we certainly can renegotiate the agreement." (RDX 5 at 20.) He added, "Once you have the changes to the agreement defined, and Kelvin and Paula are in agreement, please let me know and I will approach the supplier with them and renegotiate the agreement as needed." (*Id.*)

The Complainant testified that, during a meeting with ServiceMaster at some point in July, Mr. Walsh was allegedly berating her, hollering, and telling her that she was not giving Service Master a chance. (Dep. at 85, 90, 137, 312, 320.) She stated that Mr. Walsh told her that she "needed to outline" where Service Master was "deficient and give them some information to help them not be deficient and cure their deficiencies," which she stated that she had already done when she gave them a memorandum of understanding. (Dep. at 91.) The Complainant could not recall what Mr. Walsh said to her during the meeting, but she reiterated that he was "hollering" at her. (Dep. at 93.) The Complainant later testified that Mr. Walsh yelled at her in two meetings. (Dep. at 88-89.) However, in her continued deposition, when asked whether the July meeting with Service Master was the *only* time Mr. Walsh yelled at her, she replied, "That is correct." (Dep. at 320.) Ms. McCurry stated that she witnessed Mr. Walsh berate the Complainant at a HAACP meeting. (Declaration of Edith McCurry). She also alleged that the "whole situation of Mary all of the sudden being inept came less than two (2) weeks after Mary had reported Kelvin asking her to relax her standards and about billing for work ServiceMaster was not performing, as well as, falsifying sanitation logs." (*Id.*)

On July 8, 2013, Mr. Walsh gave the Complainant a Performance Improvement Plan ("PIP"). (RDX 4; MSDX B at 3.) On July 8 and July 9, Mr. Walsh and Len Szplett met with the Complainant to discuss the PIP. (Dep. at 205.) Mr. Szplett agreed that he was present at the meeting on July 8, 2013, when Mr. Walsh presented the Complainant with her PIP, but he was not aware of the purpose of the meeting. (Declaration of Leonard Szplett). The PIP identified the following job responsibilities and priorities that the Complainant needed to improve: (1) working collaboratively with fellow site managers; (2) demonstrating commitment with compassion; (3) communication with leadership; and (4) working outside of outlined job responsibilities. (RDX 4 at 1.) Moreover, the PIP identified the following five related competencies that the Complainant needed to improve: (1) effective communication; (2) leading of others; (3) time management; (4) interpersonal skills; and (5) project management. (RDX 4 at 2-3.) The PIP stated that a "follow up discussion" would be scheduled once the Complainant completed her "personal development plan," which needed to be presented to her manager within ten days of the date of the PIP. (RDX 4 at 4.) Moreover, the PIP warned the Complainant that the "required improvements must be made to the satisfaction of your manager within 30 days," and warned that if they were not made

within the allotted timeframe, the Complainant would be "subject to further disciplinary action, up to and including termination." (*Id.*) The Complainant, Mr. Walsh, and Ms. Hise all signed the PIP. (RDX 4.)

The Complainant agreed that she provided a written response to the PIP. (Dep. at 214; RDX 7.) According to Mr. Walsh, the Complainant's response to the PIP demonstrated her "inability to understand the problems we were having with her employment and in the 30[-] day period following the PIP, she did not improve." (MSDX B at 3.) Although the Complainant testified that Mr. Walsh "never offered" her "any strategy or any assistance to accomplish" what was outlined in the PIP, she agreed that he met with her twice to discuss the PIP. (Dep. at 203, 205, 213-214.) The Complainant further agreed that she provided a written response to the PIP, which she sent to Mr. Walsh, Ms. Hise, and Mr. Szplett. (Dep. at 214; RDX 7.) In her opinion, being placed on the PIP was "a tool that was used for an adverse employment decision." (Dep. at 215.) When asked whether she was an at-will employee and whether she knew what that meant, she replied, "Yes, uh-huh." (Dep. at 228.)

Mr. Szplett stated that the Complainant did not agree with what was written on her PIP and affirmed that in writing on her PIP. (Declaration of Leonard Szplett). The Complainant alleged that the PIP was "unlawful" because it was not consistent with the Respondent's policies and procedures. (Dep. at 234.) She thought it should have been "set up" like her Quality Engineer job description. (Dep. at 230-231; RDX 8.) She added that the job description had a "specific styling" that included a "document number," "title," and "date of the person who authored it… ." (Dep. at 231-232.) She added that it was her belief that the Respondent had a "progressive discipline policy," which required it to "identify the areas of concern" and then "come up with some type of remediation plan." (Dep. at 202-203.) She also testified that she thought the policy required establishing benchmarks and meetings, and she claimed that Mr. Walsh "never offered" her "any strategy or any assistance to accomplish" what was outlined in the PIP. (Dep. at 203, 214.) She testified that she did not know of anyone else who received a PIP, and, therefore, was not aware of anyone else who received a PIP that was different from hers. (Dep. at 238.)

After the Complainant was placed on the PIP, she e-mailed Mr. Matthew Chick and Tari Hart of Mars regarding an audit report. Thereafter, Mr. Walsh responded to the Complainant with the following e-mail:

> Mary,
>
> As covered during your performance review, you need to engage in dialogue with your follow site managers: specifically your site GM. If asked, I could have provided you detailed answers to your inquiries below. By going directly to the customer, it gives an appearance that Kenco does not have an understanding of the business. And/or it raises questions as to what measures may be lacking. In addition, it is Kenco's responsibility to ensure we are utilizing the resources provided by MARS. In final, to question the

customer that their QA manual is dated was completely inappropriate.

Going forward and until further notice, I need you to forward any requests you have for MARS to me first. I will then provide disposition.

Your cooperation in this matter is expected.

(Dep. at 245-246; RDX 9.) When asked if she did not understand that her PIP set forth that she should not be communicating with outside vendors, she testified that she did not know that she was not supposed to communicate directly with Mars because Mars was not an outside vendor. (Dep. at 253-254.) She testified that she thought that she had permission from Mr. Walsh to respond directly to Mr. Chick. (Dep. at 256.) However, she agreed that she had never communicated with Mr. Chick before. (*Id.*) She testified that she repeatedly asked Mr. Walsh for information that she needed in order to remediate deficiencies and prepare for an impending audit. (Dep. at 121-123.) She alleged that there was a conspiracy between Tracie Clifford and Mr. Walsh and that Mr. Walsh was "intentionally and willfully withholding" information that she needed from the 2012 audit. (Dep. at 126-131, 265.)

The Complainant denied that her PIP was in place for thirty days, but agreed that she was given the PIP on July 8, and terminated on August 9. (Dep. at 241-242.) When asked, "Is there anything as you sit here today specifically that you can state that you did to change any of the behavior—the performance deficiencies that were identified in the performance improvement plan?" the Complainant replied, "I told you that I tried. Whatever it was, I told you I couldn't give you any specifics." (Dep. at 271.) The Complainant stated that she did not ask any questions when she was terminated. (Dep. at 243.) In her opinion, being placed on a PIP, being terminated, and Mr. Walsh "hollering" at her were adverse actions that she suffered after Mr. Walsh told her to relax her standards. (Dep. at 347.)

Mr. Szplett stated that after terminating the Complainant, Mr. Walsh "said that he was glad that 'the educated nigger bitch from Chicago was gone, so she could stop stirring up trouble down here.'" (Declaration of Leonard Szplett). The Complainant also testified that after she met with Mr. Szplett and Mr. Walsh, Mr. Szplett told her that Mr. Walsh referred to her "as some type of crazy black bitch or something like that." (Dep. at 84.) She stated that she learned of this comment after her termination. (*Id.*) The Complaint could not identify any other racially insensitive or derogatory comments made by Mr. Walsh. (Dep. at 85.)

Mr. Walsh stated that the Complainant was discharged three months after she was hired because of his "challenges" with her, including her "continued inability to communicate effectively or accept constructive criticism about her communication style, which alienated colleagues and outside vendors." (MSDX B at 3.) Moreover, he stated that she was a "time drain" and her "work product" was ineffective. (*Id.*)

Ms. Hise stated that she observed the Complainant's performance, communicated with the Complainant via phone and e-mail, and, on several occasions, assisted with providing

feedback and guidance regarding the Complainant's work. (MSDX C at 1.) She declared that on "several occasions," the Complainant sent her "unnecessarily lengthy emails that were not user friendly," and specifically cited an occasion when the Complainant sent her a 499 line-item project-time, and another when the Complainant forwarded her the pages of the regulations rather than providing a concise analysis of them. (MSDX C at 2.) Ms. Hise stated that she discussed the Complainant's performance problems with Mr. Walsh "throughout" the Complainant's "brief employment, including the ongoing performance issues that existed after" the Complainant received the PIP. (MSDX C at 2.) She added that she and Mr. Walsh, together, made the decision to terminate the Complainant. (*Id.*)

## Summary Decision Analysis

### I. PROTECTED ACTIVITY

The Respondent argues in its motion for summary decision that the record fails to create a triable issue of fact regarding whether the Complainant engaged in protected activity under the Act. The gist of the Respondent's argument is that although the Complainant may have complained, her complaints were not understood to be complaints that it was in violation of the Act. Mr. Walsh stated that while the Complainant "often complained about ServiceMaster's cleaning services, at no time during her employment" did he "perceive her to be complaining about a violation of the Food Safety Modernization Act." (MSDX B at 2.)

Although Mr. Walsh did not consider the Complainant's complaints to be violations of the Act, his perception of the nature of the complaints is not dispositive. Indeed, the Complainant did not need to establish an actual violation; her belief that a violation had occurred needed only to be subjectively and objectively reasonable.

The Complainant alleges that she brought to Mr. Walsh's attention deficiencies in ServiceMaster's cleaning services, particularly ServiceMaster's deficiency in cleaning the men's bathroom at the Respondent's facility. (Complainant's Response at 30). The record reveals that on May 21, 2013, the Complainant wrote an e-mail to Brian Davis, Director of Procurement, with a copy to Kevin Moses, in which she stated that the "services that ServiceMaster" was providing were "less than acceptable." (MSDX B at 1742.) At her deposition, she explained that, in her opinion, the same mop being used in the bathroom was being used to clean the Respondent's facility, which created "cross-contamination" and a public health and safety issue. (Dep. at 91-93; Declaration of Mary Madison.) Ms. McCurry and Mr. Szplett also stated that employees had complained to them that there were sanitation problems in the men's bathroom. (Declaration of Edith McCurry; Declaration of Leonard Szplett.)

I find that the record is such that it creates a genuine issue of material fact regarding whether the Complainant subjectively believed that the conditions in the men's room constituted a violation of the Act, whether such belief was objectively reasonable, and whether she engaged in protected activity by complaining about this to Respondent.

## II. ADVERSE ACTIONS AGAINST THE COMPLAINANT

The record reveals that the Respondent placed the Complainant on a PIP on July 8, 2013, and terminated her on August 9, 2013. Therefore, I find that there is sufficient evidence on this issue to withstand a motion for summary decision.

## III. THE COMPLAINANT'S PROTECTED ACTIVITY WAS NOT A CONTRIBUTING FACTOR IN THE RESPONDENT'S DECISION TO TERMINATE HER

Although there is sufficient evidence in the materials presented to demonstrate an issue for hearing regarding whether the Complainant engaged in protected activity and whether the Respondent took adverse personnel actions against her, the evidence must also be sufficient to create a triable issue as to whether her protected activity contributed to her termination. As made clear by the Board in *Palmer, supra,* the first step of analysis in a case of retaliatory dismissal under the STAA "involves answering a question about what happened: did the employee's protected activity play a role, any role, in the adverse action?" *Palmer, supra,* at 52. The Board also made clear that on this question, the Complainant has the burden of proof to persuade the administrative law judge "based on a review of all the relevant, admissible evidence, that it is more likely than not that the employee's protected activity was a contributing factor in the employer's adverse action."

The ARB has described a contributing factor as "any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision." *Sievers v. Alaska Airlines, Inc.,* ARB No. 05-109, ALJ No. 2004-AIR-028, slip op. at 4 (ARB Jan. 30, 2008). The Complainant can succeed by providing either direct or indirect proof of contribution. (*Id.*) Direct evidence is evidence that conclusively links the protected activity and the adverse action. (*Id.* at 4-5.) Alternatively, the Complainant may provide circumstantial evidence by proving by a preponderance of the evidence that retaliation was the true reason for terminating her employment. For example, the Complainant may show that the Respondent's proffered reason for termination was not the true reason, but instead "pretext." *Riess v. Nucor Corp.,* ARB 08-137, 2008-STA-011, slip op. at 6 (ARB Nov. 30, 2010). If the Complainant proves pretext, it may be inferred that her protected activity contributed to the termination. (*Id.*)

Under the first approach, the Complainant must produce evidence that directly links his protected activities and termination. The ARB has described direct evidence as "smoking gun" evidence that "conclusively links the protected activity and the adverse action and does not rely on inference." *Williams v. Domino's Pizza,* ARB No. 09-092, slip op. at 6 (ARB Jan. 31, 2011).

The only direct, or "smoking gun" evidence the Complainant offers is the fact that she was terminated after Mr. Walsh allegedly told her to "relax" her "standards" on June 24, 2013, meaning her bathroom and sanitation standards, as they related to the Respondent's contract with ServiceMaster. (Dep. at 108, 113-114,337-339, 341-342; Declaration of Mary Madison.) Specifically, she stated that after that alleged conversation with Mr. Walsh, "things became progressively worse." (Dep. at 337-338.)

17

Even assuming that the Complainant was told "to relax her standards," however, the statement must be viewed in context. The evidence of record reveals that the Respondent took the Complainant's sanitation complaints seriously and took fairly quick action. After the Complainant told Mr. Davis and Kevin Moses that ServiceMaster's services were "less than acceptable," the Complainant, Mr. Walsh, and Mr. Mazello met with two people from ServiceMaster on May 21, 2013, to discuss the deficiencies in ServiceMaster's services. (Dep. at 89-90.) After that meeting, the Complainant sent ServiceMaster a MOU the next day, May 22, 2013.

Thereafter, the evidence demonstrates that the Complainant became impatient with ServiceMaster and sought to impose her own time frame on remediation. On May 23, 2013, merely two days after the meeting with ServiceMaster, and one day after the date of the MOU, the Complainant sent a letter to Mr. Davis stating that it was her belief that ServiceMaster was "seriously not interested in retaining their contract with us," adding that "[a]s to date there has not been improvement in the areas discussed that could have been easily rectified." (RDX 5 at 5; Dep. at 142, 147.)

In sum, the Complainant appears to have had the opinion that ServiceMaster was not acting to remediate the problems it had acknowledged and agreed to rectify. Understandably, her approach did not go over well with management. The evidence reveals that Mr. Davis responded to the Complainant, and stated that it was necessary to give ServiceMaster an opportunity to improve, that the vendor had a long history with the Respondent, that he wanted to keep the relationship "collaborative," and that he wanted to "make a solid effort to work with them to effect change first." (RDX 5 at 4; Dep. at 144.) In response, the Complainant stated that it was her "belief they are not going to make [any changes], as they have not done any differently." (RDX 5 at 4; Dep. at 148.) The communication between the Complainant and Mr. Davis demonstrates that Mr. Davis was taking the Complainant's sanitation complaints seriously, but he wanted the Complainant to work collaboratively with ServiceMaster and give ServiceMaster the opportunity to correct its deficiencies. It does not show that the complaints, themselves, had caused any negative reaction, or that the Respondent was not interested in hearing them.

On May 24, 2013, Tim McGrath from ServiceMaster responded to the MOU, in writing, with steps it was taking to improve its services. The letter emphasized that ServiceMaster had been working with the Respondent since 1999, demonstrating the longstanding relationship between the two entities. (RDX 5 at 3.) Moreover, he stated that he had discussed the Complainant's concerns with his employees, assigned specific responsibilities to staff to address those concerns, and made suggestions for future quarterly cleaning. (*Id.*) Once again, this evidence demonstrates that ServiceMaster was trying to work with the Complainant, and the Respondent, to address and remedy the Complainant's concerns regarding sanitation.

The record also reveals that Ms. Hise was concerned with the Complainant's tone, approach, and communication style, rather than her message, and never deterred the Complainant from attempting to correct the deficiencies in ServiceMaster's services. In fact, Ms. Hise acknowledged that the Respondent was "getting to a relatively serious point with the supplier" and, on two occasions, specifically requested that the Complainant send outgoing communications to legal counsel prior to sending them to ServiceMaster. (RDX 5 at 6-77; Dep.

18

at 160-161, 163.) Moreover, on June 28, 2013, Ms. Hise e-mailed the Complainant and provided suggestions for how to manage the relationship with ServiceMaster. (RDX 5 at 17-18; Dep. at 170-171.) She specifically asked the Complainant to review the Respondent's contract with ServiceMaster and create a spreadsheet that included one column identifying the services ServiceMaster was obligated to perform under the contract, and another column identifying the desired services. Ms. Hise stated that once the Complainant did that, she and Mr. Walsh would meet with the Complainant to "review" it and make sure they were "all in agreement" before providing the document to ServiceMaster. Once that was done, she explained, ServiceMaster could evaluate and identify any additional costs. (RDX 5 at 17-18; Dep. at 170-171.) Ms. Hise's actions, as evidenced by her e-mail communications with the Complainant, demonstrate that she was taking the Complainant's complaints seriously and she wanted to remedy ServiceMaster's deficiencies in a way that did not violate any existing agreements. Moreover, it is evident that she wanted the Complainant to work collaboratively with her and with Mr. Walsh, to ensure that everyone was in agreement regarding how best to move forward.

Thereafter, on June 28, 2013, the Complainant e-mailed Ms. Hise and stated, in part, that she felt that she had been asked to relax her standards. (RDX 5 at 16-17; Dep. at 172; MSDX C at 1.) Significantly, Ms. Hise responded directly to the Complainant's concerns and explained "that she was not being asked to relax her standards; that she was being asked to adjust her approach and work in a more collaborative and team-oriented matter." (*Id.*) Ms. Hise also declared that she spoke with Mr. Walsh and "confirmed that on no occasion had Walsh asked Madison to relax her standards related to legal compliance." (*Id.* at 2.) Mr. Walsh stated that at "no time" did he tell the Complainant "not to follow the law." (MSDX B at 3.)

For purposes of summary decision, which grants to the non-moving party the benefits of reasonable inferences, it will be assumed that that Mr. Walsh did tell the Complainant to "relax her standards." However, these words cannot be judged out of context. Clearly, the Respondent took steps to make clear to the Complainant that she was not being told to overlook violations of the Act. Ms. Hise told the Complainant, via e-mail, "No one is, or should be asking you, to relax your standards on cleanliness. All we are asking is that we modify the approach with which we work with ServiceMaster. Part of our guiding principles is that we 'Cultivate mutually beneficial partnerships with customers, associates and suppliers.' So, we want to protect the supplier relationship if we can." (RDX 5 at 15-16; Dep. at 173-174.)

In sum, even if the Complainant subjectively thought that Mr. Walsh told her to relax her legal standards when his words were first spoken, the evidence of records is rather conclusive that the Respondent took steps to clarify its position, and that its position was not to ignore the law, but seek to work with ServiceMaster in the most effective way to bring its facility into compliance. Ms. Hise's e-mails and responses, the authenticity of which is not seriously challenged, demonstrate that she appreciated the Complainant's complaints and concerns about ServiceMaster, and that nobody was suggesting that she relax her standards, in the sense that she was being asked to look the other way. Ms. Hise merely told the Complainant that she wanted her to have a collaborative and team-oriented approach to resolving the problem.

19

The evidence further shows that Mr. Davis, the Director of Procurement, was working with the Complainant to determine whether it was necessary to change the Respondent's existing agreement with ServiceMaster. Mr. Davis was concerned that changing the level of service that ServiceMaster was providing might require renegotiating the agreement. By e-mail dated June 28, 2013, he wrote to the Complainant that "we certainly can renegotiate the agreement." (RDX 5 at 20.) His concerns were entirely legitimate; he simply asked the Complainant to define the needed changes and ensure that Mr. Walsh and Ms. Hise agreed with those proposed changes. After that, he stated, he would "approach the supplier" and "renegotiate the agreement as needed." (*Id.*) Thus, contrary to the Complainant's allegation that she was asked to improperly relax her standards as shorthand for ignoring the law, the evidence is unrefuted that the Respondent was taking her concerns seriously and offering to renegotiate the contract with ServiceMaster to ensure its compliance under the Act.

On July 8, 2013, Mr. Walsh gave the Complainant a PIP, which warned her of possible termination if her performance did not improve. The PIP outlined deficiencies in the Complainant's performance and highlighted areas of necessary improvement, including communicating effectively, working with others, managing time, and improving interpersonal skills. (RDX 4.) Even despite the challenges the he was having with the Complainant, the evidence reveals that Mr. Walsh was trying to give her an opportunity to improve. In an e-mail dated June 30, 2013, written before the Complainant was placed on a PIP, but after Ms. Hise suggested that they keep an eye on the "90[-] day introductory period window," Mr. Walsh told Ms. Hise that he would "keep trying with her," and he stated that the Complainant was "really too valuable for us not to try." (RDX 5 at 15.) Thus, even despite any frustrations that Mr. Walsh had with the Complainant, it appears as though he demonstrated a willingness to work with her to ensure the Respondent's compliance under the Act.

Significantly, while the PIP mentioned ServiceMaster, it did so in the context of the Complainant's communication style. (RDX 4.) When the Complainant failed to improve her performance thirty days after she was placed on the PIP, she was terminated. There is no evidence, either direct or circumstantial, to show that the Complainant's protected activity contributed to the Respondent's decision to terminate her. Rather, the evidence shows that the Respondent took the Complainant's concerns about sanitation seriously and made conscious efforts to work with its cleaning vendor to address and remedy those concerns.

In sum, the only compelling evidence the Complainant has offered in support of her claim that her alleged protected activity contributed to her termination is Mr. Walsh's statement telling her to relax her standards. However, viewed in context, the record overwhelmingly refutes the meaning that the Complainant attempts to give to these few words: that she was being asked to overlook violations of the Act. Rather, the evidence supports, and the Complainant has failed to produce any evidence to significantly challenge, the conclusion that the Respondent took her safety complaints seriously and was working to address them in a manner that it thought the most effective with its service provider. To the extent that she relies on these words to buttress her case of retaliatory dismissal, I find that she had not produced any evidence to successfully withstand the evidence the Respondent has produced, which demonstrates that she was not being told to overlook safety concerns, and those safety concerns that she communicated were dealt with seriously.

Moreover, I find that there is a paucity of evidence other than these words to support her claim. Animus is one form of circumstantial evidence "[R]idicule, openly hostile actions or threatening statements," may serve as circumstantial evidence of retaliation. *Timmons v. Mattingly Testing Services,* 1995-ERA-00040 (ARB June 21, 1996.) In this regard, the statements attributed to Walsh by others [6] are extremely reprehensible. If true, these statements undoubtedly demonstrate racial animus. However, there is no evidence suggesting that his animus was related to the Complainant's FDA complaints or her protected activities under the Act.

### IV. THE RESPONDENT HAS PROVEN THAT EVEN IF THE COMPLAINANT HAD NOT ENGAGED IN PROTECTED ACTIVITY, IT WOULD HAVE TAKEN THE SAME ADVERSE ACTION AGAINST HER

Even assuming, *arguendo*, that the Complainant could demonstrate by a preponderance of the evidence that her protected activity contributed to the Respondent's decision to terminate her, the Respondent has presented a compelling body of evidence showing that it would have placed the Complainant on a PIP and terminated her even if she had not engaged in protected activity. 29 C.F.R. § 1987.109(b).[7]

On the record before me, although the Complainant has testified that she tried to improve her performance and change her behavior, the evidence demonstrates that she was not satisfactorily performing her job duties. While the Complainant is entitled to reasonable inferences in her favor, she is not entitled to all possible suggestions or speculations in her favor. I do note that Edith McCurry and Leonard Szplett stated that they had never seen the Complainant display an unprofessional attitude and that she was "knowledgeable, competent, even toned, easy to work with and a team player." (Declaration of Leonard Szplett; Declaration of Edith McCurry). While I take their declarations to be their own genuinely held beliefs, and consistent with their own experience, the Complainant's written communications reveal that her tone was not always even. The documents of record show that the Complainant's communication style was often less than diplomatic, if not scolding, in tone, that she had difficulty performing the functions of her job even after receiving guidance and templates from supervisors, and that she did not follow directives from senior management.

To illustrate, the evidence reveals that the Complainant failed to follow Ms. Hise's directive to have legal counsel review external communications prior to sending them to ServiceMaster. Twice, on June 25, 2013 and June 26, 2013, Ms. Hise wrote to the Complainant

---

[6] The record contains a statement by Mr. Szplett, in which he stated that after terminating the Complainant, Mr. Walsh "said that he was glad that 'the educated nigger bitch from Chicago was gone, so she could stop stirring up trouble down here.'" (Declaration of Leonard Szplett). The Complainant also reported that Mr. Szplett told her that Mr. Walsh said something to that effect. (Dep. at 84.)

[77] As outlined previously, the Board has made clear the Complainant must show by a preponderance of the evidence that her protected activity was a contributing factor in the adverse action. *Palmer, supra,* slip op. at 52. If the Complainant satisfies this element, then the burden shifts to the Respondent to show by clear and convincing evidence that it would have taken the same adverse action regardless of the Complainant's protected activity. (*Id.*)

and specifically told her to have legal counsel review any outgoing communications related to ServiceMaster. Specifically, on June 25, 2013, Ms. Hise e-mailed the Complainant and stated, "Before sending any documentation to ServiceMaster related to the outcomes of your pending meeting, let's run it by Ann first. It's always a good idea to have our legal counsel review any documentation. We are getting to a relatively serious point with the supplier." (RDX 5 at 7; Dep. at 160-161.) Thereafter, on June 26, 2013, Ms. Hise sent the Complainant another e-mail stating that it was her impression that the Complainant was going to draft a letter after the scheduled meeting with ServiceMaster "to confirm the actions and timelines jointly agreed upon during the meeting," but, she asked the Complainant to "please" "run" the letter "past Ann first." (Dep. at 163; RDX 5 at 6.) Thus, the evidence clearly shows that on two occasions, Ms. Hise directed the Complainant to have legal counsel review external communications prior to disseminating them to ServiceMaster.

As opposed to following Ms. Hise's directive, the next day, on June 27, 2013, the Complainant drafted and sent a letter to Mr. McGrath at ServiceMaster, which stated, *inter alia,* "*Therefore, be it known as a matter of concern this continued egregious conduct is unacceptable and it must cease and desist immediately.*" (RDX 5 at 14; Dep. at 165.) Moreover, she wrote, "As the goodwill and business reputation of Kenco/Mars can be adversely affected and damaged by not fulfilling the current quality mandates that can result in serious illness and even death, therefore, prompting unwarranted litigious exchanges." (RDX 5 at 14; Dep. at 165.) There is no question that the Complainant used a threatening tone in her letter to ServiceMaster.

On this issue, the Complainant has not alleged that she did, in fact, have legal counsel review her outgoing communications. Indeed, she could not firmly recall whether she had anyone review the letter before she sent it to ServiceMaster. In one instance, she claimed that she gave it to Mr. Walsh. (Dep. at 164.) In another instance, however, she was "not sure," and she could not "really say" whether anyone reviewed the letter. (Dep. at 166.) In her continued deposition, when asked again whether she gave it to anyone to review, she stated, "The only person that I probably would have shown it to would have been either Mr. Walsh or Mr. Moses, but I can't—I don't recall that detail of the situation." (Dep. at 308-310.) On the other hand, the Respondent has presented evidence strongly indicating that the Complainant did *not* have legal counsel or Mr. Walsh review the letter. In response to the Complainant's letter, Mr. Davis forwarded the Complainant's communications to Mr. Walsh on June 27, 2013, and wrote, "whatever you do please do not let Mary threaten the supplier with 'litigious exchanges' again… The last thing we need is a lawsuit brought by overzealousness." (RDX 5 at 11.) The e-mail from Mr. Davis suggests that the language the Complainant used in her e-mail to ServiceMaster shocked him. Moreover, the evidence reveals that the Respondent was genuinely concerned that the Complainant's language and approach could cause unwanted litigation with ServiceMaster. There is no documentary or testimonial evidence demonstrating that the Complainant followed Ms. Hise's directive to have legal counsel review her letter to ServiceMaster before she disseminated it. The Complainant's own uncertain testimony on this issue is not sufficient to create a genuine issue of fact.

Moreover, the Respondent has submitted numerous e-mails that document the Complainant's impolitic communication style. She used exclamation marks, wrote in capitalized letters, and often used confusing and scolding language. (*See e.g.* RDX 5.) When asked whether

she thought her e-mails were clear and concise, the Complainant testified that she "[g]enerally" "tried to limit them to a couple of sentences, maybe one or two paragraphs at the most." She stated that when the e-mails contained "any lengthy expounding on any subject matter," it was because she was trying to "fill in a gap or something..." (Dep. at 209; RDX 4.) She explained that she did not write the government regulations, so she was "not at liberty and I don't have the ability to add or take away from what is being required..." (Dep. at 209.)

While it is true that the Complainant did not write the regulations, the Respondent hired her as the Quality Engineer so that she could help bring its warehouse into compliance with applicable food-safety regulations. Her job description specifically stated that she was to "develop, implement and maintain best practices for meeting FDA regulatory requirements, key quality system processes, quality engineering methodologies, systems and practices to meet the operating system's continuous improvement strategies." (RDX 3; Dep. at 42.) As the Respondent wrote in the Complainant's PIP, the Complainant needed "to communicate through simple terms which are summarized and understandable for fellow coworkers to understand.... This cannot be achieved by responding to inquires with elongated government requirements which seemed to be cut/copied from various websites." (RDX 4 at 2.) In sum, the evidence shows that the Respondent was concerned with the Complainant's communication style and ability to synthesize the regulations into a understandable, digestible format. Clearly the Respondent raised this issue with the Complainant during her PIP and noted that it was imperative for her to understand the regulations and communicate them in an intelligible manner.

The Respondent has shown other instances where the Complainant's communication style and difficulty in understanding her job duties affected her ability to perform the basic functions of her job. For example, on June 17, 2013, the Complainant sent an e-mail to Mr. Walsh and William Schwerin, asking them to complete a Business Continuity Plan that was twenty-two pages long. (Dep. at 179-182; RDX 5 at 29.) In response, Mr. Walsh wrote, "Hi Mary, I'm really not familiar or understanding what is being asked." (Dep. at 180-184; RDX 5 at 29.) In response, the Complainant wrote, "Hope this helps!" and simply pasted a lengthy, seven-page, description of business continuity planning. (RDX 5 at 23-30; Dep. at 184-186.) She testified that she drafted the first two paragraphs of text, but she was "not sure" from where she copied the rest of text. (Dep. at 186.) Thereafter, on July 3, 2013, Mr. Walsh replied, "Mary, I really don't have time to go through this. Please summarize." (RDX 5 at 23; Dep. at 186.) In response, the Complainant did not provide a summary, but, rather, e-mailed Mr. Walsh the following:

> Bringing to your remembrance when we were speaking. It was discussed that a BCP is a plan of action in the event a disaster happens what would you do? How will you mitigate the disaster? Identifying the components of the business and the economic impact of each. Who are the key persons? The information was provide[d] so that you could have the best picture of what is being asked; Not having a handle on the business and its dynamics disallows a full picture for me.

23

(RDX 5 at 23; Dep. at 186.) The Complainant's response shows that she was unable to provide her supervisor with the information he requested in the manner, style, format, and length that he desired.

The Respondent has evidenced other instances in which the Complainant needed guidance in completing basic tasks required of her job. For example, on June 20, 2013, the Complainant wrote an e-mail to Ms. Hise and attached a project plan, which consisted of charts totaling twenty-six pages. (RDX 5 at 54; BS 1787-1816; Dep. at 188.) Ms. Hise replied, thanked the Complainant for the draft, and wrote, *inter alia*, "I'll be honest. I can't follow a project plan that has 499 line items on it. I need something simpler that hits the high points." (RDX 5 at 83; BS 1816; Dep. at 189.) Ms. Hise further added, "I've developed a sample of what I'm looking for—on the attached spreadsheet, see the tab called 'Paula's Sample'. I need to provide Mars with the high level gaps that have been identified and a timeline--without overwhelming them with the detail." (*Id.*) Ms. Hise asked the Complainant if she could respond with a revised project plan by the end of the day on July 3. (*Id.*) Thereafter, on July 3, 2013, the Complainant replied to Ms. Hise via e-mail with an updated project plan, which consisted of charts totaling sixteen pages. (RDX 5 at 86-BS 1820-1836; Dep. at 189-190.) Even after being give a template to use as a sample, the Complainant did not seem to grasp what Ms. Hise was asking of her.

The Respondent has further demonstrated that when Mr. Walsh and Ms. Hise placed the Complainant on a PIP, they identified areas where the Complainant needed to improve her performance. (RDX 4.) The PIP provided specific examples of how the Complainant's performance up until July 8, 2013, was subpar. Although the Complainant testified that she though the PIP was "unlawful," when pressed to provide examples of why it was unlawful, she simply explained that it was not on company letterhead, it was not formatted the way her job description was, and it did not have a "document number," "title," or "date of the person who authored it." (Dep. at 231-232.) In her view, the Respondent was not following its own "progressive discipline policy," which required it to "identify the areas of concern" and then "come up with some type of remediation plan." (Dep. at 202-203.) However, contrary to her testimony, Mr. Walsh did meet with the Complainant, on two occasions, to discuss her PIP. (RDX 4.) Moreover, her PIP identified specific competencies that the Complainant needed to improve. (*Id.*) Thus, I find no colorable evidence to support the Complainant's allegation that the Respondent's PIP was "unlawful" or somehow invalid. The Respondent has provided ample evidence to justify its decision to place the Complainant on a PIP and require her to communicate in more simple terms, collaborate with internal and external customers, and work within and understand compliance requirements and procedures. The Complainant has not presented any significant evidence to the contrary, even when viewed in the context of summary decision.

In sum, the Respondent has submitted clear and convincing evidence that it would have terminated the Complainant regardless of whether she engaged in protected activity. The e-mails of record, the authenticity of which has not been seriously questioned, document that the Respondent had a legitimate, factual basis to conclude that the Complainant did not follow instructions, did not communicate effectively, did not complete the tasks she was hired to do, and did not demonstrate the expertise required of the Quality Engineer position. The Complainant has not produced any persuasive evidence to suggest that the reasons for her termination were

pretextual. Nor has she created any genuine issue of fact regarding her job performance or the written materials documenting her performance. Her allegation that the Respondent did not follow proper procedures in terminating her lacks any persuasive factual basis.

## CONCLUSION

Having reviewed the record before me on the Respondent's motion for summary decision, and viewing the facts in the light most favorable to the Complainant, I find that the record is sufficient to create a genuine issue of fact regarding whether the Complainant engaged in protected activity before she was terminated. However, the record before me does not create a genuine issue of material fact as to whether the Complainant's protected activity was a contributing factor in the Respondent's decision to terminate her. The Complainant's allegation that Mr. Walsh told her to "relax her standards," when viewed in context, does not support a reasonable inference that she was being told to overlook food-safety regulations. To the extent that she has produced evidence of an animus in the alleged statements of Mr. Walsh, these statements, if true, reflect an animus that is of a type different from the employee-protection provisions of the Act. Further, the Respondent has produced a large body of compelling evidence to show that even if the Complainant had *not* engaged in protected activity, it would have taken the same adverse action against her based on legitimate, non-discriminatory reasons. This body of evidence would constitute clear and convincing evidence at hearing, and it has not been challenged in any way that creates a genuine issue of fact. Accordingly, I find that, based on the materials presented, the Respondent is entitled to summary decision as a matter of law.

## **ORDER**

The Respondent is entitled to summary decision as a matter of law. The claim of Mary Madison is hereby **DISMISSED**. The hearing scheduled to begin in Chicago, Illinois on December 11, 2017, is **CANCELLED**.



Digitally signed by John P. Sellers III
DN: CN=John P. Sellers III,
OU=Administrative Law Judge, O=US
DOL Office of Administrative Law
Judges, L=Cincinnati, S=OH, C=US
Location: Cincinnati OH

JOHN P. SELLERS, III
Administrative Law Judge

**NOTICE OF APPEAL RIGHTS**: To appeal, you must file a Petition for Review ("Petition") with the Administrative Review Board ("Board") within fourteen (14) days of the date of issuance of the administrative law judge's decision. The Board's address is: Administrative Review Board, U.S. Department of Labor, Suite S-5220, 200 Constitution Avenue, NW, Washington DC 20210, for traditional paper filing. Alternatively, the Board offers an Electronic File and Service Request (EFSR) system. The EFSR for electronic filing (eFile) permits the submission of forms and documents to the Board through the Internet instead of using postal

mail and fax. The EFSR portal allows parties to file new appeals electronically, receive electronic service of Board issuances, file briefs and motions electronically, and check the status of existing appeals via a web-based interface accessible 24 hours every day. No paper copies need be filed.

An e-Filer must register as a user, by filing an online registration form. To register, the e-Filer must have a valid e-mail address. The Board must validate the e-Filer before he or she may file any e-Filed document. After the Board has accepted an e-Filing, it is handled just as it would be had it been filed in a more traditional manner. e-Filers will also have access to electronic service (eService), which is simply a way to receive documents, issued by the Board, through the Internet instead of mailing paper notices/documents.

Information regarding registration for access to the EFSR system, as well as a step by step user guide and FAQs can be found at: https://dol-appeals.entellitrak.com. If you have any questions or comments, please contact: Boards-EFSR-Help@dol.gov

Your Petition is considered filed on the date of its postmark, facsimile transmittal, or e-filing; but if you file it in person, by hand-delivery or other means, it is filed when the Board receives it. *See* 29 C.F.R. § 1987.110(a). Your Petition must specifically identify the findings, conclusions or orders to which you object. You may be found to have waived any objections you do not raise specifically. *See* 29 C.F.R. § 1987.110(a).

At the time you file the Petition with the Board, you must serve it on all parties as well as the Chief Administrative Law Judge, U.S. Department of Labor, Office of Administrative Law Judges, 800 K Street, NW, Suite 400-North, Washington, DC 20001-8002. You must also serve the Assistant Secretary, Occupational Safety and Health Administration and, in cases in which the Assistant Secretary is a party, on the Associate Solicitor for Occupational Safety and Health. *See* 29 C.F.R. § 1987.110(a).

If filing paper copies, you must file an original and four copies of the petition for review with the Board, together with one copy of this decision. In addition, within 30 calendar days of filing the petition for review you must file with the Board an original and four copies of a supporting legal brief of points and authorities, not to exceed thirty double-spaced typed pages, and you may file an appendix (one copy only) consisting of relevant excerpts of the record of the proceedings from which the appeal is taken, upon which you rely in support of your petition for review. If you e-File your petition and opening brief, only one copy need be uploaded.

Any response in opposition to a petition for review must be filed with the Board within 30 calendar days from the date of filing of the petitioning party's supporting legal brief of points and authorities. The response in opposition to the petition for review must include an original and four copies of the responding party's legal brief of points and authorities in opposition to the petition, not to exceed thirty double-spaced typed pages, and may include an appendix (one copy only) consisting of relevant excerpts of the record of the proceedings from which appeal has been taken, upon which the responding party relies. If you e-File your responsive brief, only one copy need be uploaded.

Upon receipt of a legal brief filed in opposition to a petition for review, the petitioning party may file a reply brief (original and four copies), not to exceed ten double-spaced typed pages, within such time period as may be ordered by the Board. If you e-File your reply brief, only one copy need be uploaded.

If no Petition is timely filed, the administrative law judge's decision becomes the final order of the Secretary of Labor pursuant to 29 C.F.R. §§ 1987.109(e) and 1987.110(b). Even if a Petition is timely filed, the administrative law judge's decision becomes the final order of the Secretary of Labor unless the Board issues an order within thirty (30) days of the date the Petition is filed notifying the parties that it has accepted the case for review. *See* 29 C.F.R. § 1987.110(b).

As outlined previously, the Board has made clear the Complainant must show by a preponderance of the evidence that she her protected activity was a contributing factor in the adverse action. *Palmer, supra,* slip op. at 52. If the Complainant satisfies these elements, then the burden shifts to the Respondent to show by clear and convincing evidence that it would have taken the same adverse action regardless of the Complainant's protected activity. (*Id.*)

## SERVICE SHEET

Case Name: **MADISON MARY v. KENCO LOGISTICS**

Case Number: **2016FDA00004**

Document Title: **Decision and Order**

I hereby certify that a copy of the above-referenced document was sent to the following this 22nd day of November, 2017:

 Digitally signed by APRIL COOK
DN: CN=APRIL COOK, OU=LEGAL
ASSISTANT, O=US DOL Office of
Administrative Law Judges, L=Cincinnati,
S=OH, C=US
Location: Cincinnati OH

**APRIL COOK**
LEGAL ASSISTANT

Director
Directorate of Whistleblower Protection Programs
U S Department of Labor, OSHA
Room N 4618 FPB
200 CONSTITUTION AVE NW
WASHINGTON DC 20210
*{Hard Copy - Regular Mail}*

Associate Solicitor
Division of Fair Labor Standards
Office of the Solicitor
U.S. Department of Labor
200 Constitution Avenue, N.W., Room N-2716
WASHINGTON DC 20210
*{Hard Copy - Regular Mail}*

Regional Administrator
Region 5
U. S. Department of Labor, OSHA
Room 3244
230 South Dearborn Street
CHICAGO IL 60604
*{Hard Copy - Regular Mail}*

Counsel for Whistleblower Programs
Division of Fair Labor Standards
Office of the Solicitor
U.S. Department of Labor
200 Constitution Ave, NW, Room N-2716
WASHINGTON DC 20210
*{Hard Copy - Regular Mail}*

Administrative Review Board
U. S. Dept. of Labor
Suite S-5220, FPB
200 Constitution Ave., N.W.
WASHINGTON DC 20210
*{Hard Copy - Regular Mail}*

Chicago Regional Solicitor
Regional Solicitor
U. S. Department of Labor
Room 844
230 South Dearborn Street
CHICAGO IL 60604
*{Hard Copy - Regular Mail}*

**SERVICE SHEET** continued (2016FDA00004 Case Decision)    Page: 2

Mary Madison
9758 S. Charles
CHICAGO IL 60643
        *{Hard Copy - Regular Mail}*

Jordan TraVille Hoffman, Esq.
11528 S.. Halsted Street
CHICAGO IL 60628
        *{Hard Copy - Regular Mail}*

Scott Simmons, Esq.
Miller & Martin PLLC
832 Georgia Ave., Suite 1000
CHATTANOOGA TN 37402
        *{Hard Copy - Regular Mail}*

Kenco Logistics
1125 West Sycamore Road
MANTENO IL 60950
        *{Hard Copy - Regular Mail}*

Tim Crouse
Reg. Supervisory Investigator
USDOL, OSHA, Room 3244
230 South Dearborn Street
CHICAGO IL 60604
        *{Hard Copy - Regular Mail}*

Julia P Argentieri, Esq.
Jody Wilner Moran, Esq.
Jackson Lewis, P.C.
150 N. Michigan Ave., Suite 2500
CHICAGO IL 60601
        *{Hard Copy - Regular Mail}*

Kathryn Montgomery-Moran
Jackson Lewis, P.C.
150 N. Michigan, Suite 2500
CHICAGO IL 60601
        *{Hard Copy - Regular Mail}*



**U.S. DEPARTMENT OF LABOR**
OFFICE OF ADMINISTRATIVE LAW JUDGES
36 E. 7TH STREET
CINCINNATI, OHIO 45202

OFFICIAL BUSINESS

Jordan Hoffman, Esq.
2711 E. New York Ave., Suite 205
Aurora, IL 60502

UNITED STATES POSTAGE
PITNEY BOWES
$ 000.880
02 1P
0006980790    DEC 01 2017
MAILED FROM ZIP CODE 45202