GROUP EXHIBIT A

18-1800

**CORRESPONDENCE HISTORY**

**Group Exhibit A History**

| Date of Correspondence | Description of Event |
|---|---|
| 2.24.17 | Respondent's Motion to Extend Scheduling Order |
| 4.7.17 | Complainant's Objection filed to order entered on 3.29.17 |
| 4.17.17 | Respondents response to Complainant's objection filed 4.7.17 via email and mail |
| 5.5.17 | Letter from Respondent acknowledging opposition to combined deposition. |
| 5.12.17 | Email from April Cook, Paralegal for ALJ Sellers regarding conference call |
| 8.11.17 | Respondent Motion for Summary Decision via email and mail |
| 8.11.17 | Respondent Motion to extend prehearing deadline via email and mail |
| 8.14.17 | Complainant's Motion to Strike and Objection To Evidence email fax and mail |
| 8.15.17 | Complainant's counsel's email to April Cook, Paralegal for ALJ Sellers on prehearing exchange |
| 8.17.17 | Respondent Response Complainant's Motion to Strike and Objection To Evidence via fax, mail and email |
| 8.18.17 | Fax from April Cook, Paralegal for ALJ Sellers to Complainant's Counsel and Respondent |
| 8.21.17 | Email from Complainant's Counsel to April Cook, Paralegal for ALJ Sellers regarding message left by Cook for Complainant's counsel |
| 8.23.17 | Respondent's motion to reconsider Summary Judgement |
| 8.23.17 | Respondent's Unopposed Motion for a Short Extension Of The Hearing Dates |
| 8.25.17 | Email from April Cook, Paralegal for ALJ Sellers regarding conference call |
| 9.28.17 | Complainant's Response to Respondent's summary Decision |
| 10.20.17 | Email from Respondent regarding subpoenas |
| 11.02.17 | Respondent's Motion to Strike and Bar Madison's Proposed Expert Witness James Kolka |
| 11.16.17 | Respondent's Motion for a Pre-Hearing Conference |
| 11.20.17 | Respondent's Motion to Strike and Bar Complainant's Untimely and Irrelevant Exhibits and Witnesses |
| 11.22.17 | Complainant's Response to Respondent's Motion to Expert Witness |

**GROUP EXHIBIT A**

UNITED STATES
DEPARTMENT OF LABOR

In the Matter of:                    )
                                     )
    MARY MADISON,                )
                                     )    Case No. 2016-FDA-4
        Complainant,           )
                                     )
v.                                   )
                                     )
    KENCO LOGISTICS              )
                                     )
        Respondent.            )

## MOTION TO EXTEND SCHEDULING ORDER

Respondent Kenco Logistics Services, LLC hereby requests to extend and re-set the current dispositive motion deadline, discovery deadline, and hearing dates in the above referenced matter by at least sixty days, for the reasons set forth below:

1.    On December 13, 2016 an order was entered setting this matter for hearing on May 4, 2017 and May 5, 2017.

2.    Dispositive motions are due 45 workdays prior to the hearing, or March 2, 2017.

3.    The parties agreed to the current schedule based on the fact that there is a parallel case pending in federal court in the Central District of Illinois with substantially similar facts, *Mary Madison v. Kenco Logistics Services, LLC* (Case Number 15-cv-02290), and in order to avoid potentially duplicative discovery in the two cases, it was believed to be mutually beneficial to set the matters on a similar discovery schedule.

4.    Discovery has been delayed in the federal litigation and Kenco is awaiting resolution of discovery disputes with Madison in order to move forward with setting a deposition.

5.    For the reasons set forth above, Kenco requests that the current dispositive motion deadline be extended until a date at least sixty (60) days from now, so that Kenco can complete Madison's deposition once for both matters, and prepare any potential dispositive motion thereafter.

6.    Kenco has good cause to request this modification to the current dispositive motion deadline and any subsequent deadlines, in accordance with 29 C.F.R §1987.107, because it will reduce costs and fees to both sides by avoiding scheduling two separate depositions of Mary Madison on overlapping claims.

7.    Kenco has discussed this request with Counsel for Complainant prior to preparing this motion but has not received a response as to whether this motion can be presented as "agreed."

For all the reasons stated above, Respondent Kenco requests that the Department of Labor extend the current dispositive motion, discovery and hearing dates in this case by at least sixty days in the interests of judicial economy and to avoid duplicative discovery in the related federal litigation.

DATED: February 24, 2017

Respectfully submitted,

**KENCO LOGISTICS SERVICES, LLC**

By: /s/ Jody Wilner Moran
          One of its Attorneys

Jody Wilner Moran
Julia P. Argentieri
Jackson Lewis P.C.
150 North Michigan Avenue
Suite 2500
Chicago, Illinois 60601
Telephone:     (312) 787-4949
Facsimile:      (312)787-4995

## CERTIFICATE OF SERVICE

The undersigned attorney, hereby certifies that on February 24, 2017, I submitted a copy of the foregoing **Motion to Extend Scheduling Order** via fax and email to:

U.S. Department of Labor, Office of Administrative Law Judges
Attention: April Cook, Paralegal Specialist to Judge Sellers
36 E. 7th Street, Suite 2525
Cincinnati, Ohio 45202
FAX: (513)684-6106
Email: cook.april@dol.gov

A copy was also sent via electronic mail to:

Jordan Hoffman, esq., Counsel for Complainant
jhoffmanlaw@gmail.com

By: /s/ Jody Wilner Moran_____
One of the Attorneys for the Defendant

UNITED STATES

DEPARTMENT OF LABOR

| | | |
|---|---|---|
| MARY MADISON, | ) | |
| | ) | |
| Complainant, | ) | Case No. 2016-FDA-4 |
| v. | ) | |
| | ) | |
| | ) | |
| KENCO LOGISTICS | ) | |
| | ) | |
| Respondent | ) | |

**<u>OBJECTION</u>**

**NOW COMES** the complainant, **MARY MADISON** (hereinafter "MADISON") by her Attorney, Jordan T. Hoffman and for her Objection to the Order Entered herein on March 29, 2017, she states as follows: **THAT**:

1. On February 24, 2017, Respondent's counsel filed a motion to extend scheduling order. See Exhibit 1

2. Madison's counsel was not served in accordance with 29 CFR Part 18 and as a result was unaware that this issue was before this tribunal.

3. Specifically, respondent emailed "Madison's" counsel.

4.   The email address was incorrect.

5.   Counsel did not agree in writing to service by email.

6.   Neither Madison or Madison's counsel provided respondent or respondent's counsel with Madison's counsel's email address.

7.   The Service list for the matter before the Department of Labor only reflects Madison's counsel's mailing address.

8.   Respondent's allegations in paragraphs 3, 4, 6 and 7 are false and misleading.

9.   Specifically, in regards to paragraph 3, Madison's counsel indicated for the record on the June 2, 2016 conference call with Judge Sellers and respondent that neither Madison nor Madison's counsel felt that this case was inextricably linked to the pending federal litigation.

10.  Madison's counsel did not agree with respondent's sentiments that the discovery deadlines should dovetail with one another.

11.  Neither Madison nor Madison's counsel believed this would be mutually beneficial to set the matters on a similar discovery schedule.

12.  Madison sought an expeditious hearing date.

13.  Specifically, in regards to paragraph 4, at the time of this filing, all discovery delays had been resolved by order of the court on February 8, 2017, sixteen (16) days prior to this filing.  See Exhibit 2

14.  Since February 8, 2017, there has been no other court activity relative to discovery disputes between Madison and respondent.

15.  Consequently, this was a patently false statement made to this tribunal.

16.  Specifically, in regards to paragraph 6, based upon the aforementioned reasons Kenco did not have good cause to modify the existing scheduling order.

17.  This request has not reduced costs for Madison, as Madison has to incur additional costs borne out of this request, as a direct result of respondent having obtained an ex-parte ruling on its motion to extend scheduling order.

18.  Despite respondent's assertion that Madison's deposition could not be scheduled because of discovery disputes, respondent scheduled a deposition that encompassed the District Court case and the matter here before this tribunal for May 18, 2017.

19.  Moreover, with regard to the proposed deposition respondent's counsel sent a Fedex to Madison with an Amended Notice of Plaintiff's Deposition[1] on March 31, 2017 that was delivered to Madison on April 3, 2017.  See Exhibit  3

20.  Respondent's counsel did not confer with neither Madison nor Madison's counsel before setting the date.  See Exhibit 4

21.  Respondent's counsel did not serve Madison's counsel with a Notice of Deposition, with regards to the matter pending here at the Department of Labor.

22.  Respondent's counsel contacted Madison directly concerning the proposed deposition after the order of March 29, 2017.

23.  According to Madison, respondent's counsel was admonished on a status call by the Magistrate Judge in the federal litigation on April 4, 2017 to not confer with Madison regarding the pending case at the Department of Labor.

24.  Respondent's counsel contacted Madison's counsel on February 7, 2017, asking if she thought Madison would want to change the date.

---

[1] The initial deposition in the District Court case was scheduled for September 13, 2016.  Therefore, Respondent had had more than six (6) months to have Madison sit for a deposition before the close of discovery in this matter.

25. It was immediately indicated to respondent's counsel that Madison was out of town, but from what counsel understood Madison was firm on the date.

26. Respondent's counsel during the course of that conversation never discussed proposing a motion to extend the scheduling order.

27. Respondent was advised that Madison was firm on the set date.

28. Madison's counsel never spoke with respondent about any of the reciprocal mutualities listed in the February 24, 2017 motion.

29. Respondent never sent a proposed motion to Madison's counsel for review.

**Wherefore,** for all of the aforementioned stated reasons, Complainant Madison requests that order entered on March 29, 2017 be vacated and that:

a. discovery be closed in accordance with the original order of December 13, 2016 and;

b. that an expeditious hearing date be set in the pending matter before the Department of Labor and;

c. any such other relief, as this tribunal deems warranted in the circumstances.

Dated:  April 6, 2017                      Respectfully Submitted,

                                           MARY MADISON

                                           By: /s/ Jordan Hoffman

                                           2711 E. New York Ave., Suite 205
                                           Aurora, IL 60502
                                           (888) 958-4529

EXHIBIT 1

UNITED STATES
DEPARTMENT OF LABOR

In the Matter of:                    )
                                     )
    **MARY MADISON,**                )
                                     )    **Case No. 2016-FDA-4**
        Complainant,              )
                                     )
v.                                   )
                                     )
    **KENCO LOGISTICS**             )
                                     )
        Respondent.                )

## MOTION TO EXTEND SCHEDULING ORDER

Respondent Kenco Logistics Services, LLC hereby requests to extend and re-set the current dispositive motion deadline, discovery deadline, and hearing dates in the above referenced matter by at least sixty days, for the reasons set forth below:

1. On December 13, 2016 an order was entered setting this matter for hearing on May 4, 2017 and May 5, 2017.

2. Dispositive motions are due 45 workdays prior to the hearing, or March 2, 2017.

3. The parties agreed to the current schedule based on the fact that there is a parallel case pending in federal court in the Central District of Illinois with substantially similar facts, *Mary Madison v. Kenco Logistics Services, LLC* (Case Number 15-cv-02290), and in order to avoid potentially duplicative discovery in the two cases, it was believed to be mutually beneficial to set the matters on a similar discovery schedule.

4. Discovery has been delayed in the federal litigation and Kenco is awaiting resolution of discovery disputes with Madison in order to move forward with setting a deposition.

5.      For the reasons set forth above, Kenco requests that the current dispositive motion deadline be extended until a date at least sixty (60) days from now, so that Kenco can complete Madison's deposition once for both matters, and prepare any potential dispositive motion thereafter.

6.      Kenco has good cause to request this modification to the current dispositive motion deadline and any subsequent deadlines, in accordance with 29 C.F.R §1987.107, because it will reduce costs and fees to both sides by avoiding scheduling two separate depositions of Mary Madison on overlapping claims.

7.      Kenco has discussed this request with Counsel for Complainant prior to preparing this motion but has not received a response as to whether this motion can be presented as "agreed."

For all the reasons stated above, Respondent Kenco requests that the Department of Labor extend the current dispositive motion, discovery and hearing dates in this case by at least sixty days in the interests of judicial economy and to avoid duplicative discovery in the related federal litigation.

DATED: February 24, 2017

Respectfully submitted,

**KENCO LOGISTICS SERVICES, LLC**

By: /s/ Jody Wilner Moran
        One of its Attorneys

Jody Wilner Moran
Julia P. Argentieri
Jackson Lewis P.C.
150 North Michigan Avenue
Suite 2500
Chicago, Illinois 60601
Telephone:     (312) 787-4949
Facsimile:     (312)787-4995

## CERTIFICATE OF SERVICE

The undersigned attorney, hereby certifies that on February 24, 2017, I submitted a copy of the foregoing *Motion to Extend Scheduling Order* via fax and email to:

U.S. Department of Labor, Office of Administrative Law Judges
Attention: April Cook, Paralegal Specialist to Judge Sellers
36 E. 7th Street, Suite 2525
Cincinnati, Ohio 45202
FAX: (513)684-6106
Email: cook.april@dol.gov

A copy was also sent via electronic mail to:

Jordan Hoffman, esq., Counsel for Complainant
jhoffmanlaw@gmail.com

By: /s/ Jody Wilner Moran_____
One of the Attorneys for the Defendant

**2:15-cv-02290-CSB-EIL** Madison v. Kenco Logistic Services LLC et al
Colin Stirling Bruce, presiding
Eric I. Long, referral
**Date filed:** 12/08/2015
**Date of last filing:** 03/02/2017

# History

| Doc. No. | Dates | Description |
|---|---|---|
| 1 | *Filed & Entered:* 12/08/2015 | Complaint |
| 2 | *Filed & Entered:* 12/08/2015<br>*Terminated:* 01/04/2016 | Motion for Leave to Proceed in forma pauperis |
| 3 | *Filed & Entered:* 12/11/2015 | Order |
| 4 | *Filed & Entered:* 12/31/2015 | Remark |
| 5 | *Filed & Entered:* 01/04/2016 | Order on Motion for Leave to Proceed in forma pauperis |
| 6 | *Filed & Entered:* 01/04/2016 | Summons Issued |
| 7 | *Filed & Entered:* 01/26/2016 | Notice of Appearance of Attorney |
| 8 | *Filed & Entered:* 01/28/2016 | Summons Returned Executed (21 days to answer) |
| 9 | *Filed & Entered:* 02/01/2016<br>*Terminated:* 02/03/2016 | Motion for Extension of Time to File Answer |
|  | *Filed & Entered:* 02/03/2016 | Order on Motion for Extension of Time to Answer |
| 10 | *Filed & Entered:* 02/03/2016 | Order |
| 11 | *Filed & Entered:* 02/04/2016 | Notice of Appearance of Attorney |
| 12 | *Filed & Entered:* 03/07/2016 | Notice of Appearance of Attorney |
| 13 | *Filed & Entered:* 03/07/2016 | Notice of Appearance of Attorney |
| 14 | *Filed & Entered:* 03/07/2016 | Notice of Appearance of Attorney |
| 15 | *Filed & Entered:* 03/07/2016 | Notice of Appearance of Attorney |
| 16 | *Filed & Entered:* 03/07/2016 | Notice of Appearance of Attorney |
| 17 | *Filed & Entered:* 03/21/2016 | Notice (Other) |
| 18 | *Filed & Entered:* 03/21/2016<br>*Terminated:* 05/03/2016 | Motion to Dismiss for Failure to State a Claim |
| 19 | *Filed & Entered:* 03/21/2016 | Memorandum in Support of Motion |
| 20 | *Filed & Entered:* 03/21/2016 | Notice (Other) |
| 21 | *Filed & Entered:* 03/24/2016 | Summons Returned Executed (21 days to answer) |
| 22 | *Filed & Entered:* 04/01/2016 | Notice (Other) |
| 23 | *Filed & Entered:* 04/01/2016<br>*Terminated:* 05/03/2016 | Motion to Dismiss |
| 24 | *Filed & Entered:* 04/01/2016 | Memorandum in Support of Motion |
| 25 | *Filed & Entered:* 04/01/2016 | Notice (Other) |

| | | |
|---|---|---|
| | *Filed & Entered:* 04/04/2016 | Order on Motion for Extension of Time to File Response/Reply |
| 26 | *Filed & Entered:* 04/04/2016<br>*Terminated:* 04/04/2016 | Motion for Extension of Time to File Response/Reply |
| 27 | *Filed & Entered:* 04/18/2016 | Report of Rule 26(f) Planning Meeting |
| 28 | *Filed:* 04/18/2016<br>*Entered:* 04/19/2016 | Response to Motion |
| 29 | *Filed:* 04/18/2016<br>*Entered:* 04/19/2016 | Response to Motion |
| | *Filed & Entered:* 04/19/2016 | Setting Rule 16 Scheduling Conference |
| | *Filed & Entered:* 04/26/2016 | Set/Reset Hearings |
| 30 | *Filed & Entered:* 04/26/2016 | Scheduling Conference |
| 31 | *Filed & Entered:* 05/03/2016 | Order on Motion to Dismiss for Failure to State a Claim |
| 32 | *Filed & Entered:* 05/17/2016 | Answer to Complaint |
| | *Filed & Entered:* 07/21/2016 | Status Conference - Referral Judge |
| 33 | *Filed & Entered:* 08/23/2016<br>*Terminated:* 08/29/2016 | Motion for Default Judgment |
| 34 | *Filed & Entered:* 08/26/2016 | Response to Motion |
| | *Filed & Entered:* 08/29/2016 | Order on Motion for Default Judgment |
| | *Filed & Entered:* 08/31/2016 | Set/Reset Deadlines |
| 35 | *Filed & Entered:* 09/02/2016 | Answer to Complaint |
| 36 | *Filed & Entered:* 09/06/2016<br>*Terminated:* 09/19/2016 | Motion for Leave to File |
| 37 | *Filed & Entered:* 09/15/2016 | Response to Motion |
| | *Filed & Entered:* 09/19/2016 | Order on Motion for Leave to File |
| 38 | *Filed & Entered:* 09/19/2016 | Reply to Response to Motion |
| 39 | *Filed & Entered:* 09/19/2016<br>*Terminated:* 09/20/2016 | Motion to Strike |
| 40 | *Filed & Entered:* 09/19/2016 | Response to Motion |
| | *Filed & Entered:* 09/20/2016 | Order on Motion to Strike |
| 41 | *Filed & Entered:* 09/26/2016<br>*Terminated:* 09/28/2016 | Motion for Leave to File |
| | *Filed & Entered:* 09/28/2016 | Order on Motion for Leave to File |
| | *Filed & Entered:* 11/18/2016 | Order |
| | *Filed & Entered:* 11/21/2016 | Order |
| | *Filed & Entered:* 11/28/2016 | Status Conference |
| | *Filed & Entered:* 12/20/2016 | Status Conference - Referral Judge |
| 42 | *Filed & Entered:* 01/04/2017<br>*Terminated:* 02/08/2017 | Motion to Compel |
| 43 | *Filed & Entered:* 01/04/2017 | Memorandum in Support of Motion |
| 44 | *Filed & Entered:* 01/06/2017 | Motion for Extension of Time to File |

| | | |
|---|---|---|
| | *Terminated:*     02/03/2017 | |
| 45 | *Filed & Entered:*  01/20/2017 | Response to Motion |
| | *Filed & Entered:*  02/03/2017 | Order on Motion for Extension of Time to File |
| 46 | *Filed & Entered:*  02/08/2017 | Order on Motion to Compel |
| 47 | *Filed & Entered:*  02/08/2017<br>*Terminated:*     02/09/2017 | Motion for Leave to File |
| | *Filed & Entered:*  02/09/2017 | Order on Motion for Leave to File |
| 48 | *Filed & Entered:*  02/09/2017 | Answer to Complaint |
| | *Filed & Entered:*  02/14/2017 | Status Conference - Referral Judge |
| 49 | *Filed & Entered:*  02/21/2017<br>*Terminated:*     02/22/2017 | Motion for Extension of Time to File Response/Reply |
| | *Filed & Entered:*  02/22/2017 | Order on Motion for Extension of Time to File Response/Reply |
| 50 | *Filed & Entered:*  03/01/2017<br>*Terminated:*     03/02/2017 | Motion for Extension of Time to File |
| | *Filed & Entered:*  03/02/2017 | Order on Motion for Extension of Time to File |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 04/03/2017 18:55:17 | | |
| **PACER Login:** | jt2450:3474088:0 | **Client Code:** | |
| **Description:** | History/Documents | **Search Criteria:** | 2:15-cv-02290-CSB-EIL |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

EXHIBIT 3

Case: 18-1800    Document: 10-2    Filed: 08/01/2018    Pages: 320

Representing Management Exclusively in Workplace Law and Related Litigation

# jackson|lewis
Attorneys at Law

Jackson Lewis P.C.
150 North Michigan Avenue
Suite 2500
Chicago, Illinois 60601
Tel 312 787-4949
Fax 312 787-4995
www.jacksonlewis.com

| | | | |
|---|---|---|---|
| ALBANY, NY | GREENVILLE, SC | MONMOUTH COUNTY, NJ | RALEIGH, NC |
| ALBUQUERQUE, NM | HARTFORD, CT | MORRISTOWN, NJ | RAPID CITY, SD |
| ATLANTA, GA | HONOLULU, HI* | NEW ORLEANS, LA | RICHMOND, VA |
| AUSTIN, TX | HOUSTON, TX | NEW YORK, NY | SACRAMENTO, CA |
| BALTIMORE, MD | INDIANAPOLIS, IN | NORFOLK, VA | SALT LAKE CITY, UT |
| BIRMINGHAM, AL | JACKSONVILLE, FL | OMAHA, NE | SAN DIEGO, CA |
| BOSTON, MA | KANSAS CITY REGION | ORANGE COUNTY, CA | SAN FRANCISCO, CA |
| CHICAGO, IL | LAS VEGAS, NV | ORLANDO, FL | SAN JUAN, PR |
| CINCINNATI, OH | LONG ISLAND, NY | PHILADELPHIA, PA | SEATTLE, WA |
| CLEVELAND, OH | LOS ANGELES, CA | PHOENIX, AZ | ST. LOUIS, MO |
| DALLAS, TX | MADISON, WI | PITTSBURGH, PA | TAMPA, FL |
| DAYTON, OH | MEMPHIS, TN | PORTLAND, OR | WASHINGTON, DC REGION |
| DENVER, CO | MIAMI, FL | PORTSMOUTH, NH | WHITE PLAINS, NY |
| DETROIT, MI | MILWAUKEE, WI | PROVIDENCE, RI | |
| GRAND RAPIDS, MI | MINNEAPOLIS, MN | | |

*through an affiliation with Jackson Lewis P.C., a Law Corporation

MY DIRECT DIAL IS: 312-803-2533
MY EMAIL ADDRESS IS: JULIA.ARGENTIERI@JACKSONLEWIS.COM

March 31, 2017

**VIA E-MAIL AND FED EX**
Mary Madison
9758 South Charles
Chicago, IL 60643
Email: mdj123197@aol.com

Re:    *Madison v. Kenco et. al.*, Case No.
15-cv-2290, Case No. 2016-FDA-4

Dear Ms. Madison:

Enclosed please find a copy of an Amended Notice of Plaintiff's Deposition. Per the enclosed notice, Defendant Kenco intends to take your deposition in the above-referenced matters. In addition to your pending federal lawsuit, this deposition will also cover claims at issue in your pending appeal with the Department of Labor.

Thank you.

Regards,

**JACKSON LEWIS P.C.**

*Julia P. Argentieri*

Julia P. Argentieri

Cc:    Jordan T. Hoffman, Esq. (with enclosure)
Thomas R. Davies (with enclosure)
Harry Harmon (with enclosure)
Kimberly J. Overbaugh (with enclosure)

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | |
|---|---|
| MARY MADISON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 15-cv-2290-CSB-EIL |
| v. | ) |
| | ) |
| KENCO LOGISTIC SERVICES, et. al., | ) |
| | ) |
| Defendants. | ) |

## AMENDED NOTICE OF PLAINTIFF'S DEPOSITION

Pursuant to Rule 30 of the Federal Rules of Civil Procedure, Defendant, Kenco Logistic Services ("Kenco") hereby directs Plaintiff Mary Madison to appear for a videotaped deposition before an officer authorized by law to administer oaths on May 18, 2017 at 9:30 a.m.[1] at the offices of Jackson Lewis P.C., 150 North Michigan Avenue, Suite 2500, Chicago, Illinois 60601. Ms. Madison is directed to produce at the commencement of her deposition: (1) all documents she reviewed in preparation for the deposition and (2) all documents responsive to Defendant's First Request for Production of Documents not previously produced to Defendant.

Dated: March 31, 2017

                                    KENCO LOGISTIC SERVICES, LLC

                                    By: _____
                                    One of the Attorneys for Defendant.

Jody Wilner Moran
Julia P. Argentieri
**Jackson Lewis P.C.**
150 N. Michigan Avenue, Suite 2500
Chicago, IL 60601
Telephone: (312) 787-4949
Facsimile: (312) 787-4995
moranj@jacksonlewis.com
julia.argentieri@jacksonlewis.com

---

[1] A court reporter from Veritext Legal Solutions will be recording Plaintiff's deposition using sound and visual recording devices. The Veritext court reporter will also make written transcripts of the proceedings available.

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that on March 31, 2017, she caused a true and correct copy of the foregoing **Amended Notice of Plaintiff's Deposition** by e-mailing a copy of same to the e-mail addresses below and also by causing a copy to be placed in the U.S. Mail, first-class postage prepaid, addressed as follows:

Mary Madison (*pro se*)
9758 South Charles
Chicago, IL 60643
Mdj123197@aol.com

Thomas R. Davies
Harry Harmon
Kimberly J. Overbaugh
Harmon & Davies, P.C.
2306 Columbia Avenue
Lancaster, PA 17603
tdavies@h-dlaw.com
rharmon@h-dlaw.com
koverbaugh@h-dlaw.com

Julia P. Argentieri

4841-1823-7766, v. 1

**FedEx Express®**

fedex.com 1.800.GoFedEx 1.800.463.3339

09590

06432020

8113 0889 8065

**US Airbill** Package

**1 From**

Date 2/14/17

Sender's Name JULIA WOTHERS

Company JACKSON LEWIS P.C. LLP

Address 150 N MICHIGAN AVE STE 2500

Phone 312 803 2541

City CHICAGO    State IL    ZIP 60601-7617

**2 Your Internal Billing Reference** 342457

**3 To**

Recipient's Name MARY MCCARTHY

Company TEXAS ROADHOUSE

Address

Phone

City CHICAGO    State IL    ZIP 60643

0126486803

**4 Express Package Service**

- [ ] FedEx First Overnight
- [ ] FedEx Priority Overnight
- [X] FedEx Standard Overnight

Item No. 0215

**2 or 3 Business Days**
- [ ] FedEx 2Day A.M.
- [ ] FedEx 2Day
- [ ] FedEx Express Saver

**5 Packaging**
- [X] FedEx Envelope
- [ ] FedEx Pak
- [ ] FedEx Box
- [ ] FedEx Tube
- [ ] Other

**6 Special Handling and Delivery Signature Options**
- [ ] Saturday Delivery

Does this shipment contain dangerous goods?
- [X] No
- [ ] Yes

**Delivery Signature Options**
- [ ] No Signature Required
- [ ] Direct Signature
- [ ] Indirect Signature

- [ ] Cargo Aircraft Only

**7 Payment**  Bill to:
- [X] Sender
- [ ] Recipient
- [ ] Third Party
- [ ] Credit Card
- [ ] Cash/Check

Total Packages    Total Weight

**FedEx**
TRK# 8113 0889 8065
0215

**79 JOTA**

F ID  216623  31MR817  DHJA    6464A/7965/RC0A

MON - 03 APR AA
STANDARD OVERNIGHT

60643
IL-US
ORD



EXHIBIT 4



**Jordan Hoffman <jthoffmanlaw@gmail.com>**

---

## Re: Madison v. Kenco

---

**Mary** <mdj123197@aol.com>                                    Mon, Apr 3, 2017 at 10:25 PM
To: "Argentieri, Julia P. (Chicago)" <Julia.Argentieri@jacksonlewis.com>
Cc: "jhoffmanlaw@gmail.com" <jhoffmanlaw@gmail.com>, Tom Davies <TDavies@h-dlaw.com>, Kimberly
Overbaugh <KOverbaugh@h-dlaw.com>, "Moran, Jody Wilner (Chicago)" <MoranJ@jacksonlewis.com>

Good day,

I am in receipt of your documentation regarding the deposition that you set for May 18, 2017. As you
know, the discovery that was issued to you is overdue and you have not reached out to me in regards to
the outstanding discovery. Please do so.

As you know, Attorney Hoffman is my legal counsel in the foregoing matter at the Department of Labor.
Pointedly, setting a date for a deposition without communicating or conferring with him was inappropriate.
Pointedly, you should have conferred with Attorney Hoffman with regards to setting a deposition that
involves a matter that he is litigating. Moreover, as a courtesy you should have conferred with me as well
to ensure that time was convenient for me as well; as it is my understanding that this collaborative
process.

Since you have taken the liberty to arrange a deposition that synergizes another matter that legal counsel
is retained, I will allow him to schedule the deposition.

Furthermore, it was my understanding that the DOL is on May 4-5, 2017.

Also, the discovery for the matter is district court ends soon as well.

The date you have chosen I will be out of town at a graduation during that week.

Please refrain from contacting regarding the DOL matter, as that is not proper.

In addition, that is not Attorney Hoffman's email address. His email address is JTHoffmanlaw@gmail.com.
You left the t out.

Thank you for your cooperation.

sent from my iPad

On Mar 31, 2017, at 5:10 PM, "Argentieri, Julia P. (Chicago)" <Julia.Argentieri@jacksonlewis.com> wrote:

> Ms. Madison and Mr. Hoffman-
>
> Please see attached.
>
>
> Regards,
>
> Julie
>
>
> **Julia P. Argentieri**

Attorney at Law

**Jackson Lewis P.C.**

150 North Michigan Avenue
Suite 2500
Chicago, IL 60601

Direct: (312) 803-2533 | Main: (312) 787-4949

Julia.Argentieri@jacksonlewis.com  |  www.jacksonlewis.com

*Jackson Lewis P.C. is included in the 2016 rankings of the AmLaw 100 and Global 100 law firms.*

Confidentiality Note: This e-mail, and any attachment to it, contains privileged and confidential information intended only for the use of the individual(s) or entity named on the e-mail. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that reading it is strictly prohibited. If you have received this e-mail in error, please immediately return it to the sender and delete it from your system. Thank you.

<Madison Re-Notice of Deposition 033117.pdf>

CERTIFICATE OF SERVICE

I, Jordan T. Hoffman, hereby certify that a copy of the foregoing document was sent to the following this 7th day of April, 2017:

**By: Email and Regular Mail**

U.S. Department of Labor, Office of Administrative Law Judges
Attention: April Cook, Paralegal Specialist to Judge Sellers
36 E. 7th Street, Suite 2525
Cincinnati, Ohio 45202
Email: cook.april@dol.gov

**By: Regular Mail**

Director
Directorate of Whistleblower Protection Programs
U S Department of Labor, OSHA
Room N 4618 FPB
200 CONSTITUTION AVE NW
WASHINGTON DC 20210
           *(Hard Copy - Regular Mail)*

Free State Reporting Inc
1378 Cape St. Clair Road
ANNAPOLIS MD 21409
           *(Hard Copy - Regular Mail)*

Counsel for Whistleblower Programs
Division of Fair Labor Standards
Office of the Solicitor
U.S. Department of Labor
200 Constitution Ave, NW, Room N-2716
WASHINGTON DC 20210
           *(Hard Copy - Regular Mail)*

Chicago Regional Solicitor
Regional Solicitor
U. S. Department of Labor
Room 844
230 South Dearborn Street
CHICAGO IL 60604
           *(Hard Copy - Regular Mail)*

Mary Madison
9758 S. Charles
CHICAGO IL 60643
           *(Hard Copy - Regular Mail)*

Scott Simmons, Esq.
Miller & Martin PLLC
832 Georgia Ave., Suite 1000
CHATTANOOGA TN 37402
           *(Hard Copy - Regular Mail)*

SERVICE SHEET continued Page: 2

Tim Crouse
Reg. Supervisory Investigator
USDOL, OSHA, Room 3244
230 South Dearborn Street
CHICAGO IL 60604
     *(Hard Copy - Regular Mail)*

Julia P Argentieri, Esq.
Jody Wilner Moran, Esq.
Jackson Lewis, P.C.
150 N. Michigan Ave., Suite 2500
CHICAGO IL 60601
     *(Hard Copy - Regular Mail)*

By: /s/ Jordan Hoffman

2711 E. New York Ave., Suite 205
Aurora, IL 60502
(888) 958-4529



**Jordan Hoffman <jthoffmanlaw@gmail.com>**

---

## Madison v. Kenco 2016-FDA-4
1 message

---

**Argentieri, Julia P. (Chicago)** <Julia.Argentieri@jacksonlewis.com>      Mon, Apr 17, 2017 at 9:40 AM

To: "jthoffmanlaw@gmail.com" <jthoffmanlaw@gmail.com>
Cc: "Cook, April - OALJ" <cook.april@dol.gov>, "Moran, Jody Wilner (Chicago)" <MoranJ@jacksonlewis.com>, "Watkins, Brittany (Chicago)" <Brittany.Watkins@jacksonlewis.com>


Ms. Cook and Mr. Hoffman-

Please see the attached response to Complainant's recent objection to the scheduling order extension. Copies are also being sent via U.S. mail.


Regards,

Julie Argentieri


**Julia P. Argentieri**
Attorney at Law
**Jackson Lewis P.C.**
150 North Michigan Avenue
Suite 2500
Chicago, IL 60601
Direct: (312) 803-2533 | Main: (312) 787-4949
Julia.Argentieri@jacksonlewis.com  |  www.jacksonlewis.com
*Jackson Lewis P.C. is included in the 2016 rankings of the AmLaw 100 and Global 100 law firms.*


Confidentiality Note: This e-mail, and any attachment to it, contains privileged and confidential information intended only for the use of the individual(s) or entity named on the e-mail. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that reading it is strictly prohibited. If you have received this e-mail in error, please immediately return it to the sender and delete it from your system. Thank you.

📄 **Madison v. Kenco -Response to Complainant's Objection to Extension of Scheduling Order.pdf**
34K

**UNITED STATES**
**DEPARTMENT OF LABOR**

| | | |
|---|---|---|
| In the Matter of: | ) | |
| | ) | |
| MARY MADISON, | ) | |
| | ) | Case No. 2016-FDA-4 |
| Complainant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KENCO LOGISTICS | ) | |
| | ) | |
| Respondent. | ) | |

<u>**RESPONDENT'S RESPONSE TO COMPLAINANT'S OBJECTION TO THE**</u>
<u>**SCHEDULING ORDER**</u>

Respondent Kenco Logistics Services, LLC hereby responds to Complainant's objection

the scheduling order as follows:

Complainant has filed an objection to the March 29, 2017 extension of the scheduling

order, but it is not clear what relief Complainant is seeking, or why, given that the original dates

Complainant is asking the Court to use have already passed, and discovery has not yet been

completed.[1] Complainant's Objection states that "Complainant seeks to close discovery in

accordance with the original order dated December 13, 2016." (Objection at p. 4.) The December

13 scheduling order scheduled a hearing for May 4, 2017 with discovery to close 30 days before

the hearing, dispositive motions to be due 45 workdays before the hearing, and prehearing

exchanges due 20 workdays before the hearing. The prior hearing date is now just three weeks

away and all other deadlines have already passed. The parties have not yet deposed Madison, nor

---

[1] Much of Complainant's objection appears to also stem from Jordan Hoffman's email address being misspelled when the motion was served on him, an unintentional oversight that has no bearing on the substantive issues, given that the parties discussed this motion via telephone in advance and Complainant's counsel knew the motion was being filed. Unfortunately, Respondent was unable to serve the motion via U.S. mail because, upon contacting the work address for Jordan Hoffman, Respondent was told he no longer worked there. Complainant has not amended his appearance or provided any new mailing address, but now lists an Aurora, Illinois address on his Objection brief, which Respondent will use going forward, until hearing otherwise.

have any dispositive motions been filed, and pre-hearing exchanges have not taken place. It is therefore not practicable for the parties to adhere to the original discovery closure date.

Respondent intends to depose Complainant at the earliest possible date that the parties can schedule, but has been told by Jordan Hoffman, Counsel for Complainant, that Hoffman is refusing to provide dates for Complainant's deposition due to his objection to this Department's recent scheduling. Respondent believes that deposing Complainant once for both this matter and the related federal litigation is most efficient and cost-effective for both parties and promotes judicial economy, but Respondent will depose Complainant twice if that will allow the parties to move forward without further unnecessary disagreement over scheduling.

For all the reasons stated above, Respondent Kenco requests that the Department of Labor overrule Complainant's objection to the scheduling order, maintain the current schedule, and require Complainant to schedule and sit for her deposition so that the parties can complete discovery and move forward toward dispositive motions and hearing preparation.


DATED:  April 17, 2017                    Respectfully submitted,

                                          **KENCO LOGISTICS SERVICES, LLC**


                                          By:  /s/  Jody Wilner Moran_____
                                                    One of its Attorneys


Jody Wilner Moran
Julia P. Argentieri
Jackson Lewis P.C.
150 North Michigan Avenue
Suite 2500
Chicago, Illinois 60601
Telephone:      (312) 787-4949
Facsimile:      (312)787-4995

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney, hereby certifies that on April 17, 2017, I submitted a copy of the foregoing ***Response to Complainant's Objection to Scheduling Order*** via U.S. and email to:

> U.S. Department of Labor, Office of Administrative Law Judges
> Attention: April Cook, Paralegal Specialist to Judge Sellers
> 36 E. 7th Street, Suite 2525
> Cincinnati, Ohio 45202
> FAX: (513)684-6106
> Email: cook.april@dol.gov

A copy was also sent via electronic and U.S. mail to:

> Jordan Hoffman, esq., Counsel for Complainant
> 2711 E. New York Ave. Suite 205
> Aurora, IL 60502
> jthoffmanlaw@gmail.com

By: /s/ Jody Wilner Moran
    One of the Attorneys for the Defendant

Pages: 320

Filed: 08/01/2018

Document: 10-2

Case: 18-1800



Representing Management Exclusively in Workplace Law and Related Litigation

Jackson Lewis P.C.
150 North Michigan Avenue
Suite 2500
Chicago, Illinois 60601
Tel 312 787-4949
Fax 312 787-4995
www.jacksonlewis.com

ALBANY, NY
ALBUQUERQUE, NM
ATLANTA, GA
AUSTIN, TX
BALTIMORE, MD
BIRMINGHAM, AL
BOSTON, MA
CHICAGO, IL
CINCINNATI, OH
CLEVELAND, OH
DALLAS, TX
DAYTON, OH
DENVER, CO
DETROIT, MI
GRAND RAPIDS, MI

GREENVILLE, SC
HARTFORD, CT
HONOLULU, HI*
HOUSTON, TX
INDIANAPOLIS, IN
JACKSONVILLE, FL
KANSAS CITY REGION
LAS VEGAS, NV
LONG ISLAND, NY
LOS ANGELES, CA
MADISON, WI
MEMPHIS, TN
MIAMI, FL
MILWAUKEE, WI
MINNEAPOLIS, MN

MONMOUTH COUNTY, NJ
MORRISTOWN, NJ
NEW ORLEANS, LA
NEW YORK, NY
NORFOLK, VA
OMAHA, NE
ORANGE COUNTY, CA
ORLANDO, FL
PHILADELPHIA, PA
PHOENIX, AZ
PITTSBURGH, PA
PORTLAND, OR
PORTSMOUTH, NH
PROVIDENCE, RI

RALEIGH, NC
RAPID CITY, SD
RICHMOND, VA
SACRAMENTO, CA
SALT LAKE CITY, UT
SAN DIEGO, CA
SAN FRANCISCO, CA
SAN JUAN, PR
SEATTLE, WA
ST. LOUIS, MO
STAMFORD, CT
TAMPA, FL
WASHINGTON, DC REGION
WHITE PLAINS, NY

*through an affiliation with Jackson Lewis P.C., a Law Corporation

MY DIRECT DIAL IS: 312-803-2533
MY EMAIL ADDRESS IS: JULIA.ARGENTIERI@JACKSONLEWIS.COM

May 5, 2017

**VIA REGULAR U.S. MAIL AND
ELECTRONIC MAIL**

Jordan Hoffman, Esq.
Counsel for Complainant
2711 E. New York Ave., Suite 205
Aurora, Illinois
jthoffmanlaw@gmail.com

Re:  *Madison v. Kenco et. al.*, Case No.
2016-FDA-4

Dear Mr. Hoffman:

We have re-noticed Mary Madison's deposition in the federal litigation (*Mary Madison v. Kenco Logistics Services, LLC, Kelvin Walsh and Mars Inc.,* Case No. 15-cv-02290) for May 24 in accordance with recent court orders which were entered. It is our understanding that you object to combining the depositions for the federal litigation and the pending DOL appeal. If that is correct, we will reach out to you in the upcoming weeks to discuss scheduling of Madison's deposition for the DOL appeal, or please let us know if you would like to propose any dates within the current discovery schedule. Also, enclosed, please find a copy of Kenco's production.

Regards,

**JACKSON LEWIS P.C.**

Julia P. Argentieri

Cc:  April Cook, Paralegal Specialist to Judge Sellers (without enclosures)

                    **Jordan Hoffman <jthoffmanlaw@gmail.com>**

---

## Mary Madison - 2016-FDA-4
10 messages

---

**Cook, April - OALJ** <cook.april@dol.gov>                    Fri, May 12, 2017 at 11:03 AM
To: "jthoffmanlaw@gmail.com" <jthoffmanlaw@gmail.com>, "Argentieri, Julia P. (Chicago)"
<Julia.Argentieri@jacksonlewis.com>, "Moran, Jody Wilner (Chicago)" <MoranJ@jacksonlewis.com>
Cc: "Cook, April - OALJ" <cook.april@dol.gov>


Judge Sellers would like to schedule a conference call in the above matter.

Would you be available next week on either Wednesday, Thursday or Friday (May 17, 18 or 19th)?

Please advise me.


April Cook, Paralegal Specialist to Judge Sellers

Office of Administrative Law Judges

36 E. 7th Street, Suite 2525

Cincinnati, OH  45202

(513) 684-6016 (direct line)

(513) 684-3252 (main line)


---

**Jordan Hoffman** <jthoffmanlaw@gmail.com>                    Fri, May 12, 2017 at 12:02 PM
To: "Cook, April - OALJ" <cook.april@dol.gov>
Cc: "Argentieri, Julia P. (Chicago)" <Julia.Argentieri@jacksonlewis.com>, "Moran, Jody Wilner (Chicago)"
<MoranJ@jacksonlewis.com>

Any of those days would be fine with me.  Please advise as to the time.  Thank you.

Jordan Hoffman

The Law Office of
Jordan T. Hoffman, P.C.
2711 East New York Ave., Suite 205
Aurora, IL 60502
888.958.4529
jthoffmanlaw@gmail.com

*"Balancing the Scales of Justice"*

www.attyjthoffman.com

- CONFIDENTIALITY NOTICE: The information contained in this communication is confidential, may be
attorney-client privileged or attorney work product, may constitute inside information or internal deliberative

staff communication, and is intended only for the use of the addressee. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify the sender immediately by return e-mail and destroy this communication and all copies thereof, including all attachments. Receipt by an unintended recipient does not waive attorney-client privilege, attorney work product privilege, or any other exemption from disclosure.

On Fri, May 12, 2017 at 11:03 AM, Cook, April - OALJ <cook.april@dol.gov> wrote:

> Judge Sellers would like to schedule a conference call in the above matter.
>
> Would you be available next week on either Wednesday, Thursday or Friday (May 17, 18 or 19th)?
>
> Please advise me.
>
>
> April Cook, Paralegal Specialist to Judge Sellers
>
> Office of Administrative Law Judges
>
> 36 E. 7th Street, Suite 2525
>
> Cincinnati, OH 45202
>
> (513) 684-6016 (direct line)
>
> (513) 684-3252 (main line)

---

**Argentieri, Julia P. (Chicago)** <Julia.Argentieri@jacksonlewis.com>
To: Jordan Hoffman <jthoffmanlaw@gmail.com>, "Cook, April - OALJ" <cook.april@dol.gov>
Cc: "Moran, Jody Wilner (Chicago)" <MoranJ@jacksonlewis.com>

Fri, May 12, 2017 at 12:17 PM

Hello:

Yes, we are also available for a call next week. The best times would be after 2pm on May 18 or before noon on May 19 if one of those works for Mr. Hoffman and Judge Sellers.

Regards,

Julie


**Julia P. Argentieri**
Attorney at Law
**Jackson Lewis P.C.**
150 North Michigan Avenue
Suite 2500
Chicago, IL 60601

Direct: (312) 803-2533 | Main: (312) 787-4949

Julia.Argentieri@jacksonlewis.com  |  www.jacksonlewis.com

*Jackson Lewis P.C. is included in the AmLaw 100 and Global 100 law firm rankings.*

**From:** Jordan Hoffman [mailto:jthoffmanlaw@gmail.com]
**Sent:** Friday, May 12, 2017 12:03 PM
**To:** Cook, April - OALJ <cook.april@dol.gov>
**Cc:** Argentieri, Julia P. (Chicago) <Julia.Argentieri@jacksonlewis.com>; Moran, Jody Wilner (Chicago) <MoranJ@jacksonlewis.com>
**Subject:** Re: Mary Madison - 2016-FDA-4

Any of those days would be fine with me.  Please advise as to the time.  Thank you.

Jordan Hoffman

The Law Office of

Jordan T. Hoffman, P.C.

2711 East New York Ave., Suite 205

Aurora, IL 60502

888.958.4529

jthoffmanlaw@gmail.com

*"Balancing the Scales of Justice"*

www.attyjthoffman.com

- CONFIDENTIALITY NOTICE: The information contained in this communication is confidential, may be attorney-client privileged or attorney work product, may constitute inside information or internal deliberative staff communication, and is intended only for the use of the addressee. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify the sender immediately by return e-mail and destroy this communication and all copies thereof, including all attachments. Receipt by an unintended recipient does not waive attorney-client privilege, attorney work product privilege, or any other exemption from disclosure.

On Fri, May 12, 2017 at 11:03 AM, Cook, April - OALJ <cook.april@dol.gov> wrote:

Judge Sellers would like to schedule a conference call in the above matter.

Would you be available next week on either Wednesday, Thursday or Friday (May 17, 18 or 19th)?

Case: 18-1800      Document: 10-2      Filed: 08/01/2018      Pages: 320

Please advise me.


April Cook, Paralegal Specialist to Judge Sellers

Office of Administrative Law Judges

36 E. 7<sup>th</sup> Street, Suite 2525

Cincinnati, OH  45202

(513) 684-6016 (direct line)

(513) 684-3252 (main line)

Confidentiality Note: This e-mail, and any attachment to it, contains privileged and confidential information intended only for the use of the individual(s) or entity named on the e-mail. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that reading it is strictly prohibited. If you have received this e-mail in error, please immediately return it to the sender and delete it from your system. Thank you.

---

**Cook, April - OALJ** <cook.april@dol.gov>                    Fri, May 12, 2017 at 1:02 PM
To: "Argentieri, Julia P. (Chicago)" <Julia.Argentieri@jacksonlewis.com>, Jordan Hoffman
<jthoffmanlaw@gmail.com>
Cc: "Moran, Jody Wilner (Chicago)" <MoranJ@jacksonlewis.com>


OK.  We will schedule the conference call for Thursday, May 18<sup>th</sup>, 2017 at 3:00 p.m. E.T.

We will initiate the conference call.


April Cook

---

**From:** Argentieri, Julia P. (Chicago) [mailto:Julia.Argentieri@jacksonlewis.com]
**Sent:** Friday, May 12, 2017 1:18 PM
**To:** Jordan Hoffman; Cook, April - OALJ
**Cc:** Moran, Jody Wilner (Chicago)
**Subject:** RE: Mary Madison - 2016-FDA-4


Hello:

Yes, we are also available for a call next week. The best times would be after 2pm on May 18 or before noon on May 19 if one of those works for Mr. Hoffman and Judge Sellers.

Regards,

Julie

**Julia P. Argentieri**

Attorney at Law

**Jackson Lewis P.C.**

150 North Michigan Avenue
Suite 2500

Chicago, IL 60601

Direct: (312) 803-2533 | Main: (312) 787-4949

Julia.Argentieri@jacksonlewis.com  |  www.jacksonlewis.com

*Jackson Lewis P.C. is included in the AmLaw 100 and Global 100 law firm rankings.*

**From:** Jordan Hoffman [mailto:jthoffmanlaw@gmail.com]
**Sent:** Friday, May 12, 2017 12:03 PM
**To:** Cook, April - OALJ <cook.april@dol.gov>
**Cc:** Argentieri, Julia P. (Chicago) <Julia.Argentieri@jacksonlewis.com>; Moran, Jody Wilner (Chicago) <MoranJ@jacksonlewis.com>
**Subject:** Re: Mary Madison - 2016-FDA-4

Any of those days would be fine with me.  Please advise as to the time.  Thank you.

Jordan Hoffman

The Law Office of

Jordan T. Hoffman, P.C.

Case: 18-1800     Document: 10-2     Filed: 08/01/2018     Pages: 320

2711 East New York Ave., Suite 205

Aurora, IL 60502

888.958.4529

jthoffmanlaw@gmail.com


*"Balancing the Scales of Justice"*


www.attyjthoffman.com


- CONFIDENTIALITY NOTICE: The information contained in this communication is confidential, may be attorney-client privileged or attorney work product, may constitute inside information or internal deliberative staff communication, and is intended only for the use of the addressee. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify the sender immediately by return e-mail and destroy this communication and all copies thereof, including all attachments. Receipt by an unintended recipient does not waive attorney-client privilege, attorney work product privilege, or any other exemption from disclosure.


On Fri, May 12, 2017 at 11:03 AM, Cook, April - OALJ <cook.april@dol.gov> wrote:

> Judge Sellers would like to schedule a conference call in the above matter.
>
> Would you be available next week on either Wednesday, Thursday or Friday (May 17, 18 or 19th)?
>
> Please advise me.
>
>
> April Cook, Paralegal Specialist to Judge Sellers
>
> Office of Administrative Law Judges
>
> 36 E. 7th Street, Suite 2525
>
> Cincinnati, OH  45202
>
> (513) 684-6016 (direct line)
>
> (513) 684-3252 (main line)


Confidentiality Note: This e-mail, and any attachment to it, contains privileged and confidential information intended only for the use of the individual(s) or entity named on the e-mail. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that reading it is strictly prohibited. If you have received this e-mail in error, please immediately return it to the sender and delete it from your system. Thank you.

Case: 18-1800    Document: 10-2        Filed: 08/01/2018    Pages: 320

**Jordan Hoffman** <jthoffmanlaw@gmail.com>                    Thu, May 18, 2017 at 9:08 AM
To: "Cook, April - OALJ" <cook.april@dol.gov>

Good morning Ms. Cook,

Please initiate today's call to my mobile phone:  773-490-8940.  Thank you.

Jordan Hoffman

The Law Office of
Jordan T. Hoffman, P.C.
2711 East New York Ave., Suite 205
Aurora, IL 60502
888.958.4529
jthoffmanlaw@gmail.com

*"Balancing the Scales of Justice"*

www.attyjthoffman.com

- CONFIDENTIALITY NOTICE: The information contained in this communication is confidential, may be attorney-client privileged or attorney work product, may constitute inside information or internal deliberative staff communication, and is intended only for the use of the addressee. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify the sender immediately by return e-mail and destroy this communication and all copies thereof, including all attachments. Receipt by an unintended recipient does not waive attorney-client privilege, attorney work product privilege, or any other exemption from disclosure.

On Fri, May 12, 2017 at 1:02 PM, Cook, April - OALJ <cook.april@dol.gov> wrote:

OK.  We will schedule the conference call for Thursday, May 18th, 2017 at 3:00 p.m. E.T.

We will initiate the conference call.


April Cook


**From:** Argentieri, Julia P. (Chicago) [mailto:Julia.Argentieri@jacksonlewis.com]
**Sent:** Friday, May 12, 2017 1:18 PM
**To:** Jordan Hoffman; Cook, April - OALJ
**Cc:** Moran, Jody Wilner (Chicago)
**Subject:** RE: Mary Madison - 2016-FDA-4


Hello:

Yes, we are also available for a call next week. The best times would be after 2pm on May 18 or before noon on May 19 if one of those works for Mr. Hoffman and Judge Sellers.


Regards,

Julie

**Julia P. Argentieri**

Attorney at Law

**Jackson Lewis P.C.**

150 North Michigan Avenue
Suite 2500

Chicago, IL 60601

Direct: (312) 803-2533 | Main: (312) 787-4949

Julia.Argentieri@jacksonlewis.com  |  www.jacksonlewis.com

*Jackson Lewis P.C. is included in the AmLaw 100 and Global 100 law firm rankings.*

**From:** Jordan Hoffman [mailto:jthoffmanlaw@gmail.com]
**Sent:** Friday, May 12, 2017 12:03 PM
**To:** Cook, April - OALJ <cook.april@dol.gov>
**Cc:** Argentieri, Julia P. (Chicago) <Julia.Argentieri@jacksonlewis.com>; Moran, Jody Wilner (Chicago) <MoranJ@jacksonlewis.com>
**Subject:** Re: Mary Madison - 2016-FDA-4

Any of those days would be fine with me.  Please advise as to the time.  Thank you.

Jordan Hoffman

The Law Office of

Jordan T. Hoffman, P.C.

2711 East New York Ave., Suite 205

Aurora, IL 60502

888.958.4529

jthoffmanlaw@gmail.com

*"Balancing the Scales of Justice"*

www.attyjthoffman.com

- CONFIDENTIALITY NOTICE: The information contained in this communication is confidential, may be attorney-client privileged or attorney work product, may constitute inside information or internal deliberative staff communication, and is intended only for the use of the addressee. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify the sender immediately by return e-mail and destroy this communication and all copies thereof, including all attachments. Receipt by an unintended recipient does not waive attorney-client privilege, attorney work product privilege, or any other exemption from disclosure.

On Fri, May 12, 2017 at 11:03 AM, Cook, April - OALJ <cook.april@dol.gov> wrote:

Judge Sellers would like to schedule a conference call in the above matter.

Would you be available next week on either Wednesday, Thursday or Friday (May 17, 18 or 19th)?

Please advise me.

April Cook, Paralegal Specialist to Judge Sellers

Office of Administrative Law Judges

36 E. 7th Street, Suite 2525

Cincinnati, OH  45202

(513) 684-6016 (direct line)

(513) 684-3252 (main line)

Confidentiality Note: This e-mail, and any attachment to it, contains privileged and confidential information intended only for the use of the individual(s) or entity named on the e-mail. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that reading it is strictly prohibited. If you have received this e-mail in error, please immediately return it to the sender and delete it from your system. Thank you.

**Cook, April - OALJ** <cook.april@dol.gov>                    Thu, May 18, 2017 at 10:23 AM
To: Jordan Hoffman <jthoffmanlaw@gmail.com>

Case: 18-1800     Document: 10-2     Filed: 08/01/2018     Pages: 320

Ok  thanks


**From:** Jordan Hoffman [mailto:jthoffmanlaw@gmail.com]
**Sent:** Thursday, May 18, 2017 10:09 AM
**To:** Cook, April - OALJ
**Subject:** Re: Mary Madison - 2016-FDA-4


Good morning Ms. Cook,


Please initiate today's call to my mobile phone:  773-490-8940.  Thank you.


Jordan Hoffman


The Law Office of

Jordan T. Hoffman, P.C.

2711 East New York Ave., Suite 205

Aurora, IL 60502

888.958.4529

jthoffmanlaw@gmail.com


*"Balancing the Scales of Justice"*


www.attyjthoffman.com

- CONFIDENTIALITY NOTICE: The information contained in this communication is confidential, may be attorney-client privileged or attorney work product, may constitute inside information or internal deliberative staff communication, and is intended only for the use of the addressee. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify the sender immediately by return e-mail and destroy this communication and all copies thereof, including all attachments. Receipt by an unintended recipient does not waive attorney-client privilege, attorney work product privilege, or any other exemption from disclosure.

On Fri, May 12, 2017 at 1:02 PM, Cook, April - OALJ <cook.april@dol.gov> wrote:

OK.  We will schedule the conference call for Thursday, May 18th, 2017 at 3:00 p.m. E.T.

We will initiate the conference call.

April Cook

---

**From:** Argentieri, Julia P. (Chicago) [mailto:Julia.Argentieri@jacksonlewis.com]
**Sent:** Friday, May 12, 2017 1:18 PM
**To:** Jordan Hoffman; Cook, April - OALJ
**Cc:** Moran, Jody Wilner (Chicago)
**Subject:** RE: Mary Madison - 2016-FDA-4

Hello:

Yes, we are also available for a call next week. The best times would be after 2pm on May 18 or before noon on May 19 if one of those works for Mr. Hoffman and Judge Sellers.

Regards,

Julie

**Julia P. Argentieri**

Attorney at Law

**Jackson Lewis P.C.**

150 North Michigan Avenue
Suite 2500

Chicago, IL 60601

Direct: (312) 803-2533 | Main: (312) 787-4949

Julia.Argentieri@jacksonlewis.com   |   www.jacksonlewis.com

*Jackson Lewis P.C. is included in the AmLaw 100 and Global 100 law firm rankings.*

**From:** Jordan Hoffman [mailto:jthoffmanlaw@gmail.com]
**Sent:** Friday, May 12, 2017 12:03 PM
**To:** Cook, April - OALJ <cook.april@dol.gov>
**Cc:** Argentieri, Julia P. (Chicago) <Julia.Argentieri@jacksonlewis.com>; Moran, Jody Wilner (Chicago)
<MoranJ@jacksonlewis.com>
**Subject:** Re: Mary Madison - 2016-FDA-4

Any of those days would be fine with me.  Please advise as to the time.  Thank you.

Jordan Hoffman

The Law Office of

Jordan T. Hoffman, P.C.

2711 East New York Ave., Suite 205

Aurora, IL 60502

888.958.4529

jthoffmanlaw@gmail.com

*"Balancing the Scales of Justice"*

www.attyjthoffman.com

- CONFIDENTIALITY NOTICE: The information contained in this communication is confidential, may be
attorney-client privileged or attorney work product, may constitute inside information or internal deliberative
staff communication, and is intended only for the use of the addressee. Unauthorized use, disclosure or
copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have
received this communication in error, please notify the sender immediately by return e-mail and destroy this
communication and all copies thereof, including all attachments. Receipt by an unintended recipient does
not waive attorney-client privilege, attorney work product privilege, or any other exemption from disclosure.

On Fri, May 12, 2017 at 11:03 AM, Cook, April - OALJ <cook.april@dol.gov> wrote:

> Judge Sellers would like to schedule a conference call in the above matter.
>
> Would you be available next week on either Wednesday, Thursday or Friday (May 17, 18 or 19th)?
>
> Please advise me.
>
>
> April Cook, Paralegal Specialist to Judge Sellers

Office of Administrative Law Judges

36 E. 7th Street, Suite 2525

Cincinnati, OH  45202

(513) 684-6016 (direct line)

(513) 684-3252 (main line)

Confidentiality Note: This e-mail, and any attachment to it, contains privileged and confidential information intended only for the use of the individual(s) or entity named on the e-mail. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that reading it is strictly prohibited. If you have received this e-mail in error, please immediately return it to the sender and delete it from your system. Thank you.

---

**Cook, April - OALJ** <cook.april@dol.gov>                    Thu, May 18, 2017 at 3:09 PM
To: "Argentieri, Julia P. (Chicago)" <Julia.Argentieri@jacksonlewis.com>, "jthoffmanlaw@gmail.com"
<jthoffmanlaw@gmail.com>, "Moran, Jody Wilner (Chicago)" <MoranJ@jacksonlewis.com>
Cc: "Cook, April - OALJ" <cook.april@dol.gov>

Judge Sellers has hearings already scheduled for the last week of August.

Would you all be available if we would schedule the hearings Sept.  13-15, 2017?

Please advise

April Cook, Paralegal Specialist to Judge Sellers

Office of Administrative Law Judges

36 E. 7th Street, Suite 2525

Cincinnati, OH  45202

(513) 684-6016 (direct line)

(513) 684-3252 (main line)

---

**Cook, April - OALJ** <cook.april@dol.gov>                    Tue, May 23, 2017 at 12:23 PM
To: "Argentieri, Julia P. (Chicago)" <Julia.Argentieri@jacksonlewis.com>, "jthoffmanlaw@gmail.com"
<jthoffmanlaw@gmail.com>, "Moran, Jody Wilner (Chicago)" <MoranJ@jacksonlewis.com>

I don't think I received any responses on this yet.

**From:** Cook, April - OALJ
**Sent:** Thursday, May 18, 2017 4:09 PM
**To:** Argentieri, Julia P. (Chicago); jthoffmanlaw@gmail.com; Moran, Jody Wilner (Chicago)
**Cc:** Cook, April - OALJ
**Subject:** Mary Madison - 2016-FDA-4


Judge Sellers has hearings already scheduled for the last week of August.

Would you all be available if we would schedule the hearings Sept. 13-15, 2017?

Please advise


April Cook, Paralegal Specialist to Judge Sellers

Office of Administrative Law Judges

36 E. 7th Street, Suite 2525

Cincinnati, OH 45202

(513) 684-6016 (direct line)

(513) 684-3252 (main line)

---

**Jordan Hoffman** <jthoffmanlaw@gmail.com>                    Tue, May 23, 2017 at 12:33 PM
To: "Cook, April - OALJ" <cook.april@dol.gov>

I apologize, I did not see this email yesterday. I could be available for September 13-15.

The Law Office of
Jordan T. Hoffman, P.C.
2711 East New York Ave., Suite 205
Aurora, IL 60502
888.958.4529
jthoffmanlaw@gmail.com

*"Balancing the Scales of Justice"*

www.attyjthoffman.com

- CONFIDENTIALITY NOTICE: The information contained in this communication is confidential, may be attorney-client privileged or attorney work product, may constitute inside information or internal deliberative staff communication, and is intended only for the use of the addressee. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify the sender immediately by return e-mail and destroy this communication and all copies thereof, including all attachments. Receipt by an unintended recipient does not waive attorney-client privilege, attorney work product privilege, or any other exemption from disclosure.

On Tue, May 23, 2017 at 12:23 PM, Cook, April - OALJ <cook.april@dol.gov> wrote:

I don't think I received any responses on this yet.

**From:** Cook, April - OALJ
**Sent:** Thursday, May 18, 2017 4:09 PM
**To:** Argentieri, Julia P. (Chicago); jthoffmanlaw@gmail.com; Moran, Jody Wilner (Chicago)
**Cc:** Cook, April - OALJ
**Subject:** Mary Madison - 2016-FDA-4


Judge Sellers has hearings already scheduled for the last week of August.

Would you all be available if we would schedule the hearings Sept. 13-15, 2017?

Please advise


April Cook, Paralegal Specialist to Judge Sellers

Office of Administrative Law Judges

36 E. 7th Street, Suite 2525

Cincinnati, OH  45202

(513) 684-6016 (direct line)

(513) 684-3252 (main line)

---

**Argentieri, Julia P. (Chicago)** <Julia.Argentieri@jacksonlewis.com>                    Thu, May 25, 2017 at 11:46 AM

To: "Cook, April - OALJ" <cook.april@dol.gov>, "jthoffmanlaw@gmail.com" <jthoffmanlaw@gmail.com>, "Moran, Jody Wilner (Chicago)" <MoranJ@jacksonlewis.com>


April:

My apologies for the delay as I was awaiting some confirmation on the client end, but Respondent is available Sept. 13-15.


Thanks,

Julie Argentieri



**Julia P. Argentieri**
Attorney at Law

**Jackson Lewis P.C.**

150 North Michigan Avenue
Suite 2500

Chicago, IL 60601

Direct: (312) 803-2533 | Main: (312) 787-4949

Julia.Argentieri@jacksonlewis.com  |  www.jacksonlewis.com

*Jackson Lewis P.C. is included in the AmLaw 100 and Global 100 law firm rankings.*

**From:** Cook, April - OALJ [mailto:cook.april@dol.gov]
**Sent:** Tuesday, May 23, 2017 12:23 PM
**To:** Argentieri, Julia P. (Chicago) <Julia.Argentieri@jacksonlewis.com>; jthoffmanlaw@gmail.com; Moran, Jody Wilner (Chicago) <MoranJ@jacksonlewis.com>
**Subject:** RE: Mary Madison - 2016-FDA-4

I don't think I received any responses on this yet.

**From:** Cook, April - OALJ
**Sent:** Thursday, May 18, 2017 4:09 PM
**To:** Argentieri, Julia P. (Chicago); jthoffmanlaw@gmail.com; Moran, Jody Wilner (Chicago)
**Cc:** Cook, April - OALJ
**Subject:** Mary Madison - 2016-FDA-4

Judge Sellers has hearings already scheduled for the last week of August.

Would you all be available if we would schedule the hearings Sept. 13-15, 2017?

Please advise

April Cook, Paralegal Specialist to Judge Sellers

Office of Administrative Law Judges

36 E. 7th Street, Suite 2525

Cincinnati, OH  45202

(513) 684-6016 (direct line)

(513) 684-3252 (main line)

Confidentiality Note: This e-mail, and any attachment to it, contains privileged and confidential information intended only for the use of the individual(s) or entity named on the e-mail. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for

delivering it to the intended recipient, you are hereby notified that reading it is strictly prohibited. If you have received this e-mail in error, please immediately return it to the sender and delete it from your system. Thank you.

Case: 18-1800      Document: 10-2      Filed: 08/01/2018      Pages: 320



**Jordan Hoffman <jthoffmanlaw@gmail.com>**

# Madison v. Kenco - Motion for Summary Decision

**Argentieri, Julia P. (Chicago)** <Julia.Argentieri@jacksonlewis.com>          Fri, Aug 11, 2017 at 5:16
PM
To: "Cook, April - OALJ" <cook.april@dol.gov>
Cc: Jordan Hoffman <jthoffmanlaw@gmail.com>, "Moran, Jody Wilner (Chicago)"
<MoranJ@jacksonlewis.com>, "Watkins, Brittany (Chicago)" <Brittany.Watkins@jacksonlewis.com>

April:

Attached please find a copy of Respondent's Motion for Summary Decision which was also filed via fax
earlier this afternoon. Please note that Exhibit A was too large to fax and is being sent to opposing counsel
and Judge Sellers via mail for delivery on Monday.  Please do not hesitate to contact me with any
questions.


Regards,

Julie Argentieri


**Julia P. Argentieri**

Attorney at Law

**Jackson Lewis P.C.**

150 North Michigan Avenue
Suite 2500

Chicago, IL 60601

Direct: (312) 803-2533 | Main: (312) 787-4949

Julia.Argentieri@jacksonlewis.com  |  www.jacksonlewis.com

*Jackson Lewis P.C. is included in the AmLaw 100 and Global 100 law firm rankings.*

Confidentiality Note: This e-mail, and any attachment to it, contains privileged and confidential information intended only for the use of the
individual(s) or entity named on the e-mail. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for
delivering it to the intended recipient, you are hereby notified that reading it is strictly prohibited. If you have received this e-mail in error,
please immediately return it to the sender and delete it from your system. Thank you.

 **Respondent's Motion for Summary Decision 081117.pdf**
8548K

UNITED STATES
DEPARTMENT OF LABOR

In the Matter of:          )

                          )

    **MARY MADISON,**       )

                          )    **Case No. 2016-FDA-4**

       **Complainant,**    )

                          )

**v.**                        )

                          )

    **KENCO LOGISTICS**     )

                          )

       **Respondent.**     )

## RESPONDENT'S MOTION FOR SUMMARY DECISION

Respondent Kenco Logistics Services, LLC hereby submits the following request for summary decision in accordance with 29 CFR §18.72:

## INTRODUCTION

Mary Madison worked for Kenco for less than three months as a Quality Engineer. Her job was to identify compliance-related issues and bring Respondent's new warehouse into compliance with applicable food safety regulations. Madison's whistleblower complaint is meritless because she never blew any whistle on wrongdoing by Kenco. Kenco and Madison always agreed about what needed to be done, and the disagreements stemmed from Madison's hostile and uncooperative attitude.

During her brief employment, Madison displayed consistent problems with her job performance. In particular, her communication style was ineffective and often antagonistic. She prepared and sent an aggressive and threatening letter to Respondent's outside cleaning vendor rather than trying to work with the vendor in a collaborative and supportive manner to discuss how to make improvements. Also frustrating was Madison's continued refusal to involve her supervisor and site General Manager, Kelvin Walsh, in aspects of her daily work. She communicated to third-

parties without seeking input or approval from Walsh. Madison also sent long-winded emails to Walsh and others that consisted of copying and pasting lengthy regulations, displaying an inability to summarize compliance issues cogently. After identifying these performance problems during the first two months of Madison's employment, Walsh prepared a detailed performance improvement plan ("PIP") for Madison. During a meeting that spanned over two days, Walsh and Len Szplett (Office Manager) discussed the performance issues at great length and gave Madison thirty days to improve her performance. Unfortunately, Madison did not even acknowledge that her performance needed improvement. She took no ownership of her employer's clearly communicated perception that she was not meeting expectations; rather, she submitted an accusatory, sixteen-page challenge to the PIP, providing yet another example of her combative nature and inappropriate communication style. Thirty days passed, with no marked improvement in Madison's work performance; as a result, Kenco terminated her employment on August 9, 2013.

In this proceeding, Madison alleges that she was wrongfully terminated in retaliation for raising complaints under the Food Safety Modernization Act ("FSMA"). The prior dismissal of her claim should be affirmed because Madison cannot satisfy the elements of her retaliation claim.

<u>First</u>, Madison never engaged in a protected activity because she did not provide information to her employer about an alleged violation of the FSMA or other applicable laws. Madison simply argued with her supervisors about the correct approach for how to address compliance issues with outside vendors, and then unreasonably accused Walsh of trying to "relax her standards" when he challenged her aggressive style. Kenco made it exceedingly clear to Madison that the Company supported her mission to achieve compliance, but did not support her confrontational style. Significantly, Madison was hired as the Quality Engineer for the Manteno site to ensure that the warehouse *was* in compliance with all regulatory food-safety issues.

Second, Madison's identification of compliance issues (regardless of whether or not they can be construed as complaints) was not a contributing factor in her termination. She was discharged because of her ineffective and combative communication style.

Third, there is clear and convincing evidence that Madison would have been terminated even absent any alleged reports that could be construed as whistleblowing, because she simply could not work effectively with others. For all of these reasons, Respondent is entitled to a summary decision dismissing Madison's claim.

## UNDISPUTED MATERIAL FACTS

1.     Respondent Kenco Logistics Services, LLC is a logistics company with corporate headquarters in Chattanooga, TN. Beginning in April 2013, Kenco managed the warehouse logistics services for a Mars warehouse located in Manteno, Illinois *(Complaint at p. 1; Ex. A, Madison Dep. Tran. 62.)*

2.     Complainant Mary Madison began her employment with Kenco on May 13, 2013 as a Quality Engineer. *(See Ex. A, Madison Dep. Tran. pp. 37-39.)*

3.     As a Quality Engineer, Madison was expected to work with management to develop, implement and maintain best practices for meeting FDA regulatory requirements *(Madison Dep. Tran. pp. 41-42.)[1]* During her brief employment at Kenco, Madison assisted with preparing a separate job description for Quality Engineer *(Madison Dep. Tran. 230-31.)*

4.     As Kenco was new to managing this facility at the time that Madison was hired, the Company was not in a position to know whether the facility was in compliance with food safety

---

[1] On August 7, 2017 Madison testified during a hearing in her federal court case and provided information about her employment at Kenco, including a detailed description of her job duties. Respondent will provide the ALJ with pertinent portions of this transcript when it becomes available, as a supplement to the exhibits in support of a summary decision.

and other laws; accordingly, Madison was hired in part to identify what, if anything, was out of compliance and work to correct those issues *(Madison Dep. Tran. 62-64.)*

5.    Madison was the only Quality Engineer at the Manteno, Illinois facility *(Madison Dep. Tran. 43-44.)* She understands that the ability to communicate well with other departments, customers and vendors was an important skill for a Quality Engineer *(Madison Dep. Tran. 45.)*

6.    Madison reported to General Manager Kelvin Walsh throughout her employment *(Madison Dep. Tran. 66.)* She also believes she had a dotted line to Paula Hise, Vice President of Operations who worked at Kenco's corporate office in Chattanooga *(Madison Dep. Tran. 32-33.)*

7.    On or around May 21, 2013, Madison participated a meeting with the facility's third-party cleaning vendor, ServiceMaster, in order to go over their scope of services and discuss best practices for sanitation in the warehouse *(Madison Dep. Tran. 90.)* Kelvin Walsh ended the meeting quickly and told Madison that she was not giving ServiceMaster a chance *(Id.)*

8.    After the meeting Madison prepared a "Memorandum of Understanding" for ServiceMaster, to outline what was agreed upon in the meeting, including any performance improvements *(Madison Dep. Tran. 91.)* Madison sent this to ServiceMaster without seeking approval from her supervisors or colleagues; the MOU threatened litigation against ServiceMaster (*Ex. B Declaration of Walsh at* ¶¶ 8, 10, 11.)

9.    The very next day, on May 23, 2013, Madison emailed Kenco's Director of Procurement Brian Davis and told him that there had not been sufficient improvement and she believed Kenco should terminate its relationship with ServiceMaster. Brian Davis responded and told her to give ServiceMaster a chance to improve and to focus on making the relationship collaborative rather than confrontational *(Ex. B, Walsh Declaration ¶ 5 and Ex. 1 to Walsh Declaration.)*

Case: 18-1800    Filed: 08/01/2018    Pages: 320    Document: 10-2

10.    During June 2013, Madison claims that Kelvin Walsh told her to "relax her standards" with respect to ServiceMaster's performance of their cleaning under their contract *(Madison Dep. Tran. 113.)* Madison is not sure which "standards" Walsh was asking her to relax but believes it was bathroom standards *(Madison Dep. Tran. 341-42.)*

12.    Madison interpreted Walsh's comment to mean that Walsh wanted her to break the law *(Madison Dep. Tran. 107.)*

13.    Walsh never told Madison that she should break the law or be less attentive to compliance standards. He did on multiple occasions tell Madison to relax her aggressive approach, use a more cooperative, less threatening work-style when providing feedback to colleagues and outside vendors *(Ex. B, Walsh Declaration ¶¶ 13-14.)*

14.    On June 30, 2013 VP of Operations Paula Hise clarified to Madison in an email that she absolutely was not being asked to relax her standards, and Kenco appreciated her commitment to regulatory compliance. Hise explained that Kenco wanted Madison to modify her approach toward ServiceMaster and cultivate positive relationships with the vendor rather than threatening and attacking them *(Madison Dep. Tran. 173-74; Ex. C, Hise Declaration ¶ 5.)*

15.    Hise also encouraged Madison to work together with her managers and colleagues and reminded Madison that they could accomplish much more with a short telephone call than lengthy emails *(Madison Dep. Tran. 127, 174; Ex. C, Hise Declaration ¶ 8.)* During the same time period, in or around early July 2013, Hise and Walsh made the decision to hire outside consultant Clifford to assist Madison with developing a Quality Management System after noticing that Madison was not successfully preparing the QMS procedures that were an important part of her job duties and necessary for an upcoming audit. Madison would instead send lengthy-regulations

to other managers and instruct them to figure out how to comply, without working in a collaborative fashion or giving guidance (*Walsh Declaration ¶¶ 14-15.*)

16.    Madison claims she also told Kevin Moses, the Corporate Quality contact, that Walsh was asking her to "relax her standards" with respect to ServiceMaster. Thereafter, Moses assisted Madison with setting up several conference calls to discuss ServiceMaster *(Madison Dep. Tran. 107-09.)* Madison believes she also reported her concern to Edith McCurry (Clerk) and Len Szplett (Office Manager) but does not recall what was said, or their response *(Madison Dep. Tran. 115.)*

17.    Madison did not relax her standards, but tried to do a better job of educating ServiceMaster and being understanding of them *(Madison Dep. Tran. 116.)*

18.    Madison also claimed that ServiceMaster was falsifying a cleaning log because ServiceMaster documented that an area in the warehouse had been cleaned, but the area had been cleaned by another third-party called Jacobson *(Madison Dep. Tran. 364.)*

19.    In June 2013, Hise asked Madison to create a summary of high-level gaps that Madison had identified along with a timeline that could be shared with Mars for implementation. Madison sent Hise a spreadsheet with 499 line items and Hise explained that she needed something more simple and high-level that hits the high points of areas for improvement *(Madison Dep. Tran. 189-90; Hise Declaration ¶ 7.)*

20.    During the same time period, on June 28, 2013 Madison sent Walsh an email of approximately six (single-spaced) pages in length discussing the preparation of a Business Continuity Plan for Kenco. Walsh responded and stated "Mary, I really don't have time to go through this. Please summarize." *(Madison Dep. Tran. 179-85.)*

Case: 18-1800    Filed: 08/01/2018    Document: 10-2    Pages: 320

Case: 18-1800     Document: 10-2     Filed: 08/01/2018     Pages: 320

21.     Based on the performance issues above related to Madison's aggressive communication style, her inability to work collaboratively with others or succinctly summarize information, Walsh made the decision in collaboration with Hise to give Madison a Performance Improvement Plan ("PIP") to identify specific performance concerns and give Madison feedback about how her performance needed to improve in order to meet Kenco's expectations *(Madison Dep. Tran. 190-93; Walsh Declaration ¶ 11.)*

22.     Walsh and Len Szplett (Office Manager) met with Madison for two days, first on July 8 and then again on July 9, to discuss the PIP *(Madison Dep. Tran. 205.)* The PIP stated that "the required improvements must be made to the satisfaction of your manager within 30 days. If satisfactory improvements are not made within 30 days, you are subject to further disciplinary action, up to and including termination..." *(Walsh Declaration, Ex. 2.)*

23.     In the PIP, Madison was provided with four specific job responsibilities to improve: (1) working collaboratively with fellow site managers, (2) demonstrating commitment with compassion, (3) communication with leadership, (4) working outside of outlined job responsibilities.  She was also given five related competencies: (1) effective communication, (2) leading others, (3) time management, (4) interpersonal skills and (5) project management to improve upon *(Madison Dep. Tran. 78-80; Ex. 2 to Walsh Declaration.)*

24.     The PIP stated that Madison acted inappropriately when she sent a series of aggressive emails accusing the site General Manager of placing the business in jeopardy after he provided an alternate course of action for how to effectively deal with the ServiceMaster contract *(Madison Dep. Tran. 192; Ex. 2 to Walsh Declaration.)*

25.     The PIP further stated that Madison was excluding the site GM on communications with outside vendors, even when requested, and was over-stepping her job duties by giving

directives to outside vendors without discussing them with her co-workers and Site General Manager *(Madison Dep. Tran. 190; Ex. 2 to Walsh Declaration.)*

26.     Madison's PIP also required that she communicate in simple terms that are understandable to co-workers, rather than copying and pasting lengthy governmental requirements from websites *(Madison Dep. Tran. 191; Ex. 2 to Walsh Declaration.)*

27.     Madison recognizes that other people may have perceived her emails differently than how she perceived them, but disagreed with the rest of the PIP *(Madison Dep. Tran. 22-223.)*

28.     In response to the PIP, Madison submitted a sixteen-page response arguing with many of the statements in the PIP *(Madison Dep. Tran. 224-27.)*

29.     Thereafter, Madison continued to have other communications with outside parties without first collaborating with the site GM and her other colleagues. For example, on July 19, Madison requested audit information from Matthew Chick at Mars, and Walsh later told her that he could have provided her with this information, and it made Kenco look sloppy when they ask Mars for information that they should already know *(Madison Dep. Tran. 245-52.)*

30.     Based on Madison's lack of improvement in the 30 days following the PIP, Walsh and Hise made the decision to terminate Madison's employment for performance reasons *(Madison Dep. Tran. 241; Hise Declaration ¶ 10.)* Szplett and Walsh met with Madison and told her that it was not working out and that she was being terminated *(Madison Dep. Tran. 241.)*

31.     Madison believes that the PIP, the termination of her employment, Walsh's refusal to having regular meetings, and yelling at her in a meeting were all retaliatory *(Madison Dep. Tran. 347-57.)*

32.     Following Madison's termination, Kenco hired a new Quality Engineer named Valarie Lillie *(Ex. B, Walsh Declaration ¶ 15.)*

Case: 18-1800     Document: 10-2     Filed: 08/01/2018     Pages: 320

**STANDARD**

An ALJ may issue a summary decision if the pleadings, affidavits, and other evidence or "matters officially noticed" show that there is no genuine issue of any material fact and the moving party is entitled to prevail as a matter of law. *See In the Matter of: Robert T. Evans v. T-Mobile, USA, Inc.,* ARB. Case No. 15-037, ALJ No. 2012-SOX-036, slip. op. at 7 (ARB Feb. 27, 2017). The Food Safety Modernization Act provides protection against retaliation for whistleblowers and states that:

> No entity engaged in the manufacture, processing, packing, transporting, distribution, reception, holding, or importation of food may discharge an employee or otherwise discriminate against an employee with respect to compensation, terms, conditions, or privileges of employment because the employee, whether at the employee's initiative or in the ordinary course of the employee's duties (or any person acting pursuant to a request of the employee)-
>
> (1) provided, caused to be provided, or is about to provide or cause to be provided to the employer, the Federal Government, or the attorney general of a State information relating to any violation of, or any act or omission the employee reasonably believes to be a violation of any provision of this Act or any order, rule, regulation, standard, or ban under this Act, or any order, rule, regulation, standard, or ban under this Act;

21 U.S.C. §399d (Lexis 2017).

To state a *prima facie* case for retaliation, Madison must show that: (1) she engaged in a protected activity; (2) Respondent was aware she engaged in a protected activity; (3) Kenco took adverse action, or action that would dissuade a reasonable worker from exercising rights, against her; and (4) the protected activity was a contributing factor in the adverse action. *Patricia Hindsman v. Delta Air Lines, Inc.,* ARB Case No. 09-023, ALJ Case No. 2008-AIR-013, slip. op. 9 (ARB. June 30, 2010); *Chase v. Bros. Int'l Food Corp.*, 3 F. Supp. 3d 49, **9 (W.D.N.Y. 2014) (discussing elements in context of a FSMA claim).  A determination that a violation has occurred

may be made only if the complainant has demonstrated by a preponderance of the evidence that protected activity was a contributing factor in the adverse action alleged in the complaint. 29 C.F.R. §1987.109(a). Further, even if that burden is satisfied, relief may not be ordered if the respondent demonstrates by clear and convincing evidence that it would have taken the same adverse action in the absence of any protected activity. 29 C.F.R. §1987.109(b).

## ARGUMENT

### A. Madison Cannot Establish A Prima Facie Case of Retaliation.

#### 1. Madison's Arguments with Walsh and Other Co-Workers About Relaxing Her Aggressive Workstyle Cannot Be Viewed as a Protected Activity.

Respondent does not dispute that Kenco is a covered entity under the Food Safety Modernization Act, and was engaged in the holding of food products at the Mars warehouse in Manteno, Illinois where Madison was briefly employed. 29 CFR §1987.101. That issue aside, Respondent disputes that Madison has evidence to support any of the elements of a claim for relief as a whistleblower under the FSMA.

First, Madison did not engage in a protected activity because she was not a whistleblower. Whistleblower-protections are afforded to employees who risk their own job security for the public good by taking steps to report a company's wrongdoing.[2] To be clear, there was never any "wrongdoing" by Kenco, nor did Madison report any wrongdoing. Her purported whistleblowing was nothing more than arguing with her colleagues about how to carry out her job duties.

---

[2] Respondent acknowledges that the law extends whistleblower protection to an employee who is reporting violations of the FSMA in the course of carrying out ordinary job duties. 29 CFR §1987.102. Respondent is not arguing that Madison could never be a whistleblower as a Quality Engineer because she was performing her normal job duties of identifying food safety compliance issues. Rather, Respondent is arguing that Madison never reported a "violation" or engaged in any dispute with Kenco about violations of the law. She was rude and threatening to an outside vendor when trying to explain areas of sanitation compliance to them and was asked to work more cooperatively.

Case: 18-1800    Document: 10-2    Filed: 08/01/2018    Pages: 320

Madison was hired as a Quality Engineer to bring Kenco's warehouse into regulatory compliance and prepare for upcoming audits (SOF ¶¶ 2-3.) Performing a compliance-related job does not automatically qualify an employee as a whistleblower unless they are actually in some way "blowing the whistle," whether internally or externally, on an actual or perceived violation of the law. *See* 21 U.S.C. §399d. Madison argues that Walsh told her to "relax her standards" and Madison interpreted this comment as a request to violate "bathroom standards." (SOF ¶ 10.) But the undisputed facts establish that Kenco (and Walsh) were never, at any time, trying to avoid compliance with the law or cover up any violation; to the contrary, Hise specifically told Madison in an email that Madison was not being asked to relax her standards with respect to her commitment to compliance, and the company admired her dedication (SOF ¶ 14.) Instead, they were asking her to foster positive relationships with co-workers and outside vendors and learn how to approach problems in a way that did not come across as combative (SOF ¶ 14.) Disagreeing with co-workers about how to handle a safety-related issue is not a *per se* protected activity. *Patricia Hindsman v. Delta Air Lines, Inc.,* ARB Case No. 09-023, ALJ Case No. 2008-AIR-013 (ARB. June 30, 2010) (affirming summary decision and finding employee did not engage in protected activity where she alleged that Delta put on-time departure ahead of safety).

In *Hindsman,* a flight attendant became angry when she saw a suspicious looking device on the plane and was told by colleagues that Delta Airlines would not delay the flight and she needed to decide whether to remove the passengers from the plane or not. The flight attendant ultimately determined that the suspicious-looking device was actually FAA approved, but then complained that Delta had tried to dispatch a plane with a potential explosive on board because they were more concerned about sticking to a time schedule than security. *Id.* The flight attendant's arguments were rejected, and summary judgment for the respondent was affirmed.

Similarly, in this case, a fight over how to solve a problem and whether a problem is being addressed in the manner the employee wants to address it is not whistleblowing. Madison wanted to terminate Kenco's relationship with ServiceMaster within weeks of being hired and showed no willingness to be collaborative or team-oriented in her compliance approach. Her zeal for food safety and sanitation issues came across to others as attacking, and Kenco had every right to ask Madison to relax her communication style while maintaining their commitment to the law.

While Madison may try to argue that she *believed* she was providing information to Kenco about violations of food safety laws when she said that ServiceMaster should be fired, such a belief would not be reasonable. From an objective perspective, it is apparent that Madison's findings and compliance recommendations were never a problem to Kenco; the problem was the way she communicated, in an overly loquacious and disorganized manner, and often with highly aggressive and poorly written emails. Madison did not have an objectively reasonable belief at any point in time that she was "whistleblowing" to Kenco because her disputes all stemmed from her own unreasonable behavior. *Norman Barnett v. Lattimore Materials, Inc.,* ARB Case No. 07-053, ALJ Case No. 2006-STA-038 (ARB. Sept. 22, 2008) (summary decision affirmed where there was no objectively reasonable belief that truck was unsafe so refusal to drive truck was not a protected activity). Kenco expected Madison to perform her job in a courteous manner and communicate appropriately with colleagues and outside parties. Madison failed to do so, and she has now attempted to twist Kenco's legitimate concerns over her unprofessionalism into an alleged whistleblowing of FSMA violations. Madison did not engage in a protected activity and her claim fails.

## 2. Madison's Alleged Protected Activity Was Not a Contributing Factor to Her Termination.

Assuming, *arguendo*, that Madison's disagreements with Kenco over her interactions with ServiceMaster could be construed as a protected activity, Madison nonetheless cannot establish a *prima facie* case of retaliation because her alleged complaints did not in any way contribute to the decision to terminate her.

Where the undisputed facts establish that an employee is terminated for their own performance issues, and not for any other reason, a whistleblower retaliation claim cannot proceed. *See In the Matter of Roderick A. Carter v. CPC Logistics, Inc.,* ARB Case No. 15-050, ALJ Case No. 2012-STA-061 (ARB. Dec. 22, 2016) (affirming summary decision where employee was terminated for his poor performance and failure to improve and not for any protected activity); *Rick Jackson v. Smedema Trucking, Inc.,* ARB Case No. 07-011, ALJ Case No. 2006-STA-036 (ARB. Sept. 30, 2008) (employee was terminated for falsifying logs and not for filing a complaint against employer, so summary decision was affirmed). Returning to Madison's employment history, Madison's alleged reporting of compliance issues did not cause her termination. In fact, her alleged knowledge of the food safety industry and ideas as to how bring the warehouse into compliance was the reason Kenco hired her, because the Company wanted to have at the warehouse a knowledgeable Quality Engineer who understood food-storage related regulations (SOF ¶ 3.)

When Madison sent an accusatory and rambling email, Walsh told Hise that they needed to keep trying to make it work and that "she is really too valuable for us not to try." (*See* Ex. 1 to Walsh Declaration.) If Walsh had not valued Madison's compliance knowledge and wanted to silence her from the purported whistleblowing, he would not have coached her for three months, placed her on a detailed PIP, spent two days discussing the PIP with her, and given her every

opportunity to improve her workplace communication skills (SOF ¶¶ 21-26.) Further, Walsh and Hise would not have hired an outside consultant, Tracie Clifford, to step in and assist Madison with understanding how to create a Quality Management System (SOF ¶ 15.) Madison was either unable or unwilling to make these adjustments, and that is the only reason she was terminated.

The ALJ's role is not to step in as super-personnel and second guess a company's business decision. An inquiry must be limited to whether Kenco honestly believed that it decided to terminate Madison purely for her performance problems, including her numerous hostile and ineffective communications. *See In the Matter of Robert Powers v. Union Pacific Railroad Company,* ARB Case No. 13-034, ALJ No. 2010-FRS-030, slip. op. *24 (ARB. Jan. 6, 2017) (affirming summary decision). Further, Madison was only employed for a brief period of time at Kenco, and the evidence shows that her performance was never meeting Kenco's expectations (SOF ¶¶ 2, 9, 30.) As a result, there is no link between any complaints and her termination because Kenco had the same frustrations with Madison's job performance throughout the ninety days she worked at Kenco.  Madison simply was not well-suited for a job that required higher-level communication skills. The evidence establishes that Kenco was trying to help her improve her performance from the very earliest days of her brief employment and terminated her only because her unsatisfactory job performance continued to go uncorrected.

## B. Kenco Would Have Terminated Madison Absent Her Alleged Protected Activity.

Madison cannot satisfy the *prima facie* showing to support a claim of retaliation under the FSMA, because her termination was solely based on her own poor communication skills and inability to synthesize information and work collaboratively with others. However, even if she could satisfy the *prima facie* case, her claim would still fare no better, because there is clear and convincing evidence that Madison would have been terminated, even absent any alleged protected

activity. Madison knows that the ability to communicate with colleagues and outside vendors was an important skill for the Quality Engineer at Kenco (SOF ¶¶ 5, 24, 26, 27.) While Madison may subjectively believe that her performance was excellent at all times, the undisputed facts establish that Madison was hostile, unclear and uncooperative in her communications with colleagues. Examples include:

- On May 22, 2013 Madison prepared and sent a threatening and aggressive communication to an outside vendor without seeking approval from her supervisors (SOF ¶ 8);
- On June 20, June 27 and June 28 as well as various other times throughout her employment, Madison sent long-winded copying and pastings of regulations to her supervisors which failed to give any practical advice about compliance (SOF ¶ 26);
- On June 20, 2013 Madison prepared a project plan with 499 excel lines when her supervisors were looking for a high level summary of important information (SOF ¶ 19);
- One June 28, 2013 Madison sent an email accusing Walsh of asking her to violate the law by "relaxing her standards" when Walsh had spoken to her about being less aggressive in her tone and style toward ServiceMaster and others (SOF ¶¶ 13-14.)
- On July 8, 2013, Madison received a Performance Improvement Plan giving her 30 days to correct her performance issues (SOF ¶ 22.) Shortly thereafter, Madison submitted a 16-page argumentative response to the PIP wherein she refused to be accountable for any of the performance issues that were brought to her attention (SOF ¶¶ 28-29.)
- On July 19, 2013 Madison sent an email to a third-party requesting information after the PIP had specifically instructed her to be collaborative with colleagues and seek their input before going to external parties. Madison routinely went around her supervisor and failed to seek his input or approval before giving directives, including to outside parties (SOF ¶ 25);

The evidence is clear and convincing that Madison would have been terminated for poor performance even if she had not engaged in any alleged protected activity. She was not successful in her role, because of her poor communication skills. *In the Matter of: Robert T. Evans v. T-Mobile, USA, Inc.,* ARB. Case No. 15-037, ALJ No. 2012-SOX-036 (ARB Feb. 27, 2017) (affirming summary decision where clear and convincing evidence established that employee lacked the skills his job required and therefore would have been terminated absent any protected activity). Just like in *Evans,* Madison lacked the communication and interpersonal skills required to be successful as a Quality Engineer.

Case: 18-1800     Filed: 08/01/2018     Document: 10-2     Pages: 320

Case: 18-1800　　Document: 10-2　　Filed: 08/01/2018　　Pages: 320

## CONCLUSION

The undisputed facts establish that Madison's termination from Kenco was unrelated to any alleged complaints under the FSMA. Madison's termination stemmed entirely from her poor communication skills and combative demeanor. In a period of less than ninety days, Madison alienated her supervisors on numerous occasions by refusing to involve them in communications with third-parties, and sending long-winded, inappropriate emails. When these legitimate performance concerns were brought to her attention via a detailed performance improvement plan, Madison failed to acknowledge any performance issues raised, and responded with the exact behavior that Kenco was trying to correct by sending a sixteen page, disorganized and accusatory response to the PIP, and failed to improve her performance. For all of these reasons, Madison's termination was unrelated to any purported whistleblowing under the FSMA, and her termination resulted entirely from her own poor judgment and communication skills.

WHEREFORE, for all the reasons stated herein, Respondent Kenco Logistics Services, LLC requests that its motion for a summary decision in accordance with 29 CFR §18.72 be granted and this matter be dismissed.

DATED: August 11, 2017　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　　KENCO LOGISTICS SERVICES, LLC

　　　　　　　　　　　　　　　　　　　　　By: _____
　　　　　　　　　　　　　　　　　　　　　　　　One of its Attorneys

Jody Wilner Moran
Julia P. Argentieri
Jackson Lewis P.C.
150 North Michigan Avenue
Suite 2500
Chicago, Illinois 60601
Telephone:     (312) 787-4949
Facsimile:     (312)787-4995

## CERTIFICATE OF SERVICE

The undersigned attorney, hereby certifies that on August 11, 2017, I submitted a copy of the foregoing ***Respondent's Motion for a Summary Decision*** via U.S. mail, fax and email to:

> U.S. Department of Labor, Office of Administrative Law Judges
> Attention: April Cook, Paralegal Specialist to Judge Sellers
> 36 E. 7th Street, Suite 2525
> Cincinnati, Ohio 45202
> FAX: (513)684-6106
> Email: cook.april@dol.gov

A copy was also sent via electronic and U.S. mail to:

> Attorney Jordan Hoffman, Counsel for Complainant
> 2711 E. New York Ave. Suite 205
> Aurora, IL 60502
> jthoffmanlaw@gmail.com

By: _____

One of the Attorneys for the Defendant

Case: 18-1800     Document: 10-2     Filed: 08/01/2018     Pages: 320

# EXHIBIT A

Case: 18-1800     Document: 10-2     Filed: 08/01/2018     Pages: 320

# EXHIBIT B

Case: 18-1800     Document: 10-2     Filed: 08/01/2018     Pages: 320

<center>

UNITED STATES
DEPARTMENT OF LABOR

</center>

| | |
|---|---|
| In the Matter of: | ) |
| | ) |
| MARY MADISON, | ) |
| | ) Case No. 2016-FDA-4 |
| Complainant, | ) |
| | ) |
| v. | ) |
| | ) |
| KENCO LOGISTICS | ) |
| | ) |
| Respondent. | ) |

<center>

## DECLARATION OF KELVIN WALSH

</center>

Under the penalty of perjury as provided by law, the undersigned certifies pursuant to 28

U.S.C. §1746 that the factual statements set forth below are true and correct to the best of his

knowledge, information, and belief:

1. I am a former employee of Kenco Logistics Services, LLC.

2. From April 2013 through June 2014 I served as General Manager of Kenco's warehouse services at the Manteno, Illinois Mars facility. The General Manager position is the highest local position for Kenco at the warehouse.

3. I interviewed and hired Mary Madison for the position of Quality Engineer and directly supervised Madison at all times during her employment.

4. Madison was provided onsite training by the Kenco Corporate Quality Department within the first days of her hire. Training encompassed an overview of the Kenco Quality Management System and expectations for execution. Training also included an overview of web-based resources which included tutorials, required compliance guidelines and general documents & formats.

5. As a Quality Engineer, Madison was expected to implement a Quality Management System for the Manteno, Illinois warehouse using Kenco's pre-existing model for procedures. The Quality Management System is a set of policies that ensures Kenco is compliant with applicable laws related to the industry. To carry out her work, Madison was expected to meet with managers to discuss various processes and procedures, receive information from

<center>1</center>

them and synthesize that information into a user-friendly, procedural-format which would be approved by the General Manager (myself) and used to train staff.

6. Throughout Madison's brief employment, she exhibited difficulty and ineffectiveness in her communication skills.

7. For example, rather than speaking to managers about various policies for the Quality Management System, Madison would regularly send lengthy regulations to managers via email and instruct them to comply with those regulations without giving them a roadmap for how to do so, which managers found confusing and not helpful.

8. Madison also frequently behaved in an aggressive manner in her interactions with me, other colleagues and third-parties. For example, without asking me to review a Memorandum of Understanding she prepared based on our meeting, she provided it to our sanitation vendor, ServiceMaster, abandoning a conciliatory approach to resolve issues, and including a sentence that could reasonably be construed as threatening ServiceMaster with litigation

9. Madison did not demonstrate an ability to synthesize information or give practical suggestions.

10. Madison had a confrontational and combative style of dealing with workplace problems; for example, she wanted to terminate Kenco's relationship with the third-party cleaning vendor, ServiceMaster within days of when she started working for Kenco because she did not think their cleaning was satisfactory.

11. A copy of pertinent email communications between myself, Madison, and other Kenco colleagues are attached as *Exhibit 1*, which are illustrative of the difficulties we had communicating with Madison.

12. While Madison often complained about ServiceMaster's cleaning services, at no time during her employment did I perceive her to be complaining about a violation of the Food Safety Modernization Act.

13. Kenco hired Madison for the specific purpose of bringing the warehouse into compliance with appropriate regulations and implementing quality systems and policies, so the fact that Madison tried to carry out her compliance responsibilities was not viewed as a complaint about regulatory violations.

14. It became clear that Madison was exhibiting difficulty performing basic job functions and was failing to communicate because of her inability to understand and produce any required documents for a pending audit with Mars as related to the Kenco Quality Management System. At that point, I advised my Manager (Paula Hise) that additional resources were needed to support Madison. Hise then authorized the expense for the hiring of an independent consultant named Tracie Clifford for the purpose of directing Madison and ensuring that the Quality Management System was developed and implemented correctly.

Case: 18-1800   Document: 10-2   Filed: 08/01/2018   Pages: 320

Clifford was one of the original architects of the Kenco Quality Management System and was a previous Quality Manager with Kenco.

15. Shortly after Clifford's arrival it was reported to me that Madison had not correctly prepared any portions of the Quality Management System and Madison did not appear to understand how to perform the basic job duties requested. It was further discovered that Madison was completely unaware of how to locate the Kenco Quality Management System web-based resources. Due to Madison's general lack of knowledge for the Kenco Quality Management System, Clifford began preparing the required documents herself while guiding Madison through every step. It was at this point where appropriate documents were finally produced and provided to me for review and approval.

16. On or about July 8, 2013 I gave Madison a performance improvement plan ("PIP"). A copy of this PIP is attached as *Exhibit 2*.

17. Madison submitted a sixteen page response to the PIP which is attached as *Exhibit 3*. Madison's response demonstrated to me her inability to understand the problems we were having with her employment, and in the 30 day period following the PIP, she did not improve.

18. At no time did I tell Madison not to follow the law.

19. My challenges with Madison, which resulted in the decision to discharge her three months after she started, stemmed from her continued inability to communicate effectively or accept constructive criticism about her communication style, which alienated colleagues and outside vendors, and became a time drain and rendered her work product ineffective.

20. Following Madison's termination Kenco hired Valerie Lilley as the Quality Engineer at the Manteno, Illinois site.

Further affiant sayeth naught.

_____
Kelvin Walsh

_8/11/17_
Date

4620-1973-4604, v. 2

# EXHIBIT B-1

# Memorandum of Understanding (MOU)

Pages: 320  Filed: 08/01/2018  Document: 10-2  Case: 18-1800

May 22, 2013

RE: Service Master Recap Meeting

To:    Timothy McGrath
       Brodie McGrath
       Kevin Moses
Cc:    Brian Davis
       Kelvin Walsh
       Will Schwerin

On or about May 21, 2013, a meeting ensued with Timothy McGrath, Brodie McGrath, Kevin Moses and myself relating to the services provided by Servicemaster Janitorial Services and Commercial Cleaning.

The meeting was called to review the scope of services provided by Servicemaster at the Kenco/Mars facility in Manteno, IL. The scope of the sanitation schedule checklist was reviewed, discussed and agreed upon it being the correct scope of work; while highlighting various line items with the aforementioned persons.

Some key talking points were, but were not limited to: The general conditions of the facility, the general conditions of the cleaning equipment used in the cleaning process, the inordinate amount of accrued dust on various fixed objects, spot washing of walls, cleaning the edges of the tiled floor with an edger of some sort as opposed to leaving it unclean, as well as, the cleaning the glass vestibule.

Additional key talking points were the expectations of the agreement of the scope of work to be performed as agreed upon, as well as, the implementation of corrective and preventative actions in the execution of the tasks at hand.

Moreover, it was also discussed that Quality Standards set forth by various regulatory agencies required the facility to be in total compliance with the aforementioned standards. Being a current part of the FDA mandates.

Again, the expectation is to fulfill each and every line item scoped in the sanitation schedule, as well as, maintain clean and sanitized cleaning equipment to prevent the spread of disease. Be it known as a matter of concern, that the goodwill and business reputation of Kenco/Mars can be adversely

KENCO 001734

Case: 18-1800   Document: 10-2   Filed: 08/01/2018   Pages: 320

affected and damaged by not fulfilling the current Quality Mandates and can result in serious illness and even death; therefore, prompting unwanted litigious exchanges. Consequently, in an effort to uphold food security and defense it is paramount that these maximums be adhered to and corrected.

In addition, please provide the standard work for each of your employees. This will entail the detail job description of their daily tasks. Please remit this within (3) three business days, as well as, the corrective and preventative action plan.

Last but not least, we appreciate the comments and concerns that were shared by with your regarding the volume of persons here in the facility vs. the manpower supplied to execute the program efficiently and effectively, as well as, the various past concerns, as it relates to conditions of the restrooms and biohazards associated with the restrooms.

It goes without saying that your service has been invaluable to the facility since its inception and we look forward to that continued service.

If there are any other questions, comments, or concerns, please feel free to contact me regarding them.

Sincerely,


Mary D. Madison
Quality Engineer
Kenco/Mars

KENCO 001735

Case: 18-1800    Document: 10-2    Filed: 08/01/2018    Pages: 320

EXHIBIT 4

May 24, 2013

Kenco Logistics Services
1125 Sycamore St.
Manteno, IL 60915

Attn: Mary Madison

Re: Memorandum of Understanding

Dear Mary,

This is in response to the MOU we received from you May 22, 2013. We thank you for meeting with us this week and pointing out your expectations regarding our housekeeping and sanitation services that ServiceMaster is providing for Kenco. It is now and always has been our desire and intention to work with you as partners and share the same concerns for your facility as you do. Since 1999 at the opening of your facility we have been there trying to provide all the services that have been asked of us. We are proud of our record and reputation at Kenco and in our community at large and as we are aware that no business is perfect we are willing and desirous to correct any deficiencies that might on occasion arise if given the opportunity.

You currently receive on a daily basis a performance report filled out by the housekeepers that describes the task being performed and the frequencies of these task. In addition I will include CLEANING DETAILS, HOUSEKEEPER/SANITIZER RESPONSIBILITIES, also a sample CLEANING QUALITY INDICATOR that we will perform monthly and return to you.

In response to our meeting we have discussed the areas of concern with our employees and have assigned specific responsibilities to address the glass, the garbage cans and the dusting of the ledges in the hallways. Our supervisor has already washed the walls in the hallways and some of the marks do not remove without damaging the paint. I would suggest that the wall washing be added to the schedule on a quarterly basis. As for the darkness of the grout on the edges of the hallway floors I would ask for some time to work on that as it requires special tools and chemicals.

Sincerely,
Tim McGrath

ServiceMaster Building Maintenance

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

## RE: Service Master

**Madison, Mary**

**Sent:** Thursday, May 23, 2013 8:41 AM

**To:** Davis, Brian

YEP, GOTCHA..... Realizing there relationship it is a definite given that have to "PIP" time; but honestly it is my belief they are not going to make, as they have not done anything any differently. Easy fix things like clean the glass!!!!!!!!!!!!!!! Dust!!!!!!!!!!!!!!!!!!. So, we have to be ready when Mars come for their audit in the next 45-60 days and............We are a little under the GUN!!

**From:** Davis, Brian
**Sent:** Thursday, May 23, 2013 8:23 AM
**To:** Madison, Mary
**Subject:** RE: Service Master

Easy now... give them an opportunity to improve and let's keep in mind they have a pretty long history with the site and that the previous 3PL may have operated with a different set of expectations; I'd like to keep the relationship in a "collaborative" mode more than a "confrontational" mode as much as possible. Let's make a solid effort to work with them to effect change first.

I will be up there during the first week of June sometime for a couple days. Let's give it a good effort to work with them to improve at least until then. In the meantime, please document, photograph, etc, any issues/concerns with their performance so that we have supporting data to use should we need to terminate the contract for cause.

**Brian Davis, CPSM**

Director of Procurement

Kenco Management Services, LLC

P. O. Box 1607

2001 Riverside Drive (37406)

Chattanooga, TN 37401

Phone: 423-643-3452

Mobile: 706-264-2815

brian.davis@kencogroup.com.

www.kencogroup.com

**From:** Madison, Mary
**Sent:** Thursday, May 23, 2013 9:12 AM
**To:** Davis, Brian
**Subject:** Service Master

Good Morning!!

It is my belief that they are seriously not interested in retaining their contract with us.  As to date, there has not been improvement in the areas discussed that could have been easily rectified.

So!!!!!!!!!!!

When you come, it is my belief that you will not be "skeered" to give them the real business of seeing the door!!

With sincerest thanks

Mary

KENCO 001738

# Walsh, Kelvin

| | |
|---|---|
| **From:** | Hise, Paula |
| **Sent:** | Friday, October 11, 2013 8:48 AM |
| **To:** | Walsh, Kelvin |
| **Subject:** | FW: Service Agreements |

Hi Kelvin,
I'm looking through my files now for any emails between me and Mary relating to instruction that was given by me. I think the email below falls into that category. I don't have a lot of documentation for a couple of reasons—1) I didn't want to undermine your authority as her direct supervisor, and 2) communicating with her via email became so difficult and labor intensive, that I tried to speak with her verbally in an effort to avoid dozens of lengthy emails.....

Paula Hise, CSCP
Vice President, Operations

Kenco Logistic Services
2001 Riverside Drive
Chattanooga, TN 37406
Cell: 423-290-3749
Email: Paula.Hise@Kencogroup.com

**From:** Paula Hise <Paula.Hise@kencogroup.com>
**Date:** Wed, 26 Jun 2013 08:26:42 -0400
**To:** "Madison, Mary" <Mary.Madison@Kencogroup.com>
**Subject:** Re: Service Agreements

Hi Mary,
We may have our wires crossed here. We assumed that you would draft a letter after your meeting with ServiceMaster to confirm the actions and timelines jointly agreed upon during the meeting. But before circulating the letter, please run it past Ann first.

Thanks,

Paula Hise, CSCP
Vice President, Operations

Kenco Logistic Services
2001 Riverside Drive
Chattanooga, TN 37406
Cell: 423-290-3749
Email: Paula.Hise@Kencogroup.com

**From:** "Madison, Mary" <Mary.Madison@Kencogroup.com>
**Date:** Tue, 25 Jun 2013 17:26:34 -0400
**To:** Paula Hise <Paula.Hise@kencogroup.com>
**Subject:** RE: Service Agreements

That's great a letter is being composed and it can be forwarded so that when we have the meeting it can be given out! We will meet with them on Thursday afternoon and it is hopeful that a plan of action can be implemented. Not exactly sure what can't be cleaned in the ten (10) day time frame, as a good majority of it has been launched.

1

Thank you kindly,

Mary Madison
Quality Engineer

Kenco/Mars
1125 West Sycamore Road
Manteno, IL 60950
815.468.4448
www.Kencogroup.com

This message and any attachments are intended only for the use of the addressee and may contain information that is privileged and confidential. If the reader of the message is not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. If you have received this communication in error, notify the sender immediately by return email and delete the message and any attachments from your system.

**From:** Hise, Paula
**Sent:** Tuesday, June 25, 2013 4:04 PM
**To:** Madison, Mary; Davis, Brian
**Cc:** Moses, Kevin; Walsh, Kelvin
**Subject:** Re: Service Agreements

Hi team,
Mary, I just ran into Brian in the hallway and we had a quick chat about this. Before sending any documentation to Servicemaster related to the outcomes of your pending meeting, let's run it by Ann first. It is always a good idea to have our legal counsel review any documentation when we are getting to a relatively serious point with a supplier.

Also, Kelvin and I also discussed the 10 day requirement on remediation. It may be that they won't be able to remediate every open item within 10 days. Our expectation from them should be a written plan, addressing our specific concerns with specific dates as to when each issue will be resolved. Hopefully, most will be within a 10 day period, but some items could take longer to remediate and we need to be open to that possibility.

Thanks,

Paula Hise, CSCP
Vice President, Operations

Kenco Logistic Services
2001 Riverside Drive
Chattanooga, TN 37406
Cell: 423-290-3749
Email: Paula.Hise@Kencogroup.com

**From:** "Madison, Mary" <Mary.Madison@Kencogroup.com>
**Date:** Tue, 25 Jun 2013 14:58:26 -0400
**To:** Brian Davis <brian.davis@kencogroup.com>
**Cc:** Paula Hise <Paula.Hise@kencogroup.com>, "Moses, Kevin" <Kevin.Moses@Kencogroup.com>
**Subject:** RE: Service Agreements

Hey Brian,

KENCO 001740

They have not done what was requested in the MOU.   We are in a quandary because we have the audit/review coming within the next 30 days.  Ms. Paula said to call them in again, review the matter again, give them a letter outlining that within ten (10) days they are to become totally compliant with the line items and sanitation issues.  The letter should also include, but not limit the termination of their contract if the line items are not fulfilled, as well as, their remediation not being limited to a price increase.

It is the belief here that the limit of ten (10) days should be extended, with no specific deadline date.  It is also the belief that although they have "been pencil whipping" and admittedly not doing what is required they should be given some direction on how to manage their business.  Suggesting that perhaps we should guide them on how to staff to meet the needs or provide a detail schedule.  It was also suggested that on a regular basis that the toilet is always stopped up and that precludes them from performing the assigned tasks on an ongoing basis.  It was also the belief a new vendor would repeat the same egregious acts.  It is also the belief that Mars audit will not encompass or focus on this aspect as the long standing relationship is a forbearance to this aspect.  It is also the belief that the depth of the scope of sanitation requirements are not the focus of Mars and nor had these expectations or understandings been discussed or presented previously to essentially warrant the attention being garnered.  It is believed that the scope of work to be performed had not been effectively and efficiently outlined to the vendor and that we should work with the vendor to better understand what is needed.  It is the belief that not being involved in the process has precluded the vendor from understanding the scope of work to be preformed.

The thought was that the vendor had been provided with the scope of work some years prior to the engagement about the services in May of 2013.  That the benchmark being used was the scope of work that they were previously engaged in prior to the acquisition.  That no new moratoriums had been imposed upon them.  The thought is that it is our fiduciary and ethical obligation to protect the interest of Kenco in ensuring that vendors provide the services they were hired to do and not allowing vendors to bill for services not rendered.  That it is also our responsibility to protect the stakeholders interest, without compromise; this includes, but is not limited to: Kenco, its internal and external customers, subsidiaries, and the customer(s), as well as, the goodwill associated with these bodies.  That it is not our responsibility to manage the scope of someone else's business, but to have the best interest of Kenco and Mars at the forefront by being in compliance with the current regulations. That the incremental cost associated with perhaps a new vendor would probably offset the cost of poor quality, as well as, the loss of intrinsic and extrinsic value associated with the lack of exercised due diligence. The thought was also expressed that sanctions and fines could arise from lack of compliance.

The thought was also expressed that in good consciousness there is no justification in failing to meet the outlined and prescribed rules and regulations.  That my thought specifically is not be found in an unjustifiable position.  That these requirements were outlined and agreed upon between Kenco and Mars through the onboarding of the Quality position, with the understanding that the necessary measures would be implemented to ensure compliance with Governmental Rules, as well as, Mars and Kenco.  Therefore, encompassing the governing rules, as well as, the business objectives of all parties.  In addition, that from my stance there would be no direct conflict to the governing rules and business objectives, as well as, to the requestors for compliance.  The thought was also expressed that if a deviation in the plan of action was to occur then the deviation must be conveyed, as well as, the assumption of responsibility for the decision being made.

Attached is a copy of the MOU sent to Servicemaster in May 2013.

Thank you kindly,

Mary Madison
Quality Engineer

Kenco/Mars
1125 West Sycamore Road
Manteno, IL 60950
815.468.4448
www.Kencogroup.com

This message and any attachments are intended only for the use of the addressee and may contain information that is privileged and confidential. If the reader of the message is not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. If you have received this communication in error, notify the sender immediately by return email and delete the message and any attachments from your system.

KENCO 001741

Pages: 320

Filed: 08/01/2018

Document: 10-2

Case: 18-1800

**From:** Davis, Brian
**Sent:** Tuesday, June 25, 2013 9:18 AM
**To:** Madison, Mary
**Subject:** RE: Service Agreements

Hi Mary,

I tried to call earlier.

What's going on with Servicemaster?

Brian Davis, CPSM
Director of Procurement

Kenco Management Services, LLC
P. O. Box 1607
2001 Riverside Drive (37406)
Chattanooga, TN 37401
Phone: 423-643-3452
Mobile: 706-264-2615
brian.davis@kencogroup.com
www.kencogroup.com

**From:** Madison, Mary
**Sent:** Monday, June 24, 2013 10:23 AM
**To:** Davis, Brian
**Subject:** RE: Service Agreements

Brian,

Please call me!  Need some direction on Service Master!

Thank you kindly,

Mary Madison
Quality Engineer

Kenco/Mars
1125 West Sycamore Road
Manteno, IL 60950
815.468.4448
www.Kencogroup.com

This message and any attachments are intended only for the use of the addressee and may contain information that is privileged and confidential. If the reader of the message is not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. If you have received this communication in error, notify the sender immediately by return email and delete the message and any attachments from your system.

**From:** Davis, Brian
**Sent:** Tuesday, May 21, 2013 11:35 AM

KENCO 001742

Mr. Brian,

Good Morning!

The reason for my request is, the services that ServiceMaster are providing is less than acceptable. Attached is a schedule of what is to be performed; however, to date, the condition of the parcel does not reflect this

The lawn on yesterday looked liked a grazing field of dead dandelions..............

A meeting has been called with them today and they will be here at 11:30 am.

There are ears that are listening with baited breath and to avoid conflict and ill will, my conversation was limited:)
Mary

KENCO 001743

## Walsh, Kelvin

| | |
|---|---|
| **From:** | Walsh, Kelvin |
| **Sent:** | Thursday, June 27, 2013 9:38 AM |
| **To:** | Davis, Brian |
| **Subject:** | RE: service master |

Thanks Brian,

Trying to get my hands around this now. Is it ok to share your outlined in red response with Paula?

**From:** Davis, Brian
**Sent:** Thursday, June 27, 2013 9:36 AM
**To:** Walsh, Kelvin
**Subject:** RE: service master

Please see attached, and whatever you do, please do not let Mary threaten the supplier with "litigious exchanges" again... the last thing we need is a lawsuit brought on by overzealousness...

**Brian Davis, CPSM**
Director of Procurement

Kenco Management Services, LLC
P. O. Box 1607
2001 Riverside Drive (37406)
Chattanooga, TN 37401
Phone: 423-643-3452
Mobile: 706-264-2815
brian.davis@kencogroup.com
www.kencogroup.com

**From:** Walsh, Kelvin
**Sent:** Thursday, June 27, 2013 10:01 AM
**To:** Davis, Brian
**Subject:** service master

Hi Brian,

Can you review the attached Memo compared to their contractual agreement? I want to ensure we are not holding them to standards outside of their scope of business.

Thanks,

**Kelvin Walsh**

1

KENCO 001744

Case: 18-1800    Document: 10-2    Filed: 08/01/2018    Pages: 320

GM

**Kenco Logistics Services**
1125 W Sycamore Rd
Manteno, IL 60950
www.kencogroup.com
Email: Kelvin.Walsh@Kencogroup.com
Office: 815-468-4476
Cell: 815-474-5971
FAX: 815-468-2468

KENCO 001745

Pages: 320

Filed: 08/01/2018

Document: 10-2

Case: 18-1800



1125 West Sycamore Road
Manteno, Il 60950
815.468.4448

June 27, 2013

ServiceMaster Clean
Timothy McGrath, Owner
253 S. Wall Street
Kankakee, Il 60901

Dear Mr. McGrath:

This scope of this letter is to recap and reiterate Kenco's previous disposition and expectations, as well as, referencing the meeting of today, June 27, 2013, whereby Timothy McGrath, Brodie McGrath, Kelvin Walsh and myself are in attendance, as a follow up the meeting on or about May 21, 2013, with Timothy McGrath, Brodie McGrath, Kevin Moses and myself relating to the services provided by ServiceMaster Janitorial Services and Commercial Cleaning, as well as, the Memorandum of Understanding (MOU) issued on or about May 24, 2013 regarding the services provided by you.

On or about April 25, 2013, ServiceMaster entered into a written agreement with Kenco Logistics to perform cleaning/janitorial services at the Kenco Manteno Facility located at 1125 W. Sycamore Rd., Manteno, Il 60950 (See Exhibit 1) based upon the proposal dated March 20, 2013 (See Exhibit 2). The agreement includes, but is not limited to: the scope of work to be performed, the fiduciary obligations, as well as, the general terms and conditions. Inferentially, this is the same scope of work provided to the facility under the previous management of 4T's. More specifically, the actual scope of work to be preformed is outlined on the 4T's management Sanitation Schedule. (See Exhibit 3).

As previously discussed, there seems to be a disconnect in the services allegedly being provided and those actually being provided. During our initial meeting the key talking points were The general conditions of the facility, the general conditions of the cleaning equipment used in the cleaning process, the inordinate amount of accrued dust on various fixed objects, spot washing of walls, cleaning the edges of the tiled floor with an edger of some sort as opposed to leaving it unclean, as well as, the cleaning the glass vestibule.

Additional key talking points were the expectations of the agreement of the scope of work to be performed as agreed upon at the inception of the agreement, as well as, through verbal acknowledgement and affirmation of this agreement in the May 21, 2103 meeting. Also, there was to be an implementation of corrective and preventative actions related to the execution of the tasks at hand.

Moreover, it was also discussed that Quality Standards set forth by various regulatory agencies required the facility to be in total compliance with the aforementioned standards. Being a current part of the FDA mandates.

Last but not least there was a reiteration of the meeting and the expectations outlined in the MOU dated May 24, 2013; coupled with a request for a corrective and preventative action plan.

To date much to our chagrin, the aforementioned discussed line items have not been remediated as promised in the responsive correspondence dated May 24, 2013 (See Exhibit 4) regarding the MOU dated May 22, 2103 summarizing the May 21, 2013 meeting.

The failure to remediate the aforementioned issues continues to be in breach of the contractual agreement between Kenco and ServiceMaster dated April 25, 2013. *The breach has occurred in respect to Line items 1, 6 and Exhibit A of the Service Agreement.*

Line Item 1 is as follows: Services–SERVICEMASTER will provide employees to work at customer's designated site, serving in a cleaning/janitorial capacity. Such individuals shall perform duties as mutually agreed between the parties Exhibit A task schedule. *Duties are not being performed as agreed upon on a regular and continual basis.*

Line Item 6 is as follows: Compliance with Laws and Regulations - The Parties shall at all times comply with all applicable federal, state, municipal and provincial laws, rules and regulations. *Failing to comply with line item 1 has inexplicably caused Kenco to be in direct violation of the current FDA and industry mandates regarding cleanliness and sanitation.*

*Furthermore, factually on a regular and continual basis documentation is provided by ServiceMaster and its employees asserting and affirming the completion of tasks performed.*

*Therefore, be it known as a matter of concern this continued egregious conduct is unacceptable and it must cease and desist immediately.* As the goodwill and business reputation of Kenco/Mars can be adversely affected and damaged by not fulfilling the current Quality Mandates and can result in serious illness and even death; therefore, prompting unwanted litigious exchanges. Consequently, in an effort to uphold food security and defense it is paramount that these maximums be adhered to and corrected.

Matter of fact, on or about June 22, 2013, Kenco personnel cleaned the front area including but not limited to: the front entrance glass, front area proper, locker room, hallways, men's bathroom, lunch room, scrubbed garbage cans, Walls (hallway, front, & break room), as a matter of exercise to

Consequently, within the next _____ days at the close of business the agreed upon scope of work is to be in full compliance with concurrently with the daily tasks. _____ initial

If the issues are not remediated at the close of the business day on July ____, 2013 the contract between Kenco and ServiceMaster will be immediately terminated for breach of contract. _____ initial

If the issues are remediated at the close of the business day on July ____, 2013 the contract will remain in force, with periodic random inspections being performed to ensure compliance. _____ initial

Remediation on a permanent basis can include, but be not limited to a price increase and/or additional manpower, as well as, a detailed corrective and preventative action plan to be followed to execute the remediation.

This document has been reviewed, along with the highlighted issues, expectations, an opportunity to ask questions has been afforded, a mutually agreed upon remediation date has been established, and a clear understanding of anticipated outcomes. Therefore, the information, terms and conditions set forth are understood and mutually agreed upon. _____ initial

This document has been read and understood. _____ initial

_____        _____
Kenco Representative                                          Date

_____        _____
ServiceMaster Representative                             Date

_____        _____
Witness                                                               Date

Cc: Paula Mire, Ann Jennings, Brian Davis, Kevin Moses

Pages: 320  Filed: 08/01/2018  Document: 10-2  Case: 18-1800

## Walsh, Kelvin

**From:** Walsh, Kelvin
**Sent:** Sunday, June 30, 2013 7:21 PM
**To:** Hise, Paula
**Subject:** RE: Disposition of MOU

All I can say is I'll keep trying with her. She is really too valuable for us not to try. It's a good thing I have thick skin.. LOL..

Thanks,

**From:** Hise, Paula
**Sent:** Sunday, June 30, 2013 12:59 PM
**To:** Walsh, Kelvin
**Subject:** FW: Disposition of MOU

I'm just keeping you in the loop. All I can say, is that we need to keep an eye on that 90 day introductory period window. I hate to go there this early in the game, but man, she is wearing us out....

Paula Hise, CSCP
Vice President, Operations

Kenco Logistic Services
2001 Riverside Drive
Chattanooga, TN 37406
Cell: 423-290-3749
Email: Paula.Hise@Kencogroup.com

**From:** Paula Hise <Paula.Hise@kencogroup.com>
**Date:** Sun, 30 Jun 2013 13:57:01 -0400
**To:** "Madison, Mary" <Mary.Madison@Kencogroup.com>
**Subject:** Re: Disposition of MOU

Mary,

I understand and appreciate your position, and am grateful for your passion on the subject – truly. I firmly believe that we are all (you, me, Brian Davis, Kelvin, the site management staff) on the same team and we have the same goals and objectives, although the way we pursue those goals and objectives might be a bit different. Further, everyone is coming at it from different perspectives – Brian, from a risk management and supplier management perspective, Kelvin and I from an operational perspective, and you, from the Quality perspective. I'm confident that we will get to where we need to be. But what we have to do is work together as a team, understanding that as GM, Kelvin is ultimately responsible for the overall facility operations, feel confident that we can voice our different opinions to one another, but then move forward together to execute the agreed upon direction. No one is, or should be asking you, to relax your standards on cleanliness. All we are asking is that we modify the approach with which we work with ServiceMaster. Part of our guiding principles is that we "Cultivate mutually beneficial partnerships with customers, associates and suppliers". So, we want to protect a supplier relationship if we can.

We are both so busy – if you are still concerned about our direction in this area, then let's me, you and Kelvin get on the phone to discuss. We can accomplish in a short call much more than we can accomplish in sending lengthy emails.

Thanks,

1

Paula Hise, CSCP
Vice President, Operations

Kenco Logistic Services
2001 Riverside Drive
Chattanooga, TN 37406
Cell: 423-290-3749
Email: Paula.Hise@kencogroup.com

**From:** "Madison, Mary" <Mary.Madison@Kencogroup.com>
**Date:** Fri, 28 Jun 2013 18:02:06 -0400
**To:** Paula Hise <Paula.Hise@kencogroup.com>
**Subject:** RE: Disposition of MOU

Absolutely, that is no problem, as we have a spread sheet already that is used as a part of their daily routine and the exact sheet can be dated back to 2010 from the retained records. The spread sheet itemizes each and every area and what is to be done. Prior to Kevin and I having the meeting and issuing the MOU, the contract was gotten from Brian and reviewed to make sure that the scope of work being discussed was accurate. Kelvin specifically said on yesterday that we were forcing them to do something other than what was outlined in the scope of work agreed upon. He indicated that this information was given to him a few days ago from Brian Davis based upon the infractions listed on the MOU issued. My question was to get clarification on how ServiceMaster has been forced to perform the duties as agreed, as to be compliant with basic health and safety rules to prevent the spread of disease and contamination. As shared with Kelvin, the scope of work to be preformed has not been changed or altered from what was being performed prior to the acquisition.

We are merely discussing basic health and sanitation rules and principles. The general populous of people here are in an at-risk class for communicable disease. The cleanliness of the restrooms, garbage cans, and eating areas are below par. In addition, Kelvin stated that the standards should be relaxed relating to what is required for compliance as that is not Mars focus.

My concern progressively arose out of being asked to relax my standards to accommodate the current state of affairs and to quintessentially document things in fashion that will achieve these results. First, this has taken me aback that it would be asked of me to do such a thing when it is so simple to just do the correct thing, the correct way, the first time. In addition, continually suggesting to me that my understanding of what to be done is not correct, as the plan of action has been modified, despite direct verbal and written instructions regarding the same matter. Assuring me that this plan of action to deviate from the mandated rules has been corroborated without exception. When resistance and/or reluctance shown about the potential results of being disobedient from jeopardizing the health and welfare of the associates, to being fined and sanctioned by the governing body (FDA) or at the extreme end fatalities to the facility being closed down. From there other methodologies of persuasiveness were used such as, but not limited to: that full responsibility would be taken by him, if something occurred and that there would be no repercussions to me for not following the rules. Not having much faith in the fact that one would be absolved from the matter and most of all diminishing one's integrity to believe someone who would be willing to place themselves in such a predicament to not follow, or better yet enforce someone to do what they are required to do has left me in a quandary.

After preparing to meet with them, despite the fact that there has been no improvement since the original meeting, less than (2) hours before the meeting an email is sent to me to cancel the meeting. ServiceMaster nor myself were aware and at the appointed meeting time, it is stated that the meeting is canceled and in lieu of the meeting he would speak to me. During this meeting, now it is told to me that actually they (1) we were forcing them to do things outside the scope of work to be preformed and now we were in breach of the agreement, per Brian Davis, and my these actions were causing a problem. Requesting that they use clean equipment in the cleaning process was in violation of the agreement, as it did not call for clean equipment. That we were forcing them to uphold Federal Regulations that relate to sanitation because they never were aware of them. Amongst some other highlighted items in red from the response from Brian that he recently got regarding the MOU dated 5/22/2013. In my limited understanding, one cannot use dirty, no filthy, cleaning utensils to clean up. This filth breeds and spreads germs and bacteria; therefore, becoming a health concern. More specifically, the purpose of cleaning and sanitizing is to retard and reduce the spread of germs. This is a prerequisite for food safety, public health, and pretty sure of condition of the terms of agreement with Mars.

2

KENCO 001749

Case: 18-1800   Document: 10-2   Filed: 08/01/2018   Pages: 320

Additionally, the Federal rules have always existed and are the precursors to the state rules, these rules have been enforce since 1938 regarding food safety. Furthermore, as stated it is not the position of the company to assume the role of managing ServiceMaster's business, if that being the case this whole process can be managed in-house. In addition, not wanting to held be responsible for issuing advice to ServiceMaster and being held accountable for their interpretation in the event that there is another deviation.

It was also shared that the risk involved in this kind of decision making was very great and it did not prove prudent to be in blatant disobedience and my vehement unwillingness to participate in this type of behviour. It is mind boggling that someone would not have any mind for themselves and others to extend themselves for someone who has exhibited substandard practices; specifically, a discussion ensued over a month age. Kelvin called them on Monday night and this is what the place looked like Thursday morning the same day they were coming. Reallyl Ok, not to mention that during this whole exercise, it was discovered that ServiceMaster has been saying that they clean the Co-Pack offices as agreed and according to John Gaughan, GM for Co-Pack in the past four (4) years they have not preformed those services. See attached. The records date back to 2010 for the sanitation records. When these documents were being scanned, someone came and took them off, as they were reading them, I walked up and began looking for my documents and they said "are these yours" and "I said yes"! My hand was held out and they said "let me keep looking so I can make sure they are yours"!. They sit directly in front of the scanner.

Last, but not least it is realized that there are a lot of things that we cannot get done before the impending audit and review, but from my limited perspective, it is my strongest belief that we can accomplish such a rudimentary task of cleaning the place up, especially when it is an outside vendor. The mentality of the people here is that yeah, Kenco may have bought it; but its just the same, no different, same management. The people here are the assets as well and they do not deserve deplorable conditions; in addition, if they are sick they can not come, if they do not come we do not have an adequate workforce. They blame it on the people, but the old adage is what you put out is what you get back! So, they think its crap, they think they are thought of as crap, and therefore, they treat it like crap! Finally, understandably, we cannot do everything, but what's wrong with doing the things that can be done? Why would we not want Mars to see a marked difference in the facility, as that is a very easy and achievable goal. It would be so different, if we could not achieve it, but because of some unknown reason that is in stark contrast to the very guidelines of our operation. It is almost like sabotage. There are numerous things that can be done with no real effort. I've said all this to say, you are to far away for Manteno to be gone wild!!!!!!!!

Thank you kindly,

Mary Madison
Quality Engineer

Kenco/Mars
1125 West Sycamore Road
Manteno, IL 60950
815.468.4448
www.Kencogroup.com

This message and any attachments are intended only for the use of the addressee and may contain information that is privileged and confidential. If the render of the message is not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. If you have received this communication in error, notify the sender immediately by return email and delete the message and any attachments from your system.

From: Hise, Paula
Sent: Friday, June 28, 2013 11:58 AM
To: Madison, Mary; Davis, Brian
Cc: Walsh, Kelvin
Subject: Re: Disposition of MOU

KENCO 001750

Pages: 320    Filed: 08/01/2018    Document: 10-2    Case: 18-1800

Hi Mary,

Here would be my suggestion for closing this issue. I do not believe that any correspondence, other than your MOU, has been sent from Kenco to ServiceMaster documenting any infractions. With that said, I believe you have a copy of the Kenco contract with ServiceMaster? If not, you can obtain one from Len, who should have a copy of it. I would suggest that you create a simple spreadsheet, column A defines what services they are currently obligated to perform. Column B should be the services that we want to them to perform. Once you have that on paper, then let's the 3 of us get together for a quick call to review and make sure we are all in agreement. Then we can provide that document to ServiceMaster and they can evaluate what any additional costs may be.

Sound okay?

Paula Hise, CSCP
Vice President, Operations

Kenco Logistic Services
2001 Riverside Drive
Chattanooga, TN 37406
Cell: 423-290-3749
Email: Paula.Hise@Kencogroup.com

From: "Madison, Mary" <Mary.Madison@Kencogroup.com>
Date: Fri, 28 Jun 2013 10:34:38-0400
To: Brian Davis <brian.davis@kencogroup.com>
Cc: "Walsh, Kelvin" <Kelvin.Walsh@Kencogroup.com>, "Walsh, Kelvin" <Kelvin.Walsh@Kencogroup.com>, Paula Hise <Paula.Hise@kencogroup.com>
Subject: Disposition of MOU

Good Morning!

Brian,

On yesterday, Kelvin shared with me that, within recent days, a response was generated to him by you in regards to a MOU that was date 5/22/2103 to ServiceMaster; whereby, it was stated that you acknowledged that the MOU inference a breach of agreement (contract) with ServiceMaster by causing them to perform work outside the scope of the agreement that you signed with them on April 25, 2013. Some of the items referenced in your response were the general conditions of the cleaning equipment used in the cleaning process (that the equipment used in cleaning did not have to be clean and sanitary), that because they were not given the rules of cleaning and sanitation they were being forced to meet an expectation that they had no knowledge of, that they were being forced to clean walls and glass outside the prescribed time frames outlined, as well as, a few other line items that cannot be recalled or were not discussed in-depth.

To promptly ensure that they are not continually forced to perform work outside the scope of what was agreed upon, would you please be kind enough to forward a copy of the correspondence that specifically outlined these infractions; that they may be readily corrected according to the interpretations stated to Kelvin by you, as well as, the agreed upon scope of ServiceMaster's work. As previously stated to Kelvin, it was not my desire to place the company in a compromising position of compelling vendors through coercive measures to perform work outside the agreed upon scope.

In addition, if you would be kind enough to help me come up to speed on the proper interpretation of the agreed upon work it would be appreciated, as it would be a travesty, as well as, a waste of productivity and resources to continue to belabour issues that are not merited; while simultaneously placing the company in unnecessary precarious situations.

Your feedback is welcomed!

4

Thank you kindly,

Mary Madison
Quality Engineer

Kenco/Mars
1125 West Sycamore Road
Manteno, IL 60950
815.468.4448
www.Kencogroup.com

This message and any attachments are intended only for the use of the addressee and may contain information that is privileged and confidential. If the reader of the message is not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. If you have received this communication in error, notify the sender immediately by return email and delete the message and any attachments from your system.

Case: 18-1800     Document: 10-2     Filed: 08/01/2018     Pages: 320

5

KENCO 001752

Pages: 320    Filed: 08/01/2018    Document: 10-2    Case: 18-1800

| From: | Davis, Brian </o=kenco/ou=exchange administrative group (fydibohf23spdlt)/cn=recipients/cn=brian.davis> |
|---|---|
| To: | Madison, Mary </o=kenco/ou=exchange administrative group (fydibohf23spdlt)/cn=recipients/cn=mary.madison> |
| Cc: | Walsh, Kelvin </o=kenco/ou=exchange administrative group (fydibohf23spdlt)/cn=recipients/cn=kelvin.walsh>; Walsh, Kelvin </o=kenco/ou=exchange administrative group (fydibohf23spdlt)/cn=recipients/cn=kelvin.walsh>; Hise, Paula </o=kenco/ou=kls/cn=recipients/cn=paula.hise> |
| Bcc: | |
| Subject: | RE: Disposition of MOU |
| Date: | Fri Jun 28 2013 13:57:20 EDT |
| Attachments: | |

Hi Mary,

When we transitioned the site from 4T's to Kenco, the intent was to keep the janitorial service the same as it had been with 4T's. All the information I had at the time indicated that there had been no historical problems with the janitorial service and that Mars was satisfied with the service.

Now, if it is necessary to make changes to the level of service or to the performance expectations we require from the supplier, or it is deemed necessary to better define the current requirements, we certainly can renegotiate the agreement. Please understand that renegotiation of the agreement would most likely result in increased costs for the services in proportion to any increased level of service, etc. and presumably those would need to be explained to the customer and approved or absorbed by the site.

Once you have the changes to the agreement defined, and Kelvin and Paula are in agreement, please let me know and I will approach the supplier with them and renegotiate the agreement as needed.

Thanks,

Brian Davis, CPSM

Director of Procurement

Filed: 08/01/2018    Pages: 320

Case: 18-1800    Document: 10-2

Kenco Management Services, LLC

P. O. Box 1607

2001 Riverside Drive (37406)

Chattanooga, TN  37401

Phone: 423-643-3452

Mobile: 706-264-2815

brian.davis@kencogroup.com

www.kencogroup.com


From: Madison, Mary
Sent: Friday, June 28, 2013 10:35 AM
To: Davis, Brian
Cc: Walsh, Kelvin; Walsh, Kelvin; Hise, Paula
Subject: Disposition of MOU


Good Morning!

Brian,

On yesterday, Kelvin shared with me that, within recent days, a response was generated to him by you in regards to a MOU that was date 5/22/2103 to ServiceMaster; whereby, it was stated that you acknowledged that the MOU inference a breach of agreement (contract) with ServiceMaster by causing them to perform work outside the scope of the agreement that you signed with them on April 25, 2013. Some of the items referenced in your response were the general conditions of the cleaning equipment used in the cleaning process (that the equipment used in cleaning did not have to be clean and sanitary), that because they were not given the rules of cleaning and sanitation they were being forced to meet an expectation that they had no knowledge of, that they were being forced to clean walls and glass outside the prescribed time frames outlined, as well as, a few other line items that cannot be recalled or were not discussed in-depth.

To promptly ensure that they are not continually forced to perform work outside the scope of what was agreed upon, would you please be kind enough to forward a copy of the correspondence that specifically outlined these infractions; that they may be readily corrected according to the interpretations stated to Kelvin by you, as well as, the agreed upon scope of ServiceMaster's work.  As previously stated to Kelvin, it was not my desire to place the company in a compromising position of compelling vendors through coercive measures to perform work outside the agreed upon scope.

In addition, if you would be kind enough to help me come up to speed on the proper interpretation of the agreed upon work it would be appreciated, as it would be a travesty, as well as, a waste of productivity and resources to continue to belabour issues that are not merited; while simultaneously placing the company in unnecessary precarious situations.

Your feedback is welcomed!

Thank you kindly,

Mary Madison

Quality Engineer

---

Kenco/Mars

1125 West Sycamore Road

Manteno, IL 60950

815.468.4448

www.Kencogroup.com

This message and any attachments are intended only for the use of the addressee and may contain information that is privileged and confidential. If the reader of the message is not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. If you have received this communication in error, notify the sender immediately by return email and delete the message and any attachments from your system.

**Walsh, Kelvin**

| | |
|---|---|
| **From:** | Madison, Mary |
| **Sent:** | Thursday, July 04, 2013 12:19 AM |
| **To:** | Walsh, Kelvin |
| **Subject:** | RE: BCP- |

Bringing to your remembrance when we were speaking, it was discussed that a BCP is a plan of action in the event a disaster happens what would you do? How will you mitigate the disaster? Identifying the components of the business and the economic impact of each. Who are the key persons? The information was provide so that you could have the best picture of what is being asked; Not having a handle on the business and its dynamics disallows a full picture for me. Thank you kindly,

Mary Madison
Quality Engineer

Kenco/Mars
1125 West Sycamore Road
Manteno, IL 60950
815.468.4448
www.Kencogroup.com

This message and any attachments are intended only for the use of the addressee and may contain information that is privileged and confidential. If the reader of the message is not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. If you have received this communication in error, notify the sender immediately by return email and delete the message and any attachments from your system.

From: Walsh, Kelvin
Sent: Wednesday, July 03, 2013 4:53 PM
To: Madison, Mary
Subject: RE: BCP-

Mary,

I really don't have time to go through this. Please summarize.

From: Madison, Mary
Sent: Thursday, June 27, 2013 11:48 AM
To: Walsh, Kelvin
Subject: RE: BCP-

Hope this helps!
Business continuity planning provides a quick and smooth restoration of operations after a disruptive event. Business continuity planning is a major component of risk management. Business continuity planning includes business impact analysis, business continuity plan (BCP) development, testing, awareness, training, and maintenance.
A business continuity plan addresses actions to be taken before, during, and after a disaster. A BCP spells out in detail what, who, how, and when. It requires a continuing investment of time and resources. Interruptions to business

KENCO 001756

Case: 18-1800    Document: 10-2    Filed: 08/01/2018    Pages: 320

functions can result from major natural disasters such as tornadoes, floods, and fires, or from man-made disasters such as terrorist attacks. The most frequent disruptions are less sensational— equipment failures, theft, or employee sabotage. The definition of a disaster, then, is any incident that causes an extended disruption of business functions. Traditionally, disaster recovery planning has focused on computer systems. Because mission-critical functions inevitably depend on technology and telecommunications networks, rapid recovery of these is of little value without also recovering business unit operations. Mainframe and minicomputer systems usually have reliable recovery plans. Today, however, many critical applications have migrated to distributed, decentralized environments with less rigid controls. Recovering functional processes includes more than just information systems—consideration needs to be given to such items as 800 and long distance service, locations for employees to work, the salvage of building contents, and so forth.

As with an insurance policy, it is hoped that a business continuity plan is never needed for a real disaster. Keep in mind that a BCP not maintained can be worse than no plan at all. An agency's ability to recover mission-critical processes, resume operations, and eventually return to a normal business environment can be considered a major asset. Thorough planning can reduce liability, disruption to normal operations, decision making during a disaster, and financial loss. And equally important to state government, it can provide continued goodwill and service.

Determining Scope and Readiness
The purpose of this section is to determine what information is needed to begin business recovery planning, and how to determine the scope of the planning effort based on this information.
The commitment of management is essential for the business recovery effort to succeed. Management commitment can be recognized when • A sound impact analysis is funded, the results of which are read, understood, and acted on by management deciding to use a strategy based on likely impacts to the organization.
• Comprehensive planning involves all program and technical management's clear accountability for the continuation of the areas that they manage. The effort culminates in a written plan that is specific, credible, and candid regarding its constraints, weaknesses, and vulnerabilities.
• An ongoing exercise and maintenance program is developed that ensures the viability of the BCP.
A practical approach is one that plans for the worst-case-scenario—including:
• Loss of access to the facility,
• Loss of access to information resources (systems, networks, data), and • Loss of skilled or key personnel who perform critical processes.
Just about any event could result in these losses. A practical plan is based on the input analysis, which details the element of recovery by priority and timeframes. This approach provides procedures for dealing with less devastating events as well as "smoke-and-rubble" disasters.

Most recoveries focus on the most critical functions by • Moving selected personnel to an alternate facility.
• Using alternate information resources and other office equipment.
• Repairing/replacing equipment or making minor repairs to the home site.
• Returning to the home site in a fairly short time.
4

The organization cannot meet its mandated missions without its support functions. Recovery must involve the entire organization—facilities, administration, accounting, information systems, personnel, and most importantly, the business functions that perform the missions. All functions must interact with each other for optimum recovery.
The business recovery process includes determining critical functions, identifying the available resources, establishing the level of support needed, and determining the methods to be used.

KENCO 001757

Case: 18-1800     Document: 10-2     Filed: 08/01/2018     Pages: 320

The parallel between the business recovery planning effort and other business planning efforts is useful to all managers who are called on to contribute to the business recovery effort.
• From a business perspective, management must be aware that the effort can contribute something to the organization that would not be possible otherwise.

Thorough planning, for example, can provide management with a complete picture of the organization's processes and their dependences.

• Projects proceed with a careful analysis of needs.
• With analysis complete, the design is created.
• When the design is approved, resources are committed to develop the product. Costs must be clearly defined.
• Upon completion, testing performance and integrating changes refines the product.
• Support and maintenance tasks keep the product current and relevant to the business.
An effective method for developing the scope of the plan is to focus recovery efforts on the major mandates of your organization. Each business recovery plan should provide action steps to recovery from • Loss of physical or electronic access to computer centers, information resources, offices, or multi-use facilities maintained by the state agencies and resources therein.
• Loss of key information needed for the organization to function.
• Loss of key personnel involved in any business function, use of information resources, or the decision-making function, which could have intolerable impacts if not recovered in a determined amount of time.
• Testing and maintenance of the recovery process reflecting the inevitable changes in growth and functionality of the organization.
Performing a readiness audit determines how prepared an organization is to respond to a disaster. The readiness audit differs slightly from risk assessment/analysis. The audit determines what resources are already available for use in the business recovery

planning effort and what resources are missing, rather than determining threats to assets and subsequent frequency and severity of threat.
specific responsibilities for
information resource asset ownership, custodian, and user responsibilities. Business recovery, a key component of asset protection, requires responsibilities significantly different from those of the information security function. The following guidelines for business recovery outline the roles and responsibilities associated with the planning activities.
The coordinator chosen to lead or manage business recovery planning needs to be familiar with all of the agency's business functions and be able to cross the organizational and budgetary lines. Assigning the Information Resources Manager (IRM) to the role of business recovery coordinator may or may not be the appropriate choice.
Executive Management
The agency head must assure that the agency's resources and information assets are protected, including planning for recovery from the effects of damage or destruction. The agency head is responsible for establishing and maintaining a business recovery planning program within the agency and appointing appropriate personnel to administer information resource and business recovery planning.
Typically, heads of agencies are responsible for the following:
1.    Enforcement of state-level disaster recovery and business recovery policies.
2.    Establishing and maintaining a business recovery program, including an impact analysis process that identifies critical business processes.
3.    Establishing and maintaining internal policies and procedures that provide for the recovery of personnel, information technology, facilities, software, and equipment, and the business functions that they enable.
4.    Assigning program managers to administer business unit and information resources recovery responsibilities for all critical business unit and information resources within the agency.
5.    Ensuring the preparation and maintenance of the agency's business recovery plan for the continuation of critical business functions and information support services in case of a disaster.

KENCO 001758

6.   Ensuring agency compliance with the DIR standards by describing disaster recovery requirements in the agency strategic plans in accordance with business objectives

7.   Ensuring agency compliance with state information systems audit requirements.

8.

8                                    Business Continuity Planning Guide | Business Recovery Responsibilities

Ensuring participation at all necessary levels of management, administrative, and technical staff during the planning, development, testing, modification, and implementation of disaster recovery and business recovery policies and procedures.

## Program Management

Agency program managers have ownership responsibility and management authority for the personnel, information assets, equipment, and property used in fulfilling the goals of the program(s) under their direction.

Program managers need to work in cooperation with the agency business recovery coordinator, acting on behalf of the agency head, for the purpose of recovery of all critical business functions and information resources within the agency. Program managers should assign custody of program assets to appropriate staff and ensure the staff is provided appropriate direction to implement the defined procedures.

Typically, program managers should

1.   Define the specific processes and resources that need to be in place to minimize the impact of interruption; assign responsibilities.

2.   Participate in the agency's impact analysis process to identify business functions required by law or otherwise critical to the mission of the agency.

3.   Ensure participation between the program staff, technical staff, and the business recovery coordinator by identifying and selecting appropriate, cost-effective strategies and procedures to recover business functions and information assets.

4.   Ensure the proper planning, development, and establishment of recovery policies and procedures for all files or data bases supporting critical functions for which the program has ownership responsibility, and for physical assets assigned to and located in program area(s).

5.   Formally assign custody of program assets to appropriate managers and ensure direction is provided to implement the defined recovery plans, strategies, and procedures.

6.   Establish all recovery procedures necessary to comply with these guidelines for recovery of critical agency missions, which would have intolerable impacts on the state if lost.

7.   Ensure contractual agreements exist, based on impact analysis, for recovery of the state's mission-critical business functions and information resources, where technical services are outsourced to another agency or private firm.

Program managers are accountable for recovery of their business functions. Recovery planning should become a part of their unit goals and performance evaluation.

## Technical Management

Technical managers have a role in business recovery. Technical managers include Information Resource Managers (IRMs), data processing directors, data center managers, and network directors. These individuals have custodial responsibilities, provide information services, and have oversight or support responsibility for information resource assets that support business functions.

4

Typically, technical managers need to

1. Provide the necessary technical support services to define and select cost-effective recovery strategies, policies, and procedures.
2. Ensure the development and documentation of recovery strategies and procedures for critical business functions as defined by the owners of the information.
3. Develop and implement adequate backup and recovery procedures for all critical data and software in the facility.
4. Implement and maintain a recovery plan for information resources resumption in cooperation with agency management, the business recovery coordinator, program managers, custodians, and the assigned owners and users.
5. Monitor the recovery testing and develop the reports and reporting procedures in accordance with the requirements of the DIR, program areas, and auditors.
6. Coordinate the business functions to identify the information resources (facilities, personnel, data, voice communications, equipment) required to support the IR-dependent processes for mission-critical needs.

This can be based on the resource dependencies analysis.

7. Identify, evaluate, and arrange for the acquisition of alternative information resources and recovery services as required to recover the critical business functions as a custodial role.
8. Develop appropriate information resource recovery strategies based on the results of the analysis and business process study.
It is recommended that recovery planning become part of technical managers' goals and performance evaluations if those managers provide technical support of critical business functions.
Business Recovery Coordinator
In many agencies, recovery planning is assigned as a sub-function of another full-time position within the organization. However, assignment of the duties is significant

10          Business Continuity Planning Guide | Business Recovery Responsibilities

because of the function's unique and critical nature. The function crosses organizational and budgetary lines. It combines business and technical information roles and responsibilities and is critical to the continuation of the agency's mission.
Assignment of business recovery responsibility includes authority from the agency head to act as a liaison between program management and technical management for the purpose of recovery planning. The function should be positioned on the agency organization chart with direct access to the executive office, as is the internal auditor.
Planning as a full-time assignment may be justified, depending on the size and complexity of the organization, and the importance of the agency's mission to the state.
The primary focus of the business recovery coordinator is to oversee a viable and tested business recovery plan that demonstrates to management the agency's ability to continue critical business functions following a disruption of services. Maintenance of the plan is ongoing, reflecting changes in the agency and its mission. Testing is conducted regularly to ensure the viability of the plan. Training also occurs on a regular basis to assure agency-wide awareness of the business recovery function.
Typically, the business recovery coordinator
1. Coordinates the planning activities of team members.
2. Develops an initial budget and informs senior management of any changes.
3. Oversees the identification and review of critical tasks that are essential during recovery, based on input from program and technical management in the business impact analysis process.

5

4.    Establishes an ongoing training program to promote agency-wide awareness of the recovery function.
5.    Establishes a timetable for regular review and updating of plans, resources, and procedures to ensure that changes to critical procedures, functions, and documentation are reflected in the plan.
6.    Coordinates monthly, quarterly, semi-annual, and annual testing of the plan as needed, reporting results to management.
7.    Establishes a standards program that ensures changes to critical procedures, functions, and documentation are reflected in the plan. Assures that contact is maintained with all personnel as necessary to keep recovery support considerations current.
8.    Maintains contact with vendors to assure support during a recovery effort.
9.    Acts as a liaison for contingency planning issues between information resources and other business units, including auditing.
10.   Meets regularly with recovery teams to review responsibilities required during a recovery effort.
11.   Maintains contact with city, county, state, and federal emergency organizations that may be involved during a recovery effort.


12.


Provides input, support, and coordination to other departmental areas for projects that relate to contingency planning (e.g., updating documentation, creating procedures, evaluating security systems).
13.   Researches, evaluates, and recommends internal and external solutions to business recovery problems.
14.   Maintains contracts for alternate facilities and/or services.
15.   Provides input for performance reviews of contingency planning staff.
The recovery coordinator's role is coordination with and among program and technical managers. These managers implement and carry out the recovery.


Thank you kindly,

Mary Madison
Quality Engineer

Kenco/Mars
1125 West Sycamore Road
Manteno, IL 60950
815.468.4448
www.Kencogroup.com<http://www.kencogroup.com/>

This message and any attachments are intended only for the use of the addressee and may contain information that is privileged and confidential. If the reader of the message is not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. If you have received this communication in error, notify the sender immediately by return email and delete the message and any attachments from your system.


From: Walsh, Kelvin

KENCO 001761

Sent: Wednesday, June 26, 2013 1:46 PM
To: Madison, Mary
Subject: RE: BCP-
Hi Mary,

I'm not really familiar or understanding what is being asked.

From: Madison, Mary
Sent: Monday, June 17, 2013 11:41 AM
To: Walsh, Kelvin; Schwerin, William
Cc: Madison, Mary
Subject: BCP-

Good Day!

Please find the attached form for the completion of the Business Continuity Plan. Please review and fill out the information that is needed and/or the point person for that information. Please review and return as soon as possible. Thank you kindly,

Mary Madison
Quality Engineer
_____
Kenco/Mars
1125 West Sycamore Road
Manteno, IL 60950
815.468.4448
www.Kencogroup.com<http://www.kencogroup.com/>

This message and any attachments are intended only for the use of the addressee and may contain information that is privileged and confidential. If the reader of the message is not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. If you have received this communication in error, notify the sender immediately by return email and delete the message and any attachments from your system.

KENCO 001762

Case: 18-1800     Document: 10-2     Filed: 08/01/2018     Pages: 320

# EXHIBIT B-2

# Performance Improvement Plan

Employee Name: Mary Madison

Site: Manteno- Mars

Date: July 8, 2013

---

## Job Responsibilities/Priorities

**Job Responsibility: Working Collaboratively with Fellow Site Managers**

*Mary needs to better communicate with all applicable site personnel which includes the GM. Mary is not openly communicating or working collaboratively with fellow associates. She is not informing Site Leadership prior to pulling labor resources when conducting reviews with non-exempt staff.*

*Part of Mary's responsibility is to bring the site team up to speed in the area of QC through training and education. She does not take a training and development approach with co-workers, contributing to the perception that she is too aggressive. When asked for additional information or clarification, Mary often responds with lengthy emails that refer to governmental requirements. These emails are not helpful nor do they offer an avenue of understanding for the task at hand. It is incumbent upon the site QA Engineer to deliver a clear and understandable message of what is required of the site. It is also incumbent that the QA Engineer to help lead fellow associates through training and collaborative discussion to a clear understanding of QC measures.*

**Job Responsibility: Demonstrating Commitment with Compassion**

*Mary is not demonstrating commitment with compassion. There have been several occasions where the tone of her emails have been aggressive in nature. Although written in a professional manner, her emails are perceived by the recipient as demanding and as attacks. This was specially seen in the subject of Service Master Sanitation. After the site GM provided an alternate course of action for dealing with Service Master, Mary began sending off a series of aggressive emails accusing the site GM of placing the business in jeopardy for failure to comply with her course of action. In addition, audit forms provided to Service Master after the initial conversation with the site GM continued to be aggressive in nature. These audit forms were never provided to the site GM prior to review even after they were requested.*

**Job Responsibility: Communication with Leadership**

*Mary is not communicating adequately to the site GM. She is not consistently providing updates of what projects she is working on. With a pending customer audit, it is important for the site leadership team to understand a timeline of activities and the current status. She is also not including the site GM on communication with internal and external customers or vendors, even when requested.*

**Job Responsibility: Working outside of outlined job responsibilities**

*Mary's approach to the site QC activities is too independent in nature; often exceeding the boundaries of her scope of responsibility. Mary has taken on an active role with working directly with the Site's local vendors. She is providing directives to the vendors without conferring with her co-workers or the Site GM. She has also over-reached her responsibility by contacting the Site Customer Contact for requests of services without conferring with her site GM.*

KENCO 000021

## Competencies

*Identify the specific competencies needing improvement from the list below. Describe the performance improvement required.*

**Communication Skills**
- Business Writing
- Effective Communications
- Conducting Meetings
- Interpersonal Skills w/Associates

**Decision making and Problem Solving**
- Project Management
- Time Management
- Problem Solving

**Business Knowledge**
- Warehousing & Logistics 101
- Supply Chain Management

**Financial Management**
- Efficiency Improvement Program (EIP)

**Leading Others**
- Conflict Management
- Employment Law
- Performance Management
- Team Building
- Change Management

**Systems Capability**
- KQMS
- Lean tools
- WESnet, WMS, TMS
- PC Desktop systems
- Safety/Security/DOT

**Competency:** Effective Communication

*Specific Improvement Required:*

- Mary needs to communicate through simple terms which are summarized and understandable for fellow coworkers to understand. The Site Management needs to be lead through the process of QC requirements. This cannot be achieved by responding to inquires with elongated governmental requirements which seemed to be cut/ copied from various websites.
- Mary needs to communicate with her Site GM. She cannot proceed in a course of action of implementing processes changes or introducing additional changes without conferring with her site GM.

**Competency:** Leading of Others

*Specific Improvement Required:*

- It is important for Mary to understand that it is incumbent of the site QA Engineer to bring the local Site Management up to speed in matters of QC through training and development. She cannot achieve this by isolating herself and working independently of others.
- Mary needs to communicate with fellow Site Managers if resources are needed. This needs to be done by direct scheduled face to face meetings followed by an email summary. This will ensure the Department Manager(s) have a clear understanding of what is being requested and why.

**Competency:** Time Management

*Specific Improvement Required:*

- Mary needs to develop a realistic and achievable approach for QA compliance measures. She needs to provide an outline of priorities, based on risk, with achievable timelines. Once developed, the list is to be reviewed and agreed upon by both local Site Management as well as

KENCO 000022

Case: 18-1800    Document: 10-2    Filed: 08/01/2018    Pages: 320

*Corp QA. Progress checks should be reviewed and circulated with the site management team based on a schedule determined by the GM.*

**Competency:  Interpersonal Skills**

*Specific Improvement Required:*

*The Kenco Culture is one of partnership and collaboration, along with commitment & compassion. Mary needs to modify her work behaviors so that this approach is taken when dealing with both internal and external customers and vendors. When confronted with different ways of handling situations, Mary needs to be open to suggestions and ideas.*

**Competency:  Project Management**

*Specific Improvement Required:*

*Mary needs to have a clear understanding of the KQMS requirements. The KQMS process provides a detailed outline of how QA processes are to be developed and implemented. Although Mary has been working to develop many of the sites documents, she is not following the KQMS outline. It is incumbent upon the site QA Engineer to have a full understanding of the KQMS processes and procedures. It is also expected that Mary works within the parameters of the KQMS requirements and procedures. It is also incumbent that the site QA Engineer coordinates with Department Managers to schedule and facilitate training.*

KENCO 000023

*Plan Establishment*

*A follow up discussion will be scheduled once you have completed your personal development plan. Your personal development plan is to be presented to your Manager within 10 days of this review.*

The required improvements must be made to the satisfaction of your Manager within 30 days. If satisfactory improvements are not made within 30 days, you are subject to further disciplinary action, up to and including termination. Failure to successfully perform job responsibilities after the successful completion of the improvement plan may result in additional disciplinary action up to and including termination of employment without the issuance of another warning or improvement plan.

Comments: *The finer items discussed are acknowledge, but not agreed upon.*

Plan Establishment Signatures:

Employee: _____ Date: 7/11/13

Supervisor: _____ Date: 7/09/13

Director/VP: _____ Date: 7-9-13

Case: 18-1800    Document: 10-2    Filed: 08/01/2018    Pages: 320

Case: 18-1800    Document: 10-2    Filed: 08/01/2018    Pages: 320

# EXHIBIT B-3

# Performance Improvement Plan

**Employee Name: Mary Madison**

**Site: Manteno- Mars**

**Date: July 8, 2013**

Pages: 320   Filed: 08/01/2018   Document: 10-2   Case: 18-1800

## Job Responsibilities/Priorities

### Job Responsibility: Working Collaboratively with Fellow Site Managers

*Mary needs to better communicate with all applicable site personnel which includes the GM. Mary is not openly communicating or working collaboratively with fellow associates. She is not informing Site Leadership prior to pulling labor resources when conducting reviews with non-exempt staff*

*First and foremost, it is my belief that there is a good dialogue with the site personnel in general. The site personnel in general have been found to be very cooperative in regards to supplying information needed for various subject areas. It is also my belief that the objective and the desired results are clearly communicated. For example, the second shift supervisor, Saul Beck, was asked to assist in the development of various SOP's and processes. Mr. Beck responded to the multiple requests and supplied the information exactly as requested the very next day. Jackie Nelson, John Montgomery, Stacy Bushy, Preston Lambert, Woody Piekarczy,, Frank Slagger, and Rodger Payne, just to name a few, also aided in the information quest; providing detailed feedback; some even on their own personal time. In addition, an email was generated by you on or about May 29, 2013, asking a mired of persons designated to participate in the SOP cataloging process.*

*Furthermore, to date, an infrastructure breakdown of exempt and non-exempt employees has been provided to determine the status of fellow co-worker, nor had it been outlined that there were rules of engagement in regards to whom can or cannot be spoken with in regards to job related functions. Moreover, in general, outside of common courtesies, fellow associates are engaged based upon job related functions, activities and how they relate to the subject at hand.*

*Quality is a systemic function and obviously, in order to accurately capture the scope of the job functions and processes, it would require contact with site personnel on each and every level. Last but not least, no reviews have been conducted. To date, several audits have take place: The Warehouse and Distribution Audit and a sanitation audit. Copies of these audits were supplied to you; comprising these audits required no input from any personnel, as there are no documented policies of procedures to review.*

*Part of Mary's responsibility is to bring the site team up to speed in the area of QC through training and education. She does not take a training and development approach with co-workers, contributing to the perception that she is too aggressive. When asked for additional information or clarification, Mary often responds with lengthy emails that refer to governmental requirements. These emails are not helpful nor do they offer an avenue of understanding for the task at hand. It is incumbent upon the site QA Engineer to deliver a clear and understandable message of what is required of the site. It is also incumbent that the QA Engineer to help lead fellow associates through training and collaborative discussion to a clear understanding of QC measures.*

1

KENCO 000025

Case: 18-1800    Document: 10-2    Filed: 08/01/2018    Pages: 320

*Correct! In order to have an effective training program, one must first implore some fundamental techniques. These are such as but not limited to: DMAIC process, (which one defines, measures, analyze, improve and control) and/or TQM (Total Quality Management, synergized with this is, the SDCA (Standardize Do Check Act) when standards are not in place-Standardization occurs in all aspects of the process-man, machines, methods, systems, materials, measurements, and environment. From there PDCA (Plan Do Check Act Process) can be deployed synergized with the PDPC (Process Decision Program Charts) which is the framework for implementing change (Kaizen).*

*From a pragmatic and practical approach, first and foremost, to mitigate business interruptions, bottlenecks, and hiccups, one would first look at the current scope of training, evaluate it for accuracy and compliance and modify, if necessary to meet the current objectives. Considering that there is relatively little to no documentation, accurate benchmarks have to be established and validated. This is crucial from a Risk Management Perspective, as this effort minimizes liability and creates accountability.*

*From an in depth discussions with you and Tom White, it was determined that a training program was needed for onboarding and current hires. This was reiterated in your email of May 16, 2013; whereby it was requested that a format be developed by 5/27/2013 by Tom and myself.*

*A formal follow up by email with Tom White and Bill Schwerin (Cc: Kelvin Walsh) for availability occurred on 5/28/2013.*

*On May 28, 2013, a request for you to host Management review meetings was sent by email; no response and no meeting to date.*

*On 5/29/2013, an email was drafted and sent by you requesting assistance in processes that contribute to potential training opportunities. Pre Kelvin A Training template was requested.*

*On June 3, 2013, an email was sent following up with Tom (Cc: Kelvin Walsh) on availability and a meeting set for June 4, 2013 to implement training program.*

*On June 5, 2013, a developed training template was submitted for your review. To date no disposition has been given by you.*

*On June 7, 2013, CPQE6220011thru3 was sent to Tom (Cc: Kelvin Walsh) to help clarify training for associates.*

*On June 10, 2013, a meeting was set up for June 13, 2013 to review training matrix.*

*One June 13, 2013, the meeting was cancelled by you and was to be rescheduled. To date it has not been rescheduled.*

*On July 1, 2013, disposition of training matrix discussed and a request to resubmit training template to you; resubmitted template for review be email. No disposition given.*

*On July 8, 2013, a follow up email was sent to Tom (Cc: Kelvin Walsh) with a request for disposition and a requested completion date.*

*On July 9, 2013, an email was sent to you following up on the training piece.*

*On July 9, 2013, an email was received from you stating "That the original request was sent prior to many changes in the business. Due to current state of business and the available resources this will need to be tabled."*

2

KENCO 000026

Case: 18-1800 · Document: 10-2 · Filed: 08/01/2018 · Pages: 320

Furthermore, we have not reached the training stage, as we are still in the developmental phase. In addition, there have been Various Policies such as but not limited to: Glass Control, corrective action form, Personal Practices, general yard and facilities, Hazard communications, HAZMAT Placard requirements, Safety orientation, Summary of HOS Changes, HACCP Flow Chart that have been sent for your review and have not been given a disposition to date. Therefore, they have not been validated for accuracy.

*When asked for additional information or clarification, Mary often responds with lengthy emails that refer to governmental requirements. These emails are not helpful nor do they offer an avenue of understanding for the task at hand.*

The instance where additional information was requested, after having several conversations regarding the BCP, ranging from why this has to be done to what is being asked. To first and foremost, address the issue again about why the plan needed to be created, several possible reasons were offered to you as to why this may have materialized, but did not meet with your satisfaction and at the end of the banter, the best answer that could be supplied was that Ms. Paula asked for the plan; solely based on the fact that it was requested by her, from my perspective it should be supplied. Given the fact that Ms. Paula is the direct liaison to Mars from Kenco, it is understood that it would not be prudent or behooving of me to question or challenge this request. The request was not unreasonable, nor immoral or unethical and apparently needed to be done.

As it was apparent, that my ability to effectively communicate what was being asked of identifying the key components of the business at hand, how they interrelate and correlate had not been achieved. It then became incumbent upon me to provide resource information to help facilitate a clearer understanding. Due to the nature of resource information, it may contain terminology and verbiage not commonly used and perhaps cites other reference materials, codes, and regulations.

To my amazement, only to later learn, during our exchange on the performance improvement plan, that you had no foreknowledge of what a BCP plan was. This concept had never crossed my mind considering that in our June 12, 2013 meeting with Ms. Paula, Anthony, and yourself; it was asked of you by Ms. Paula, if you agreed to give me the BCP plan to do and you said yes. Not to mention that housed in your office is a Contingency Plan which is a precursor to a BCP. Leading one to believe that you had sufficient knowledge of the BCP and what it entailed.

*It is incumbent upon the site QA Engineer to deliver a clear and understandable message of what is required of the site.*

To the best of my recollection being at the April 16, 2013 initial meeting it was covered that the warehouse needed to become standardized and compliant with several entities, such as but not limited to: Mars, FDA, Kenco, etc...

On or about May 17, 2013 a Warehouse and Distribution audit and sanitation forms were supplied to you as a basis for review to provide structure for the upcoming audit. This audit scheme (tool) was supplied through my previous immediate occupation in certifying warehouse and distribution centers for HACCP, SQF, and numerous other certifications; This audit scheme is up to date with the current FSMA regulations.

The requirements were scoped out and reviewed with you on or about May 31, 2013 with Kevin Moses and myself.

June 12, 2013- Kelvin Walsh, Anthony Marquez, Mary Madison reviewed audit requirements.

3

*July 1, 2013- Kelvin Walsh, Mike Manzello, Mary Madison, Paula Hise, and Kevin Moses reviewed audit requirements.*

*July 3, 2013- Kelvin Walsh, Mike Manzello, Mary Madison reviewed audit requirements.*

**Job Responsibility: Demonstrating Commitment with Compassion**

*Mary is not demonstrating commitment with compassion. There have been several occasions where the tone of her emails have been aggressive in nature. Although written in a professional manner, her emails are perceived by the recipient as demanding and as attacks. This was specially seen in the subject of Service Master Sanitation. After the site GM provided an alternate course of action for dealing with Service Master, Mary began sending off a series of aggressive emails accusing the site GM of placing the business in jeopardy for failure to comply with her course of action. In addition, audit forms provided to Service Master after the initial conversation with the site GM continued to be aggressive in nature. These audit forms were never provided to the site GM prior to review even after they were requested.*

*Mary is not demonstrating commitment with compassion. There have been several occasions where the tone of her emails have been aggressive in nature. Although written in a professional manner, her emails are perceived by the recipient as demanding and as attacks.*

*It is difficult to address perceptions, as that is just what they are an insight, intuition, or knowledge gained by assumptions. Given the fact that our history is quite limited, it is more than overly presumption to assert aggression, as there is no benchmark of my demeanor to attach such assertions to. From my perception, aggressive in nature, would have a proclivity towards being hostile or punitive in nature; which is quite an anomaly to a professionally written email. Please do extend and/or accept my apologies for these misperceptions. For proper planning, time frames, dates, and expectancies are tantamount and paramount, as it creates accountability and trending.*

*Furthermore, it is my belief that my zeal and commitment to the organization is demonstrated on an ongoing basis. This can be proof texted through the exhibited work ethics of coming early and staying late on a daily basis, working on the weekends, and through the weekends, participating in facility based venues, as well as, lending a hand of assistance when needed.*

*This was specially seen in the subject of Service Master Sanitation. After the site GM provided an alternate course of action for dealing with Service Master,*

*The alternate course of action offered, encompassed several factors, such as but not limited to: imploring me to give to provide Service Master with business management techniques, relaxing of "my standards", and educational resources. All of which, did not and does not seem commensurate with role the QE role. It was not outlined for me to manage, a vendors business, but to ensure proper service from the vendor. In addition, it is my contention that if this is there line of business it is their responsibility to know and understand the rules of engagement. In view of the impending review and audit, under the circumstances, it seemed that it would be a mismanagement of time when there is a plethora of outstanding and unaddressed issues for the impending audit.*

*When an avenue was provided for Service Master to receive guidance in May, a plan of action was requested during the initial meeting in May with ServiceMaster, Kevin Moses, and myself. Service Master along with several other vendors were spoken with by Kevin Moses and myself regarding various Regulatory concerns, as well as, what the forthcoming expectations were. ServiceMaster failed to create and return a plan of action.*

4

Pages: 320    Filed: 08/01/2018    Document: 10-2    Case: 18-1800

Case: 18-1800    Document: 10-2    Filed: 08/01/2018    Pages: 320

*Mary began sending off a series of aggressive emails accusing the site GM of placing the business in jeopardy for failure to comply with her course of action.*

First and foremost, to the best of my knowledge no emails were sent specifically stating that you have placed the company in a position of liability. As a matter of fact, the emails were sent solely as a mere matter of position and a recap of the facts at hand. Moreover, it is a required part of my job function to Demonstrate the ability to effectively communicate the needs for Regulatory Affairs to customers and senior management, outlined in the additional skills section. Therefore, it is the mantra to observe, advise, and document every step of the way.

As you recall Kelvin, it was stated by you in the meeting in the stead of ServiceMaster's meeting of June 27, 1013, that Brian Davis had emailed you recently and stated that ServiceMaster was being forced to do things outside of the scope of the agreement, such as but not limited to: requiring them to use clean equipment to clean the facility, as that was not a requirement of the agreed upon scope of work.

In an effort for me not to place the company in a compromising position, as stated by you, with regards to forcing Service Master to engage in activities outside the scope of agreed upon work, for clearer clarification, the SME, Brian Davis, in the matter was deferred to for clarification purposes only. That by my hand ServiceMaster is not forced to perform duties outside the agreed upon scope, as my intent is to not engage in coercion. By making ServiceMaster believe that if they don't comply then retaliation or retribution of some form could occur.

Be it known, as a matter of concern, when any person and/or entity, including myself, compromise and/or violate the rules and regulations set forth, places people and entities in position of liability.

*In addition, audit forms provided to Service Master after the initial conversation with the site GM continued to be aggressive in nature. These audit forms were never provided to the site GM prior to review even after they were requested.*

No audit was conducted by me and supplied to Service Master. Service Master supplied a monthly assessment sheet conducted by them for review by email to me. Comments were made on the assessment, as well as, requesting that a corrective plan of action be supplied along with these results, as the results did not tell me anything that was not already known about the current state of the facility, but what was the most important aspect, was not identifying the bottlenecks or constraints, but how were they to be corrected. Any and all audit forms have been provided-5.17.13, 6.6.13 and 6.12.13.

Moreover, there was sufficient enough dialogue about the condition of the facility, as your corporate card was used to buy supplies for a cleaning blitz with temps on June 21, 2013.

**Job Responsibility: Communication with Leadership**

*Mary is not communicating adequately to the site GM. She is not consistently providing updates of what projects she is working on. With a pending customer audit, it is important for the site leadership team to understand a timeline of activities and the current status.*

Upon our initial meeting, a plan of action had been scribed out with regards to becoming Mars Compliant. Matter of fact, on 5.17.13 a copy of the Warehouse and Distribution was supplied to you, as a platform for structure on becoming Mars complaint as this would address the current FSMA mandates that supersede the requirements of Mars. We have been instructed verbally and in writing by Ms. Paula to

5

KENCO 000029

Case: 18-1800     Document: 10-2     Filed: 08/01/2018     Pages: 320

*defer to regulations if there is any difference. This was noted in the SOW's provided by her to us on or about June 13, 2013 by email, as well as, in an email dated on or about June 26, 2013 directed to Kevin Moses, yourself, as well as, me that specifically stated "Mary, In preparation for this call, I think it would be helpful to have a brief bullet point list of the actions that need to be taken to comply with the recommendations made by Mars in last year's quality audit. In the event that they provided conflicting information, then defer to the reg."*

*With a pending customer audit, it is important for the site leadership team to understand a timeline of activities and the current status.*

*The timeline of the audit had been predetermined from at the close of the 2012 audit. It was made clear the gravity of the audit and what was required had been discussed from inception. In addition, the review had been highlighted. In having immediate prior experience in the certification of FSMA warehousing an audit was conducted against the known standard, evaluated and provided for review for a benchmark. Furthermore, being regulatory complaint was an instantaneous and paramount goal. Therefore, the imminent and immediate items needing attention to detail were highlighted, such as sanitation. Most of these line items are marginal at best in terms of being corrected with minimal effort.*

*Realizing that all things could not be achieved, there are some basic fundamental line items that are achievable and directly tied to the ability to demonstrate the core values of maintaining a food grade facility. The laws may be new in application to warehousing, but are the infrastructure and mantra of the food safety and defense globally.*

*Moreover, on several occasions it has been requested to for management review meetings to occur. The first request was from the recap meetings of Kevin Moses and myself during a conference call with you, as well as, in an email dated may 28, 2013, asking you to host the management review meetings. To date, we have had no meetings and none have been scheduled.*

*Furthermore, we have only had (3) three planning meetings dedicated to the Mars Traceability audit May 16, 31, and July 3, 2013. The subject matter has been discussed (4) four additional times on May31, 3013 with Kevin Moses by conference call, June 12, 2103 with Ms Paula, Anthony, myself and you, and July 1, 2013 with Ms. Paula, Kevin Moses, Mike Manzello, myself and you, July 17, 2013 with Tracie Clifford, Anthony Marquez, Mike Manzello, Tom White, William Schwerin, Jerry Cirello and myself. To date, no other dedicated meetings have ensued regarding the audit, which was to initially transpire the first week of August.*

*The disposition of the meetings allowed us to work through a limited number of line items and most times with no deliverables being identified, as often times discounting the line item, by maintaining that it was good enough last year and it should be the same this year; despite highlighting the fact that the industry norms and standards were being cited in an adjacent column.*

*She is also not including the site GM on communication with internal and external customers or vendors, even when requested.*

*Kelvin, as a matter of protocol you have been included on correspondence that directly related to you, even prior to your July 5, 2013 request in the ServiceMaster meeting.*

**Job Responsibility: Working outside of outlined job responsibilities**

KENCO 000030

*Mary's approach to the site QC activities is too independent in nature, often exceeding the boundaries of her scope of responsibility.*

*This assertion is not quite clear in nature. Quality is a systemic function; therefore, the matrix encompasses every facet of the operation. Furthermore, Quality assessment, auditing, etc... to a certain degree is an independent function of the departments, as it is to provide an accurate and non–bias account of the state of condition. In addition, based upon what was outlined in the posting and engagements, there has been no deviation from deliverables sought and requested.*

*In addition, here are a few excerpts from the job description:*

- Minimum of two to five years of experience with proven execution in FDA GMP regulatory requirements. Food Safety and Defense programs. USDA National Organics programs, quality system management and a quality engineering lead role.
- Demonstrated ability to correctly interpret technical information.
- Demonstrated ability to understand plant processes, regulatory requirements, and procedures affecting operations.
- ASQ Certification COE, CQM/QE, CQA, CQIA, CSSGB, Lean Certification (SMEIAME/Shingo Prize/ASQ Partnership or ISO Lead Auditor preferred.
- Demonstrated ability to effectively communicate the needs for Regulatory Affairs to customers and senior management is a requirement.
- Analytical thinking, excellent problem solving skills, concern for impact and ability to explain complicated issues to different levels in the organization
- A team player that is passionate about the business and has a strong desire to continuously improve performance and service.
- Ability to think strategically and effectively plan, execute, and resolve quality and risk conflicts.
- Ability to respond effectively and quickly to internal and external customer needs and issues
- Demonstrated working knowledge and application of ISO, TS, AS, ASTM or other industry standard.
- Effective interface with internal departments. as well as with groups from the outside that provide services relating to regulated product support operations, warehousing and distribution, and associated quality systems.
- Takes ownership *and* personal responsibility to achieve results.

Given the fact these are merely only a few excerpts of what is required of the position. Given the fact that these, as well as, other enumerations were met for the execution of this position; it was understood that these excerpts along with the other enumeration of principles and concepts would implored and executed for the advancement of Kenco's business modeling, ultimately translating into maximum profitability and goodwill for all the stakeholders.

*Mary has taken on an active role with working directly with the Site's local vendors. She is providing directives to the vendors without conferring with her co-workers or the Site GM.*

*Yes, an active role has been taken. Brining to your remembrance the June 12, 2013, it was delegated and conferred upon my by Ms. Paula to oversee the Sanitation and Pest Control with full authority up to contract negotiation. In addition, sanitation and pest duties are usual and customary functions of Quality. Furthermore, this expertise of FDA Food GMP's for warehousing was sought in the filling of the position; therefore, filling those requirements explicitly infers that they are to be conveyed at this facility.*

*In addition, the engagement of vendors was initiated during the week of May 20, 2013, when the Regulatory Affairs Specialist, Kevin Moses visited the facility and scoped out various regulatory concerns. Regulatory affairs and compliance is a significant part of the quality function, as it provides the infrastructure to the quality program.*

7

KENCO 000031

*More specifically, the expectations had been discussed with the Regulatory Affairs Specialist, Kevin Moses and dovetailed with the directives from Ms. Paula. In addition, you have been conferred with, as we have had numerous discussions and correspondence regarding this matter. Furthermore, to the best of my knowledge, there is no one else here at the facility that needed to be conferred with in regards to ServiceMaster. Therefore, no other opinions would have been considered.*

*She has also over-reached her responsibility by contacting the Site Customer Contact for requests of services without conferring with her site GM.*

*Not exactly sure how to address this, as information has been needed in the achievement of various tasks; the process owner of this task facilitated and/or initiated an introduction to achieve the completion of the task at hand. The only way that the process owner could have been identified is either they were identified as such or a collaborative dialogue with fellow associates occurred. Generally, if someone is identified as the process owner, then they are the ones who manage or control that process; having said that they would normally be the point person. If they were not identified as the process owner, then that means that a collaborative dialogue ensued with fellow associates to facilitate the identification and execution of such; which totally defies the assertion that one is not working collaboratively with other fellow associates.*

*Furthermore, any requests for services and/or information were directly related to the scope of audit compliance only and for no other reason, as there is no personal benefit or gain in any requested service or information.*

8

KENCO 000032

## Competencies

*Identify the specific competencies needing improvement from the list below. Describe the performance improvement required.*

**Communication Skills**
- Business Writing
– Effective Communications
- Conducting Meetings
– Interpersonal Skills w/Associates

**Decision making and Problem Solving**
- Project Management
- Time Management
- Problem Solving

**Business Knowledge**
-Warehousing & Logistics 101

**Financial Management**
- Efficiency Improvement Program (EIP)

**Leading Others**
- Conflict Management
- Employment Law
- Performance Management
- Team Building
- Change Management

**Systems Capability**
- KQMS
- Lean tools
- WESnet. WMS, TMS
- PC Desktop systems
- Safety/Security/DOT - Supply Chain Management

**See attached letter dated July 23, 2013**

### Competency: Effective Communication

*Specific Improvement Required:*

- *Mary needs to communicate through simple terms which are summarized and understandable for fellow coworkers to understand. The Site Management needs to be lead through the process of QC requirements. This cannot be achieved by responding to inquires with elongated governmental requirements which seemed to be cut/ copied from various websites.*

    *Kelvin, it is not my endeavor to use terms that are unfamiliar or uncommon vernacular; however, due to the nature and scope of the business some terminology may not offer alternative words in simpler terms and/or the redefining of terms may alter or take other aspects out of context. Therefore, the text may reflect it as such. Furthermore, correct use of terminology and verbiage allows one to effectively and efficiently communicate on a professional level with other industry constituents.*

    *Realizing that persons have different learning styles and after visiting a subject matter on several occasions, and my attempts to convey a thought or concept is not achieved, resource material seems to be the next best mode of conveyance, as perhaps it can provide different vantages that may assist in the learning process.*

    *The rules and regulations are exactly what they are "elongated governmental requirements" written and geared towards industry specifications and personnel, cross referenced and embedded with other "elongated governmental requirements" becoming the standard language. As great and as noble the charge of being able to relax, minimize, or alter these standards, my position and ability to influence these standards on any level does not exist. Furthermore, the*

9

KENCO 000033

*thought pattern was after not being able to bring an understanding or a resolve to the matter at hand from the abridged and condensed version, that some basic information should be supplied to offer a foundation.*

- *Mary needs to communicate with her Site GM. She cannot proceed in a course of action of implementing processes changes or introducing additional changes without conferring with her site GM.*

*To date, no changes have been implemented as we have not moved passed the gathering phase.*

**Competency: Leading of Others**

*Specific Improvement Required:*

- *It is important for Mary to understand that it is incumbent of the site QA Engineer to bring the local Site Management up to speed in matters of QC through training and development. She cannot achieve this by isolating herself and working independently of others.*

*This is a very true and correct statement. The platform has yet to be created in order to implement this strategy. Numerous polices have been submitted for review and to date have had no disposition placed on them nor have any meetings resulted from the submission of such, despite queries and follow ups. It is my thought that the process would have been worked through with you, scoped out, refined, and then presented to your managers, and so on and so forth. When information is neither accepted, refuted, or denied, then no benchmark is established and the information cannot be disseminated because it has not been validated for accuracy and plausibility.*

*On several occasions it has been requested to for management review meetings to occur. The first request was from the recap meetings of Kevin Moses and myself during a conference call with you, as well as, in an email dated may 28, 2013, asking you to host the management review meetings. To date, we have had no meetings and none have been scheduled.*

*Furthermore, we have only had (3) three planning meetings dedicated to the Mars Traceability audit May 16, 31, and July 3, 2013. The subject matter has been discussed (3) three additional times on May31, 3013 with Kevin Moses by conference call, June 12, 2103 with Ms Paula, Anthony, myself and you, and July 1, 2013 with Ms. Paula, Kevin Moses, Mike Manzello, myself and you.*

*The assertion is correct that this cannot be achieved alone; however, the proper protocol has not been established nor has the proper infrastructure been instituted to bring everyone on the same page. In addition, some line items assigned to me do not require input from fellow constituents. For example, the food defense and HACCP Plans or the Corporate Social Responsibility piece or the Quality Site Plan and outside the necessary information to construct the BCP; consequently, it would not be prudent to engage persons in subjects that they have no knowledge of.*

- *Mary needs to communicate with fellow Site Managers if resources are needed. This needs to be done by direct scheduled face to face meetings followed by an email summary. This will ensure the Department Manager(s) have a clear understanding of what is being requested and why.*

10

KENCO 000034

*Most assuredly, there has been a strong dialogue, this can be proofed out in the scope of work developed, as well as, with the assertions made by you in your perception of "working outside the of the outlines job responsibilities." In order to garner the necessary information to achieve any one of these task would have definitely required collaboration, as the necessary information had to be supplied from some faction within this facility. Moreover, it would not be prudent to request information without giving a disposition or background to what is being asked. Understanding that perhaps there may be an impasse the personal communication allows touch points to be identified regarding how the request is being received and perceived and allows for the necessary adjustments to be made.*

*Furthermore, there is no way that the amount of information amassed could have been garnered without fellow site manager interaction and assistance; as we have already identified and agreed that there is no written correspondence outlining the procedures at hand. For example, on a daily basis William Schwerin is spoken with, initially we spoke primarily in person until we established a base line of what the objectives were and what was needed. Moving forward, we communicate in a combination of ways. Bill is one of the largest components to this audit piece, as well as, Tari Hart the Inventory and Quality Clerk the second largest component. As stated in the July 17, 2013 meeting both have done yeomen jobs in getting any and all requested information in a timely manner. They have also allowed me the opportunity to revisit issues with them on numerous occasions until clarity was obtained about the subject or process. Tom has also been helpful, when things are requested, even if it is acknnowleding that he cannot fulfill the request. Mike Manzello speaks with me on a daily basis updating me on the progression of the cleanliness of the warehouse. Consequently, it is difficult for me to understand or recognize who may have been left out of the loop, as Tom, Bill, Mike and yourself are the managers at hand that have a direct impact on the information needed to date. Obviously, other individuals have been engaged for the specific outlining of their job functions and processes.*

**Competency: Time Management**

*Specific Improvement Required:*

*Mary needs to develop a realistic and achievable approach for QA compliance measures. She needs to provide an outline of priorities, based on risk, with achievable timelines. Once developed, the list is to be reviewed and agreed upon by both local Site Management as well as Corp QA. Progress checks should be reviewed and circulated with the site management team based on a schedule determined by the GM.*

*During the meeting on June 12, 2013 with MS. Paula, Anthony, you and myself a copy of an outline was provided. Not only was this provided, but Provided policies on SQF, Food Defense, disposition of Sanitation-Pictures, Warehouse and sanitation Audits, KQSP, Destruction room, STD Work, GMPs, Allergen, as well as, the Process outline.*

*The outline was agreed upon and the target items were the sanitation, facility, and safety, with a tie into QA with a subset of line items. The outline was ranked in terms of risk. A project plan was developed. The initial project plan was scoped more for my personal use and has since been revised, and will be revised again to accommodate KOS initiatives geared towards a business perspective.*

**Competency: Interpersonal Skills**

*Specific Improvement Required:*

11

KENCO 000035

Case: 18-1800    Document: 10-2    Filed: 08/01/2018    Pages: 320

*The Kenco Culture is one of partnership and collaboration, along with commitment & compassion. Mary needs to modify her work behaviors so that this approach is taken when dealing with both internal and external customers and vendors. When confronted with different ways of handling situations, Mary needs to be open to suggestions and ideas.*

*Most successful relationships, families, business, entities and the likes are built on collaboration, mutual respect morals, and ethics. Therefore, the Kenco concept is fully embraced and embodied. This mantra is to be lauded.*

*From a Quality and Business perspective, every time ones hand is put to a task there is an associated cost. Following the Kenco and Mars (TQM) and Zero defects models we are always to reduce defects, delays and derivations. Consequently, Muda or waste occurred, when in fact Service Master was engaged about the services provided and had to be engaged again. Time is equitable to money. The enormous amount of man hours being spent monitoring them, auditing them, corresponding about them and much to my chagrin to this date there have been no marked improvement. Putting us no closer to our goal of being compliant, as well as, creating the positive perception of the company for the review and audit through tangible deliverables like cleanliness.*

*In addition, the needs of the many out way those of the few. Realizing again from your stated perspective on numerous occasions that the review was not important, the sense of urgency to bring corrective action was not the same as mine. As the review is a precursor to the audit and how we have managed the business at hand. Moreover, the cost of poor quality was explained and how adversely this could affect the overall operation from being fined, sanctioned, facility closure, loss of goodwill, loss of revenue or any combination of the above. Relentlessly, you rallied to lend resources, as well as, my quality and business management skills in assistance to them; while there are so many other issues at hand that require and need those resources and tutelage.*

*Fundamentally, we are not privy to the overall business agreement between Mars and Kenco; however, inferentially it can be assumed that some deliverables were negotiated, the basics being; upholding the fiduciary obligation to ensure the safe warehousing of Mars product. That would include, but not limited to being compliant with current local, state, and Federal legislation, maintaining training records, sanitation logs and temperature charts for seven (7) years, as well as, ensuring that the facility is registered with the US Food and Drug Administration. It is interpreted or taken to mean that the latter of these excerpts statements extracted from the SOW Requirements would mean training, sanitation, and temperature charts would have to be developed, deployed and maintained, as well as, being compliant with the rules and regulations sanctioned by this governing body. Therefore, interpreting these mandates in any other manner would be out of scope.*

*In addition, after learning that ServiceMaster completes work scope forms, on a regular and continual basis, dating back to 2010, asserts that it provides cleaning services for the Co-Pack offices in the warehouse; when in fact the General Manager and Operations Manger of Co-Pack state that for some years Service Master has not cleaned their offices. This was confirmed in writing. More information surfaces that there is a third (3rd) porter from ServiceMaster that comes from 9:30 p.m. -1:30 a.m. and is responsible for cleaning certain areas and within less than 12 hours on an off shift the areas are in disarray. Not to mention, the scope of cleanliness has not improved, while listening to them enumerate the various regulated facilities they service and their interpretations of what spots should constitute and them being limited to certain types of spots! This was a bit exasperating and challenging to hear this rhetoric with no concrete resolution to date on how to resolve the matter. Consequently, another approach had to be*

12

KENCO 000036

taken, a more firm approach; as Service Master was in full denial of what had been outlined verbally, in the Memorandum of Understanding, as well as, the expectations needed from that outline.

When asking ServiceMaster if they planned to address the cleaning techniques along with securing additional help, became characterized as an attack; whereby you chastised me openly in the meeting with ServiceMaster about your perceived characterization. If in fact, additional help is secured but not properly changed then, the goal still has not been achieved.

Ironically enough, even though ServiceMaster has demonstrated by your characterization the same level of quality service provided throughout the years; has clearly asserted completing task that have not been completed, as well as, asserting that they are cleaning parts of the facility that have not been cleaned by them in a number of years, there has been an earnest and sincere desire to remediate them to an acceptable standard; while endeavoring to keep them whole. But yet, in my perception, this same level of earnest desire to remediate my cited inadequacies and unacceptable behaviors has not occurred at this same level and magnitude. Considering that there had been no previous dialogue or mention of these inadequacies or unacceptable behaviors prior to the "PIP."

When confronted with different ways of handling situations, Mary needs to be open to suggestions and ideas.

It is my most sincerest desire, to dialogue and banter ideas to create stellar concepts. Furthermore, when the suggestion and ideas were posed, substantiating information was not provided; therefore, providing to concrete support in this effort.

However, at the risk of being non-complaint, compromising, and directly disobedient, it will be my natural proclivity and inclination to shun those suggestions and ideas.

**Competency: Project Management**

Specific Improvement Required:

Mary needs to have a clear understanding of the KQMS requirements. The KQMS process provides a detailed outline of how QA processes are to be developed and implemented..

There is a clear understanding of KQMS requirements, as these are predicated on ISO. Having more than a (20) twenty year stint with ISO, they are very clear. The application of these requirements to the current facility can only successfully be achieved through total management buy in.

Although Mary has been working to develop many of the sites documents, she is not following the KQMS outline. It is incumbent upon the site QA Engineer to have a full understanding of the KQMS processes and procedures. It is also expected that Mary works within the parameters of the KQMS requirements and procedures

The first line of defense implored was to become as FSMA compliant as possible. Consequently, there is no KQMS on the governmental mandates and would not necessarily fall

13

into this category. To be able to effectively convey any concepts, the platform to do so must be created, and to date no management review meetings have occurred since February 2013. Therefore, making it impossible to present these concepts to your management team; in addition, you had requested reducing engaging your personnel in and for information as they were not accustomed to a dialogue of information exchange, as well as, being in fire fighting mode. The absence in not having a disposition on presented known industry policies and how they relate to the facilitate impaired implementation and training; as they could easily be scoped specific and implemented, as we as, stating after several queries that the scope of the business had changed and that training should be tabled-July 9, 2013 left the training piece unattainable.

*It is also incumbent that the site QA Engineer coordinates with Department Managers to schedule and facilitate training.*

It would out of scope for training to occur, when the appropriate and proper training programs have not been identified and the parameters of training outlined, as well as, when templates and polices have not been reviewed, disposed and scoped. Furthermore, it was not until July 9, 2013, after several follow ups, that the communication was received indicating that the project scope exceeded their perceived capabilities.

14

KENCO 000038

KENCO 000039

Case: 18-1800    Document: 10-2    Filed: 08/01/2018    Pages: 320

*Plan Establishment*

*A* follow *up* discussion will be scheduled once you have completed your personal development plan. Your personal development plan is to be presented to your Manager within 10 days of this review.

The required improvements must be made to the satisfaction of your Manager within 30 days. If satisfactory improvements are not made within 30 days, you are subject to further disciplinary action, up to and including termination. Failure to successfully perform job responsibilities after the successful completion of the improvement plan may result in additional disciplinary action up to and including termination of employment without the issuance of another warning or improvement plan.

**Comments:**

**Plan Establishment Signatures:**

Employee: _____    Date: _____

Supervisor: _____    Date: _____

Director/VP: _____    Date: _____

16

Case: 18-1800     Document: 10-2     Filed: 08/01/2018     Pages: 320

# EXHIBIT C

| | |
|---|---|
| In the Matter of: | ) |
| | ) |
| **MARY MADISON,** | ) |
| | )    **Case No. 2016-FDA-4** |
| Complainant, | ) |
| | ) |
| v. | ) |
| | ) |
| **KENCO LOGISTICS** | ) |
| | ) |
| Respondent. | ) |

## DECLARATION OF PAULA HISE

Under the penalty of perjury as provided by law, the undersigned certifies pursuant to 28 U.S.C. §1746 that the factual statements set forth below are true and correct to the best of his knowledge, information, and belief:

1. I am the Vice President of Operations for Kenco Logistics Services ("Kenco") and have held this position since at least 2009. I am located at Kenco's headquarters in Chattanooga, Tennessee.

2. In my role, one of my many job functions includes providing operational support to the site General Managers ("GM") and their staff.

3. From May 2013 through August 2013, I had opportunities to observe Mary Madison's work performance as a Quality Engineer in person at the Manteno, Illinois Mars warehouse, as well as via emails and telephone calls. I assisted with giving feedback and guidance regarding her work on several occasions.

4. On or about June 28, 2013 Madison sent me an email suggesting in part that she felt she had been asked to relax her standards. A copy of this email is attached as *Exhibit 1*.

5. I immediately responded to Madison and explained to her that she was not being asked to relax her standards; that she was being asked to adjust her approach and work in a more collaborative and team-oriented manner. *Exhibit 1*.

Pages: 320   Filed: 08/01/2018   Document: 10-2   Case: 18-1800

6. I also spoke with Kelvin Walsh, Manteno Site GM, and confirmed that on no occasion had Walsh asked Madison to relax her standards related to legal compliance.

7. On several occasions Madison sent me unnecessarily lengthy emails that were not user friendly. One time, she included a 499 line-item project plan. Another time, she forwarded pages of regulations rather than simply provide a concise analysis. I consistently tried to guide her in the direction of communicating in a more concise high-level manner expected of someone in her position.

8. I also specifically encouraged Madison to pick up the phone and speak to me or Walsh about issues rather than relying on long-winded emails.

9. I discussed Madison's performance with Walsh throughout her brief employment with Kenco, and believed, based on my personal observations, that Madison was not a good fit for the job based on her often aggressive and ineffective communication style.

10. Walsh discussed Madison's performance problems with me throughout her brief employment, including the ongoing performance issues that existed after Madison received the Performance Improvement Plan (PIP). Together, we made the decision to terminate Madison.

Further affiant sayeth naught.

_Paula Hise_____          _8-10-17_____
Paula Hise                                          Date

2

Case: 18-1800    Document: 10-2    Filed: 08/01/2018    Pages: 320

# EXHIBIT C-1

Pages: 320    Filed: 08/01/2018    Document: 10-2    Case: 18-1800

# Walsh, Kelvin

| | |
|---|---|
| From: | Walsh, Kelvin |
| Sent: | Sunday, June 30, 2013 7:21 PM |
| To: | Hise, Paula |
| Subject: | RE: Disposition of MOU |

All I can say is I'll keep trying with her. She is really too valuable for us not to try. It's a good thing I have thick skin.. LOL...

Thanks,

**From:** Hise, Paula
**Sent:** Sunday, June 30, 2013 12:59 PM
**To:** Walsh, Kelvin
**Subject:** FW: Disposition of MOU

I'm just keeping you in the loop. All I can say, is that we need to keep an eye on that 90 day introductory period window. I hate to go there this early in the game, but man, she is wearing us out....

Paula Hise, CSCP
Vice President, Operations

Kenco Logistic Services
2001 Riverside Drive
Chattanooga, TN 37406
Cell: 423-290-3749
Email: Paula.Hise@Kencogroup.com

**From:** Paula Hise <Paula.Hise@kencogroup.com>
**Date:** Sun, 30 Jun 2013 13:57:01 -0400
**To:** "Madison, Mary" <Mary.Madison@kencogroup.com>
**Subject:** Re: Disposition of MOU

Mary,

I understand and appreciate your position, and am grateful for your passion on the subject – truly. I firmly believe that we are all (you, me, Brian Davis, Kelvin, the site management staff) on the same team and we have the same goals and objectives, although the way we pursue those goals and objectives might be a bit different. Further, everyone is coming at it from different perspectives – Brian, from a risk management and supplier management perspective, Kelvin and I from an operational perspective, and you, from the Quality perspective. I'm confident that we will get to where we need to be. But what we have to do is work together as a team, understanding that as GM, Kelvin is ultimately responsible for the overall facility operations, feel confident that we can voice our different opinions to one another, but then move forward together to execute the agreed upon direction. No one is, or should be asking you, to relax your standards on cleanliness. All we are asking is that we modify the approach with which we work with ServiceMaster. Part of our guiding principles is that we "Cultivate mutually beneficial partnerships with customers, associates and suppliers". So, we want to protect a supplier relationship if we can.

We are both so busy – if you are still concerned about our direction in this area, then let's me, you and Kelvin get on the phone to discuss. We can accomplish in a short call much more than we can accomplish in sending lengthy emails.

Thanks,

KENCO 001748

Paula Hise, CSCP
Vice President, Operations

Kenco Logistic Services
2001 Riverside Drive
Chattanooga, TN 37406
Cell: 423-290-3749
Email: Paula.Hise@Kencogroup.com

**From:** "Madison, Mary" <Mary.Madison@Kencogroup.com>
**Date:** Fri, 28 Jun 2013 18:02:06 -0400
**To:** Paula Hise <Paula.Hise@kencogroup.com>
**Subject:** RE: Disposition of MOU

Absolutely, that is no problem, as we have a spread sheet already that is used as a part of their daily routine and the exact sheet can be dated back to 2010 from the retained records. The spread sheet itemizes each and every area and what is to be done. Prior to Kevin and I having the meeting and issuing the MOU, the contract was gotten from Brian and reviewed to make sure that the scope of work being discussed was accurate. Kelvin specifically said on yesterday that we were forcing them to do something other than what was outlined in the scope of work agreed upon. He indicated that this information was given to him a few days ago from Brian Davis based upon the infractions listed on the MOU issued. My question was to get clarification on how ServiceMaster has been forced to perform the duties as agreed, as to be compliant with basic health and safety rules to prevent the spread of disease and contamination. As shared with Kelvin, the scope of work to be preformed has not been changed or altered from what was being performed prior to the acquisition.

We are merely discussing basic health and sanitation rules and principles. The general populous of people here are in an at-risk class for communicable disease. The cleanliness of the restrooms, garbage cans, and eating areas are below par. In addition, Kelvin stated that the standards should be relaxed relating to what is required for compliance as that is not Mars focus.

My concern progressively arose out of being asked to relax my standards to accommodate the current state of affairs and to quintessentially document things in fashion that will achieve these results. First, this has taken me aback that it would be asked of me to do such a thing when it is so simple to just do the correct thing, the correct way, the first time. In addition, continually suggesting to me that my understanding of what to be done is not correct, as the plan of action has been modified, despite direct verbal and written instructions regarding the same matter. Assuring me that this plan of action to deviate from the mandated rules has been corroborated without exception. When resistance and/or reluctance shown about the potential results of being disobedient from jeopardizing the health and welfare of the associates, to being fined and sanctioned by the governing body (FDA) or at the extreme end fatalities to the facility being closed down. From there other methodologies of persuasiveness were used such as, but not limited to: that full responsibility would be taken by him, if something occurred and that there would be no repercussions to me for not following the rules. Not having much faith in the fact that one would be absolved from the matter and most of all diminishing one's integrity to believe someone who would be willing to place themselves in such a predicament to not follow, or better yet enforce someone to do what they are required to do has left me in a quandary.

After preparing to meet with them, despite the fact that there has been no improvement since the original meeting; less than (2) hours before the meeting an email is sent to me to cancel the meeting. ServiceMaster nor myself were aware and at the appointed meeting time, it is stated that the meeting is canceled and in lieu of the meeting he would speak to me. During this meeting, now it is told to me that actually they (1) we were forcing them to do things outside the scope of work to be preformed and now we were in breach of the agreement, per Brian Davis, and my these actions were causing a problem. Requesting that they use clean equipment in the cleaning process was in violation of the agreement, as it did not call for clean equipment. That we were forcing them to uphold Federal Regulations that relate to sanitation because they never were aware of them. Amongst some other highlighted items in red from the response from Brian that he recently got regarding the MOU dated 5/22/2013. In my limited understanding, one cannot use dirty, no filthy, cleaning utensils to clean up. This filth breeds and spreads germs and bacteria; therefore, becoming a health concern. More specifically, the purpose of cleaning and sanitizing is to retard and reduce the spread of germs. This is a prerequisite for food safety, public health, and pretty sure of condition of the terms of agreement with Mars.

Pages: 320.    Filed: 08/01/2018    Document: 10-2    Case: 18-1800

KENCO 001749

Case: 18-1800     Document: 10-2     Filed: 08/01/2018     Pages: 320

Additionally, the Federal rules have always existed and are the precursors to the state rules, these rules have been enforce since 1938 regarding food safety. Furthermore, as stated it is not the position of the company to assume the role of managing ServiceMaster's business, if that being the case this whole process can be managed in-house. In addition, not wanting to held be responsible for issuing advice to ServiceMaster and being held accountable for their interpretation in the event that there is another deviation.

It was also shared that the risk involved in this kind of decision making was very great and it did not prove prudent to be in blatant disobedience and my vehement unwillingness to participate in this type of behviour. It is mind boggling that someone would not have any mind for themselves and others to extend themselves for someone who has exhibited substandard practices; specifically, a discussion ensued over a month ago. Kelvin called them on Monday night and this is what the place looked like Thursday morning the same day they were coming. Really! Ok, not to mention that during this whole exercise, it was discovered that ServiceMaster has been saying that they clean the Co-Pack offices as agreed and according to John Gaughan, GM for Co-Pack in the past four (4) years they have not preformed those services. See attached. The records date back to 2010 for the sanitation records. When these documents were being scanned, someone came and took them off, as they were reading them, I walked up and began looking for my documents and they said "are these yours" and "I said yes"! My hand was held out and they said "let me keep looking so I can make sure they are yours"!. They sit directly in front of the scanner.

Last, but not least it is realized that there are a lot of things that cannot get done before the impending audit and review, but from my limited perspective, it is my strongest belief that we can accomplish such a rudimentary task of cleaning the place up, especially when it is an outside vendor. The mentality of the people here is that yeah, Kenco may have bought it; but its just the same, no different, same management. The people here are the assets as well and they do not deserve deplorable conditions; in addition, if they are sick they can not come, if they do not come we do not have an adequate workforce. They blame it on the people, but the old adage is what you put out is what you get back! So, they think its crap, they think they are thought of as crap, and therefore, they treat it like crap! Finally, understandably, we cannot do everything, but what's wrong with doing the things that can be done? Why would we not want Mars to see a marked difference in the facility, as that is a very easy and achievable goal. It would be so different, if we could not achieve it, but because of some unknown reason that is in stark contrast to the very guidelines of our operation. It is almost like sabotage. There are numerous things that can be done with no real effort. I've said all this to say, you are to far away for Manteno to be gone wild!!!!!!!!

Thank you kindly,

Mary Madison
Quality Engineer

Kenco/Mars
1125 West Sycamore Road
Manteno, IL 60950
815.468.4448
www.Kencogroup.com

This message and any attachments are intended only for the use of the addressee and may contain information that is privileged and confidential. If the reader of the message is not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. If you have received this communication in error, notify the sender immediately by return email and delete the message and any attachments from your system.

From: Hise, Paula
Sent: Friday, June 28, 2013 11:58 AM
To: Madison, Mary; Davis, Brian
Cc: Walsh, Kelvin
Subject: Re: Disposition of MOU

3

Hi Mary,

Here would be my suggestion for closing this issue. I do not believe that any correspondence, other than your MOU, has been sent from Kenco to ServiceMaster documenting any infractions. With that said, I believe you have a copy of the Kenco contract with ServiceMaster? If not, you can obtain one from Len, who should have a copy of it. I would suggest that you create a simple spreadsheet, column A defines what services they are currently obligated to perform. Column B should be the services that we want to them to perform. Once you have that on paper, then let's the 3 of us get together for a quick call to review and make sure we are all in agreement. Then we can provide that document to ServiceMaster and they can evaluate what any additional costs may be.

Sound okay?

Paula Hise, CSCP
Vice President, Operations

Kenco Logistic Services
2001 Riverside Drive
Chattanooga, TN 37406
Cell: 423-290-3749
Email: Paula.Hise@Kencogroup.com

**From:** "Madison, Mary" <Mary.Madison@Kencogroup.com>
**Date:** Fri, 28 Jun 2013 10:34:38 -0400
**To:** Brian Davis <brian.davis@kencogroup.com>
**Cc:** "Walsh, Kelvin" <Kelvin.Walsh@Kencogroup.com>, "Walsh, Kelvin" <Kelvin.Walsh@Kencogroup.com>, Paula Hise <Paula.Hise@kencogroup.com>
**Subject:** Disposition of MOU

Good Morning!

Brian,

On yesterday, Kelvin shared with me that, within recent days, a response was generated to him by you in regards to a MOU that was date 5/22/2103 to ServiceMaster; whereby, it was stated that you acknowledged that the MOU inference a breach of agreement (contract) with ServiceMaster by causing them to perform work outside the scope of the agreement that you signed with them on April 25, 2013. Some of the items referenced in your response were the general conditions of the cleaning equipment used in the cleaning process (that the equipment used in cleaning did not have to be clean and sanitary), that because they were not given the rules of cleaning and sanitation they were being forced to meet an expectation that they had no knowledge of, that they were being forced to clean walls and glass outside the prescribed time frames outlined, as well as, a few other line items that cannot be recalled or were not discussed in-depth.

To promptly ensure that they are not continually forced to perform work outside the scope of what was agreed upon, would you please be kind enough to forward a copy of the correspondence that specifically outlined these infractions; that they may be readily corrected according to the interpretations stated to Kelvin by you, as well as, the agreed upon scope of ServiceMaster's work. As previously stated to Kelvin, it was not my desire to place the company in a compromising position of compelling vendors through coercive measures to perform work outside the agreed upon scope.

In addition, if you would be kind enough to help me come up to speed on the proper interpretation of the agreed upon work it would be appreciated, as it would be a travesty, as well as, a waste of productivity and resources to continue to belabour issues that are not merited; while simultaneously placing the company in unnecessary precarious situations.

Your feedback is welcomed!

Pages: 320   Filed: 08/01/2018   Document: 10-2   Case: 18-1800

Thank you kindly,

Mary Madison
Quality Engineer

Kenco/Mars
1125 West Sycamore Road
Manteno, IL 60950
815.468.4448
www.Kencogroup.com

This message and any attachments are intended only for the use of the addressee and may contain information that is privileged and confidential. If the reader of the message is not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. If you have received this communication in error, notify the sender immediately by return email and delete the message and any attachments from your system.

KENCO 001752

                                   Jordan Hoffman <jthoffmanlaw@gmail.com>

## Madison v. Kenco -Respondent's Motion to Extend Pre-Hearing and Hearing Deadlines

1 message

**Argentieri, Julia P. (Chicago)** <Julia.Argentieri@jacksonlewis.com>                    Fri, Aug 11, 2017 at 5:12 PM

To: "Cook, April - OALJ" <cook.april@dol.gov>
Cc: "Moran, Jody Wilner (Chicago)" <MoranJ@jacksonlewis.com>, "Watkins, Brittany (Chicago)" <Brittany.Watkins@jacksonlewis.com>, Jordan Hoffman <jthoffmanlaw@gmail.com>

April:

Attached please find Respondent's Motion to Extend Pre-Hearing and Hearing Deadlines. A copy was also served via fax earlier today, and has been sent to Mr. Hoffman and Judge Sellers via mail for delivery on Monday. Please contact me with any questions.

Regards,

Julie Argentieri

**Julia P. Argentieri**

Attorney at Law

**Jackson Lewis P.C.**

150 North Michigan Avenue

Suite 2500

Chicago, IL 60601

Direct: (312) 803-2533 | Main: (312) 787-4949

Julia.Argentieri@jacksonlewis.com  |  www.jacksonlewis.com

*Jackson Lewis P.C. is included in the AmLaw 100 and Global 100 law firm rankings.*

Confidentiality Note: This e-mail, and any attachment to it, contains privileged and confidential information intended only for the use of the individual(s) or entity named on the e-mail. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that reading it is strictly prohibited. If you have received this e-mail in error, please immediately return it to the sender and delete it from your system. Thank you.

📄 **Respondent's Motion to Extend the Deadline for Pre-Hearing Exchanges 081....pdf**
1069K

Case: 18-1800     Filed: 08/01/2018     Document: 10-2     Pages: 320

# UNITED STATES
# DEPARTMENT OF LABOR

| | | |
|---|---|---|
| In the Matter of: | ) | |
| | ) | |
| **MARY MADISON,** | ) | |
| | ) | **Case No. 2016-FDA-4** |
| Complainant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **KENCO LOGISTICS** | ) | |
| | ) | |
| Respondent. | ) | |

## RESPONDENT'S MOTION TO EXTEND THE DEADLINE FOR PRE-HEARING EXCHANGES AND RE-SET THE HEARING PENDING RULING OF RESPONDENT'S MOTION FOR SUMMARY DECISION

Respondent Kenco Logistics Services, LLC hereby submits the following request to extend the deadline for pre-hearing exchanges and re-set the hearing date:

1. On August 11, 2017 Respondent Kenco Logistics Services, LLC filed a motion for summary decision in this matter in accordance with 29 CFR §18.72.

2. The hearing is currently scheduled for September 13-15, 2017.

3. In accordance with 29 CFR §18.80, pre-hearing exchanges are due twenty-one days before the hearing, or August 23, 2017.[1]

4. Respondent's motion for summary decision has presented undisputed facts establishing that Complainant was terminated solely for performance reasons, and not in retaliation for engaging in any protected activity that could constitute whistleblowing. Accordingly,

---

[1] The December 13, 2016 Notice of Hearing stated that pre-hearing exchanges are due 20 <u>business days</u> before the hearing rather than 21 days before the Hearing, which would be August 16, 2017. The Amended Notice of Hearing dated June 6, 2017 did not provide such a deadline. In either case, the pre-hearing exchanges are due in the upcoming days or weeks.

Respondent's pending motion provides a basis for granting a summary decision without the need for an evidentiary hearing.

5.   For the sake of judicial economy, and in the interests of avoiding potentially unnecessary legal costs, Respondent believes that it is in the interests of both parties and the Department of Labor to avoid submitting pre-hearing materials or conducting a hearing until it becomes known whether or not the Administrative Law Judge finds that a hearing is necessary in order to resolve any disputed issues of fact in this case.

6.   Respondent alternatively requests that in the event this motion is denied and the hearing is not postponed, the time for any pre-hearing exchange materials be extended until after such a ruling in order to avoid any ambiguity related to looming deadlines while this motion is being considered.

WHEREFORE, for all the reasons stated herein, Respondent requests that the hearing and any pre-hearing submissions be postponed while the Judge considers this motion for summary decision, in order to avoid any potentially unnecessary fees and costs.

DATED:  August 11, 2017                    Respectfully submitted,

                                           **KENCO LOGISTICS SERVICES, LLC**

                                           By:  _____
                                                    One of its Attorneys

Jody Wilner Moran
Julia P. Argentieri
Jackson Lewis P.C.
150 North Michigan Avenue
Suite 2500
Chicago, Illinois 60601
Telephone:     (312) 787-4949
Facsimile:     (312)787-4995

Case: 18-1800     Document: 10-2     Filed: 08/01/2018     Pages: 320

## CERTIFICATE OF SERVICE

The undersigned attorney, hereby certifies that on August 11, 2017, I submitted a copy of the foregoing *Motion to Extend the Deadline for Pre-Hearing Exchanges and Re-Set the Hearing Date* via U.S. mail, fax and email to:

> U.S. Department of Labor, Office of Administrative Law Judges
> Attention: April Cook, Paralegal Specialist to Judge Sellers
> 36 E. 7th Street, Suite 2525
> Cincinnati, Ohio 45202
> FAX: (513)684-6106
> Email: cook.april@dol.gov

A copy was also sent via electronic and U.S. mail to:

> Attorney Jordan Hoffman, Counsel for Complainant
> 2711 E. New York Ave. Suite 205
> Aurora, IL 60502
> jthoffmanlaw@gmail.com

By: _____
One of the Attorneys for the Defendant

Case: 18-1800     Document: 10-2     Filed: 08/01/2018     Pages: 320

  **Jordan Hoffman <jthoffmanlaw@gmail.com>**

---

# Motion to Object and Stricken-2016-FDA-4
2 messages

---

**Jordan Hoffman** <jthoffmanlaw@gmail.com>                    Mon, Aug 14, 2017 at 11:09 AM
To: "Cook, April - OALJ" <cook.april@dol.gov>
Cc: "Argentieri, Julia P. (Chicago)" <Julia.Argentieri@jacksonlewis.com>, "Moran, Jody Wilner (Chicago)"
<MoranJ@jacksonlewis.com>

Ms. Cook,

The attached motion is being faxed over regarding 2016-FDA-4.

Please find the attached motion.

Thanks

The Law Office of
Jordan T. Hoffman, P.C.
2711 East New York St., Suite 205
Aurora, IL 60502
888.958.4529
jthoffmanlaw@gmail.com

*"Balancing the Scales of Justice"*

www.attyjthoffman.com

- CONFIDENTIALITY NOTICE: The information contained in this communication is confidential, may be attorney-client privileged or attorney work product, may constitute inside information or internal deliberative staff communication, and is intended only for the use of the addressee. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify the sender immediately by return e-mail and destroy this communication and all copies thereof, including all attachments. Receipt by an unintended recipient does not waive attorney-client privilege, attorney work product privilege, or any other exemption from disclosure.

📄 **Madison_DOL objection8.14.17.pdf**
   11041K

---

**Cook, April - OALJ** <cook.april@dol.gov>                    Mon, Aug 14, 2017 at 11:22 AM
To: Jordan Hoffman <jthoffmanlaw@gmail.com>

I think we are having trouble with our fax machine.  You can just send a hard copy in the mail.

**From:** Jordan Hoffman [mailto:jthoffmanlaw@gmail.com]
**Sent:** Monday, August 14, 2017 12:09 PM
**To:** Cook, April - OALJ
**Cc:** Argentieri, Julia P. (Chicago); Moran, Jody Wilner (Chicago)
**Subject:** Motion to Object and Stricken-2016-FDA-4

Case: 18-1800      Document: 10-2      Filed: 08/01/2018      Pages: 320

[Quoted text hidden]

UNITED STATES

DEPARTMENT OF LABOR

| | | |
|---|---|---|
| MARY MADISON, | ) | |
| | ) | |
| Complainant, | ) | Case No. 2016-FDA-4 |
| v. | ) | |
| | ) | |
| | ) | |
| KENCO LOGISTICS | ) | |
| | ) | |
| Respondent | ) | |

## MOTION TO STRIKE AND OBJECTION TO EVIDENCE

**NOW COMES** the complainant, **MARY MADISON** by her Attorney, Jordan T. Hoffman and for her Objection to Respondent's Motion to Extend Scheduling Order and Respondent's Dispositive Motion, she states as follows: **THAT**:

1. On December 13, 2016 a Notice of Hearing and Prehearing Order was issued hereto attached as Exhibit 1

2. The Notice of Hearing and Prehearing Order states in ¶ 3 § b that:

"Dispositive Motions.   Dispositive motions may be filed at any time, but no later than thirty (45)[1] workdays before hearing.  Response to such motion must be filed by the party opposing such motion no later than fourteen (14) workdays after receipt of the motion."

3.  Respondent did not file its motion timely in accordance with Notice of Hearing and Prehearing Order of December 13, 2016.

4.  Respondent intentionally filed these motions to delay these preceding's, as Respondent has been in receipt of this tribunal's order of December 13, 2016 outlining the actions that the parties were/are to take.

5.  More specifically, Respondent motioned this court on February 24, 2017, without serving Complainant's counsel in accordance with 29 CFR Part 18 and as a result obtained an Order Entered on March 29, 2017 to extend scheduling order.

6.  An objection to the Order Entered herein on March 29, 2017 was filed on April 6, 2017 herein attached as Exhibit 2

7.  To date, Respondent's counsel has not had Madison sit for a deposition for this matter; as it alleged that it wanted to do in its motion of February 24, 2017 to extend scheduling order.

8.  Respondent proposed during the status conference of May 18, 2017 of having Complainant do a combined deposition for both matters.

9.  After Complainant's counsel agreed to the combined deposition, Respondent declined and instructed Complainant to come alone, without counsel hereto attached as Exhibit 3

---

[1] There seems to be a discrepancy in the written time and the numerical value; however, both thirty (30) and forty-five (45) workdays had passed prior to Respondent filing its Dispositive Motion.  In addition, the motion was filed after the cut off time of 4:30 pm on Friday, August 11, 2017.

10.  Respondent deposed Complainant about matters relative to this matter before this tribunal at the deposition for a matter pending in the Central District of Illinois Federal Court.

11.  Complainant and Complainant's counsel believes that Respondent continues to act in bad faith.

12.  Respondent's Exhibit B-1 and C-1[2] were used in the deposition that was for the matter before the District Court; these documents at no time have been tendered to Complainant in the matter before the District Court herein attached as Group Exhibit 5.

13.  Respondent's Bate Stamped evidence it submitted to Complainant in the District Court is not commensurate to the evidence it tendered Complainant in the Department of Labor matter[3].

14.  Respondent knew that it had intended on deposing Madison and willfully stated otherwise.

15.  Respondent caused Complainant an irreparable harm by disallowing Complainant to not be represented by counsel.

16.  Complainant and Complainant's counsel believe that violations of the Federal Rule(s) of Civil Procedure 11, 26, 30 & 37 have occurred.

17.  Complainant and Complainant's counsel believe that Respondent violated Rule 3. 1 and Rule 3.3 of the Model Rules of Professional Conduct by deposing Complainant without proper legal counsel, as well as, their previous actions of February 24, 2017.

---

[2] Hereto attached is Exhibit 4 which is a list of Respondent's evidence to Madison in the matter pending before the District Court

[3] Respondent had only submitted to Plaintiff Bates Stamped evidence number to 1733 as referenced in Exhibit 4. However, during the May 24, 2017 deposition, the deposition for the District Court, Respondent deposed Complainant on evidence of 1734 and above.

18. Complainant and Complainant's counsel believes that Respondent violated 29 CFR part 18.22 § C & D as well.

19. Complainant and Complainant's counsel object to information obtained during Complainant's deposition that directly related to Defendant's defense in this matter.

20. Complainant and Complainant's counsel believe these actions were prejudicial.

21. Complainant believes that these actions were willful and in bad faith.

22. Complainant and Complainant's counsel believes that Rule 37(c)[4] Exclusionary Sanction applies

---

[4] Rule 37(c) enforces the disclosure requirements imparted by Rule 26. Rule 37(c) states, in relevant part:

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.

The American Bar Association Trial Evidence Committee states in its June 30, 2011 article regarding The Duty to Disclose: Rule 37(c) and Self-Executing Sanctions:

> The rule is said to be automatic, or self-executing, because a court may exclude undisclosed evidence even if no motion to compel has been brought. There is no meet-and-confer requirement prior to bringing a motion to exclude evidence under Rule 37(c). *See, e.g.*, *Fulmore v. Home Depot, U.S.A., Inc.*, 423 F. Supp. 2d 861, 871–72 (S.D. Ind. 2006) ("The Advisory Committee Notes to both the 1993 and 2000 Amendments to Rule 37 make clear that Rule 37(c) operates independent of any motion required by Rule 37(a). Rule 37(c) simply does not require conferral."). The rule applies not only at trial but also to any motion, such as a motion for summary judgment, or a hearing. It applies both to information not disclosed and to witnesses.

They also state:

> Many courts, including the First and Seventh Circuits, have held that the sanction of exclusion is mandatory, unless the nondisclosing party can demonstrate substantial justification for the failure to disclose or can demonstrate that the failure was harmless. *See, e.g., id.* (holding that the exclusion of undisclosed evidence is a mandatory sanction); *Happel v. Walmart Stores, Inc.*, 602 F.3d 820 (7th Cir. 2010) (holding that the sanction for failure to comply with expert disclosures is automatic and mandatory exclusion unless the failure was substantially justified or harmless); *David v. Caterpillar, Inc.*, 324 F.3d 851 (7th Cir. 2003) (same).

23. Complainant filed this matter in 2013 with the Department of Labor.

24. Complainant and Complainant's counsel still contend and reiterate that the matter at the District Court and the matter before the Department of Labor are not inextricably linked.

25. Specifically, Respondent, Kenco, did not have good cause when it asked to modify the December 13, 2016 scheduling order.

26. Complainant and Complainant's counsel believe that Respondent intentionally deceived the court into changing the scheduling order to obtain an unfair advantage in this litigation.

27. Complainant and Complainant's counsel believe that Respondent used this tribunal as means to harass Complainant and thwart Complainant's case.

28. Complainant believes that no "good cause" exist to extend the amended scheduling order.

29. Complainant and Complainant's counsel seek to have the hearing on the date currently set for September 13-15, 2017.

30. Complainant and Complainant's counsel have always sought an expeditious hearing date.

31. Neither Complainant nor Complainant's counsel believe that the order herein entered on March 29, 2017 extending the scheduling order was mutually beneficial.

**Wherefore,** for all of the aforementioned stated reasons, Complainant Madison requests that scheduling remain intact, and that the Respondent's Dispositive motion be stricken and that this court address the actions of Respondent:

a. discovery be closed in accordance with the amended notice of hearing scheduled of June 6, 2017 and;

b. that an hearing date remain September 13-15, 2017 in the pending matter before the Department of Labor and;

c. that Respondent's Bate Stamped evidence 1734-1762 be excluded, as well as, any other evidence that is beyond Respondent's Bated Stamped evidence of 1734 used in the District Court deposition(s).

d. any such other relief, as this tribunal deems warranted in the circumstances.

Dated:  August 14, 2017                    Respectfully Submitted,

MARY MADISON

By: /s/ Jordan Hoffman

2711 E. New York Ave., Suite 205
Aurora, IL 60502
(888) 958-4529

**U.S. Department of Labor**     Office of Administrative Law Judges
36 E. 7th St., Suite 2525
Cincinnati, Ohio 45202

(513) 684-3252
(513) 684-6108 (FAX)



**Issue Date: 13 December 2016**

Case No. 2016-FDA-4

In the Matter of:
MARY MADISON,
      Complainant,

   v.

KENCO LOGISTICS,
      Respondent.

## NOTICE OF HEARING AND PREHEARING ORDER

    **NOTICE IS HEREBY GIVEN** that a hearing will be conducted under the Section 402 of the FDA Food Safety Modernization Act, P.l. 111-353 (Jan. 4, 2011), codified at Federal, Food, Drug, and Cosmetic Act, 21 U.S.C. § 399d by the Honorable John P. Sellers, III, Administrative Law Judge, U.S. Department of Labor, in the above-captioned matter, **beginning at 9:30 a.m. on May 4, 2017, and continuing, if necessary, through May 5, 2017,** in the Chicago, Illinois area.

    The proceeding shall be governed by the Rules of Practice and Procedure for Administrative Hearings before the Office of Administrative Law Judges, 29 C.F.R. Part 18.[1] In all proceedings, the parties shall have the right to be represented by counsel.

    In the interest of expediting the hearing and insuring a prompt disposition of the matter, **IT IS FURTHER ORDERED** that the parties shall take the following action:

    1.   **PREHEARING EXCHANGE.**  At least twenty (20) workdays prior to the hearing, the parties shall submit to the Administrative Law Judge and exchange by mail a prehearing submission containing the following information:

        (a) A <u>brief</u> statement of each issue and the parties' position with regard thereto, including the citation of all relevant statutes, regulations, and case law.

---

[1] On May 19, 2015, the Department of Labor published final Rules of Practice and Procedure for Administrative Hearings before the Office of Administrative Law Judges ("Rules of Practice and Procedure"). 80 Fed. Reg. 28767 (May 19, 2015). The Rules of Practice and Procedure are published in Title 29, Part 18, of the Code of Federal Regulations ("CFR"). The C.F.R. is updated annually, on a staggered basis. Title 29 of the C.F.R. will be updated beginning July 1, 2015. Until the 2015 edition of the C.F.R. is updated to include 29 C.F.R. Part 18, I have cited to the Federal Register, 80 Fed. Reg. 28767 (May 19, 2015), when referring to the Rules of Practice and Procedure.

(b) The full name and address of each witness[2] the party proposes to call with a short summary of the witness' expected testimony.[3]  **NO EXPERT WITNESS** will be permitted to testify unless the party calling that witness shall have served upon the other parties not less than five (5) workdays before the hearing date a written expert witness report, together with a Curriculum Vitae setting forth the professional qualifications of the expert.  The written report will be marked as an exhibit of the offering party and received into evidence as the witness' testimony in chief.  Additional direct testimony from the expert will be allowed only if circumstances warrant.  It is expected that the qualifications of the expert will ordinarily be stipulated to.  However, objections to the expert's qualifications will be considered so long as the objections are raised in writing at least five (5) workdays prior to the scheduled hearing date.  Following the qualification of the expert and the introduction of his/her report into evidence, the witness will be made available for cross-examination.  Cross-examination by way of deposition is also encouraged.

(c) A copy of all non-stipulated documents which the party expects to introduce as evidence.  Each document must be properly marked for identification at the bottom of each Exhibit as DOL, Employer, Complainant or Respondent Exhibit 1, 2, 3, etc., tabbed and paginated.  Only those documents which are **NOT** stipulated should be submitted under this section.

2.    **STIPULATION OF DOCUMENTS**.  The parties are directed to stipulate as to the authenticity and content all documents which they mutually agree should be made a part of the record.  Each of the stipulated documents must be properly marked for identification at the bottom of each page as Joint Exhibit 1, 2, 3, etc., tabbed and paginated, and either placed in a three-ring binder or be bound together in some other acceptable form.  It is expected that any computations of the Department of Labor, if applicable, will be fully stipulated to the extent that the parties agree with such computations (such as hours worked, rate of pay, investigator's findings, etc.) or as they agree with any of the individual items.

3.    (a) **PRELIMINARY MOTIONS**.  All preliminary **MOTIONS** and a statement of objections to any of the proposed testimony or documentary evidence submitted must be lodged within five (5) workdays from the date of receipt of the pre-hearing exchange materials.  Failure to voice an objection within the 5-day period will result in a waiver of all rights with respect to the introduction of the testimony or any of the other materials.

(b) **DISPOSITIVE MOTIONS**.  Dispositive motions may be filed at any time, but no later than thirty (45) workdays before hearing.  Response to such motion must be filed by the party opposing such motion no later than fourteen (14) workdays after receipt of the motion.

---

[2] Each party bears the responsibility and financial burden of having available an interpreter if that is necessary in order for testimony of one of their witnesses to be made a part of the record.
[3] Failure to comply with this provision may result in exclusion of the testimony of witnesses not listed.  Cf. Rule 16, Federal Rules of Civil Procedure.

4.    **DISCOVERY**. Any written motions to compel disclosure or discovery shall comply with 29 C.F.R. § 18.21. Additionally, such written motion must include a certification that the movant has in good faith conferred or attempted to confer with the party not making the disclosure or discovery in an effort to secure the disclosure or discovery without action by the administrative law judge.[4] All discovery will be concluded thirty (30) days before the scheduled hearing.

5.    **LEGIBLE COPIES**. The parties are also directed to conduct a review of all documents which are made a part of the formal record. All documents received into evidence which are not clearly legible will be given no weight.

6.    **SETTLEMENT.** The parties are encouraged to engage in good faith negotiations in an attempt to reach a mutually agreeable and just disposition of the issues. *See* 29 C.F.R. § 18.9(a) for OALJ settlement judge procedures.

7.    **PRE-HEARING CONFERENCE**. A pre-hearing conference may be held prior to the calling of this matter for hearing.

Failure to timely comply with this pre-hearing order without good cause may result in the dismissal of the proceeding or the imposition of other appropriate sanctions against the non-complying party.



Digitally signed by John P. Sellers III
DN: CN=John P. Sellers III,
OU=Administrative Law Judge, O=US
DOL Office of Administrative Law
Judges, L=Cincinnati, S=OH, C=US
Location: Cincinnati OH

JOHN P. SELLERS, III
Administrative Law Judge

---

[4] Failure to comply with this provision may result in denial of the motion to compel. *Cf.* Rule 37(a)(2)(A), Federal Rules of Civil Procedure.

**SERVICE SHEET**

Case Name: **MADISON_MARY_v_KENCO_LOGISTICS_**

Case Number: **2016FDA00004**

Document Title: **Notice of Hearing**

I hereby certify that a copy of the above-referenced document was sent to the following this 13th day of December, 2016:



Digitally signed by APRIL COOK
DN: CN=APRIL COOK, OU=LEGAL
ASSISTANT, O=US DOL Office of
Administrative Law Judges, L=Cincinnati,
S=OH, C=US
Location: Cincinnati OH

**APRIL COOK**
LEGAL ASSISTANT

Director
Directorate of Whistleblower Protection Programs
U S Department of Labor, OSHA
Room N 4618 FPB
200 CONSTITUTION AVE NW
WASHINGTON DC 20210
 *{Hard Copy - Regular Mail}*

Free State Reporting Inc
1378 Cape St. Clair Road
ANNAPOLIS MD 21409
 *{Hard Copy - Regular Mail}*

Counsel for Whistleblower Programs
Division of Fair Labor Standards
Office of the Solicitor
U.S. Department of Labor
200 Constitution Ave, NW, Room N-2716
WASHINGTON DC 20210
 *{Hard Copy - Regular Mail}*

Chicago Regional Solicitor
Regional Solicitor
U. S. Department of Labor
Room 844
230 South Dearborn Street
CHICAGO IL 60604
 *{Hard Copy - Regular Mail}*

Mary Madison
9758 S. Charles
CHICAGO IL 60643
 *{Hard Copy - Regular Mail}*

Jordan TraVille Hoffman, Esq.
11528 S.. Halsted Street
CHICAGO IL 60628
 *{Hard Copy - Regular Mail}*

Scott Simmons, Esq.
Miller & Martin PLLC
832 Georgia Ave., Suite 1000
CHATTANOOGA TN 37402
 *{Hard Copy - Regular Mail}*

**SERVICE SHEET** continued (2016FDA00004 Notice of Hearing) Page: 2

Kenco Logistics
1125 West Sycamore Road
MANTENO IL 60950
        *{Hard Copy - Regular Mail}*

Tim Crouse
Reg. Supervisory Investigator
USDOL, OSHA, Room 3244
230 South Dearborn Street
CHICAGO IL 60604
        *{Hard Copy - Regular Mail}*

Julia P Argentieri, Esq.
Jody Wilner Moran, Esq.
Jackson Lewis, P.C.
150 N. Michigan Ave., Suite 2500
CHICAGO IL 60601
        *{Hard Copy - Regular Mail}*

UNITED STATES

DEPARTMENT OF LABOR


MARY MADISON,                                    )

                                                 )

Complainant,                                     )        Case No. 2016-FDA-4

                                    v.           )

                                                 )

                                                 )

KENCO LOGISTICS                                  )

                                                 )

Respondent                                       )


## **OBJECTION**


**NOW COMES** the complainant, **MARY MADISON** (hereinafter "MADISON") by her

Attorney, Jordan T. Hoffman and for her Objection to the Order Entered herein on March 29,

2017, she states as follows: **THAT:**


1.   On February 24, 2017, Respondent's counsel filed a motion to extend scheduling order.

     See Exhibit 1

2.   Madison's counsel was not served in accordance with 29 CFR Part 18 and as a result

     was unaware that this issue was before this tribunal.

3.   Specifically, respondent emailed "Madison's" counsel.

4.   The email address was incorrect.

5.   Counsel did not agree in writing to service by email.

6.   Neither Madison or Madison's counsel provided respondent or respondent's counsel with Madison's counsel's email address.

7.   The Service list for the matter before the Department of Labor only reflects Madison's counsel's mailing address.

8.   Respondent's allegations in paragraphs 3, 4, 6 and 7 are false and misleading.

9.   Specifically, in regards to paragraph 3, Madison's counsel indicated for the record on the June 2, 2016 conference call with Judge Sellers and respondent that neither Madison nor Madison's counsel felt that this case was inextricably linked to the pending federal litigation.

10.  Madison's counsel did not agree with respondent's sentiments that the discovery deadlines should dovetail with one another.

11.  Neither Madison nor Madison's counsel believed this would be mutually beneficial to set the matters on a similar discovery schedule.

12.  Madison sought an expeditious hearing date.

13.  Specifically, in regards to paragraph 4, at the time of this filing, all discovery delays had been resolved by order of the court on February 8, 2017, sixteen (16) days prior to this filing.  See Exhibit 2

14.  Since February 8, 2017, there has been no other court activity relative to discovery disputes between Madison and respondent.

15.  Consequently, this was a patently false statement made to this tribunal.

16. Specifically, in regards to paragraph 6, based upon the aforementioned reasons Kenco did not have good cause to modify the existing scheduling order.

17. This request has not reduced costs for Madison, as Madison has to incur additional costs borne out of this request, as a direct result of respondent having obtained an ex-parte ruling on its motion to extend scheduling order.

18. Despite respondent's assertion that Madison's deposition could not be scheduled because of discovery disputes, respondent scheduled a deposition that encompassed the District Court case and the matter here before this tribunal for May 18, 2017.

19. Moreover, with regard to the proposed deposition respondent's counsel sent a Fedex to Madison with an Amended Notice of Plaintiff's Deposition[1] on March 31, 2017 that was delivered to Madison on April 3, 2017. See Exhibit 3

20. Respondent's counsel did not confer with neither Madison nor Madison's counsel before setting the date. See Exhibit 4

21. Respondent's counsel did not serve Madison's counsel with a Notice of Deposition, with regards to the matter pending here at the Department of Labor.

22. Respondent's counsel contacted Madison directly concerning the proposed deposition after the order of March 29, 2017.

23. According to Madison, respondent's counsel was admonished on a status call by the Magistrate Judge in the federal litigation on April 4, 2017 to not confer with Madison regarding the pending case at the Department of Labor.

24. Respondent's counsel contacted Madison's counsel on February 7, 2017, asking if she thought Madison would want to change the date.

---

[1] The initial deposition in the District Court case was scheduled for September 13, 2016. Therefore, Respondent had had more than six (6) months to have Madison sit for a deposition before the close of discovery in this matter.

25. It was immediately indicated to respondent's counsel that Madison was out of town, but from what counsel understood Madison was firm on the date.

26. Respondent's counsel during the course of that conversation never discussed proposing a motion to extend the scheduling order.

27. Respondent was advised that Madison was firm on the set date.

28. Madison's counsel never spoke with respondent about any of the reciprocal mutualities listed in the February 24, 2017 motion.

29. Respondent never sent a proposed motion to Madison's counsel for review.

**Wherefore,** for all of the aforementioned stated reasons, Complainant Madison requests that order entered on March 29, 2017 be vacated and that:

a. discovery be closed in accordance with the original order of December 13, 2016 and;

b. that an expeditious hearing date be set in the pending matter before the Department of Labor and;

c. any such other relief, as this tribunal deems warranted in the circumstances.

Dated:  April 6, 2017

Respectfully Submitted,

MARY MADISON

By: /s/ Jordan Hoffman

2711 E. New York Ave., Suite 205
Aurora, IL 60502
(888) 958-4529

UNITED STATES
DEPARTMENT OF LABOR

In the Matter of:          )
                            )
      MARY MADISON,        )
                            )     **Case No. 2016-FDA-4**
        Complainant,        )
                            )
v.                              )
                            )
      KENCO LOGISTICS      )
                            )
        Respondent.         )

## MOTION TO EXTEND SCHEDULING ORDER

Respondent Kenco Logistics Services, LLC hereby requests to extend and re-set the current

dispositive motion deadline, discovery deadline, and hearing dates in the above referenced matter

by at least sixty days, for the reasons set forth below:

1.     On December 13, 2016 an order was entered setting this matter for hearing on May 4, 2017

and May 5, 2017.

2.     Dispositive motions are due 45 workdays prior to the hearing, or March 2, 2017.

3.     The parties agreed to the current schedule based on the fact that there is a parallel case

pending in federal court in the Central District of Illinois with substantially similar facts, *Mary*

*Madison v. Kenco Logistics Services, LLC* (Case Number 15-cv-02290), and in order to avoid

potentially duplicative discovery in the two cases, it was believed to be mutually beneficial to set

the matters on a similar discovery schedule.

4.     Discovery has been delayed in the federal litigation and Kenco is awaiting resolution of

discovery disputes with Madison in order to move forward with setting a deposition.

1

5.    For the reasons set forth above, Kenco requests that the current dispositive motion deadline be extended until a date at least sixty (60) days from now, so that Kenco can complete Madison's deposition once for both matters; and prepare any potential dispositive motion thereafter.

6.    Kenco has good cause to request this modification to the current dispositive motion deadline and any subsequent deadlines, in accordance with 29 C.F.R §1987.107, because it will reduce costs and fees to both sides by avoiding scheduling two separate depositions of Mary Madison on overlapping claims.

7.    Kenco has discussed this request with Counsel for Complainant prior to preparing this motion but has not received a response as to whether this motion can be presented as "agreed."

For all the reasons stated above, Respondent Kenco requests that the Department of Labor extend the current dispositive motion, discovery and hearing dates in this case by at least sixty days in the interests of judicial economy and to avoid duplicative discovery in the related federal litigation.

DATED: February 24, 2017

Respectfully submitted,

**KENCO LOGISTICS SERVICES, LLC**

By: /s/ Jody Wilner Moran
One of its Attorneys

Jody Wilner Moran
Julia P. Argentieri
Jackson Lewis P.C.
150 North Michigan Avenue
Suite 2500
Chicago, Illinois 60601
Telephone:    (312) 787-4949
Facsimile:    (312)787-4995

2

## CERTIFICATE OF SERVICE

The undersigned attorney, hereby certifies that on February 24, 2017, I submitted a copy of the foregoing *Motion to Extend Scheduling Order* via fax and email to:

U.S. Department of Labor, Office of Administrative Law Judges
Attention: April Cook, Paralegal Specialist to Judge Sellers
36 E. 7th Street, Suite 2525
Cincinnati, Ohio 45202
FAX: (513)684-6106
Email: cook.april@dol.gov

A copy was also sent via electronic mail to:

Jordan Hoffman, esq., Counsel for Complainant
jhoffmanlaw@gmail.com

By: /s/ Jody Wilner Moran_____
                    One of the Attorneys for the Defendant

**2:15-cv-02290-CSB-EIL** Madison v. Kenco Logistic Services LLC et al
Colin Stirling Bruce, presiding
Eric I. Long, referral
**Date filed:** 12/08/2015
**Date of last filing:** 03/02/2017

# History

| Doc. No. | Dates | Description |
|---|---|---|
| 1 | *Filed & Entered:* 12/08/2015 | Complaint |
| 2 | *Filed & Entered:* 12/08/2015<br>*Terminated:* 01/04/2016 | Motion for Leave to Proceed in forma pauperis |
| 3 | *Filed & Entered:* 12/11/2015 | Order |
| 4 | *Filed & Entered:* 12/31/2015 | Remark |
| 5 | *Filed & Entered:* 01/04/2016 | Order on Motion for Leave to Proceed in forma pauperis |
| 6 | *Filed & Entered:* 01/04/2016 | Summons Issued |
| 7 | *Filed & Entered:* 01/26/2016 | Notice of Appearance of Attorney |
| 8 | *Filed & Entered:* 01/28/2016 | Summons Returned Executed (21 days to answer) |
| 9 | *Filed & Entered:* 02/01/2016<br>*Terminated:* 02/03/2016 | Motion for Extension of Time to File Answer |
|  | *Filed & Entered:* 02/03/2016 | Order on Motion for Extension of Time to Answer |
| 10 | *Filed & Entered:* 02/03/2016 | Order |
| 11 | *Filed & Entered:* 02/04/2016 | Notice of Appearance of Attorney |
| 12 | *Filed & Entered:* 03/07/2016 | Notice of Appearance of Attorney |
| 13 | *Filed & Entered:* 03/07/2016 | Notice of Appearance of Attorney |
| 14 | *Filed & Entered:* 03/07/2016 | Notice of Appearance of Attorney |
| 15 | *Filed & Entered:* 03/07/2016 | Notice of Appearance of Attorney |
| 16 | *Filed & Entered:* 03/07/2016 | Notice of Appearance of Attorney |
| 17 | *Filed & Entered:* 03/21/2016 | Notice (Other) |
| 18 | *Filed & Entered:* 03/21/2016<br>*Terminated:* 05/03/2016 | Motion to Dismiss for Failure to State a Claim |
| 19 | *Filed & Entered:* 03/21/2016 | Memorandum in Support of Motion |
| 20 | *Filed & Entered:* 03/21/2016 | Notice (Other) |
| 21 | *Filed & Entered:* 03/24/2016 | Summons Returned Executed (21 days to answer) |
| 22 | *Filed & Entered:* 04/01/2016 | Notice (Other) |
| 23 | *Filed & Entered:* 04/01/2016<br>*Terminated:* 05/03/2016 | Motion to Dismiss |
| 24 | *Filed & Entered:* 04/01/2016 | Memorandum in Support of Motion |
| 25 | *Filed & Entered:* 04/01/2016 | Notice (Other) |

| | | |
|---|---|---|
| | Filed & Entered: 04/04/2016 | Order on Motion for Extension of Time to File Response/Reply |
| 26 | Filed & Entered: 04/04/2016<br>Terminated: 04/04/2016 | Motion for Extension of Time to File Response/Reply |
| 27 | Filed & Entered: 04/18/2016 | Report of Rule 26(f) Planning Meeting |
| 28 | Filed: 04/18/2016<br>Entered: 04/19/2016 | Response to Motion |
| 29 | Filed: 04/18/2016<br>Entered: 04/19/2016 | Response to Motion |
| | Filed & Entered: 04/19/2016 | Setting Rule 16 Scheduling Conference |
| | Filed & Entered: 04/26/2016 | Set/Reset Hearings |
| 30 | Filed & Entered: 04/26/2016 | Scheduling Conference |
| 31 | Filed & Entered: 05/03/2016 | Order on Motion to Dismiss for Failure to State a Claim |
| 32 | Filed & Entered: 05/17/2016 | Answer to Complaint |
| | Filed & Entered: 07/21/2016 | Status Conference - Referral Judge |
| 33 | Filed & Entered: 08/23/2016<br>Terminated: 08/29/2016 | Motion for Default Judgment |
| 34 | Filed & Entered: 08/26/2016 | Response to Motion |
| | Filed & Entered: 08/29/2016 | Order on Motion for Default Judgment |
| | Filed & Entered: 08/31/2016 | Set/Reset Deadlines |
| 35 | Filed & Entered: 09/02/2016 | Answer to Complaint |
| 36 | Filed & Entered: 09/06/2016<br>Terminated: 09/19/2016 | Motion for Leave to File |
| 37 | Filed & Entered: 09/15/2016 | Response to Motion |
| | Filed & Entered: 09/19/2016 | Order on Motion for Leave to File |
| 38 | Filed & Entered: 09/19/2016 | Reply to Response to Motion |
| 39 | Filed & Entered: 09/19/2016<br>Terminated: 09/20/2016 | Motion to Strike |
| 40 | Filed & Entered: 09/19/2016 | Response to Motion |
| | Filed & Entered: 09/20/2016 | Order on Motion to Strike |
| 41 | Filed & Entered: 09/26/2016<br>Terminated: 09/28/2016 | Motion for Leave to File |
| | Filed & Entered: 09/28/2016 | Order on Motion for Leave to File |
| | Filed & Entered: 11/18/2016 | Order |
| | Filed & Entered: 11/21/2016 | Order |
| | Filed & Entered: 11/28/2016 | Status Conference |
| | Filed & Entered: 12/20/2016 | Status Conference - Referral Judge |
| 42 | Filed & Entered: 01/04/2017<br>Terminated: 02/08/2017 | Motion to Compel |
| 43 | Filed & Entered: 01/04/2017 | Memorandum in Support of Motion |
| 44 | Filed & Entered: 01/06/2017 | Motion for Extension of Time to File |

| | *Terminated:* 02/03/2017 | |
|---|---|---|
| 45 | *Filed & Entered:* 01/20/2017 | Response to Motion |
| | *Filed & Entered:* 02/03/2017 | Order on Motion for Extension of Time to File |
| 46 | *Filed & Entered:* 02/08/2017 | Order on Motion to Compel |
| 47 | *Filed & Entered:* 02/08/2017 *Terminated:* 02/09/2017 | Motion for Leave to File |
| | *Filed & Entered:* 02/09/2017 | Order on Motion for Leave to File |
| 48 | *Filed & Entered:* 02/09/2017 | Answer to Complaint |
| | *Filed & Entered:* 02/14/2017 | Status Conference - Referral Judge |
| 49 | *Filed & Entered:* 02/21/2017 *Terminated:* 02/22/2017 | Motion for Extension of Time to File Response/Reply |
| | *Filed & Entered:* 02/22/2017 | Order on Motion for Extension of Time to File Response/Reply |
| 50 | *Filed & Entered:* 03/01/2017 *Terminated:* 03/02/2017 | Motion for Extension of Time to File |
| | *Filed & Entered:* 03/02/2017 | Order on Motion for Extension of Time to File |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 04/03/2017 18:55:17 | | | |
| **PACER Login:** | jt2450:3474088:0 | **Client Code:** | |
| **Description:** | History/Documents | **Search Criteria:** | 2:15-cv-02290-CSB-EIL |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

EXHIBIT 3

Case: 18-1800    Document: 10-2    Filed: 08/01/2018    Pages: 320

Representing Management Exclusively in Workplace Law and Related Litigation

# jackson|lewis

Attorneys at Law

Jackson Lewis P.C.
150 North Michigan Avenue
Suite 2500
Chicago, Illinois 60601
Tel 312 787-4949
Fax 312 787-4995
www.jacksonlewis.com

| | | | |
|---|---|---|---|
| ALBANY, NY | GREENVILLE, SC | MONMOUTH COUNTY, NJ | RALEIGH, NC |
| ALBUQUERQUE, NM | HARTFORD, CT | MORRISTOWN, NJ | RAPID CITY, SD |
| ATLANTA, GA | HONOLULU, HI* | NEW ORLEANS, LA | RICHMOND, VA |
| AUSTIN, TX | HOUSTON, TX | NEW YORK, NY | SACRAMENTO, CA |
| BALTIMORE, MD | INDIANAPOLIS, IN | NORFOLK, VA | SALT LAKE CITY, UT |
| BIRMINGHAM, AL | JACKSONVILLE, FL | OMAHA, NE | SAN DIEGO, CA |
| BOSTON, MA | KANSAS CITY REGION | ORANGE COUNTY, CA | SAN FRANCISCO, CA |
| CHICAGO, IL | LAS VEGAS, NV | ORLANDO, FL | SAN JUAN, PR |
| CINCINNATI, OH | LONG ISLAND, NY | PHILADELPHIA, PA | SEATTLE, WA |
| CLEVELAND, OH | LOS ANGELES, CA | PHOENIX, AZ | ST. LOUIS, MO |
| DALLAS, TX | MADISON, WI | PITTSBURGH, PA | TAMPA, FL |
| DAYTON, OH | MEMPHIS, TN | PORTLAND, OR | WASHINGTON, DC REGION |
| DENVER, CO | MIAMI, FL | PORTSMOUTH, NH | WHITE PLAINS, NY |
| DETROIT, MI | MILWAUKEE, WI | PROVIDENCE, RI | |
| GRAND RAPIDS, MI | MINNEAPOLIS, MN | | |

*through an affiliation with Jackson Lewis P.C., a Law Corporation

MY DIRECT DIAL IS: 312-803-2533
MY EMAIL ADDRESS IS: JULIA.ARGENTIERI@JACKSONLEWIS.COM

March 31, 2017

**VIA E-MAIL AND FED EX**
Mary Madison
9758 South Charles
Chicago, IL 60643
Email: mdj123197@aol.com

Re:   *Madison v. Kenco et. al.*, Case No.
        15-cv-2290, Case No. 2016-FDA-4

Dear Ms. Madison:

Enclosed please find a copy of an Amended Notice of Plaintiff's Deposition. Per the enclosed notice, Defendant Kenco intends to take your deposition in the above-referenced matters. In addition to your pending federal lawsuit, this deposition will also cover claims at issue in your pending appeal with the Department of Labor.

Thank you.

Regards,

**JACKSON LEWIS P.C.**

Julia P. Argentieri

Cc:    Jordan T. Hoffman, Esq. (with enclosure)
        Thomas R. Davies (with enclosure)
        Harry Harmon (with enclosure)
        Kimberly J. Overbaugh (with enclosure)

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

MARY MADISON,                          )
                                       )
            Plaintiff,                 )
                                       )      Case No. 15-cv-2290-CSB-EIL
      v.                               )
                                       )
KENCO LOGISTIC SERVICES, et. al.,      )
                                       )
            Defendants.                )

<u>AMENDED NOTICE OF PLAINTIFF'S DEPOSITION</u>

      Pursuant to Rule 30 of the Federal Rules of Civil Procedure, Defendant, Kenco Logistic Services ("Kenco") hereby directs Plaintiff Mary Madison to appear for a videotaped deposition before an officer authorized by law to administer oaths on May 18, 2017 at 9:30 a.m.[1] at the offices of Jackson Lewis P.C., 150 North Michigan Avenue, Suite 2500, Chicago, Illinois 60601. Ms. Madison is directed to produce at the commencement of her deposition: (1) all documents she reviewed in preparation for the deposition and (2) all documents responsive to Defendant's First Request for Production of Documents not previously produced to Defendant.

Dated: March 31, 2017

                              **KENCO LOGISTIC SERVICES, LLC**

                              By: _____
                                One of the Attorneys for Defendant.

Jody Wilner Moran
Julia P. Argentieri
**Jackson Lewis P.C.**
150 N. Michigan Avenue, Suite 2500
Chicago, IL 60601
Telephone: (312) 787-4949
Facsimile: (312) 787-4995
moranj@jacksonlewis.com
julia.argentieri@jacksonlewis.com

---

[1] A court reporter from Veritext Legal Solutions will be recording Plaintiff's deposition using sound and visual recording devices. The Veritext court reporter will also make written transcripts of the proceedings available.

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that on March 31, 2017, she caused a true and

correct copy of the foregoing **Amended Notice of Plaintiff's Deposition** by e-mailing a copy of

same to the e-mail addresses below and also by causing a copy to be placed in the U.S. Mail,

first-class postage prepaid, addressed as follows:

> Mary Madison (*pro se*)
> 9758 South Charles
> Chicago, IL 60643
> Mdj123197@aol.com
>
> Thomas R. Davies
> Harry Harmon
> Kimberly J. Overbaugh
> Harmon & Davies, P.C.
> 2306 Columbia Avenue
> Lancaster, PA 17603
> tdavies@h-dlaw.com
> rharmon@h-dlaw.com
> koverbaugh@h-dlaw.com

_____
Julia P. Argentieri

4841-1823-7766, v. 1

**FedEx Express**

fedex.com 1.800.GoFedEx 1.800.463.3339

09590

06432020

8113 0899 8065

**FedEx US Airbill** Package

Tracking Number 8113 0899 8065

**1 From**

Date 1/24/17

Sender's Name Julia Mathern

Company JACKSON LEWIS P.C. LLP

Address 150 N MICHIGAN AVE STE 2500

City CHICAGO    State IL    ZIP 60601-7619

Phone 312 803 2646

**2 Your Internal Billing Reference** 342957

**3 To**

Recipient's Name Marlin McGinley

Company GEXSAWMER

Address

City Chicago    State IL    ZIP

0126486803

**4 Express Package Service**

- FedEx First Overnight
- FedEx Priority Overnight
- FedEx Standard Overnight
- FedEx 2Day A.M.
- FedEx 2Day
- FedEx Express Saver

**5 Packaging**

- FedEx Envelope
- FedEx Pak
- FedEx Box
- FedEx Tube
- Other

**6 Special Handling and Delivery Signature Options**

- Saturday Delivery
- No Signature Required
- Direct Signature
- Indirect Signature

Does this shipment contain dangerous goods?

- No
- Yes As per attached Shipper's Declaration
- Yes Shipper's Declaration not required
- Dry Ice
- Cargo Aircraft Only

**7 Payment** Bill to:

- Sender
- Recipient
- Third Party
- Credit Card
- Cash/Check

Total Packages    Total Weight

0215

FedEx
TRK# 8113 0899 8065
0215

FID 216623 31MR17 CHIA 6464X/7965/ACDA

79 JOTA

MON – 03 APR AA
STANDARD OVERNIGHT

60643
IL-US
ORD

EXHIBIT 4

 Gmail

**Jordan Hoffman <jthoffmanlaw@gmail.com>**

---

## Re: Madison v. Kenco

**Mary** <mdj123197@aol.com>                                    Mon, Apr 3, 2017 at 10:25 PM
To: "Argentieri, Julia P. (Chicago)" <Julia.Argentieri@jacksonlewis.com>
Cc: "jhoffmanlaw@gmail.com" <jhoffmanlaw@gmail.com>, Tom Davies <TDavies@h-dlaw.com>, Kimberly
Overbaugh <KOverbaugh@h-dlaw.com>, "Moran, Jody Wilner (Chicago)" <MoranJ@jacksonlewis.com>

Good day,

I am in receipt of your documentation regarding the deposition that you set for May 18, 2017.  As you
know, the discovery that was issued to you is overdue and you have not reached out to me in regards to
the outstanding discovery.  Please do so.

As you know, Attorney Hoffman is my legal counsel in the foregoing matter at the Department of Labor.
 Pointedly, setting a date for a deposition without communicating or conferring with him was inappropriate.
Pointedly, you should have conferred with Attorney Hoffman with regards to setting a deposition that
involves a matter that he is litigating.  Moreover, as a courtesy you should have conferred with me as well
to ensure that time was convenient for me as well; as it is my understanding that this collaborative
process.

Since you have taken the liberty to arrange a deposition that synergizes another matter that legal counsel
is retained, I will allow him to schedule the deposition.

Furthermore, it was my understanding that the DOL is on May 4-5, 2017.

Also, the discovery for the matter is district court ends soon as well.

The date you have chosen I will be out of town at a graduation during that week.

Please refrain from contacting regarding the DOL matter, as that is not proper.

In addition, that is not Attorney Hoffman's email address.   His email address is JTHoffmanlaw@gmail.com.
You left the t out.

Thank you for your cooperation.

sent from my iPad

On Mar 31, 2017, at 5:10 PM, "Argentieri, Julia P. (Chicago)" <Julia.Argentieri@jacksonlewis.com> wrote:

> Ms. Madison and Mr. Hoffman-
>
> Please see attached.
>
>
> Regards,
>
> Julie
>
>
> Julia P. Argentieri

Attorney at Law

**Jackson Lewis P.C.**

150 North Michigan Avenue
Suite 2500
Chicago, IL 60601

Direct: (312) 803-2533 | Main: (312) 787-4949

Julia.Argentieri@jacksonlewis.com  |  www.jacksonlewis.com

*Jackson Lewis P.C. is included in the 2016 rankings of the AmLaw 100 and Global 100 law firms.*

Confidentiality Note: This e-mail, and any attachment to it, contains privileged and confidential information intended only for the use of the individual(s) or entity named on the e-mail. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that reading it is strictly prohibited. If you have received this e-mail in error, please immediately return it to the sender and delete it from your system. Thank you.

&lt;Madison Re-Notice of Deposition 033117.pdf&gt;

CERTIFICATE OF SERVICE

I, Jordan T. Hoffman, hereby certify that a copy of the foregoing document was sent to the following this 7th day of April, 2017:

**By: Email and Regular Mail**

U.S. Department of Labor, Office of Administrative Law Judges
Attention: April Cook, Paralegal Specialist to Judge Sellers
36 E. 7th Street, Suite 2525
Cincinnati, Ohio 45202
Email: cook.april@dol.gov

**By: Regular Mail**

Director
Directorate of Whistleblower Protection Programs
U S Department of Labor, OSHA
Room N 4618 FPB
200 CONSTITUTION AVE NW
WASHINGTON DC 20210
        *(Hard Copy - Regular Mail)*

Free State Reporting Inc
1378 Cape St. Clair Road
ANNAPOLIS MD 21409
        *(Hard Copy - Regular Mail)*

Counsel for Whistleblower Programs
Division of Fair Labor Standards
Office of the Solicitor
U.S. Department of Labor
200 Constitution Ave, NW, Room N-2716
WASHINGTON DC 20210
        *(Hard Copy - Regular Mail)*

Chicago Regional Solicitor
Regional Solicitor
U. S. Department of Labor
Room 844
230 South Dearborn Street
CHICAGO IL 60604
        *(Hard Copy - Regular Mail)*

Mary Madison
9758 S. Charles
CHICAGO IL 60643
        *(Hard Copy - Regular Mail)*

Scott Simmons, Esq.
Miller & Martin PLLC
832 Georgia Ave., Suite 1000
CHATTANOOGA TN 37402
        *(Hard Copy - Regular Mail)*

SERVICE SHEET continued Page: 2

Tim Crouse
Reg. Supervisory Investigator
USDOL, OSHA, Room 3244
230 South Dearborn Street
CHICAGO IL 60604
        *(Hard Copy - Regular Mail)*

Julia P Argentieri, Esq.
Jody Wilner Moran, Esq.
Jackson Lewis, P.C.
150 N. Michigan Ave., Suite 2500
CHICAGO IL 60601
        *(Hard Copy - Regular Mail)*

By: /s/ Jordan Hoffman

2711 E. New York Ave., Suite 205
Aurora, IL 60502
(888) 958-4529

 **Exhibit 111**



**Jordan Hoffman <jthoffmanlaw@gmail.com>**

---

## Madison v. Kenco

1 message

---

**Argentieri, Julia P. (Chicago)** <Julia.Argentieri@jacksonlewis.com>

Tue, May 23, 2017 at 1:37 PM

To: Jordan Hoffman <jthoffmanlaw@gmail.com>
Cc: "Moran, Jody Wilner (Chicago)" <MoranJ@jacksonlewis.com>

Jordan:

In follow up to my voicemail, I am returning your call from earlier today- While we appreciate you letting us know that Madison is willing to sit for both depositions at once, we will not be adjusting the plans on such short notice. Tomorrow's deposition will not include her DOL appeal. Given that we tried to suggest combining the depositions for efficiency several months ago, and it was met with very strong opposition, we are not in a position now on less than 24 hours' notice to take Madison's deposition for the DOL matter tomorrow. The deposition tomorrow will only cover Madison's federal lawsuit, where she is pro se. If you have available dates in June or July you'd like to suggest for Madison's DOL deposition, please feel free to give me a call or email.

Thanks,
Julie Argentieri

**Julia P. Argentieri**

Attorney at Law

**Jackson Lewis P.C.**

150 North Michigan Avenue
Suite 2500

Chicago, IL 60601

Direct: (312) 803-2533 | Main: (312) 787-4949

Julia.Argentieri@jacksonlewis.com | www.jacksonlewis.com

*Jackson Lewis P.C. is included in the AmLaw 100 and Global 100 law firm rankings.*

Confidentiality Note: This e-mail, and any attachment to it, contains privileged and confidential information intended only for the use of the individual(s) or entity named on the e-mail. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that reading it is strictly prohibited. If you have received this e-mail in error, please immediately return it to the sender and delete it from your system. Thank you.

Case: 18-1800    Document: 10-2    Filed: 08/01/2018    Pages: 320

**Exhibit 1v**

**From:** Julia P Argentieri <notifier@mail.vault.netvoyage.com>
**To:** mdj123197 <mdj123197@aol.com>
**Subject:** Julia P Argentieri shared these documents with you
**Date:** Tue, Feb 14, 2017 10:03 am

Ms. Madison
Attached please find document production from Kenco Logistic Services, LLC regarding the above-referenced matter - Please let us know if you are agreeable to entering a protective order so that any confidential documents containing sensitive information or non-party information can be marked confidential. We will produce additional documents following agreement regarding a protective order.

Please note that the link to access these documents will expire in 30 days. Please contact me if you have any difficulty opening them.

Regards,
Julie Argentieri

Links expire 2017-03-16

Download all

| | | |
|---|---|---|
| Kenco 000001-000040 - Personnel File.pdf | DOWNLOAD | VIEW |
| Kenco 000041-000059 - EEOC FOIA.pdf | DOWNLOAD | VIEW |
| Kenco 000060- 000559 - IDHR FOIA.pdf | DOWNLOAD | VIEW |

Download all

| | | |
|---|---|---|
| Kenco 000560- 000904 - IDHR FOIA 2.pdf | DOWNLOAD | VIEW |
| Kenco 000905-001159 - IDHR FOIA 3.pdf | DOWNLOAD | VIEW |
| Kenco 001160-001352 - IDHR FOIA 4.pdf | DOWNLOAD | VIEW |

Download all

| | | |
|---|---|---|
| Kenco 001353-001724 - IDHR FOIA 5.pdf | DOWNLOAD | VIEW |
| Kenco 001731-001733 - Quality Engineer Job Description.pdf | DOWNLOAD | VIEW |

**Thank you for using NetDocuments for secure document delivery.**
If you have any questions, contact support or find out more about **net**documents at www.netdocuments.com

**Exhibit V**

Case: 18-1800     Document: 10-2     Filed: 08/01/2018     Pages: 320

# EXHIBIT B-1

# Memorandum of Understanding (MOU)

May 22, 2013

RE: Service Master Recap Meeting

To:   Timothy McGrath
      Brodie McGrath
      Kevin Moses
Cc:   Brian Davis
      Kelvin Walsh
      Will Schwerin

On or about May 21, 2013, a meeting ensued with Timothy McGrath, Brodie McGrath, Kevin Moses and myself relating to the services provided by Servicemaster Janitorial Services and Commercial Cleaning.

The meeting was called to review the scope of services provided by Servicemaster at the Kenco/Mars facility in Manteno, IL.  The scope of the sanitation schedule checklist was reviewed, discussed and agreed upon it being the correct scope of work; while highlighting various line items with the aforementioned persons.

Some key talking points were, but were not limited to:  The general conditions of the facility, the general conditions of the cleaning equipment used in the cleaning process, the inordinate amount of accrued dust on various fixed objects, spot washing of walls, cleaning the edges of the tiled floor with an edger of some sort as opposed to leaving it unclean, as well as, the cleaning the glass vestibule.

Additional key talking points were the expectations of the agreement of the scope of work to be performed as agreed upon, as well as, the implementation of corrective and preventative actions in the execution of the tasks at hand.

Moreover, it was also discussed that Quality Standards set forth by various regulatory agencies required the facility to be in total compliance with the aforementioned standards.  Being a current part of the FDA mandates.

Again, the expectation is to fulfill each and every line item scoped in the sanitation schedule, as well as, maintain clean and sanitized cleaning equipment to prevent the spread of disease.  Be it known as a matter of concern, that the goodwill and business reputation of Kenco/Mars can be adversely

KENCO 001734

Pages: 320   Filed: 08/01/2018   Document: 10-2   Case: 18-1800

Case: 18-1800    Document: 10-2    Filed: 08/01/2018    Pages: 320

affected and damaged by not fulfilling the current Quality Mandates and can result in serious illness and even death; therefore, prompting unwanted litigious exchanges. Consequently, in an effort to uphold food security and defense it is paramount that these maximums be adhered to and corrected.

In addition, please provide the standard work for each of your employees. This will entail the detail job description of their daily tasks. Please remit this within (3) three business days, as well as, the corrective and preventative action plan.

Last but not least, we appreciate the comments and concerns that were shared by with your regarding the volume of persons here in the facility vs. the manpower supplied to execute the program efficiently and effectively, as well as, the various past concerns, as it relates to conditions of the restrooms and biohazards associated with the restrooms.

It goes without saying that your service has been invaluable to the facility since its inception and we look forward to that continued service.

If there are any other questions, comments, or concerns, please feel free to contact me regarding them.

Sincerely,


Mary D. Madison
Quality Engineer
Kenco/Mars

KENCO 001735

Case: 18-1800    Document: 10-2    Filed: 08/01/2018    Pages: 320

EXHIBIT 4

May 24, 2013

Kenco Logistics Services
1125 Sycamore St.
Manteno, IL 60915

Attn: Mary Madison

Re: Memorandum of Understanding

Dear Mary,

This is in response to the MOU we received from you May 22, 2013. We thank you for meeting with us this week and pointing out your expectations regarding our housekeeping and sanitation services that ServiceMaster is providing for Kenco. It is now and always has been our desire and intention to work with you as partners and share the same concerns for your facility as you do. Since 1999 at the opening of your facility we have been there trying to provide all the services that have been asked of us. We are proud of our record and reputation at Kenco and in our community at large and as we are aware that no business is perfect we are willing and desirous to correct any deficiencies that might on occasion arise if given the opportunity.

You currently receive on a daily basis a performance report filled out by the housekeepers that describes the task being performed and the frequencies of these task. In addition I will include CLEANING DETAILS, HOUSEKEEPER/SANITIZER RESPONSIBILITIES, also a sample CLEANING QUALITY INDICATOR that we will perform monthly and return to you.

In response to our meeting we have discussed the areas of concern with our employees and have assigned specific responsibilities to address the glass, the garbage cans and the dusting of the ledges in the hallways. Our supervisor has already washed the walls in the hallways and some of the marks do not remove without damaging the paint. I would suggest that the wall washing be added to the schedule on a quarterly basis. As for the darkness of the grout on the edges of the hallway floors I would ask for some time to work on that as it requires special tools and chemicals.

Sincerely,
Tim McGrath

ServiceMaster Building Maintenance

KENCO 001736

## RE: Service Master

Madison, Mary

**Sent:** Thursday, May 23, 2013 8:41 AM

**To:** Davis, Brian

YEP, GOTCHA..... Realizing there relationship it is a definite given that have to "PIP" time; but honestly it is my belief they are not going to make, as they have not done anything any differently. Easy fix things like clean the glass!!!!!!!!!!!! Dust!!!!!!!!!!!!!!!!!. So, we have to be ready when Mars come for their audit in the next 45-60 days and...........We are a little under the GUN!!

**From:** Davis, Brian
**Sent:** Thursday, May 23, 2013 8:23 AM
**To:** Madison, Mary
**Subject:** RE: Service Master

Easy now... give them an opportunity to improve and let's keep in mind they have a pretty long history with the site and that the previous 3PL may have operated with a different set of expectations; I'd like to keep the relationship in a "collaborative" mode more than a "confrontational" mode as much as possible; Let's make a solid effort to work with them to effect change first.

I will be up there during the first week of June sometime for a couple days. Let's give it a good effort to work with them to improve at least until then. In the meantime, please document, photograph, etc, any issues/concerns with their performance so that we have supporting data to use should we need to terminate the contract for cause.

**Brian Davis, CPSM**

Director of Procurement

_____

Kenco Management Services, LLC

P. O. Box 1607

2001 Riverside Drive (37406)

Chattanooga, TN 37401

Phone: 423-643-3452

Mobile: 706-264-2815

brian.davis@kencogroup.com.

www.kencogroup.com

**From:** Madison, Mary
**Sent:** Thursday, May 23, 2013 9:12 AM
**To:** Davis, Brian
**Subject:** Service Master

Good Morning!!

It is my belief that they are seriously not interested in retaining their contract with us. As to date, there has not been improvement in the areas discussed that could have been easily rectified.

So!!!!!!!!!!

When you come, it is my belief that you will not be "skeered" to give them the real business of seeing the door!!

With sincerest thanks

Mary

KENCO 001738

## Walsh, Kelvin

| | |
|---|---|
| **From:** | Hise, Paula |
| **Sent:** | Friday, October 11, 2013 8:48 AM |
| **To:** | Walsh, Kelvin |
| **Subject:** | FW: Service Agreements |

Hi Kelvin,
I'm looking through my files now for any emails between me and Mary relating to instruction that was given by me. I think the email below falls into that category. I don't have a lot of documentation for a couple of reasons – 1) I didn't want to undermine your authority as her direct supervisor, and 2) communicating with her via email became so difficult and labor intensive, that I tried to speak with her verbally in an effort to avoid dozens of lengthy emails.....

Paula Hise, CSCP
Vice President, Operations

Kenco Logistic Services
2001 Riverside Drive
Chattanooga, TN 37406
Cell: 423-290-3749
Email: Paula.Hise@Kencogroup.com

**From:** Paula Hise <Paula.Hise@kencogroup.com>
**Date:** Wed, 26 Jun 2013 08:26:42 -0400
**To:** "Madison, Mary" <Mary.Madison@Kencogroup.com>
**Subject:** Re: Service Agreements

Hi Mary,
We may have our wires crossed here. We assumed that you would draft a letter after your meeting with ServiceMaster to confirm the actions and timelines jointly agreed upon during the meeting. But before circulating the letter, please run it past Ann first.

Thanks,

Paula Hise, CSCP
Vice President, Operations

Kenco Logistic Services
2001 Riverside Drive
Chattanooga, TN 37406
Cell: 423-290-3749
Email: Paula.Hise@Kencogroup.com

**From:** "Madison, Mary" <Mary.Madison@Kencogroup.com>
**Date:** Tue, 25 Jun 2013 17:26:34 -0400
**To:** Paula Hise <Paula.Hise@kencogroup.com>
**Subject:** RE: Service Agreements

That's great a letter is being composed and it can be forwarded so that when we have the meeting it can be given out! We will meet with them on Thursday afternoon and it is hopeful that a plan of action can be implemented. Not exactly sure what can't be cleaned in the ten (10) day time frame, as a good majority of it has been launched.

1

Thank you kindly,

Mary Madison
Quality Engineer

Kenco/Mars
1125 West Sycamore Road
Manteno, IL 60950
815.468.4448
www.Kencogroup.com

This message and any attachments are intended only for the use of the addressee and may contain information that is privileged and confidential. If the reader of the message is not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. If you have received this communication in error, notify the sender immediately by return email and delete the message and any attachments from your system.

**From:** Hise, Paula
**Sent:** Tuesday, June 25, 2013 4:04 PM
**To:** Madison, Mary; Davis, Brian
**Cc:** Moses, Kevin; Walsh, Kelvin
**Subject:** Re: Service Agreements

Hi team,
Mary, I just ran into Brian in the hallway and we had a quick chat about this. Before sending any documentation to Servicemaster related to the outcomes of your pending meeting, let's run it by Ann first. It is always a good idea to have our legal counsel review any documentation when we are getting to a relatively serious point with a supplier.

Also, Kelvin and I also discussed the 10 day requirement on remediation. It may be that they won't be able to remediate every open item within 10 days. Our expectation from them should be a written plan, addressing our specific concerns with specific dates as to when each issue will be resolved. Hopefully, most will be within a 10 day period, but some items could take longer to remediate and we need to be open to that possibility.

Thanks,

Paula Hise, CSCP
Vice President, Operations

Kenco Logistic Services
2001 Riverside Drive
Chattanooga, TN 37406
Cell: 423-290-3749
Email: Paula.Hise@Kencogroup.com

**From:** "Madison, Mary" <Mary.Madison@Kencogroup.com>
**Date:** Tue, 25 Jun 2013 14:58:26 -0400
**To:** Brian Davis <brian.davis@kencogroup.com>
**Cc:** Paula Hise <Paula.Hise@kencogroup.com>, "Moses, Kevin" <Kevin.Moses@Kencogroup.com>
**Subject:** RE: Service Agreements

Hey Brian,

KENCO 001740

They have not done what was requested in the MOU. We are in a quandary because we have the audit/review coming within the next 30 days. Ms. Paula said to call them in again, review the matter again, give them a letter outlining that within ten (10) days they are to become totally compliant with the line items and sanitation issues. The letter should also include, but not limit the termination of their contract if the line items are not fulfilled, as well as, their remediation not being limited to a price increase.

It is the belief here that the limit of ten (10) days should be extended, with no specific deadline date. It is also the belief that although they have "been pencil whipping" and admittedly not doing what is required they should be given some direction on how to manage their business. Suggesting that perhaps we should guide them on how to staff to meet the needs or provide a detail schedule. It was also suggested that on a regular basis that the toilet is always stopped up and that precludes them from performing the assigned tasks on an ongoing basis. It was also the belief a new vendor would repeat the same egregious acts. It is also the belief that Mars audit will not encompass or focus on this aspect as the long standing relationship is a forbearance to this aspect. It is also the belief that the depth of the scope of sanitation requirements are not the focus of Mars and nor had these expectations or understandings been discussed or presented previously to essentially warrant the attention being garnered. It is believed that the scope of work to be performed had not been effectively and efficiently outlined to the vendor and that we should work with the vendor to better understand what is needed. It is the belief that not being involved in the process has precluded the vendor from understanding the scope of work to be preformed.

The thought was that the vendor had been provided with the scope of work some years prior to the engagement about the services in May of 2013. That the benchmark being used was the scope of work that they were previously engaged in prior to the acquisition. That no new moratoriums had been imposed upon them. The thought is that it is our fiduciary and ethical obligation to protect the interest of Kenco in ensuring that vendors provide the services they were hired to do and not allowing vendors to bill for services not rendered. That it is also our responsibility to protect the stakeholders interest, without compromise; this includes, but is not limited to: Kenco, its internal and external customers, subsidiaries, and the customer(s), as well as, the goodwill associated with these bodies. That it is not our responsibility to manage the scope of someone else's business, but to have the best interest of Kenco and Mars at the forefront by being in compliance with the current regulations. That the incremental cost associated with perhaps a new vendor would probably offset the cost of poor quality, as well as, the loss of intrinsic and extrinsic value associated with the lack of exercised due diligence. The thought was also expressed that sanctions and fines could arise from lack of compliance.

The thought was also expressed that in good consciousness there is no justification in failing to meet the outlined and prescribed rules and regulations. That my thought specifically is not be found in an unjustifiable position. That these requirements were outlined and agreed upon between Kenco and Mars through the onboarding of the Quality position, with the understanding that the necessary measures would be implemented to ensure compliance with Governmental Rules, as well as, Mars and Kenco. Therefore, encompassing the governing rules, as well as, the business objectives of all parties. In addition, that from my stance there would be no direct conflict to the governing rules and business objectives, as well as, to the requestors for compliance. The thought was also expressed that if a deviation in the plan of action was to occur then the deviation must be conveyed, as well as, the assumption of responsibility for the decision being made.

Attached is a copy of the MOU sent to Servicemaster in May 2013.

Thank you kindly,

Mary Madison
Quality Engineer

Kenco/Mars
1125 West Sycamore Road
Manteno, IL 60950
815.468.4448
www.Kencogroup.com

This message and any attachments are intended only for the use of the addressee and may contain information that is privileged and confidential. If the reader of the message is not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. If you have received this communication in error, notify the sender immediately by return email and delete the message and any attachments from your system.

KENCO 001741

Pages: 320

Filed: 08/01/2018

Document: 10-2

Case: 18-1800

**From:** Davis, Brian
**Sent:** Tuesday, June 25, 2013 9:18 AM
**To:** Madison, Mary
**Subject:** RE: Service Agreements

Hi Mary,

I tried to call earlier.

What's going on with Servicemaster?

**Brian Davis, CPSM**
Director of Procurement

Kenco Management Services, LLC
P. O. Box 1607
2001 Riverside Drive (37406)
Chattanooga, TN 37401
Phone: 423-643-3452
Mobile: 706-264-2815
brian.davis@kencogroup.com
www.kencogroup.com

**From:** Madison, Mary
**Sent:** Monday, June 24, 2013 10:23 AM
**To:** Davis, Brian
**Subject:** RE: Service Agreements

Brian,

Please call me!  Need some direction on Service Master!

Thank you kindly,

Mary Madison
Quality Engineer

Kenco/Mars
1125 West Sycamore Road
Manteno, IL 60950
815.468.4448
www.Kencogroup.com

This message and any attachments are intended only for the use of the addressee and may contain information that is privileged and confidential. If the reader of the message is not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. If you have received this communication in error, notify the sender immediately by return email and delete the message and any attachments from your system.

**From:** Davis, Brian
**Sent:** Tuesday, May 21, 2013 11:35 AM

KENCO 001742

Mr. Brian,

Good Morning!

The reason for my request is, the services that ServiceMaster are providing is less than acceptable. Attached is a schedule of what is to be performed; however, to date, the condition of the parcel does not reflect this

The lawn on yesterday looked liked a grazing field of dead dandelions...............

A meeting has been called with them today and they will be here at 11:30 am.

There are ears that are listening with baited breath and to avoid conflict and ill will, my conversation was limited:)
Mary

KENCO 001743

## Walsh, Kelvin

| | |
|---|---|
| **From:** | Walsh, Kelvin |
| **Sent:** | Thursday, June 27, 2013 9:38 AM |
| **To:** | Davis, Brian |
| **Subject:** | RE: service master |

Thanks Brian,

Trying to get my hands around this now. Is it ok to share your outlined in red response with Paula?

**From:** Davis, Brian
**Sent:** Thursday, June 27, 2013 9:36 AM
**To:** Walsh, Kelvin
**Subject:** RE: service master

Please see attached, and whatever you do, please do not let Mary threaten the supplier with "litigious exchanges" again... the last thing we need is a lawsuit brought on by overzealousness...

**Brian Davis, CPSM**
Director of Procurement

Kenco Management Services, LLC
P. O. Box 1607
2001 Riverside Drive (37406)
Chattanooga, TN 37401
Phone: 423-643-3452
Mobile: 706-264-2815
brian.davis@kencogroup.com
www.kencogroup.com

**From:** Walsh, Kelvin
**Sent:** Thursday, June 27, 2013 10:01 AM
**To:** Davis, Brian
**Subject:** service master

Hi Brian,

Can you review the attached Memo compared to their contractual agreement? I want to ensure we are not holding them to standards outside of their scope of business.

Thanks,

**Kelvin Walsh**

1

GM

**Kenco Logistics Services**
1125 W Sycamore Rd
Manteno, IL 60950
www.kencogroup.com
Email: Kelvin.Walsh@Kencogroup.com
Office: 815-468-4476
Cell: 815-474-5971
FAX: 815-468-2468

Case: 18-1800     Document: 10-2     Filed: 08/01/2018     Pages: 320

KENCO 001745



1125 West Sycamore Road
Manteno, Il 60950
815.468.4448

June 27, 2013

ServiceMaster Clean
Timothy McGrath, Owner
253 S. Wall Street
Kankakee, Il 60901

Dear Mr. McGrath:

This scope of this letter is to recap and reiterate Kenco's previous disposition and expectations, as well as, referencing the meeting of today, June 27, 2013, whereby Timothy McGrath, Brodie McGrath, Kelvin Walsh and myself are in attendance, as a follow up the meeting on or about May 21, 2013, with Timothy McGrath, Brodie McGrath, Kevin Moses and myself relating to the services provided by ServiceMaster Janitorial Services and Commercial Cleaning, as well as, the Memorandum of Understanding (MOU) issued on or about May 24, 2013 regarding the services provided by you.

On or about April 25, 2013, ServiceMaster entered into a written agreement with Kenco Logistics to perform cleaning/janitorial services at the Kenco Manteno Facility located at 1125 W. Sycamore Rd., Manteno, Il 60950 (See Exhibit 1) based upon the proposal dated March 20, 2013 (See Exhibit 2). The agreement includes, but is not limited to: the scope of work to be performed, the fiduciary obligations, as well as, the general terms and conditions. Inferentially, this is the same scope of work provided to the facility under the previous management of 4T's. More specifically, the actual scope of work to be preformed is outlined on the 4T's management Sanitation Schedule. (See Exhibit 3).

As previously discussed, there seems to be a disconnect in the services allegedly being provided and those actually being provided. During our initial meeting the key talking points were The general conditions of the facility, the general conditions of the cleaning equipment used in the cleaning process, the inordinate amount of accrued dust on various fixed objects, spot washing of walls, cleaning the edges of the tiled floor with an edger of some sort as opposed to leaving it unclean, as well as, the cleaning the glass vestibule.

Additional key talking points were the expectations of the agreement of the scope of work to be performed as agreed upon at the inception of the agreement, as well as, through verbal acknowledgement and affirmation of this agreement in the May 21, 2103 meeting. Also, there was to be an implementation of corrective and preventative actions related to the execution of the tasks at hand.

Moreover, it was also discussed that Quality Standards set forth by various regulatory agencies required the facility to be in total compliance with the aforementioned standards. Being a current part of the FDA mandates.

Last but not least there was a reiteration of the meeting and the expectations outlined in the MOU dated May 24, 2013; coupled with a request for a corrective and preventative action plan.

To date much to our chagrin, the aforementioned discussed line items have not been remediated as promised in the responsive correspondence dated May 24, 2013 (See Exhibit 4) regarding the MOU dated May 22, 2103 summarizing the May 21, 2013 meeting.

The failure to remediate the aforementioned issues continues to be in breach of the contractual agreement between Kenco and ServiceMaster dated April 25, 2013. *The breach has occurred in respect to Line items 1, 6 and Exhibit A of the Service Agreement.*

Line Item 1 is as follows: <u>Services</u>-SERVICEMASTER will provide employees to work at customer's designated site, serving in a cleaning/janitorial capacity. Such individuals shall perform duties as mutually agreed between the parties Exhibit A task schedule. *Duties are not being performed as agreed upon on a regular and continual basis.*

Line item 6 is as follows: <u>Compliance with Laws and Regulations</u> - The Parties shall at all times comply with all applicable federal, state, municipal and provincial laws, rules and regulations. *Failing to comply with line item 1 has inexplicably caused Kenco to be in direct violation of the current FDA and industry mandates regarding cleanliness and sanitation.*

*Furthermore, factually on a regular and continual basis documentation is provided by ServiceMaster and its employees asserting and affirming the completion of tasks performed.*

*Therefore, be it known as a matter of concern this continued egregious conduct is unacceptable and it must cease and desist immediately.* As the goodwill and business reputation of Kenco/Mars can be adversely affected and damaged by not fulfilling the current Quality Mandates and can result in serious illness and even death; therefore, prompting unwanted litigious exchanges. Consequently, in an effort to uphold food security and defense it is paramount that these maximums be adhered to and corrected.

Matter of fact, on or about June 22, 2013, Kenco personnel cleaned the front area including but not limited to: the front entrance glass, front area proper, locker room, hallways, men's bathroom, lunch room, scrubbed garbage cans, Walls (hallway, front, & break room), as a matter of exercise to

Consequently, within the next _____ days at the close of business the agreed upon scope of work is to be in full compliance with concurrently with the daily tasks. _____ initial

If the issues are not remediated at the close of the business day on July ____, 2013 the contract between Kenco and ServiceMaster will be immediately terminated for breach of contract. _____ initial

If the issues are remediated at the close of the business day on July _____, 2013 the contract will remain in force, with periodic random inspections being performed to ensure compliance. _____ initial

Remediation on a permanent basis can include, but be not limited to a price increase and/or additional manpower, as well as, a detailed corrective and preventative action plan to be followed to execute the remediation.

This document has been reviewed, along with the highlighted issues, expectations, an opportunity to ask questions has been afforded, a mutually agreed upon remediation date has been established, and a clear understanding of anticipated outcomes. Therefore, the information, terms and conditions set forth are understood and mutually agreed upon. _____ initial

This document has been read and understood. _____ initial


_____          _____
Kenco Representative                                          Date


_____          _____
ServiceMaster Representative                             Date


_____          _____
Witness                                                               Date


Cc: Paula Hise, Ann Jennings, Brian Davis, Kevin Moses

KENCO 001747

**Walsh, Kelvin**

| | |
|---|---|
| From: | Walsh, Kelvin |
| Sent: | Sunday, June 30, 2013 7:21 PM |
| To: | Hise, Paula |
| Subject: | RE: Disposition of MOU |

All I can say is I'll keep trying with her. She is really too valuable for us not to try. It's a good thing I have thick skin.. LOL..

Thanks,

**From:** Hise, Paula
**Sent:** Sunday, June 30, 2013 12:59 PM
**To:** Walsh, Kelvin
**Subject:** FW: Disposition of MOU

I'm just keeping you in the loop. All I can say, is that we need to keep an eye on that 90 day introductory period window. I hate to go there this early in the game, but man, she is wearing us out....

Paula Hise, CSCP
Vice President, Operations

Kenco Logistic Services
2001 Riverside Drive
Chattanooga, TN 37406
Cell: 423-290-3749
Email: Paula.Hise@Kencogroup.com

**From:** Paula Hise <Paula.Hise@kencogroup.com>
**Date:** Sun, 30 Jun 2013 13:57:01 -0400
**To:** "Madison, Mary" <Mary.Madison@Kencogroup.com>
**Subject:** Re: Disposition of MOU

Mary,

I understand and appreciate your position, and am grateful for your passion on the subject – truly. I firmly believe that we are all (you, me, Brian Davis, Kelvin, the site management staff) on the same team and we have the same goals and objectives, although the way we pursue those goals and objectives might be a bit different. Further, everyone is coming at it from different perspectives – Brian, from a risk management and supplier management perspective, Kelvin and I from an operational perspective, and you, from the Quality perspective. I'm confident that we will get to where we need to be. But what we have to do is work together as a team, understanding that as GM, Kelvin is ultimately responsible for the overall facility operations, feel confident that we can voice our different opinions to one another, but then move forward together to execute the agreed upon direction. No one is, or should be asking you, to relax your standards on cleanliness. All we are asking is that we modify the approach with which we work with ServiceMaster. Part of our guiding principles is that we "Cultivate mutually beneficial partnerships with customers, associates and suppliers". So, we want to protect a supplier relationship if we can.

We are both so busy – if you are still concerned about our direction in this area, then let's me, you and Kelvin get on the phone to discuss. We can accomplish in a short call much more than we can accomplish in sending lengthy emails.

Thanks,

KENCO 001748

Paula Hise, CSCP
Vice President, Operations

Kenco Logistic Services
2001 Riverside Drive
Chattanooga, TN 37406
Cell: 423-290-3749
Email: Paula.Hise@kencogroup.com

**From:** "Madison, Mary" <Mary.Madison@kencogroup.com>
**Date:** Fri, 28 Jun 2013 18:02:06 -0400
**To:** Paula Hise <Paula.Hise@kencogroup.com>
**Subject:** RE: Disposition of MOU

Absolutely, that is no problem, as we have a spread sheet already that is used as a part of their daily routine and the exact sheet can be dated back to 2010 from the retained records. The spread sheet itemizes each and every area and what is to be done. Prior to Kevin and I having the meeting and issuing the MOU, the contract was gotten from Brian and reviewed to make sure that the scope of work being discussed was accurate. Kelvin specifically said on yesterday that we were forcing them to do something other than what was outlined in the scope of work agreed upon. He indicated that this information was given to him a few days ago from Brian Davis based upon the infractions listed on the MOU issued. My question was to get clarification on how ServiceMaster has been forced to perform the duties as agreed, as to be compliant with basic health and safety rules to prevent the spread of disease and contamination. As shared with Kelvin, the scope of work to be preformed has not been changed or altered from what was being performed prior to the acquisition.

We are merely discussing basic health and sanitation rules and principles. The general populous of people here are in an at-risk class for communicable disease. The cleanliness of the restrooms, garbage cans, and eating areas are below par. In addition, Kelvin stated that the standards should be relaxed relating to what is required for compliance as that is not Mars focus.

My concern progressively arose out of being asked to relax my standards to accommodate the current state of affairs and to quintessentially document things in fashion that will achieve these results. First, this has taken me aback that it would be asked of me to do such a thing when it is so simple to just do the correct thing, the correct way, the first time. In addition, continually suggesting to me that my understanding of what to be done is not correct, as the plan of action has been modified, despite direct verbal and written instructions regarding the same matter. Assuring me that this plan of action to deviate from the mandated rules has been corroborated without exception. When resistance and/or reluctance shown about the potential results of being disobedient from jeopardizing the health and welfare of the associates, to being fined and sanctioned by the governing body (FDA) or at the extreme end fatalities to the facility being closed down. From there other methodologies of persuasiveness were used such as, but not limited to: that full responsibility would be taken by him, if something occurred and that there would be no repercussions to me for not following the rules. Not having much faith in the fact that one would be absolved from the matter and most of all diminishing one's integrity to believe someone who would be willing to place themselves in such a predicament to not follow, or better yet enforce someone to do what they are required to do has left me in a quandary.

After preparing to meet with them, despite the fact that there has been no improvement since the original meeting, less than (2) hours before the meeting an email is sent to me to cancel the meeting. ServiceMaster nor myself were aware and at the appointed meeting time, it is stated that the meeting is canceled and in lieu of the meeting he would speak to me. During this meeting, now it is told to me that actually they (1) we were forcing them to do things outside the scope of work to be preformed and now we were in breach of the agreement, per Brian Davis, and my these actions were causing a problem. Requesting that they use clean equipment in the cleaning process was in violation of the agreement, as it did not call for clean equipment. That we were forcing them to uphold Federal Regulations that relate to sanitation because they never were aware of them. Amongst some other highlighted items in red from the response from Brian that he recently got regarding the MOU dated 5/22/2013. In my limited understanding, one cannot use dirty, no filthy, cleaning utensils to clean up. This filth breeds and spreads germs and bacteria; therefore, becoming a health concern. More specifically, the purpose of cleaning and sanitizing is to retard and reduce the spread of germs. This is a prerequisite for food safety, public health, and pretty sure of condition of the terms of agreement with Mars.

KENCO 001749

Additionally, the Federal rules have always existed and are the precursors to the state rules, these rules have been enforce since 1938 regarding food safety. Furthermore, as stated it is not the position of the company to assume the role of managing ServiceMaster's business, if that being the case this whole process can be managed in-house. In addition, not wanting to held be responsible for issuing advice to ServiceMaster and being held accountable for their interpretation in the event that there is another deviation.

It was also shared that the risk involved in this kind of decision making was very great and it did not prove prudent to be in blatant disobedience and my vehement unwillingness to participate in this type of behviour. It is mind boggling that someone would not have any mind for themselves and others to extend themselves for someone who has exhibited substandard practices; specifically, a discussion ensued over a month ago. Kelvin called them on Monday night and this is what the place looked like Thursday morning the same day they were coming. Really! Ok, not to mention that during this whole exercise, it was discovered that ServiceMaster has been saying that they clean the Co-Pack offices as agreed and according to John Gaughan, GM for Co-Pack in the past four (4) years they have not preformed those services. See attached. The records date back to 2010 for the sanitation records. When these documents were being scanned, someone came and took them off, as they were reading them, I walked up and began looking for my documents and they said "are these yours" and "I said yes"! My hand was held out and they said "let me keep looking so I can make sure they are yours"!. They sit directly in front of the scanner.

Last, but not least it is realized that there are a lot of things that we cannot get done before the impending audit and review, but from my limited perspective, it is my strongest belief that we can accomplish such a rudimentary task of cleaning the place up, especially when it is an outside vendor. The mentality of the people here is that yeah, Kenco may have bought it; but its just the same, no different, same management. The people here are the assets as well and they do not deserve deplorable conditions; in addition, if they are sick they can not come, if they do not come we do not have an adequate workforce. They blame it on the people, but the old adage is what you put out is what you get back! So, they think its crap, they think they are thought of as crap, and therefore, they treat it like crap! Finally, understandably, we cannot do everything, but what's wrong with doing the things that can be done? Why would we not want Mars to see a marked difference in the facility, as that is a very easy and achievable goal. It would be so different, if we could not achieve it, but because of some unknown reason that is in stark contrast to the very guidelines of our operation. It is almost like sabotage. There are numerous things that can be done with no real effort. I've said all this to say, you are to far away for Manteno to be gone wild!!!!!!!!

Thank you kindly,

Mary Madison
Quality Engineer

Kenco/Mars
1125 West Sycamore Road
Manteno, IL 60950
815.468.4448
www.Kencogroup.com

This message and any attachments are intended only for the use of the addressee and may contain information that is privileged and confidential. If the render of the message is not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. If you have received this communication in error, notify the sender immediately by return email and delete the message and any attachments from your system.

**From:** Hise, Paula
**Sent:** Friday, June 28, 2013 11:58 AM
**To:** Madison, Mary; Davis, Brian
**Cc:** Walsh, Kelvin
**Subject:** Re: Disposition of MOU

KENCO 001750

Pages: 320    Filed: 08/01/2018    Document: 10-2    Case: 18-1800

Hi Mary,
Here would be my suggestion for closing this issue. I do not believe that any correspondence, other than your MOU, has been sent from Kenco to ServiceMaster documenting any infractions. With that said, I believe you have a copy of the Kenco contract with ServiceMaster? If not, you can obtain one from Len, who should have a copy of it. I would suggest that you create a simple spreadsheet, column A defines what services they are currently obligated to perform. Column B should be the services that we want to them to perform. Once you have that on paper, then let's the 3 of us get together for a quick call to review and make sure we are all in agreement. Then we can provide that document to ServiceMaster and they can evaluate what any additional costs may be.

Sound okay?

Paula Hise, CSCP
Vice President, Operations

Kenco Logistic Services
2001 Riverside Drive
Chattanooga, TN 37406
Cell: 423-290-3749
Email: Paula.Hise@Kencogroup.com

From: "Madison, Mary" <Mary.Madison@Kencogroup.com>
Date: Fri, 28 Jun 2013 10:34:38-0400
To: Brian Davis <brian.davis@kencogroup.com>
Cc: "Walsh, Kelvin" <Kelvin.Walsh@Kencogroup.com>, "Walsh, Kelvin" <Kelvin.Walsh@Kencogroup.com>, Paula Hise <Paula.Hise@kencogroup.com>
Subject: Disposition of MOU

Good Morning!

Brian,

On yesterday, Kelvin shared with me that, within recent days, a response was generated to him by you in regards to a MOU that was date 5/22/2103 to ServiceMaster; whereby, it was stated that you acknowledged that the MOU inference a breach of agreement (contract) with ServiceMaster by causing them to perform work outside the scope of the agreement that you signed with them on April 25, 2013. Some of the items referenced in your response were the general conditions of the cleaning equipment used in the cleaning process (that the equipment used in cleaning did not have to be clean and sanitary), that because they were not given the rules of cleaning and sanitation they were being forced to meet an expectation that they had no knowledge of, that they were being forced to clean walls and glass outside the prescribed time frames outlined, as well as, a few other line items that cannot be recalled or were not discussed in-depth.

To promptly ensure that they are not continually forced to perform work outside the scope of what was agreed upon, would you please be kind enough to forward a copy of the correspondence that specifically outlined these infractions; that they may be readily corrected according to the interpretations stated to Kelvin by you, as well as, the agreed upon scope of ServiceMaster's work. As previously stated to Kelvin, it was not my desire to place the company in a compromising position of compelling vendors through coercive measures to perform work outside the agreed upon scope.

In addition, if you would be kind enough to help me come up to speed on the proper interpretation of the agreed upon work it would be appreciated, as it would be a travesty, as well as, a waste of productivity and resources to continue to belabour issues that are not merited; while simultaneously placing the company in unnecessary precarious situations.

Your feedback is welcomed!

4

KENCO 001751

Thank you kindly,

Mary Madison
Quality Engineer

Kenco/Mars
1125 West Sycamore Road
Manteno, IL 60950
815.468.4448
www.Kencogroup.com

This message and any attachments are intended only for the use of the addressee and may contain information that is privileged and confidential. If the reader of the message is not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. If you have received this communication in error, notify the sender immediately by return email and delete the message and any attachments from your system.

| | |
|---|---|
| From: | Davis, Brian </o=kenco/ou=exchange administrative group (fydibohf23spdlt)/cn=recipients/cn=brian.davis> |
| To: | Madison, Mary </o=kenco/ou=exchange administrative group (fydibohf23spdlt)/cn=recipients/cn=mary.madison> |
| Cc: | Walsh, Kelvin </o=kenco/ou=exchange administrative group (fydibohf23spdlt)/cn=recipients/cn=kelvin.walsh>; Walsh, Kelvin </o=kenco/ou=exchange administrative group (fydibohf23spdlt)/cn=recipients/cn=kelvin.walsh>; Hise, Paula </o=kenco/ou=kls/cn=recipients/cn=paula.hise> |
| Bcc: | |
| Subject: | RE: Disposition of MOU |
| Date: | Fri Jun 28 2013 13:57:20 EDT |
| Attachments: | |

Hi Mary,

When we transitioned the site from 4T's to Kenco, the intent was to keep the janitorial service the same as it had been with 4T's. All the information I had at the time indicated that there had been no historical problems with the janitorial service and that Mars was satisfied with the service.

Now, if it is necessary to make changes to the level of service or to the performance expectations we require from the supplier, or it is deemed necessary to better define the current requirements, we certainly can renegotiate the agreement. Please understand that renegotiation of the agreement would most likely result in increased costs for the services in proportion to any increased level of service, etc. and presumably those would need to be explained to the customer and approved or absorbed by the site.

Once you have the changes to the agreement defined, and Kelvin and Paula are in agreement, please let me know and I will approach the supplier with them and renegotiate the agreement as needed.

Thanks,

Brian Davis, CPSM

Director of Procurement

Kenco Management Services, LLC

P. O. Box 1607

2001 Riverside Drive (37406)

Chattanooga, TN 37401

Phone: 423-643-3452

Mobile: 706-264-2815

brian.davis@kencogroup.com

www.kencogroup.com

From: Madison, Mary
Sent: Friday, June 28, 2013 10:35 AM
To: Davis, Brian
Cc: Walsh, Kelvin; Walsh, Kelvin; Hise, Paula
Subject: Disposition of MOU

Good Morning!

Brian,

On yesterday, Kelvin shared with me that, within recent days, a response was generated to him by you in regards to a MOU that was date 5/22/2103 to ServiceMaster; whereby, it was stated that you acknowledged that the MOU inference a breach of agreement (contract) with ServiceMaster by causing them to perform work outside the scope of the agreement that you signed with them on April 25, 2013. Some of the items referenced in your response were the general conditions of the cleaning equipment used in the cleaning process (that the equipment used in cleaning did not have to be clean and sanitary), that because they were not given the rules of cleaning and sanitation they were being forced to meet an expectation that they had no knowledge of, that they were being forced to clean walls and glass outside the prescribed time frames outlined, as well as, a few other line items that cannot be recalled or were not discussed in-depth.

To promptly ensure that they are not continually forced to perform work outside the scope of what was agreed upon, would you please be kind enough to forward a copy of the correspondence that specifically outlined these infractions; that they may be readily corrected according to the interpretations stated to Kelvin by you, as well as, the agreed upon scope of ServiceMaster's work. As previously stated to Kelvin, it was not my desire to place the company in a compromising position of compelling vendors through coercive measures to perform work outside the agreed upon scope.

In addition, if you would be kind enough to help me come up to speed on the proper interpretation of the agreed upon work it would be appreciated, as it would be a travesty, as well as, a waste of productivity and resources to continue to belabour issues that are not merited; while simultaneously placing the company in unnecessary precarious situations.

Your feedback is welcomed!

Thank you kindly,

Mary Madison

Quality Engineer

---

Kenco/Mars

1125 West Sycamore Road

Manteno, IL 60950

815.468.4448

www.Kencogroup.com

This message and any attachments are intended only for the use of the addressee and may contain information that is privileged and confidential. If the reader of the message is not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. If you have received this communication in error, notify the sender immediately by return email and delete the message and any attachments from your system.

## Walsh, Kelvin

| | |
|---|---|
| **From:** | Madison, Mary |
| **Sent:** | Thursday, July 04, 2013 12:19 AM |
| **To:** | Walsh, Kelvin |
| **Subject:** | RE: BCP- |

Bringing to your remembrance when we were speaking, it was discussed that a BCP is a plan of action in the event a disaster happens what would you do? How will you mitigate the disaster? Identifying the components of the business and the economic impact of each. Who are the key persons? The information was provide so that you could have the best picture of what is being asked; Not having a handle on the business and its dynamics disallows a full picture for me. Thank you kindly,

Mary Madison
Quality Engineer
_____
Kenco/Mars
1125 West Sycamore Road
Manteno, IL 60950
815.468.4448
www.Kencogroup.com

This message and any attachments are intended only for the use of the addressee and may contain information that is privileged and confidential. If the reader of the message is not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. If you have received this communication in error, notify the sender immediately by return email and delete the message and any attachments from your system.

From: Walsh, Kelvin
Sent: Wednesday, July 03, 2013 4:53 PM
To: Madison, Mary
Subject: RE: BCP-

Mary,

I really don't have time to go through this. Please summarize.

From: Madison, Mary
Sent: Thursday, June 27, 2013 11:48 AM
To: Walsh, Kelvin
Subject: RE: BCP-

Hope this helps!
Business continuity planning provides a quick and smooth restoration of operations after a disruptive event. Business continuity planning is a major component of risk management. Business continuity planning includes business impact analysis, business continuity plan (BCP) development, testing, awareness, training, and maintenance.
A business continuity plan addresses actions to be taken before, during, and after a disaster. A BCP spells out in detail what, who, how, and when. It requires a continuing investment of time and resources. Interruptions to business

KENCO 001756

Case: 18-1800    Document: 10-2    Filed: 08/01/2018    Pages: 320

functions can result from major natural disasters such as tornadoes, floods, and fires, or from man-made disasters such as terrorist attacks. The most frequent disruptions are less sensational— equipment failures, theft, or employee sabotage. The definition of a disaster, then, is any incident that causes an extended disruption of business functions. Traditionally, disaster recovery planning has focused on computer systems. Because mission-critical functions inevitably depend on technology and telecommunications networks, rapid recovery of these is of little value without also recovering business unit operations. Mainframe and minicomputer systems usually have reliable recovery plans. Today, however, many critical applications have migrated to distributed, decentralized environments with less rigid controls. Recovering functional processes includes more than just information systems—consideration needs to be given to such items as 800 and long distance service, locations for employees to work, the salvage of building contents, and so forth.

As with an insurance policy, it is hoped that a business continuity plan is never needed for a real disaster. Keep in mind that a BCP not maintained can be worse than no plan at all. An agency's ability to recover mission-critical processes, resume operations, and eventually return to a normal business environment can be considered a major asset. Thorough planning can reduce liability, disruption to normal operations, decision making during a disaster, and financial loss. And equally important to state government, it can provide continued goodwill and service.

### Determining Scope and Readiness
The purpose of this section is to determine what information is needed to begin business recovery planning, and how to determine the scope of the planning effort based on this information.
The commitment of management is essential for the business recovery effort to succeed. Management commitment can be recognized when • A sound impact analysis is funded, the results of which are read, understood, and acted on by management deciding to use a strategy based on likely impacts to the organization.
• Comprehensive planning involves all program and technical management's clear accountability for the continuation of the areas that they manage. The effort culminates in a written plan that is specific, credible, and candid regarding its constraints, weaknesses, and vulnerabilities.
• An ongoing exercise and maintenance program is developed that ensures the viability of the BCP.
A practical approach is one that plans for the worst-case-scenario—including:
• Loss of access to the facility,
• Loss of access to information resources (systems, networks, data), and • Loss of skilled or key personnel who perform critical processes.
Just about any event could result in these losses. A practical plan is based on the input analysis, which details the element of recovery by priority and timeframes. This approach provides procedures for dealing with less devastating events as well as "smoke-and-rubble" disasters.

Most recoveries focus on the most critical functions by • Moving selected personnel to an alternate facility.
• Using alternate information resources and other office equipment.
• Repairing/replacing equipment or making minor repairs to the home site.
• Returning to the home site in a fairly short time.
4

The organization cannot meet its mandated missions without its support functions. Recovery must involve the entire organization—facilities, administration, accounting, information systems, personnel, and most importantly, the business functions that perform the missions. All functions must interact with each other for optimum recovery.
The business recovery process includes determining critical functions, identifying the available resources, establishing the level of support needed, and determining the methods to be used.

KENCO 001757

Case: 18-1800    Document: 10-2    Filed: 08/01/2018    Pages: 320

The parallel between the business recovery planning effort and other business planning efforts is useful to all managers who are called on to contribute to the business recovery effort.
• From a business perspective, management must be aware that the effort can contribute something to the organization that would not be possible otherwise.

Thorough planning, for example, can provide management with a complete picture of the organization's processes and their dependencies.

• Projects proceed with a careful analysis of needs.
• With analysis complete, the design is created.
• When the design is approved, resources are committed to develop the product. Costs must be clearly defined.
• Upon completion, testing performance and integrating changes refines the product.
• Support and maintenance tasks keep the product current and relevant to the business.

An effective method for developing the scope of the plan is to focus recovery efforts on the major mandates of your organization. Each business recovery plan should provide action steps to recovery from • Loss of physical or electronic access to computer centers, information resources, offices, or multi-use facilities maintained by the state agencies and resources therein.

• Loss of key information needed for the organization to function.
• Loss of key personnel involved in any business function, use of information resources, or the decision-making function, which could have intolerable impacts if not recovered in a determined amount of time.
• Testing and maintenance of the recovery process reflecting the inevitable changes in growth and functionality of the organization.

Performing a readiness audit determines how prepared an organization is to respond to a disaster. The readiness audit differs slightly from risk assessment/analysis. The audit determines what resources are already available for use in the business recovery

planning effort and what resources are missing, rather than determining threats to assets and subsequent frequency and severity of threat.

specific responsibilities for

information resource asset ownership, custodian, and user responsibilities. Business recovery, a key component of asset protection, requires responsibilities significantly different from those of the information security function. The following guidelines for business recovery outline the roles and responsibilities associated with the planning activities.

The coordinator chosen to lead or manage business recovery planning needs to be familiar with all of the agency's business functions and be able to cross the organizational and budgetary lines. Assigning the Information Resources Manager (IRM) to the role of business recovery coordinator may or may not be the appropriate choice.

Executive Management

The agency head must assure that the agency's resources and information assets are protected, including planning for recovery from the effects of damage or destruction. The agency head is responsible for establishing and maintaining a business recovery planning program within the agency and appointing appropriate personnel to administer information resource and business recovery planning.

Typically, heads of agencies are responsible for the following:

1.    Enforcement of state-level disaster recovery and business recovery policies.

2.    Establishing and maintaining a business recovery program, including an impact analysis process that identifies critical business processes.

3.    Establishing and maintaining internal policies and procedures that provide for the recovery of personnel, information technology, facilities, software, and equipment, and the business functions that they enable.

4.    Assigning program managers to administer business unit and information resources recovery responsibilities for all critical business unit and information resources within the agency.

5.    Ensuring the preparation and maintenance of the agency's business recovery plan for the continuation of critical business functions and information support services in case of a disaster.

3

6.    Ensuring agency compliance with the DIR standards by describing disaster recovery requirements in the agency strategic plans in accordance with business objectives

7.    Ensuring agency compliance with state information systems audit requirements.

8.

8                                     Business Continuity Planning Guide | Business Recovery Responsibilities

Ensuring participation at all necessary levels of management, administrative, and technical staff during the planning, development, testing, modification, and implementation of disaster recovery and business recovery policies and procedures.

## Program Management

Agency program managers have ownership responsibility and management authority for the personnel, information assets, equipment, and property used in fulfilling the goals of the program(s) under their direction.

Program managers need to work in cooperation with the agency business recovery coordinator, acting on behalf of the agency head, for the purpose of recovery of all critical business functions and information resources within the agency. Program managers should assign custody of program assets to appropriate staff and ensure the staff is provided appropriate direction to implement the defined procedures.

Typically, program managers should

1.    Define the specific processes and resources that need to be in place to minimize the impact of interruption; assign responsibilities.

2.    Participate in the agency's impact analysis process to identify business functions required by law or otherwise critical to the mission of the agency.

3.    Ensure participation between the program staff, technical staff, and the business recovery coordinator by identifying and selecting appropriate, cost-effective strategies and procedures to recover business functions and information assets.

4.    Ensure the proper planning, development, and establishment of recovery policies and procedures for all files or data bases supporting critical functions for which the program has ownership responsibility, and for physical assets assigned to and located in program area(s).

5.    Formally assign custody of program assets to appropriate managers and ensure direction is provided to implement the defined recovery plans, strategies, and procedures.

6.    Establish all recovery procedures necessary to comply with these guidelines for recovery of critical agency missions, which would have intolerable impacts on the state if lost.

7.    Ensure contractual agreements exist, based on impact analysis, for recovery of the state's mission-critical business functions and information resources, where technical services are outsourced to another agency or private firm.

Program managers are accountable for recovery of their business functions. Recovery planning should become a part of their unit goals and performance evaluation.

## Technical Management

Technical managers have a role in business recovery. Technical managers include Information Resource Managers (IRMs), data processing directors, data center managers, and network directors. These individuals have custodial responsibilities, provide information services, and have oversight or support responsibility for information resource assets that support business functions.

KENCO 001759

Typically, technical managers need to

1.  Provide the necessary technical support services to define and select cost-effective recovery strategies, policies, and procedures.
2.  Ensure the development and documentation of recovery strategies and procedures for critical business functions as defined by the owners of the information.
3.  Develop and implement adequate backup and recovery procedures for all critical data and software in the facility.
4.  Implement and maintain a recovery plan for information resources resumption in cooperation with agency management, the business recovery coordinator, program managers, custodians, and the assigned owners and users.
5.  Monitor the recovery testing and develop the reports and reporting procedures in accordance with the requirements of the DIR, program areas, and auditors.
6.  Coordinate the business functions to identify the information resources (facilities, personnel, data, voice communications, equipment) required to support the IR-dependent processes for mission-critical needs.

This can be based on the resource dependencies analysis.

7.  Identify, evaluate, and arrange for the acquisition of alternative information resources and recovery services as required to recover the critical business functions as a custodial role.
8.  Develop appropriate information resource recovery strategies based on the results of the analysis and business process study.

It is recommended that recovery planning become part of technical managers' goals and performance evaluations if those managers provide technical support of critical business functions.

Business Recovery Coordinator

In many agencies, recovery planning is assigned as a sub-function of another full-time position within the organization. However, assignment of the duties is significant

10   Business Continuity Planning Guide | Business Recovery Responsibilities

because of the function's unique and critical nature. The function crosses organizational and budgetary lines. It combines business and technical information roles and responsibilities and is critical to the continuation of the agency's mission.

Assignment of business recovery responsibility includes authority from the agency head to act as a liaison between program management and technical management for the purpose of recovery planning. The function should be positioned on the agency organization chart with direct access to the executive office, as is the internal auditor.

Planning as a full-time assignment may be justified, depending on the size and complexity of the organization, and the importance of the agency's mission to the state.

The primary focus of the business recovery coordinator is to oversee a viable and tested business recovery plan that demonstrates to management the agency's ability to continue critical business functions following a disruption of services. Maintenance of the plan is ongoing, reflecting changes in the agency and its mission. Testing is conducted regularly to ensure the viability of the plan. Training also occurs on a regular basis to assure agency-wide awareness of the business recovery function.

Typically, the business recovery coordinator

1.  Coordinates the planning activities of team members.
2.  Develops an initial budget and informs senior management of any changes.
3.  Oversees the identification and review of critical tasks that are essential during recovery, based on input from program and technical management in the business impact analysis process.

5

4.    Establishes an ongoing training program to promote agency-wide awareness of the recovery function.
5.    Establishes a timetable for regular review and updating of plans, resources, and procedures to ensure that changes to critical procedures, functions, and documentation are reflected in the plan.
6.    Coordinates monthly, quarterly, semi-annual, and annual testing of the plan as needed, reporting results to management.
7.    Establishes a standards program that ensures changes to critical procedures, functions, and documentation are reflected in the plan. Assures that contact is maintained with all personnel as necessary to keep recovery support considerations current.
8.    Maintains contact with vendors to assure support during a recovery effort.
9.    Acts as a liaison for contingency planning issues between information resources and other business units, including auditing.
10.   Meets regularly with recovery teams to review responsibilities required during a recovery effort.
11.   Maintains contact with city, county, state, and federal emergency organizations that may be involved during a recovery effort.



12.



Provides input, support, and coordination to other departmental areas for projects that relate to contingency planning (e.g., updating documentation, creating procedures, evaluating security systems).
13.   Researches, evaluates, and recommends internal and external solutions to business recovery problems.
14.   Maintains contracts for alternate facilities and/or services.
15.   Provides input for performance reviews of contingency planning staff.
The recovery coordinator's role is coordination with and among program and technical managers. These managers implement and carry out the recovery.


Thank you kindly,

Mary Madison
Quality Engineer
_____
Kenco/Mars
1125 West Sycamore Road
Manteno, IL 60950
815.468.4448
www.Kencogroup.com<http://www.kencogroup.com/>


This message and any attachments are intended only for the use of the addressee and may contain information that is privileged and confidential. If the reader of the message is not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. If you have received this communication in error, notify the sender immediately by return email and delete the message and any attachments from your system.


_____
From: Walsh, Kelvin

KENCO 001761

Pages: 320

Filed: 08/01/2018

Document: 10-2

Case: 18-1800

Sent: Wednesday, June 26, 2013 1:46 PM
To: Madison, Mary
Subject: RE: BCP-
Hi Mary,

I'm not really familiar or understanding what is being asked.


From: Madison, Mary
Sent: Monday, June 17, 2013 11:41 AM
To: Walsh, Kelvin; Schwerin, William
Cc: Madison, Mary
Subject: BCP-

Good Day!

Please find the attached form for the completion of the Business Continuity Plan.  Please review and fill out the information that is needed and/or the point person for that information.  Please review and return as soon as possible.  Thank you kindly,

Mary Madison
Quality Engineer
_____
Kenco/Mars
1125 West Sycamore Road
Manteno, IL 60950
815.468.4448
www.Kencogroup.com<http://www.kencogroup.com/>

This message and any attachments are intended only for the use of the addressee and may contain information that is privileged and confidential. If the reader of the message is not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. If you have received this communication in error, notify the sender immediately by return email and delete the message and any attachments from your system.

KENCO 001762

Case: 18-1800     Document: 10-2     Filed: 08/01/2018     Pages: 320

# EXHIBIT C-1

# Walsh, Kelvin

| | |
|---|---|
| **From:** | Walsh, Kelvin |
| **Sent:** | Sunday, June 30, 2013 7:21 PM |
| **To:** | Hise, Paula |
| **Subject:** | RE: Disposition of MOU |

All I can say is I'll keep trying with her. She is really too valuable for us not to try. It's a good thing I have thick skin.. LOL..

Thanks,

**From:** Hise, Paula
**Sent:** Sunday, June 30, 2013 12:59 PM
**To:** Walsh, Kelvin
**Subject:** FW: Disposition of MOU

I'm just keeping you in the loop. All I can say, is that we need to keep an eye on that 90 day introductory period window. I hate to go there this early in the game, but man, she is wearing us out....

Paula Hise, CSCP
Vice President, Operations

Kenco Logistic Services
2001 Riverside Drive
Chattanooga, TN 37406
Cell: 423-290-3749
Email: Paula.Hise@Kencogroup.com

**From:** Paula Hise <Paula.Hise@kencogroup.com>
**Date:** Sun, 30 Jun 2013 13:57:01 -0400
**To:** "Madison, Mary" <Mary.Madison@kencogroup.com>
**Subject:** Re: Disposition of MOU

Mary,

I understand and appreciate your position, and am grateful for your passion on the subject – truly. I firmly believe that we are all (you, me, Brian Davis, Kelvin, the site management staff) on the same team and we have the same goals and objectives, although the way we pursue those goals and objectives might be a bit different. Further, everyone is coming at it from different perspectives – Brian, from a risk management and supplier management perspective, Kelvin and I from an operational perspective, and you, from the Quality perspective. I'm confident that we will get to where we need to be. But what we have to do is work together as a team, understanding that as GM, Kelvin is ultimately responsible for the overall facility operations, feel confident that we can voice our different opinions to one another, but then move forward together to execute the agreed upon direction. No one is, or should be asking you, to relax your standards on cleanliness. All we are asking is that we modify the approach with which we work with ServiceMaster. Part of our guiding principles is that we "Cultivate mutually beneficial partnerships with customers, associates and suppliers". So, we want to protect a supplier relationship if we can.

We are both so busy – if you are still concerned about our direction in this area, then let's me, you and Kelvin get on the phone to discuss. We can accomplish in a short call much more than we can accomplish in sending lengthy emails.

Thanks,

KENCO 001748

Paula Hise, CSCP
Vice President, Operations

Kenco Logistic Services
2001 Riverside Drive
Chattanooga, TN 37406
Cell: 423-290-3749
Email: Paula.Hise@Kencogroup.com

**From:** "Madison, Mary" <Mary.Madison@Kencogroup.com>
**Date:** Fri, 28 Jun 2013 18:02:06 -0400
**To:** Paula Hise <Paula.Hise@kencogroup.com>
**Subject:** RE: Disposition of MOU

Absolutely, that is no problem, as we have a spread sheet already that is used as a part of their daily routine and the exact sheet can be dated back to 2010 from the retained records. The spread sheet itemizes each and every area and what is to be done. Prior to Kevin and I having the meeting and issuing the MOU, the contract was gotten from Brian and reviewed to make sure that the scope of work being discussed was accurate. Kelvin specifically said on yesterday that we were forcing them to do something other than what was outlined in the scope of work agreed upon. He indicated that this information was given to him a few days ago from Brian Davis based upon the infractions listed on the MOU issued. My question was to get clarification on how ServiceMaster has been forced to perform the duties as agreed, as to be compliant with basic health and safety rules to prevent the spread of disease and contamination. As shared with Kelvin, the scope of work to be preformed has not been changed or altered from what was being performed prior to the acquisition.

We are merely discussing basic health and sanitation rules and principles. The general populous of people here are in an at-risk class for communicable disease. The cleanliness of the restrooms, garbage cans, and eating areas are below par. In addition, Kelvin stated that the standards should be relaxed relating to what is required for compliance as that is not Mars focus.

My concern progressively arose out of being asked to relax my standards to accommodate the current state of affairs and to quintessentially document things in fashion that will achieve these results. First, this has taken me aback that it would be asked of me to do such a thing when it is so simple to just do the correct thing, the correct way, the first time. In addition, continually suggesting to me that my understanding of what to be done is not correct, as the plan of action has been modified, despite direct verbal and written instructions regarding the same matter. Assuring me that this plan of action to deviate from the mandated rules has been corroborated without exception. When resistance and/or reluctance shown about the potential results of being disobedient from jeopardizing the health and welfare of the associates, to being fined and sanctioned by the governing body (FDA) or at the extreme end fatalities to the facility being closed down. From there other methodologies of persuasiveness were used such as, but not limited to: that full responsibility would be taken by him, if something occurred and that there would be no repercussions to me for not following the rules. Not having much faith in the fact that one would be absolved from the matter and most of all diminishing one's integrity to believe someone who would be willing to place themselves in such a predicament to not follow, or better yet enforce someone to do what they are required to do has left me in a quandary.

After preparing to meet with them, despite the fact that there has been no improvement since the original meeting; less than (2) hours before the meeting an email is sent to me to cancel the meeting. ServiceMaster nor myself were aware and at the appointed meeting time, it is stated that the meeting is canceled and in lieu of the meeting he would speak to me. During this meeting, now it is told to me that actually they (1) we were forcing them to do things outside the scope of work to be preformed and now we were in breach of the agreement, per Brian Davis, and my these actions were causing a problem. Requesting that they use clean equipment in the cleaning process was in violation of the agreement, as it did not call for clean equipment. That we were forcing them to uphold Federal Regulations that relate to sanitation because they never were aware of them. Amongst some other highlighted items in red from the response from Brian that he recently got regarding the MOU dated 5/22/2013. In my limited understanding, one cannot use dirty, no filthy, cleaning utensils to clean up. This filth breeds and spreads germs and bacteria; therefore, becoming a health concern. More specifically, the purpose of cleaning and sanitizing is to retard and reduce the spread of germs. This is a prerequisite for food safety, public health, and pretty sure of condition of the terms of agreement with Mars.

KENCO 001749

Pages: 320

Filed: 08/01/2018

Document: 10-2

Case: 18-1800

Additionally, the Federal rules have always existed and are the precursors to the state rules, these rules have been enforce since 1938 regarding food safety. Furthermore, as stated it is not the position of the company to assume the role of managing ServiceMaster's business, if that being the case this whole process can be managed in-house. In addition, not wanting to held be responsible for issuing advice to ServiceMaster and being held accountable for their interpretation in the event that there is another deviation.

It was also shared that the risk involved in this kind of decision making was very great and it did not prove prudent to be in blatant disobedience and my vehement unwillingness to participate in this type of behviour. It is mind boggling that someone would not have any mind for themselves and others to extend themselves for someone who has exhibited substandard practices; specifically, a discussion ensued over a month ago. Kelvin called them on Monday night and this is what the place looked like Thursday morning the same day they were coming. Really! Ok, not to mention that during this whole exercise, it was discovered that ServiceMaster has been saying that they clean the Co-Pack offices as agreed and according to John Gaughan, GM for Co-Pack in the past four (4) years they have not preformed those services. See attached. The records date back to 2010 for the sanitation records. When these documents were being scanned, someone came and took them off, as they were reading them, I walked up and began looking for my documents and they said "are these yours" and "I said yes"! My hand was held out and they said "let me keep looking so I can make sure they are yours"!. They sit directly in front of the scanner.

Last, but not least it is realized that there are a lot of things that cannot get done before the impending audit and review, but from my limited perspective, it is my strongest belief that we can accomplish such a rudimentary task of cleaning the place up, especially when it is an outside vendor. The mentality of the people here is that yeah, Kenco may have bought it, but its just the same, no different, same management. The people here are the assets as well and they do not deserve deplorable conditions; in addition, if they are sick they can not come, if they do not come we do not have an adequate workforce. They blame it on the people, but the old adage is what you put out is what you get back! So, they think its crap, they think are thought of as crap, and therefore, they treat it like crap! Finally, understandably, we cannot do everything, but what's wrong with doing the things that can be done? Why would we not want Mars to see a marked difference in the facility, as that is a very easy and achievable goal. It would be so different, if we could not achieve it, but because of some unknown reason that is in stark contrast to the very guidelines of our operation. It is almost like sabotage. There are numerous things that can be done with no real effort. I've said all this to say, you are to far away for Manteno to be gone wild!!!!!!!!

Thank you kindly,

Mary Madison
Quality Engineer

Kenco/Mars
1125 West Sycamore Road
Manteno, IL 60950
815.468.4448
www.Kencogroup.com

This message and any attachments are intended only for the use of the addressee and may contain information that is privileged and confidential. If the reader of the message is not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. If you have received this communication in error, notify the sender immediately by return email and delete the message and any attachments from your system.

From: Hise, Paula
Sent: Friday, June 28, 2013 11:58 AM
To: Madison, Mary; Davis, Brian
Cc: Walsh, Kelvin
Subject: Re: Disposition of MOU

KENCO 001750

Hi Mary,
Here would be my suggestion for closing this issue. I do not believe that any correspondence, other than your MOU, has been sent from Kenco to ServiceMaster documenting any infractions. With that said, I believe you have a copy of the Kenco contract with ServiceMaster? If not, you can obtain one from Len, who should have a copy of it. I would suggest that you create a simple spreadsheet, column A defines what services they are currently obligated to perform. Column B should be the services that we want to them to perform. Once you have that on paper, then let's the 3 of us get together for a quick call to review and make sure we are all in agreement. Then we can provide that document to ServiceMaster and they can evaluate what any additional costs may be.

Sound okay?

Paula Hise, CSCP
Vice President, Operations

Kenco Logistic Services
2001 Riverside Drive
Chattanooga, TN 37406
Cell: 423-290-3749
Email: Paula.Hise@Kencogroup.com

From: "Madison, Mary" <Mary.Madison@Kencogroup.com>
Date: Fri, 28 Jun 2013 10:34:38 -0400
To: Brian Davis <brian.davis@kencogroup.com>
Cc: "Walsh, Kelvin" <Kelvin.Walsh@Kencogroup.com>, "Walsh, Kelvin" <Kelvin.Walsh@Kencogroup.com>, Paula Hise <Paula.Hise@kencogroup.com>
Subject: Disposition of MOU

Good Morning!

Brian,

On yesterday, Kelvin shared with me that, within recent days, a response was generated to him by you in regards to a MOU that was date 5/22/2103 to ServiceMaster; whereby, it was stated that you acknowledged that the MOU inference a breach of agreement (contract) with ServiceMaster by causing them to perform work outside the scope of the agreement that you signed with them on April 25, 2013. Some of the items referenced in your response were the general conditions of the cleaning equipment used in the cleaning process (that the equipment used in cleaning did not have to be clean and sanitary), that because they were not given the rules of cleaning and sanitation they were being forced to meet an expectation that they had no knowledge of, that they were being forced to clean walls and glass outside the prescribed time frames outlined, as well as, a few other line items that cannot be recalled or were not discussed in-depth.

To promptly ensure that they are not continually forced to perform work outside the scope of what was agreed upon, would you please be kind enough to forward a copy of the correspondence that specifically outlined these infractions; that they may be readily corrected according to the interpretations stated to Kelvin by you, as well as, the agreed upon scope of ServiceMaster's work. As previously stated to Kelvin, it was not my desire to place the company in a compromising position of compelling vendors through coercive measures to perform work outside the agreed upon scope.

In addition, if you would be kind enough to help me come up to speed on the proper interpretation of the agreed upon work it would be appreciated, as it would be a travesty, as well as, a waste of productivity and resources to continue to belabour issues that are not merited; while simultaneously placing the company in unnecessary precarious situations.

Your feedback is welcomed!

4

KENCO 001751

Thank you kindly,

Mary Madison
Quality Engineer

Kenco/Mars
1125 West Sycamore Road
Manteno, IL 60950
815.468.4448
www.Kencogroup.com

This message and any attachments are intended only for the use of the addressee and may contain information that is privileged and confidential. If the sender of the message is not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. If you have received this communication in error, notify the sender immediately by return email and delete the message and any attachments from your system.

Case: 18-1800    Document: 10-2    Filed: 08/01/2018    Pages: 320

5

KENCO 001752

CERTIFICATE OF SERVICE


I, Jordan T. Hoffman, hereby certify that a copy of the foregoing document was sent to the following this 14th day of August, 2017:


**By: Fax, Email and Regular Mail**

U.S. Department of Labor, Office of Administrative Law Judges

Attention: April Cook, Paralegal Specialist to Judge Sellers

36 E. 7th Street, Suite 2525

Cincinnati, Ohio 45202

Email: cook.april@dol.gov

Fax:513.684.6106



**By: Regular Mail**

Director

Directorate of Whistleblower Protection Programs

U S Department of Labor, OSHA

Room N 4618 FPB

200 CONSTITUTION AVE NW

WASHINGTON DC 20210

   *(Hard Copy - Regular Mail)*


Free State Reporting Inc

1378 Cape St. Clair Road

ANNAPOLIS MD 21409

   *(Hard Copy - Regular Mail)*


Counsel for Whistleblower Programs

Division of Fair Labor Standards

Office of the Solicitor

U.S. Department of Labor

200 Constitution Ave, NW, Room N-2716

WASHINGTON DC 20210

   *(Hard Copy - Regular Mail)*


Chicago Regional Solicitor

Regional Solicitor

U. S. Department of Labor

Room 844

230 South Dearborn Street

CHICAGO IL 60604

   *(Hard Copy - Regular Mail)*


Mary Madison

9758 S. Charles

CHICAGO IL 60643

   *(Hard Copy - Regular Mail)*


Scott Simmons, Esq.

Miller & Martin PLLC

832 Georgia Ave., Suite 1000

CHATTANOOGA TN 37402

   *(Hard Copy - Regular Mail)*

SERVICE SHEET continued Page: 2

Tim Crouse
Reg. Supervisory Investigator
USDOL, OSHA, Room 3244
230 South Dearborn Street
CHICAGO IL 60604
      *(Hard Copy - Regular Mail)*

Julia P Argentieri, Esq.
Jody Wilner Moran, Esq.
Jackson Lewis, P.C.
150 N. Michigan Ave., Suite 2500
CHICAGO IL 60601
      *(Hard Copy - Regular Mail)*

By: /s/ Jordan Hoffman

2711 E. New York Ave., Suite 205
Aurora, IL 60502
(888) 958-4529

Case: 18-1800    Document: 10-2    Filed: 08/01/2018    Pages: 320

                                        Jordan Hoffman <jthoffmanlaw@gmail.com>

## MARY MADISON V. KENCO LOGISTICS - 2016-FDA-4--Pre-Hearing Exchange

4 messages

---

**Jordan Hoffman** <jthoffmanlaw@gmail.com>                    Tue, Aug 15, 2017 at 2:13 PM
To: "Cook, April - OALJ" <cook.april@dol.gov>, "Argentieri, Julia P. (Chicago)"
<Julia.Argentieri@jacksonlewis.com>

Good afternoon Ms. Cook,

As you are aware, there has been a motion filed by the Respondent in this matter for a Summary Decision
as well as a Response in filed by Complainant seeking to strike the same on procedural grounds and also
seeking to exclude certain evidence.

I am in a bit of a quandary as to whether we should still be preparing and submitting pre-hearing exchange
and need guidance from Judge Sellers in this regard in light of the hearing scheduled for September 13-15
in Chicago.   Thank you.

Respectfully yours,


Jordan Hoffman

The Law Office of
Jordan T. Hoffman, P.C.
2711 East New York St., Suite 205
Aurora, IL 60502
888.958.4529
jthoffmanlaw@gmail.com

*"Balancing the Scales of Justice"*

www.attyjthoffman.com

- CONFIDENTIALITY NOTICE: The information contained in this communication is confidential, may be
attorney-client privileged or attorney work product, may constitute inside information or internal deliberative
staff communication and is intended only for the use of the addressee. Unauthorized use, disclosure or
copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have
received this communication in error, please notify the sender immediately by return e-mail and destroy this
communication and all copies thereof, including all attachments. Receipt by an unintended recipient does
not waive attorney-client privilege, attorney work product privilege, or any other exemption from disclosure.

---

**Argentieri, Julia P. (Chicago)** <Julia.Argentieri@jacksonlewis.com>        Tue, Aug 15, 2017 at 2:23
                                                                              PM
To: Jordan Hoffman <jthoffmanlaw@gmail.com>, "Cook, April - OALJ" <cook.april@dol.gov>
Cc: "Moran, Jody Wilner (Chicago)" <MoranJ@jacksonlewis.com>, "Watkins, Brittany (Chicago)"
<Brittany.Watkins@jacksonlewis.com>


Ms. Cook:

Respondent also filed a separate motion last Friday to extend the pre-hearing submission and hearing deadlines while the motion for summary decision is being considered. I have re-attached a copy hereto.

Thank you.

Regards,

Julie Argentieri

**Julia P. Argentieri**
Attorney at Law
**Jackson Lewis P.C.**
150 North Michigan Avenue
Suite 2500
Chicago, IL 60601
Direct: (312) 803-2533 | Main: (312) 787-4949
Julia.Argentieri@jacksonlewis.com  |  www.jacksonlewis.com
*Jackson Lewis P.C. is included in the AmLaw 100 and Global 100 law firm rankings.*

**From:** Jordan Hoffman [mailto:jthoffmanlaw@gmail.com]
**Sent:** Tuesday, August 15, 2017 2:13 PM
**To:** Cook, April - OALJ <cook.april@dol.gov>; Argentieri, Julia P. (Chicago)
<Julia.Argentieri@jacksonlewis.com>
**Subject:** MARY MADISON V. KENCO LOGISTICS - 2016-FDA-4--Pre-Hearing Exchange

[Quoted text hidden]

Confidentiality Note: This e-mail, and any attachment to it, contains privileged and confidential information intended only for the use of the individual(s) or entity named on the e-mail. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that reading it is strictly prohibited. If you have received this e-mail in error, please immediately return it to the sender and delete it from your system. Thank you.

 **Respondent's Motion to Extend the Deadline for Pre-Hearing Exchanges 081....pdf**
1069K

Jordan Hoffman <jthoffmanlaw@gmail.com>                    Wed, Aug 16, 2017 at 5:52 PM
To: "Cook, April - OALJ" <cook.april@dol.gov>

Good evening Ms. Cook,

I apologize for not getting back to you sooner, but I actually didn't check my messages until the end of the day and learned that you needed my fax number.  It is also (888) 958-4259.  Thank you,

Jordan Hoffman

The Law Office of
Jordan T. Hoffman, P.C.
2711 East New York St., Suite 205
Aurora, IL 60502
888.958.4529
jthoffmanlaw@gmail.com

*"Balancing the Scales of Justice"*

www.attyjthoffman.com

- CONFIDENTIALITY NOTICE: The information contained in this communication is confidential, may be attorney-client privileged or attorney work product, may constitute inside information or internal deliberative staff communication, and is intended only for the use of the addressee. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify the sender immediately by return e-mail and destroy this communication and all copies thereof, including all attachments. Receipt by an unintended recipient does not waive attorney-client privilege, attorney work product privilege, or any other exemption from disclosure.

[Quoted text hidden]

---

**Jordan Hoffman** <jthoffmanlaw@gmail.com>                     Thu, Aug 17, 2017 at 1:44 PM
To: "Cook, April - OALJ" <cook.april@dol.gov>

Good afternoon Ms. Cook,

I was reviewing my email sent to you previously and realized that I transposed the numbers in the fax number the correct number is 888-958-4529. I apologize for any inconvenience that the error may have caused.

Respectfully yours,

Jordan Hoffman

The Law Office of
Jordan T. Hoffman, P.C.
2711 East New York St., Suite 205
Aurora, IL 60502
888.958.4529
jthoffmanlaw@gmail.com

*"Balancing the Scales of Justice"*

www.attyjthoffman.com

- CONFIDENTIALITY NOTICE: The information contained in this communication is confidential, may be attorney-client privileged or attorney work product, may constitute inside information or internal deliberative staff communication, and is intended only for the use of the addressee. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify the sender immediately by return e-mail and destroy this communication and all copies thereof, including all attachments. Receipt by an unintended recipient does not waive attorney-client privilege, attorney work product privilege, or any other exemption from disclosure.

[Quoted text hidden]

Gmail - Mary Madison vs. Kenco Logistics | Case No. 2016-FDA-4 Response to Complai...   Page 1 of 2

Case: 18-1800      Document: 10-2      Filed: 08/01/2018      Pages: 320

 **Jordan Hoffman <jthoffmanlaw@gmail.com>**

## Mary Madison vs. Kenco Logistics | Case No. 2016-FDA-4 Response to Complainant's Motion to Strike
1 message

**Watkins, Brittany (Chicago) <Brittany.Watkins@jacksonlewis.com>**                    Thu, Aug 17, 2017 at 12:49 PM

To: "Cook, April - OALJ" <cook.april@dol.gov>
Cc: Jordan Hoffman <jthoffmanlaw@gmail.com>, "Moran, Jody Wilner (Chicago)" <MoranJ@jacksonlewis.com>

**SENT ON BEHALF OF JODY MORAN and JULIA P. ARGENTIERI**

-

Dear Ms. Cook,


Attached, please find Respondent's Response to Complainant's Motion to Strike and Objection to Evidence. A copy was also served via fax today, and has been sent to Mr. Hoffman and Judge Sellers via UPS Next Day mail service for delivery.



Thank you,



**Brittany Watkins**

Legal Secretary to Monica H. Khetarpal, Jane M. McFetridge, Julia P. Argentieri

**Jackson Lewis P.C.**

150 North Michigan Avenue,
Suite 2500

Chicago, IL 60601

Direct: 312-803-2546 |

Brittany.Watkins@Jacksonlewis.com   |   www.jacksonlewis.com

*Jackson Lewis P.C. is included in the AmLaw 100 and Global 100 law firm rankings.*

Confidentiality Note: This e-mail, and any attachment to it, contains privileged and confidential information intended only for the use of the individual(s) or entity named on the e-mail. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that reading it is strictly prohibited. If you have received this e-mail in error,

Gmail - Mary Madison vs. Kenco Logistics | Case No. 2016-FDA-4 Response to Complai...    Page 2 of 2

Case: 18-1800      Document: 10-2      Filed: 08/01/2018      Pages: 320

please immediately return it to the sender and delete it from your system. Thank you.

**Respondent's Response to Complainant's Motion to Strike and Objection to Evidence 081717.pdf**
684K

Case: 18-1800    Document: 10-2    Filed: 08/01/2018    Pages: 320

| | | |
|---|---|---|
| In the Matter of: | ) | |
| | ) | |
| **MARY MADISON,** | ) | **Case No. 2016-FDA-4** |
| | ) | |
| Complainant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **KENCO LOGISTICS** | ) | |
| | ) | |
| Respondent. | ) | |

## RESPONDENT'S RESPONSE TO COMPLAINANT'S MOTION TO STRIKE AND OBJECTION TO EVIDENCE

Respondent Kenco Logistics Services, LLC submits the following response to Complainant Mary Madison's Motion to Strike Respondent's Motion for Summary Decision and Objection to Evidence:

## INTRODUCTION

Complainant was terminated from Kenco for performance reasons stemming from her hostile and ineffective communicate-style. Her termination had no relationship to any purported whistle-blowing. Complainant's motion seeks to avoid a determination of this appeal on the merits by raising numerous unsupported allegations of "bad faith" and improper conduct by Respondent. Complainant further argues that the motion for summary decision was untimely, but in fact, the motion was filed more than 30 days before hearing, in advance of the close of discovery, in accordance with 29 C.F.R. §18.72. For all of these reasons, Complainant's motion should be denied and Respondent's request for summary decision should be granted.

## FACTS

1.    Complainant seeks to argue that the motions for summary decision was due more than 30 days before hearing due to the original pre-hearing order. There are several reasons why this argument is not compelling. First, Complainant acknowledges that the original order appeared to have inconsistencies as to whether it was seeking to set a 30-day or 45-day workday deadline for motions for summary decision. Furthermore, the order continuing the hearing dated March 29, 2017 specifically negated the original deadlines when it continued to the hearing, and gave the parties "and additional 60 days" for any discovery and dispositive motions. *See Exhibit A, 3-29-17 Order attached hereto.*

2.    Complainant subsequently objected to the extension of the scheduling order, and, following a telephone status hearing on May 18, 2017 an Amended Notice of Hearing was entered on June 6, 2017 scheduling the matter for hearing on September 13-15, 2017. This order did not provide any express deadlines for discovery or dispositive motions, nor did it mention that any prior scheduling remained in place. Further, the parties specifically advised Judge Sellers on May 18, 2017 that Madison's deposition had not yet been completed and discovery was ongoing. It would defy logic to argue that one of these earlier discovery or dispositive motion deadlines were to apply, when it would have already passed, or nearly passed, at the time the hearing was scheduled in early June. Accordingly, in accordance with 29 C.F.R. §18.72 the motion for summary decision was timely filed more than 30 days before hearing.[1]

---

[1] Even if the Department were to find that it intended to set an earlier deadline for motions for summary decision, it is clear that the three orders that have been entered are unclear as to whether any fixed deadline existed, since the original order was unclear as to a 30 or 45 day deadline, and was then eliminated by the March 29, 2017 order. Accordingly, at the very least, Respondent had good cause for adhering to the regulatory deadline of 29 C.F.R. §18.72 and should not be penalized.

Case: 18-1800     Document: 10-2     Filed: 08/01/2018     Pages: 320

3.      The remainder of Complainant's objection argues that Respondent has acted in bad faith by relying on a deposition transcript from Madison's federal lawsuit, and failing to disclose evidence. Respondent is troubled by the continued, unfounded accusations of bad faith from Complainant and her attorney, but the record clearly establishes that Respondent has acted courteously and appropriately at all times. The suggestion that Respondent has violated rules of professional conduct by taking Madison's deposition (in her federal lawsuit, where she is not represented) without an attorney present is ridiculous and offensive.

4.      When Respondent originally scheduled these depositions, Madison objected to combining the depositions, so her deposition was set up for the federal lawsuit only. Her testimony went into great detail about her job duties, her performance and her termination. As Respondent has argued throughout this proceeding, the facts of the two cases are extremely intertwined, because both matters hinge on whether Madison was terminated for her poor communication skills, or for some discriminatory/retaliatory reason.

5.      Fed. R. Civ. Pro. 32(a)(8) provides that "[a] deposition lawfully taken and, if required, filed in any federal- or state-court action may be used in a later action involving the same subject matter between the same parties, or their representatives or successors in interest, to the same extent as if taken in the later action. A deposition previously taken may also be used as allowed by the Federal Rules of Evidence." Fed. R. Civ. Pro. 32(a)(8). After taking Madison's deposition in the federal lawsuit, Respondent reviewed the testimony and determined that the deposition answers were sufficiently broad to cover the information necessary for the instant proceeding as well. Complainant's suggestion that Madison was somehow prejudiced by not having an attorney present at a deposition where she was unrepresented is untrue. Madison was required to testify truthfully and accurately about her federal lawsuit, and she was treated

3

courteously and in accordance with Federal Rules of Civil Procedure during her federal lawsuit deposition.

6.　　Respondent believes it would be duplicative to depose Madison a second time for the Department of Labor matter, and add an unnecessary cost to this litigation, because the existing sworn testimony and documents establish that Respondent is entitled to summary decision.

7.　　Complainant's arguments are circular in nature. On the one hand, Complainant disagrees with any request to extend deadlines in this litigation and states that Madison is seeking an expeditious hearing date (Objection at ¶ 30). Yet at the same time, Complainant is arguing that Respondent cannot use a deposition transcript from another proceeding in this litigation and must depose Madison again (Objection at ¶ 19.) That objection is absurd. It is axiomatic that testimony under oath, no matter what proceeding, is admissible in other proceedings. *See Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 978 (7th Cir. 2014) (explaining that even if Fed. R. Civ. Pro. 32(a)(8) is not satisfied, a deposition from another proceeding is admissible for summary judgment if it is: based on personal knowledge and made part of the record in the present case). Madison's deposition transcript has been circulated to Complainant's attorney and the Department, and has been properly incorporated into the record for purposes of considering Respondent's motion for summary decision. Madison's attorney, of course, was welcome to depose Madison himself, if he so chose.

8.　　Discovery has now closed in the instant proceeding, and no depositions were taken in this matter. Accordingly, Respondent relied on supporting affidavits from Kelvin Walsh and Paula Hise in support of its motion for summary decision in accordance with 29 C.F.R. §18.72(c)(4). Complainant oddly argues that these affidavits were used for deposition in the federal case and somehow should not be allowed. These affidavits have not previously been submitted in

4

any proceeding; but, even if they had been, they are sworn statements reflecting the testimony of supervisors who dealt most closely with Mary Madison and their impressions of her job performance. Just like the use of Madison's deposition federal court testimony in this proceeding, there is nothing improper about the declarations. Complainant's attempt to discredit or bar them is yet another improper tactic that Madison and her counsel have been engaging in. Indeed, Madison testified at a recent hearing in federal court, that despite the fact that Hoffman never entered an appearance in the federal lawsuit, he has been working with her every step of the way, with respect to each of her filings.

9.     Respondent has produced all evidence to Complainant more than once during this litigation. On May 5, 2017 all document production was sent to Jordan Hoffman via Fed Ex. *See, Ex. B, Cover Letter to Hoffman.* Subsequently, on August 14, 2017, Respondent sent secure electronic links to Hoffman to ensure that he has access to all of the documents, after reading the accusations in the instant motion. *See Ex. C, Communications with Hoffman via Secure Links to Documents.* Furthermore Complainant has had these documents for years. The documents that Hoffman is claiming were not provided to him (and were actually provided twice prior to the close of discovery) consist of emails documenting Madison's poor performance and have been at issue since the inception of this proceeding.

WHEREFORE, for all the reasons stated herein, Respondent requests that Complainant's Motion to Strike and Objection to Evidence be denied, and that Respondent's Motion for Summary Decision be granted.

DATED: August 17, 2017

Respectfully submitted,

**KENCO LOGISTICS SERVICES, LLC**

By: _____
          One of its Attorneys

Jody Wilner Moran
Julia P. Argentieri
Jackson Lewis P.C.
150 North Michigan Avenue
Suite 2500
Chicago, Illinois 60601
Telephone:     (312) 787-4949
Facsimile:     (312)787-4995

Pages: 320    Filed: 08/01/2018    Document: 10-2    Case: 18-1800

## CERTIFICATE OF SERVICE

The undersigned attorney, hereby certifies that on August 17, 2017, I submitted a copy of the foregoing ***Response to Complainant's Motion to Strike and Objection to Evidence*** via U.S. mail, fax and email to:

> U.S. Department of Labor, Office of Administrative Law Judges
> Attention: April Cook, Paralegal Specialist to Judge Sellers
> 36 E. 7th Street, Suite 2525
> Cincinnati, Ohio 45202
> FAX: (513) 684-6108
> Email: cook.april@dol.gov

A copy was also sent via electronic and U.S. mail to:

> Attorney Jordan Hoffman, Counsel for Complainant
> 2711 E. New York Ave. Suite 205
> Aurora, IL 60502
> jthoffmanlaw@gmail.com

By: _____
One of the Attorneys for the Defendant

Case: 18-1800    Document: 10-2    Filed: 08/01/2018    Pages: 320

# EXHIBIT A

Case: 18-1800     Document: 10-2     Filed: 08/01/2018     Pages: 320

**U.S. Department of Labor**     Office of Administrative Law Judges
36 E. 7th St., Suite 2525
Cincinnati, Ohio 45202

(513) 684-3252
(513) 684-6108 (FAX)



Issue Date: **29 March 2017**

Case No.  2016-FDA-4

In the Matter of:
MARY MADISON,
     Complainant,

    v.

KENCO LOGISTICS,
     Respondent.

## ORDER CONTINUING HEARING

    Pursuant to a Notice of Hearing and Prehearing Order dated December 13, 2016, the above matter is scheduled for hearing on May 4-5, 2017 in Chicago, Illinois.  On February 24, 2017, the Respondent submitted a Motion to Extend Scheduling Order. The parties agreed to the current schedule because there is a parallel case pending in federal district court with  similar facts, and they believed it would be beneficial to set both matters on similar discovery schedules. However, the Respondent noted that discovery has been delayed in the federal district court litigation and the parties are awaiting resolution of those discovery disputes in order to schedule Ms. Madison's deposition.  Therefore, the Respondent is requesting additional time in order to the conduct Ms. Madison's deposition for both matters and/or to prepare any potential dispositive motions.  Counsel for the Complainant has not filed a response to the Respondent's motion. Accordingly,

    **IT IS ORDERED** that the parties will now have an extension of sixty (60) days from the date of this order to finish discovery and/or any dispositive motions.  The hearing scheduled for May 4-5, 2017, in Chicago, Illinois, in the above captioned matter is **CONTINUED.** The parties will mutually confer and advise the undersigned by **June 2, 2017** of dates convenient to reschedule the hearing in the month of August.

    **SO ORDERED.**



Digitally signed by John P. Sellers III
DN: CN=John P. Sellers III,
OU=Administrative Law Judge, O=US
DOL Office of Administrative Law
Judges, L=Cincinnati, S=OH, C=US
Location: Cincinnati OH

JOHN P. SELLERS, III
Administrative Law Judge

Case: 18-1800     Document: 10-2     Filed: 08/01/2018     Pages: 320

# SERVICE SHEET

Case Name: MADISON_MARY_v_KENCO_LOGISTICS_

Case Number: **2016FDA00004**

Document Title: **Order Continuing Hearing**

I hereby certify that a copy of the above-referenced document was sent to the following this 29th day of March, 2017:



Digitally signed by APRIL COOK
DN: CN=APRIL COOK, OU=LEGAL
ASSISTANT, O=US DOL Office of
Administrative Law Judges, L=Cincinnati,
S=OH, C=US
Location Cincinnati OH

**APRIL COOK**
LEGAL ASSISTANT

Director
Directorate of Whistleblower Protection Programs
U S Department of Labor, OSHA
Room N 4618 FPB
200 CONSTITUTION AVE NW
WASHINGTON DC 20210
        {Hard Copy - Regular Mail}

Free State Reporting Inc
1378 Cape St. Clair Road
ANNAPOLIS MD 21409
        {Hard Copy - Regular Mail}

Counsel for Whistleblower Programs
Division of Fair Labor Standards
Office of the Solicitor
U.S. Department of Labor
200 Constitution Ave, NW, Room N-2716
WASHINGTON DC 20210
        {Hard Copy - Regular Mail}

Chicago Regional Solicitor
Regional Solicitor
U. S. Department of Labor
Room 844
230 South Dearborn Street
CHICAGO IL 60604
        {Hard Copy - Regular Mail}

Mary Madison
9758 S. Charles
CHICAGO IL 60643
        {Hard Copy - Regular Mail}

Jordan TraVille Hoffman, Esq.
11528 S.. Halsted Street
CHICAGO IL 60628
        {Hard Copy - Regular Mail}

Scott Simmons, Esq.
Miller & Martin PLLC
832 Georgia Ave., Suite 1000
CHATTANOOGA TN 37402
        {Hard Copy - Regular Mail}

Case: 18-1800    Document: 10-2    Filed: 08/01/2018    Pages: 320

**SERVICE SHEET** continued (2016FDA00004 Hearing Continued) Page: 2

Kenco Logistics
1125 West Sycamore Road
MANTENO IL 60950
        *{Hard Copy - Regular Mail}*

Tim Crouse
Reg. Supervisory Investigator
USDOL, OSHA, Room 3244
230 South Dearborn Street
CHICAGO IL 60604
        *{Hard Copy - Regular Mail}*

Julia P Argentieri, Esq.
Jody Wilner Moran, Esq.
Jackson Lewis, P.C.
150 N. Michigan Ave., Suite 2500
CHICAGO IL 60601
        *{Hard Copy - Regular Mail}*

Case: 18-1800    Document: 10-2    Filed: 08/01/2018    Pages: 320

# EXHIBIT B



**jackson|lewis**
Attorneys at Law

Jackson Lewis P.C.
150 North Michigan Avenue
Suite 2500
Chicago, Illinois 60601
Tel 312 787-4949
Fax 312 787-4995
www.jacksonlewis.com

ALBANY, NY
ALBUQUERQUE, NM
ATLANTA, GA
AUSTIN, TX
BALTIMORE, MD
BIRMINGHAM, AL
BOSTON, MA
CHICAGO, IL
CINCINNATI, OH
CLEVELAND, OH
DALLAS, TX
DAYTON, OH
DENVER, CO
DETROIT, MI
GRAND RAPIDS, MI

GREENVILLE, SC
HARTFORD, CT
HONOLULU, HI
HOUSTON, TX
INDIANAPOLIS, IN
JACKSONVILLE, FL
KANSAS CITY REGION
LAS VEGAS, NV
LONG ISLAND, NY
LOS ANGELES, CA
MADISON, WI
MEMPHIS, TN
MIAMI, FL
MILWAUKEE, WI
MINNEAPOLIS, MN

MONMOUTH COUNTY, NJ
MORRISTOWN, NJ
NEW ORLEANS, LA
NEW YORK, NY
NORFOLK, VA
OMAHA, NE
ORANGE COUNTY, CA
ORLANDO, FL
PHILADELPHIA, PA
PHOENIX, AZ
PITTSBURGH, PA
PORTLAND, OR
PORTSMOUTH, NH
PROVIDENCE, RI

RALEIGH, NC
RAPID CITY, SD
RICHMOND, VA
SACRAMENTO, CA
SALT LAKE CITY, UT
SAN DIEGO, CA
SAN FRANCISCO, CA
SAN JUAN, PR
SEATTLE, WA
ST. LOUIS, MO
STAMFORD, CT
TAMPA, FL
WASHINGTON, DC REGION
WHITE PLAINS, NY

*through an affiliation with Jackson Lewis P.C., a Law Corporation

MY DIRECT DIAL IS: 312-803-2533
MY EMAIL ADDRESS IS: JULIA.ARGENTIERI@JACKSONLEWIS.COM

May 5, 2017

**VIA REGULAR U.S. MAIL AND**
**ELECTRONIC MAIL**

Jordan Hoffman, Esq.
Counsel for Complainant
2711 E. New York Ave., Suite 205
Aurora, Illinois
jthoffmanlaw@gmail.com

Re:  *Madison v. Kenco et. al.*, Case No.
2016-FDA-4

Dear Mr. Hoffman:

We have re-noticed Mary Madison's deposition in the federal litigation (*Mary Madison v. Kenco Logistics Services, LLC, Kelvin Walsh and Mars Inc.*, Case No. 15-cv-02290) for May 24 in accordance with recent court orders which were entered. It is our understanding that you object to combining the depositions for the federal litigation and the pending DOL appeal. If that is correct, we will reach out to you in the upcoming weeks to discuss scheduling of Madison's deposition for the DOL appeal, or please let us know if you would like to propose any dates within the current discovery schedule. Also, enclosed, please find a copy of Kenco's production.

Regards,

**JACKSON LEWIS P.C.**

Julia P. Argentieri

Cc:  April Cook, Paralegal Specialist to Judge Sellers (without enclosures)

Case: 18-1800    Document: 10-2    Filed: 08/01/2018    Pages: 320

# EXHIBIT C

| From: | Jordan Hoffman <jthoffmanlaw@gmail.com> |
|---|---|
| Sent: | Tuesday, August 15, 2017 12:17 PM |
| To: | Argentieri, Julia P. (Chicago) |
| Subject: | Re: Julia P Argentieri shared these documents with you |

Thank you again, for the documents. Are these documents that are being stipulated as being a part of the record for the purpose of pre-hearing exchange?

Respectfully yours,

Jordan Hoffman

On Aug 14, 2017 1:07 PM, "Julia P Argentieri" <notifier@mail.vault.netvoyage.com> wrote:
Mr. Hoffman:
Respondent's production was previously sent to you via U.S. mail on May 5, 2017. I am re-sending secure email links to all documents to ensure that you have received everything. If you have any difficulty accessing these documents or questions, please contact me at (312)803-2533.

Regards,
Julie Argentieri

Links expire 2017-09-18

Download all

| | | |
|---|---|---|
| Kenco 000001-000040 - Personnel File.pdf | DOWNLOAD | VIEW |
| Kenco 000041-000059 - EEOC FOIA.pdf | DOWNLOAD | VIEW |
| Kenco 000060- 000559 - IDHR FOIA.pdf | DOWNLOAD | VIEW |

Download all

| | | |
|---|---|---|
| Kenco 000560- 000904 - IDHR FOIA 2.pdf | DOWNLOAD | VIEW |
| Kenco 000905-001159 - IDHR FOIA 3.pdf | DOWNLOAD | VIEW |
| Kenco 001160-001352 - IDHR FOIA 4.pdf | DOWNLOAD | VIEW |

Download all

| | | |
|---|---|---|
| Kenco 001353-001724 - IDHR FOIA 5.pdf | DOWNLOAD | VIEW |
| Kenco 001725-001730 CONFIDENTIAL Kenco policies.pdf | DOWNLOAD | VIEW |
| Kenco 001731-001733 - Quality Engineer Job Description.pdf | DOWNLOAD | VIEW |

Download all

Kenco 001734 -001864 - CONFIDENTIAL Madison
Performance documents.pdf

**Thank you for using NetDocuments for secure document delivery.**
If you have any questions, contact support or find out more about **net**documents at www.netdocuments.com

Pages: 320

Filed: 08/01/2018

Document: 10-2

Case: 18-1800

                    **Jordan Hoffman <jthoffmanlaw@gmail.com>**

---

## Madison v Kenco
2 messages

---

**Argentieri, Julia P. (Chicago)** <Julia.Argentieri@jacksonlewis.com>     Mon, Aug 21, 2017 at 7:09 PM

To: Jordan Hoffman <jthoffmanlaw@gmail.com>
Cc: "Moran, Jody Wilner (Chicago)" <MoranJ@jacksonlewis.com>, "Watkins, Brittany (Chicago)" <Brittany.Watkins@jacksonlewis.com>


Mr. Hoffman:
Attached please find the order entered last week on August 16, along with our motion for a brief extension that we discussed with you via phone earlier this evening. Please let us know if you have any questions and please confirm your receipt. Also, we look forward to hearing from you further once you have spoken to your client regarding a settlement demand and discussing the possibility of resolution.


Thanks,

Julie Argentieri


**Julia P. Argentieri**

Attorney at Law

**Jackson Lewis P.C.**

150 North Michigan Avenue
Suite 2500

Chicago, IL 60601

Direct: (312) 803-2533 | Main: (312) 787-4949

Julia.Argentieri@jacksonlewis.com  |  www.jacksonlewis.com

*Jackson Lewis P.C. is included in the AmLaw 100 and Global 100 law firm rankings.*

Confidentiality Note: This e-mail, and any attachment to it, contains privileged and confidential information intended only for the use of the individual(s) or entity named on the e-mail. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that reading it is strictly prohibited. If you have received this e-mail in error, please immediately return it to the sender and delete it from your system. Thank you.

**2 attachments**

**Cisco_fax.tif**
85K

Case: 18-1800          Document: 10-2          Filed: 08/01/2018          Pages: 320



 **Respondent's Motion to Extend Hearing Date 082217.docx**
22K

---

**Jordan Hoffman** <jthoffmanlaw@gmail.com>                                Mon, Aug 21, 2017 at 8:18 PM
To: "Argentieri, Julia P. (Chicago)" <Julia.Argentieri@jacksonlewis.com>

I acknowledge that I have received a copy of the fax order previously entered by Judge Sellers and also the motion to extend the hearing date. Thank you for submitting the documents to me.

Respectfully yours,


Jordan Hoffman



The Law Office of
Jordan T. Hoffman, P.C.
2711 East New York St., Suite 205
Aurora, IL 60502
888.958.4529 Phone and Facsimile
jthoffmanlaw@gmail.com

*"Balancing the Scales of Justice"*

www.attyjthoffman.com

- CONFIDENTIALITY NOTICE: The information contained in this communication is confidential, may be attorney-client privileged or attorney work product, may constitute inside information or internal deliberative staff communication, and is intended only for the use of the addressee. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify the sender immediately by return e-mail and destroy this communication and all copies thereof, including all attachments. Receipt by an unintended recipient does not waive attorney-client privilege, attorney work product privilege, or any other exemption from disclosure.
[Quoted text hidden]

**U.S. Department of Labor**

Office of Administrative Law Judges
36 E. 7th St., Suite 2525
Cincinnati, Ohio 45202

(513) 684-3252
(513) 684-6108 (FAX)



# FAX TRANSMISSION

**To:**     **Jordan Hoffman, Esq.**
          **Julie Argentieri, Esq.**

**Fax Number:**    $(888)\ 958-4259$
                    **(312) 787-4995**

**From:**     April Cook, Paralegal Specialist to Judge Sellers

**No. of Pages (including cover sheet):**   5
**Date:  August 16, 2017**

·

**Note:**

*Please call (513) 684-3252 if this fax is incomplete or illegible*

Case: 18-1800     Document: 10-2     Filed: 08/01/2018     Pages: 320

## U.S. Department of Labor

Office of Administrative Law Judges
36 E. 7th St., Suite 2525
Cincinnati, Ohio 45202

(513) 684-3252
(513) 684-6108 (FAX)



**Issue Date: 16 August 2017**

Case No. 2016-FDA-00004

*In the Matter of:*

**MARY MADISON,**
    Complainant,

    v.

**KENCO LOGISTICS,**
    Respondent.

### ORDER DENYING RESPONDENT'S
### MOTION FOR SUMMARY DECISION

The above-captioned claim is currently scheduled for hearing on September 13, 2017, in Chicago, Illinois. By e-mail received on August 11, 2017, Kenco Logistics (the "Respondent") filed a Motion for Summary Decision. The same day, also by e-mail, the Respondent filed a Motion to Extend the Deadline for Pre-Hearing Exchanges and Re-Set The Hearing Pending Ruling of Respondent's Motion for Summary Decision. On August 14, 2017, the Complainant filed a Motion to Strike and Objection to Evidence.

At the outset, I note that neither party requested, nor has the undersigned granted, permission to file papers electronically or via facsimile.[1] The parties are hereby **ORDERED** to file all future correspondence in writing, to the address listed above. Electronic and facsimile filings will no longer be accepted.

The Notice of Hearing and Prehearing Order, issued on December 13, 2016, stated that dispositive motions must be filed "no later than thirty (45) workdays before hearing." Moreover, it stated, "Response to such motion must be filed by the party opposing such motion no later than fourteen (14) workdays after receipt of the motion." The undersigned acknowledges the clerical error printed in the Notice of Hearing, as it is unclear whether the parties had thirty (30) or forty-five (45) workdays to file dispositive motions. Nonetheless, even assuming that the Notice of Hearing stated that dispositive motions were due "no later than thirty (30) workdays before hearing," the Respondent's motion was untimely. There is simply insufficient time for the Complainant to respond to, and for the undersigned to rule on, the merits of the Respondent's motion prior to the hearing. Consequently, the Respondent's Motion for Summary Decision is hereby **DENIED**.

---

[1] *See* The Rules of Practice and Procedure for Hearings before the Office of Administrative Law Judges at 29 C.F.R. § 18.30.

Case: 18-1800    Document: 10-2    Filed: 08/01/2018    Pages: 320

In its Motion to Extend the Deadline for Pre-Hearing Exchanges and Re-Set The Hearing Pending Ruling of Respondent's Motion for Summary Decision, the Respondent stated that it "believes that it is in the interest of both parties and the Department of Labor to avoid submitting pre-hearing materials or conducting a hearing until it becomes known whether or not the Administrative Law Judge finds that a hearing is necessary in order to resolve any disputed issues of fact in this case." I interpret this as a request to continue the hearing pending resolution of the Respondent's Motion for Summary Decision. The Complainant has objected to this request. As the Respondent's Motion for Summary Decision has been denied as untimely, the Respondent's request to re-set the hearing date is also **DENIED**. The hearing will proceed as scheduled on September 13, 2017.

Finally, the Respondent requested additional time to submit its prehearing exchange. The Notice of Hearing provides that the parties are required to submit prehearing exchanges at least twenty (20) workdays prior to the hearing. To date, the undersigned has not received a prehearing exchange from either party. Therefore, the parties are hereby **ORDERED** to file with the undersigned, in writing, and send to opposing counsel their prehearing exchanges no later than **Friday, September 1, 2017.**

Any objections to specific exhibits will be addressed on the record at the hearing on September 13, 2017.

SO ORDERED.



Digitally signed by John P. Sellers III
DN: CN=John P. Sellers III,
OU=Administrative Law Judge, O=US
DOL Office of Administrative Law
Judges, L=Cincinnati, S=OH, C=US
Location: Cincinnati OH

JOHN P. SELLERS, III
Administrative Law Judge

Case: 18-1800 Document: 10-2 Filed: 08/01/2018 Pages: 320

## SERVICE SHEET

Case Name: MADISON_MARY_v_KENCO_LOGISTICS_

Case Number: **2016FDA00004**

Document Title: **Order Denying Respondent's Motion for Summary Decision**

I hereby certify that a copy of the above-referenced document was sent to the following this 16th day of August, 2017:



Digitally signed by April COOK
DN: CN=APRIL COOK, OU=LI DAI
ASSISTANT, O=US DOL Office of
Administrative Law Judges, L=Cincinnati,
S=OH, C=US
Location: Cincinnati OH

**APRIL COOK**
LEGAL ASSISTANT

Director
Directorate of Whistleblower Protection Programs
U S Department of Labor, OSHA
Room N 4618 FPB
200 CONSTITUTION AVE NW
WASHINGTON DC 20210
*{Hard Copy - Regular Mail}*

Counsel for Whistleblower Programs
Division of Fair Labor Standards
Office of the Solicitor
U.S. Department of Labor
200 Constitution Ave, NW, Room N-2716
WASHINGTON DC 20210
*{Hard Copy - Regular Mail}*

Chicago Regional Solicitor
Regional Solicitor
U. S. Department of Labor
Room 844
230 South Dearborn Street
CHICAGO IL 60604
*{Hard Copy - Regular Mail}*

Mary Madison
9758 S. Charles
CHICAGO IL 60643
*{Hard Copy - Regular Mail}*

Jordan TraVille Hoffman, Esq.
11528 S.. Halsted Street
CHICAGO IL 60628
*{Hard Copy - Regular Mail}*

Scott Simmons, Esq.
Miller & Martin PLLC
832 Georgia Ave., Suite 1000
CHATTANOOGA TN 37402
*{Hard Copy - Regular Mail}*

Kenco Logistics
1125 West Sycamore Road
MANTENO IL 60950
*{Hard Copy - Regular Mail}*

Tim Crouse
Reg. Supervisory Investigator
USDOL, OSHA, Room 3244
230 South Dearborn Street
CHICAGO IL 60604
*{Hard Copy - Regular Mail}*

**SERVICE SHEET** continued (2016FDA00004 Order)       Page: 2

Julia P Argentieri, Esq.
Jody Wilner Moran, Esq.
Jackson Lewis, P.C.
150 N. Michigan Ave., Suite 2500
CHICAGO IL 60601
        *[Hard Copy – Regular Mail]*

Case: 18-1800    Document: 10-2    Filed: 08/01/2018    Pages: 320

Case: 18-1800      Document: 10-2        Filed: 08/01/2018      Pages: 320

                    **Jordan Hoffman <jthoffmanlaw@gmail.com>**

---

## MARY MADISON V. KENCO LOGISTICS - 2016-FDA-4-
3 messages

---

**Jordan Hoffman** <jthoffmanlaw@gmail.com>                    Mon, Aug 21, 2017 at 4:23 PM
To: "Cook, April - OALJ" <cook.april@dol.gov>

Dear Ms. Cook,

You left a voice message for me earlier today concerning the order that was entered in this matter 4 or 5 days ago. To date, I have not received the order in the mail. I had previously requested that you fax it to the same number that you have been leaving voice messages for me, i.e., (888) 958-4529. Additionally, I had also requested that if you needed to call me that you do so on my mobile phone. Thank you in advance for your cooperation.


The Law Office of
Jordan T. Hoffman, P.C.
2711 East New York St., Suite 205
Aurora, IL 60502
888.958.4529 Phone and Facsimile
jthoffmanlaw@gmail.com

*"Balancing the Scales of Justice"*

www.attyjthoffman.com

- CONFIDENTIALITY NOTICE: The information contained in this communication is confidential, may be attorney-client privileged or attorney work product, may constitute inside information or internal deliberative staff communication, and is intended only for the use of the addressee. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify the sender immediately by return e-mail and destroy this communication and all copies thereof, including all attachments. Receipt by an unintended recipient does not waive attorney-client privilege, attorney work product privilege, or any other exemption from disclosure.

---

**Cook, April - OALJ** <cook.april@dol.gov>                    Tue, Aug 22, 2017 at 10:12 AM
To: Jordan Hoffman <jthoffmanlaw@gmail.com>


I tried again this morning to fax the order and it won't go through



**From:** Jordan Hoffman [mailto:jthoffmanlaw@gmail.com]
**Sent:** Monday, August 21, 2017 5:23 PM
**To:** Cook, April - OALJ
**Subject:** MARY MADISON V. KENCO LOGISTICS - 2016-FDA-4-

[Quoted text hidden]

---

**Jordan Hoffman** <jthoffmanlaw@gmail.com>                    Tue, Aug 22, 2017 at 11:00 AM
To: "Cook, April - OALJ" <cook.april@dol.gov>

---

Dear Ms. Cook,

Can you please call me on my cell phone 773.490.8940.

That is so so odd, as I received a fax this last night and this morning on the 888.958.4529.

Thank you

The Law Office of
Jordan T. Hoffman, P.C.
2711 East New York St., Suite 205
Aurora, IL 60502
888.958.4529 Phone and Facsimile
jthoffmanlaw@gmail.com

*"Balancing the Scales of Justice"*

www.attyjthoffman.com

- CONFIDENTIALITY NOTICE: The information contained in this communication is confidential, may be attorney-client privileged or attorney work product, may constitute inside information or internal deliberative staff communication, and is intended only for the use of the addressee. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify the sender immediately by return e-mail and destroy this communication and all copies thereof, including all attachments. Receipt by an unintended recipient does not waive attorney-client privilege, attorney work product privilege, or any other exemption from disclosure.

[Quoted text hidden]

RECEIVED

AUG 23 2017

Office of Administrative Law Judges
Cincinnati, Ohio

**UNITED STATES
DEPARTMENT OF LABOR**

In the Matter of:                        )
                                         )
    **MARY MADISON,**              )
                                         )    **Case No. 2016-FDA-4**
        **Complainant,**        )
                                         )
**v.**                                   )
                                         )
    **KENCO LOGISTICS**            )
                                         )
        **Respondent.**         )

**RESPONDENT'S MOTION FOR RECONSIDERATION OF THE
AUGUST 16, 2017 RULING**

Respondent Kenco Logistics Services, LLC hereby submits the following request for reconsideration of the Order dated August 16, 2017 finding Respondent's Motion for Summary Decision untimely:

1. On August 11, 2017 Respondent filed a Motion for Summary Decision.

2. On August 14, 2017 Complainant filed an Objection to the Motion.

3. On August 16, 2017 the Department entered an Order declining to consider Respondent's Motion for Summary Decision based on timeliness.

4. On August 17, 2017 Respondent filed a response brief articulating the reasons why Respondent believes that Respondent's Motion for Summary Decision was timely filed, or alternatively, why Respondent had good cause for understanding August 11, 2017 to be an appropriate deadline.

5. The Department's August 16, 2017 ruling was issued prior to receiving and reviewing Respondent's response to the Objection.

1

6. Respondent therefore requests that the Department reconsider its August 16, 2017 ruling, if it deems appropriate, in light of the additional pertinent information presented in Respondent's brief submitted on August 17, 2017.

WHEREFORE, for all the reasons stated herein, Respondent requests that the Department reconsider its ruling dated August 16, 2017 in order to consider Respondent's response submitted on August 17, 2017 and grant such further relief as is just and proper.


DATED: August 23, 2017                    Respectfully submitted,


                                          **KENCO LOGISTICS SERVICES, LLC**


                                          By: _Jody Moran_____
                                              One of its Attorneys


Jody Wilner Moran
Julia P. Argentieri
Jackson Lewis P.C.
150 North Michigan Avenue
Suite 2500
Chicago, Illinois 60601
Telephone:    (312) 787-4949
Facsimile:    (312)787-4995

Case: 18-1800      Document: 10-2      Filed: 08/01/2018      Pages: 320

Case: 18-1800    Document: 10-2    Filed: 08/01/2018    Pages: 320

## CERTIFICATE OF SERVICE

The undersigned attorney, hereby certifies that on August 23, 2017, I submitted a copy of the foregoing *Respondent's Motion for Reconsideration of the August 16, 2017 Ruling* via hand delivery, and mail to:

> U.S. Department of Labor, Office of Administrative Law Judges
> Attention: April Cook, Paralegal Specialist to Judge Sellers
> 36 E. 7th Street, Suite 2525
> Cincinnati, Ohio 45202

A copy was also sent via electronic and U.S. mail to:

> Attorney Jordan Hoffman, Counsel for Complainant
> 2711 E. New York Ave. Suite 205
> Aurora, IL 60502

By: _____
      One of the Attorneys for Respondent

RECEIVED

AUG 2 3 2017

Office of Administrative Law Judge
Cincinnati, C.

Pages: 320

Filed: 08/01/2018

Document: 10-2

Case: 18-1800

**UNITED STATES
DEPARTMENT OF LABOR**

In the Matter of:                    )
                                     )
    **MARY MADISON,**               )
                                     )       **Case No. 2016-FDA-4**
        **Complainant,**          )
                                     )
**v.**                               )
                                     )
    **KENCO LOGISTICS**             )
                                     )
        **Respondent.**           )

### RESPONDENT'S UNOPPOSED MOTION FOR A SHORT
### EXTENSION OF THE HEARING DATES

Respondent Kenco Logistics Services, LLC hereby moves without opposition for a short extension of the hearing in accordance with 29 C.F.R. §18.41. In support thereof, Respondent states as follows:

1.    The hearing in this matter currently is scheduled for September 13-15, 2017.

2.    Pre-hearing exchange materials are due September 1, 2017 in accordance with the Order dated August 16, 2017.

3.    Within the last two weeks, the lead attorney for Respondent, Jody Wilner Moran, received a serious medical diagnosis that will require her to be out of the office for at least several months. Accordingly, Moran will be transitioning this case to another lead counsel to handle the hearing, along with Associate Julia Argentieri.

4.    Jackson Lewis P.C. has other attorneys who are able to assist with this hearing, however, in order to avoid conflicts with other commitments and be quickly brought up to speed, Respondent requests a brief extension.

1

Case: 18-1800     Document: 10-2     Filed: 08/01/2018     Pages: 320

5.    Respondent does not seek to unduly delay this matter, and wishes to proceed with the hearing at the earliest reasonable juncture.

6.    However, Respondent will suffer prejudice if the hearing goes forward September 13-15 given Counsel for Respondent's recent medical situation that has left her unable to continue to serve as lead counsel in the short-term.

7.    In accordance with 29 C.F.R. §18.41 Respondent has requested this continuance promptly upon being made aware of the personal circumstances that necessitate a brief continuance.

8.    Counsel for Respondent spoke to Jordan Hoffman via telephone on August 21 regarding this proposed motion. Hoffman had no objection to the brief extension, and indicated that he was available on the requested dates.

WHEREFORE, for all the reasons stated herein, Respondent requests that the hearing date, be moved to October 18-20, 2017 or to mutually agreeable dates that work for the parties and Judge Sellers.

DATED:  August 23, 2017                    Respectfully submitted,

                                           **KENCO LOGISTICS SERVICES, LLC**


                                           By: _Jody Moran_____
                                                   One of its Attorneys

Jody Wilner Moran
Julia P. Argentieri
Jackson Lewis P.C.
150 North Michigan Avenue, Suite 2500
Chicago, Illinois 60601
Telephone:     (312) 787-4949
Facsimile:     (312)787-4995

2

Case: 18-1800     Document: 10-2     Filed: 08/01/2018     Pages: 320

## CERTIFICATE OF SERVICE

The undersigned attorney, hereby certifies that on August 23, 2017, I submitted a copy of the foregoing ***Respondent's Unopposed Motion for a Short Extension of the Hearing Dates*** via hand delivery, and mail to:

> U.S. Department of Labor, Office of Administrative Law Judges
> Attention: April Cook, Paralegal Specialist to Judge Sellers
> 36 E. 7th Street, Suite 2525
> Cincinnati, Ohio 45202

A copy was also sent via electronic and U.S. mail to:

> Attorney Jordan Hoffman, Counsel for Complainant
> 2711 E. New York Ave. Suite 205
> Aurora, IL 60502

By: _Jody Moran_

One of the Attorneys for Respondent

3

Case: 18-1800      Document: 10-2      Filed: 08/01/2018      Pages: 320

                    **Jordan Hoffman <jthoffmanlaw@gmail.com>**

---

## Mary Madison - Pending Motions
6 messages

---

**Cook, April - OALJ** <cook.april@dol.gov>                    Fri, Aug 25, 2017 at 8:54 AM
To: "Argentieri, Julia P. (Chicago)" <Julia.Argentieri@jacksonlewis.com>, "jthoffmanlaw@gmail.com"
<jthoffmanlaw@gmail.com>

Judge Sellers would like to have a conference call today at 1:30 p.m. E.T. regarding rescheduling the above matter.

Mr. Hoffman – I left you a voice mail message as well.

April Cook, Paralegal Specialist to Judge Sellers and Judge Silvain

Office of Administrative Law Judges

36 E. 7th Street, Suite 2525

Cincinnati, OH  45202

(513) 684-6016 (direct line)

(513) 684-3252 (main line)

---

**Argentieri, Julia P. (Chicago)** <Julia.Argentieri@jacksonlewis.com>        Fri, Aug 25, 2017 at 9:43 AM
To: "Cook, April - OALJ" <cook.april@dol.gov>, "jthoffmanlaw@gmail.com" <jthoffmanlaw@gmail.com>
Cc: "Moran, Kathryn Montgomery (Chicago)" <Kathryn.Moran@jacksonlewis.com>

April:

1:30 p.m. EST will work for our office. You can reach me at this number. My colleague Kathryn who is copied on this email will most likely be filing an appearance as the new lead counsel on this matter, so I anticipate that she will join the call too.

Thanks,

Julie Argentieri

**Julia P. Argentieri**

---

Attorney at Law

**Jackson Lewis P.C.**

150 North Michigan Avenue

Suite 2500

Chicago, IL 60601

Direct: (312) 803-2533 | Main: (312) 787-4949

Julia.Argentieri@jacksonlewis.com  |  www.jacksonlewis.com

***Jackson Lewis P.C. is included in the AmLaw 100 and Global 100 law firm rankings.***

---

**From:** Cook, April - OALJ [mailto:cook.april@dol.gov]
**Sent:** Friday, August 25, 2017 8:54 AM
**To:** Argentieri, Julia P. (Chicago) <Julia.Argentieri@jacksonlewis.com>; jthoffmanlaw@gmail.com
**Subject:** Mary Madison - Pending Motions

[Quoted text hidden]

---

Confidentiality Note: This e-mail, and any attachment to it, contains privileged and confidential information intended only for the use of the individual(s) or entity named on the e-mail. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that reading it is strictly prohibited. If you have received this e-mail in error, please immediately return it to the sender and delete it from your system. Thank you.

---

**Jordan Hoffman** <jthoffmanlaw@gmail.com>                    Fri, Aug 25, 2017 at 9:44 AM
To: "Cook, April - OALJ" <cook.april@dol.gov>
Cc: "Argentieri, Julia P. (Chicago)" <Julia.Argentieri@jacksonlewis.com>

Good Day,

That will be fine.  Please call on my cell phone 773.490.8940.

Thanks

The Law Office of
Jordan T. Hoffman, P.C.
2711 East New York St., Suite 205
Aurora, IL 60502
888.958.4529 Phone and Facsimile
jthoffmanlaw@gmail.com

***"Balancing the Scales of Justice"***

www.attyjthoffman.com

- CONFIDENTIALITY NOTICE: The information contained in this communication is confidential, may be attorney-client privileged or attorney work product, may constitute inside information or internal deliberative staff communication, and is intended only for the use of the addressee. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify the sender immediately by return e-mail and destroy this communication and all copies thereof, including all attachments. Receipt by an unintended recipient does not waive attorney-client privilege, attorney work product privilege, or any other exemption from disclosure.

[Quoted text hidden]

---

Case: 18-1800    Document: 10-2    Filed: 08/01/2018    Pages: 320

**Cook, April - OALJ** <cook.april@dol.gov>    Fri, Aug 25, 2017 at 9:47 AM
To: Jordan Hoffman <jthoffmanlaw@gmail.com>

Ok. Thank you.

**From:** Jordan Hoffman [mailto:jthoffmanlaw@gmail.com]
**Sent:** Friday, August 25, 2017 10:44 AM
**To:** Cook, April - OALJ
**Cc:** Argentieri, Julia P. (Chicago)
**Subject:** Re: Mary Madison - Pending Motions

[Quoted text hidden]

**Argentieri, Julia P. (Chicago)** <Julia.Argentieri@jacksonlewis.com>    Mon, Aug 28, 2017 at 5:04 PM
To: "Cook, April - OALJ" <cook.april@dol.gov>, "jthoffmanlaw@gmail.com" <jthoffmanlaw@gmail.com>
Cc: "Moran, Kathryn Montgomery (Chicago)" <Kathryn.Moran@jacksonlewis.com>

April:
I am following up on our telephone conference from last Friday and confirming that Respondent is available December 12-14 for hearing on the above matter in Chicago.

Regards,

Julie Argentieri

**Julia P. Argentieri**
Attorney at Law
**Jackson Lewis P.C.**
150 North Michigan Avenue
Suite 2500
Chicago, IL 60601
Direct: (312) 803-2533 | Main: (312) 787-4949
Julia.Argentieri@jacksonlewis.com | www.jacksonlewis.com
*Jackson Lewis P.C. is included in the AmLaw 100 and Global 100 law firm rankings.*

**From:** Cook, April - OALJ [mailto:cook.april@dol.gov]
**Sent:** Friday, August 25, 2017 8:54 AM
**To:** Argentieri, Julia P. (Chicago) <Julia.Argentieri@jacksonlewis.com>; jthoffmanlaw@gmail.com
**Subject:** Mary Madison - Pending Motions

[Quoted text hidden]

Confidentiality Note: This e-mail, and any attachment to it, contains privileged and confidential information intended only for the use of the individual(s) or entity named on the e-mail. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that reading it is strictly prohibited. If you have received this e-mail in error, please immediately return it to the sender and delete it from your system. Thank you.

---

**Argentieri, Julia P. (Chicago)** <Julia.Argentieri@jacksonlewis.com>           Tue, Sep 5, 2017 at 9:06 AM

To: "Cook, April - OALJ" <cook.april@dol.gov>, "jthoffmanlaw@gmail.com" <jthoffmanlaw@gmail.com>
Cc: "Moran, Kathryn Montgomery (Chicago)" <Kathryn.Moran@jacksonlewis.com>

Hi April:

Hope you enjoyed your long weekend. We wanted to follow up on the Mary Madison v. Kenco (2016-FDA-4) matter and our telephone conference from August 25 to confirm that a new scheduling order will be issued to set this matter for hearing in December, and any existing deadlines pertaining to the previously-scheduled September hearing, and pre-hearing exchanges, have been vacated. Please confirm that this is correct or let us know if you are waiting on any additional information from either party.

Thank you.

Regards,

Julie Argentieri

**Julia P. Argentieri**
Attorney at Law
**Jackson Lewis P.C.**
150 North Michigan Avenue
Suite 2500
Chicago, IL 60601
Direct: (312) 803-2533 | Main: (312) 787-4949
Julia.Argentieri@jacksonlewis.com  |  www.jacksonlewis.com
*Jackson Lewis P.C. is included in the AmLaw 100 and Global 100 law firm rankings.*

---

**From:** Argentieri, Julia P. (Chicago)
**Sent:** Monday, August 28, 2017 5:05 PM
**To:** Cook, April - OALJ <cook.april@dol.gov>; jthoffmanlaw@gmail.com
**Cc:** Moran, Kathryn Montgomery (Chicago) <Kathryn.Moran@jacksonlewis.com>
**Subject:** RE: Mary Madison - Pending Motions

[Quoted text hidden]
[Quoted text hidden]

UNITED STATES
DEPARTMENT OF LABOR

In the Matter of :                          )
                                           )
        MARY MADISON,                      )
                                           )
            Complainant,                   )
                                           )
v.                                         )      Case No. 2016-FDA-4
                                           )
        KENCO LOGISTICS                    )
                                           )
            Respondent.                    )

**COMPLAINANT'S RESPONSE TO RESPONDENT'S MOTION FOR SUMMARY DECISION**

NOW COMES, Complainant, Mary Madison and she hereby submits the following as her

Response to Respondent, Kenco Logistics' (hereafter "Kenco") Motion for Summary Decision

pursuant 29 C.F.R. §18.72:

## BACKGROUND

**THE REGULATORY ENVIRONMENT**

Kenco is a third-party Logistics Company headquartered in Chattanooga, Tennessee.  In April,

2013, Kenco took on the management of a warehouse facility in Manteno, Illinois a dedicated

warehouse owned by Mars, Inc., a multi-national manufacturer of candy, pet food, drink brands and

other food products.  Madison was hired by Kenco on May 13, 2013 as a Quality Engineer. Madison's

hire coincided with the implementation of legislation that had been signed into law on January 4, 2011

by then President Obama. The purpose of this law was to better protect public health and by ensuring

food safety[1] and security of the food supply. (See, *81 FR 90186-01*). The law also provided for new

enforcement authorities to help achieve higher rates of compliance with risk-based, prevention-oriented

safety standards and to better respond and to contain problems when they do occur. *Id.* The law known

as the Food Safety Modernization Act (hereafter "FSMA") was an amendment to the Food Drug and

---

[1]Food Safety is governed by thirteen (13) various agencies that include but are not limited to: FDA, USDA, FSIS, CDC, OSHA and EPA to name a few

Cosmetics Act (hereafter "FD&C Act"), 21 U.S.C. §384(d) adding §808 which directed the Food and

Drug to establish Administration (hereafter "the FDA") to establish programs for third-party

certification bodies to conduct food safety audits. *Id*. This regulatory scheme requires third-party

certification bodies to perform unannounced facility audits conducted under the third-party certification

program and to notify the FDA upon discovering a condition that could cause or contribute to a serious

risk to public health, and to submit reports of regular audits conducted for certification purposes. *Id*.

§103 of FSMA also amended the FD&C Act by adding §418 (21 U.S.C. §350g). This adds the

requirements for hazard analysis and risk-based preventative controls for facilities that produce food

for humans or animals. (See 81 FR 30219-01).

The FDA was charged with developing new regulations and implementing them pursuant to FSMA.

However, due to the complexity, difficulty and novelty of the regulations coupled with the need to build

a comprehensive system of regulatory controls that integrated different food types, and also coordinate

such regulations with existing regulations, the FDA failed to meet its deadline to promulgate, finalize

and implement the regulations mandated by FSMA. (See, *Center for Food Safety v. Hamburg*, 954 F.

Supp.2d 965 (2013) at 968. There were seven major areas concerning food regulation that the FDA

was charged with implementing as follows: (1) Regulations with regard to establishing science-based

minimum standards for conducting hazard analysis, documenting hazards, implementing preventing

controls, and documenting implementation of preventative controls, as required by 21 U.S.C. §350g(n).

These regulations were to be implemented by July 4, 2012. *Id.* At 966. (2) Regulations with regard to (a)

activities that constitute on-farm packing or holding of food not raised or consumed on such farm or

another under the same ownership for the purpose of §415 of the Food, Drug and Cosmetic Act; and (b)

activities that constitute on-farm manufacturing or processing of food not consumed on that farm or on

another farm not under the same ownership for purposes of §415, as required by provision that the FDA

must clarify activities included as part of definition of "facility," pursuant to 21 U.S.C. §350d ("notice

of proposed rulemaking" to be published in Federal Register." This regulation was to be implemented

by October 4, 2011—with final rules to be adopted 9 months after close of comment period. *Id.* At

967); (3) Regulations establishing science-based minimum standards for safe production and harvesting

of fruits and vegetables as required by 21 U.S.C §350h. *Id.*  This regulation was to be published by

January 4, 2012, with final regulation to be adopted one year after the close of the comment period); (4)

Regulations to protect  against intentional adulteration of food subject to FSMA, as required by 21

U.S.C. §350i(b), in consultation with Secretary of Homeland Security and Secretary of Agriculture. *Id.*

This regulation was due July 4, 2012; (5) Regulations regarding FDA requirements that shippers,

carriers by motor vehicle or rail, receivers, and other persons engaged in transportation of food use

sanitary transportation practices to ensure that food is not transported under conditions that might

render it adulterated, as required by 21 U.S.C. §350e(b). *Id.*  This regulation was due by July 4, 2012.

(6) Regulations regarding foreign supplier verification program, as required by 21 U.S.C. 384a(c) with

final regulations due by January 4, 2012; (7) Regulations ensuring the neutrality and independence of

third-party audits, as required by 21 U.S.C. §384d(c)(5)(C). *Id*. This was due on July 4, 2012. In

finding against the FDA and issuing an injunction against it for failing to implement these regulations

pursuant to FSMA, the court noted that:

 "the parties are in agreement that the "purpose" of FSMA is to protect human health by ensuring that the food supply is safe from contaminants.  Nevertheless the FDA is correct that the purpose of ensuring food safety will not be served by the issuance of regulations that are insufficiently considered, based on a timetable that is unconnected to the magnitude of the task set by Congress." *Id.* At 971-972.

Prior to the enactment and implementation of FSMA, the food industry developed and

implemented food safety management systems tailored to particular food products and food

operations.[2] The Hazard Analysis and Critical Control Point (hereafter "HACCP") is universally

---

[2]Food safety is composed of a panoply of schemes across the globe known as New Governance, Transnational Governance, and Global Food Safety Regulation. (See, "*A New Governance for Food-safety*," 47 Loy. U. L.J., for a comprehensive discussion of various food safety governance schemes).  Three choices exist:  "SPS—default," "SPS-*plus*" and SPS-plus *plus*-all referencing the food safety  standards covered under the World Trade Organization ("WTO") Agreement and within it the Sanitary and Phytosanitary  ("SPS") Agreement. *Id*.  The SPS Agreement under the umbrella of the WTO that

recognized and accepted for food safety assurance. (See 4 Toxic Torts Litigation Guide §39:7). In 1992, the Nation Advisory Committee on Microbiological Criteria for Foods (hereafter "NACMCF") approved HACCP as an effective and logical system of food safety assurance. *Id.* The NACMCF formulated seven principles to be employed in the development of HACCP plans, viz: (1) **Conduct of Hazard Analysis**. *The first step in establishing a HACCP plan* is to develop all hazards—biological, physical, or chemical that can be associated with the product. The hazard must be such that its prevention, elimination, or reduction to acceptable levels is essential to the production of safe food. *Id.* The second principle is to (2) **Identify the Critical Control Points ("CCP's") in the process**. The CCP is defined as a point, step, or procedure at which control can be applied and a food-safety hazard can be prevented, eliminated, or reduced to an acceptable level. All significant hazards identified during the hazard analysis must be addressed. CCP's include cooking, chilling, specific sanitation procedures, prevention of cross-contamination, product-formulation controls, and employees and environmental hygiene. All CCP's must be carefully developed and documented. *Id.* The third principle is to (3) **Establish Critical Limits for Preventative Measures Associated with Each Identified CCP.** A critical limit is defined as a criterion that must be met for each preventative measure associated with a CCP. CCP's are most often based process parameters, such as temperature, time, physical dimensions, humidity, moisture level, water activity, pH, salt concentration, etc. The

---

regulates trade and indirectly, regulates food safety. *Id.* The SPS Agreement contains rules applying to sanitary [human or animal health] or phytosanitary [plant health] measures, collectively, SPS measures. *Id.* The first standard is the "SPS-default," a standard in which countries adopt the standards promoted by the Codex Commission, a global standard-setting organization responsible for setting thousands of standards and guidelines to protect health and ensure fair trade practices. *Id.* The Codex standards run parallel with WTO norms as codified in the WTO Agreement. *Id.* The SPS Agreement and country adoption of the Codex standards equates per se consistency with the WTO Agreement. *Id.*

Achieving the higher standard than "default" standard, or similar standards found in supply chain networks, is possible in two cases. *Id.* Countries with the capacity to enter into international negotiations can secure higher food safety standards by pursuing the "SPS-plus" standards. *Id.* This is done through negotiating legal instruments that include more detailed and demanding provisions than the WTO or SPS Agreement, or that can contain other regulatory cooperative elements beyond the scope of the agreements. *Id.* The practice of adopting SPS-plus standards into bilateral or regional agreements sanctioned by the WTO. *Id.* A minority of countries—the United States, Canada, the Netherlands and the United Kingdom—are adopting novel regulations that allow them to reach beyond those SPS-plus standards and pursue "SPS-plus standards. *Id.* The new level of standard entails the country of third-party certification, and other private practices found in supply chains, supermarket programs, grocery standards, and voluntary codes and guidelines. *Id.*

Food Safety Inspection Service ("FSIS") proposed that processors identify critical limits in their HACCP plans that must be met at each CCP to be certain that the hazard is controlled. *Id*. The fourth principle involves (4) **Establishing CCP Monitoring Requirements and Procedures for using Monitoring Results to Adjust Processes and Maintain Control**. Monitoring consists of observations or measurements taken to assess whether a CCP is under control. Monitoring is used to determine when a deviation occurs at a CCP and, if not continuous, needs to be conducted at a frequency sufficient to ensure that the CCP is under control. *Id*. The Fifth Principle requires (5) **Establishing Corrective Actions to be Taken when Monitoring Indicates that There is a Deviation from an Established Critical Limit**. HACCP systems are designed to identify potential health hazards and to establish strategies to prevent their occurrence. However, ideal circumstances will not always prevail in a processing operation and deviations will occur. In such instances, NACMCF points out that the corrective action plans must be in place to determine the disposition of the non-compliant product, and to identify and correct the cause of the deviation to regain control of the CCP. FSIS proposed that establishments describe in their HACCP plans the corrective actions that will be taken if a critical limits is not met. *Id*. The sixth principle in the HACCP analysis involves (6) **Establishing Procedures that Document the HACCP plan**. NACMCF states that an establishment's HACCP plan and all associated records must be maintained on file at the establishment. Examples include records on incoming ingredients, product processing, packaging, storage, distribution, and deviations and corrective actions. Records generated during operation of the HACCP plan must be maintained and available for review, and FSIS has specified that records must contain actual values, rather than general terms such as "satisfactory," or "unsatisfactory." *Id*. The Seventh principle of the HACCP Analysis involves (7) **Establishing Procedures to Verify that the HACCP System is Working Correctly**. The NACMCF defines verification as the use of methods, procedures, or tests, in addition to those used for monitoring, to determine if the HACCP system is in compliance with the plan needs modification and

revalidation.  The NACMCF identified **four processes as steps in the establishment's verification of its HACCP system**:

1.    Scientific and technical processes to verify that all critical elements at CCP's are adequate and sufficient to control hazards that are likely to occur (also known as "validating the process).

2.    Assurance that the HACCP plan functions properly, through frequently review of the plan, verification, review of records, an determination that appropriate decisions and product dispositions occur when deviations occur.

3.    Documentation through periodic review to ensure the accuracy of the HACCP plan, including on-site review and verification of all flow diagrams, CCP's, critical limits, monitoring procedures, corrective actions, and records.

4.    Regulatory verifications that the plan is functioning satisfactorily through overall process validation (including any or all of the verification steps listed above) plus final product testing to demonstrate compliance with regulatory as well as other desired performance standards.  The FSIS considered this verification principle a key element to link HACCP with the agency's regulatory strategy to establish public health oriented standards that establishments must meet in order to do business.  Without some objective measures of what constitutes an acceptable level of food-safety performance with respect to pathogenic microorganisms, it would be impossible to determine whether an establishment's HACCP plan is acceptable and functioning. *Id.*   FSMA passed in response to growing levels of imports, diminishing resources to inspect, and heightened food-safety risks adopts key New Governance features: third-party certifications voluntary standards and public-private partnerships (See, "A New Governance Recipe for Food Safety", Supra. At 913).

**Madison's Work Experience; Job Performance and Protected Activity**

       Thus, as of the hire date of Madison, such regulations had not been fully promulgated and implemented by the FDA as mandated by FSMA due to the complexity of the task involved, although

they had been greatly anticipated. Kelvin Walsh, was the General Manager of the Manteno facility at all times relevant to this matter.  At the time that Madison was hired, the Manteno facility also was anticipating an upcoming audit which was to be done within 45-90 days.   Madison was a subject matter expert when in the area of Quality Control. Madison had supply chain management experience coming from a manufacturing background of DOE-formulation chemistry and process engineering. Madison was a change agent for the implementation of one of North America's first to market ISO 9001 certifications for a Fortune 500 company more than 20 years ago.   In addition, she had the experience of being an internal and external 3rd party auditor cross-functionally on the supply chain as part her employment background. Madison was also HACCP certified.  Madison completed over 70 projects within the first month of employment at the Manteno facility, including: A) Warehouse and Distribution Audit[3] conducted on 5.14.13 comprised of an analysis of the: 1) quality system; 2) pest control management system; 3) operational methods of the facility; 4) maintenance and repair of the facility; 5) cleaning program; 6) allergen; 7) security; and 8) HACCP.  B)  On 5.17.13 the following were emailed to Kelvin Walsh for assignment and review a: 1)Sanitation Audit was conducted for a more forensic follow up to the Warehouse and Distribution Audit of 5.14.13 regarding sanitation and cleanliness that was emailed[4] to Kelvin Walsh, Tom White, William Schwerin and Madison. 2)  A completed FDA checklist. 3) Policies and Procedures regarding: Good Manufacturing Practices (GMP), recoup inventory control, social accountability audit, and unloading and inbound Kenco[5] 4) A Material Handling Spill policy[6] C) Created A Training Plan Template dated 06.5.13[7]. D) Food Defense Plan[8] developed 6.6.13 that addresses broad mitigation strategies regarding security, logistics, and management in the defense to the adulteration of the food products, perils and terrorism. E) Standard

---

[3]Respondent's Bates Stamped Document 1271-1307
[4]Respondent's Bates Stamped Document 1488-89and 1699
[5]Respondent's Bates Stamped Document 1491-92
[6]Respondent's Bates Stamped Document 1490
[7]Respondent's Bates Stamped Document 654
[8]Respondent's Bates Stamped Document 1075-1086

Operating Procedures for Mars Manteno Facility[9] amongst other projects[10].  Despite, Kenco's claim that she was inept at her job, Madison had received commendations and compliments from Paula Hise,[11] V.P. of Operations, through Kevin Moses, Regulatory Affairs Specialist, on May 22, 2017, Kevin Moses, on May 29, 2013[12], May 31, 2013[13] and June 3, 2013[14], from Tracie Clifford on July 16, 2013[15] and Tracie Owens, Quality Lead Auditor, on July 27, 2013;[16]  Owens was also to mark Madison's online training as completed hereto attached are copies of Madison's completed training **Exhibit 1.**   In addition, because of Madison's expertise, Madison often times had timely completed job tasks and duties that had not yet been assigned on the Road Map for Success by Jerry Ciriello of Kenco Corporate.  For example, Documentation and Record control was completed prior to the due date[17]vs the MARS Manteno Roadmap for Success that was issued on July 17, 2013.[18] In addition, Madison had begun creating and had completed the Employee Suggestion Program[19] prior to that task being assigned to her on August 1, 2013.[20]

Contrary to Kenco's claim that Madison was overly aggressive and combative towards her fellow managers, she enjoyed an extremely good working relationships with two of the other four managers with which she regularly interacted with as well as her counterpart at Mars, Inc. as  evinced by emails[21] and Szplett's and McCurry's declarations.  Madison did however, experience difficulties with Walsh as he seemed to be annoyed by her request for meetings and request to take actions that were commensurate with putting the facility into compliance with FSMA.  Walsh manifested an

---

[9]Respondent's Bates Stamped Document 1561,1563,1565
[10]Respondent's Bates Stamped Documents 525-534, 956, 1450-1480, 1493
[11]Respondent's Bates Stamped Document 1055
[12]Respondent's Bates Stamped Document 1559-1662
[13]Respondent's Bates Stamped Document 1068
[14]Respondent's Bates Stamped Document 1069
[15]Respondent's Bates Stamped Document 1120
[16]Respondent's Bates Stamped Document 1146-1148
[17]Respondent's Bates Stamped Document 1322-1326
[18]Respondent's Bates Stamped Document 977-978
[19]Respondent's Bates Stamped Document 1559-1562
[20]Respondent's Bates Stamped Document 1156-1157
[21]Respondent's Bates Stamped Documents Group Exhibit

openly hostile attitude towards Madison which suggests that he had problems with women, African-Americans or both.

Madison had made at least six, separate request[22] for documents that were needed to prepare for the upcoming audit. Walsh was either off-putting of her or simply ignored her request. It was only after Terri Hart contacted Madison's counterpart at Mars, Inc., Matt Chick, and upon his sending an email to Madison, that she communicated with Chick by responding to his email, when she requested clarification on the information that he had sent to her initially. It was at that time that she received the information that was necessary to prepare for the audit. The information that was necessary to prepare for the audit. [23] After this, miraculously, Walsh uncovered the materials and tried to turn the tables on Madison by claiming that she made Kenco and more accurately, himself look bad by her having to approach Mars, Inc. for this vital information. Walsh claimed that if Madison only would have called him to ask for the information, he could have given it to her.

In addition to sabotaging Madison's efforts to bring the facility into compliance with FSMA, Walsh undermined her as a Quality Engineer, subject matter expert after she had reported that there had been numerous complaints that the men's bathroom regularly had feces[24] and urine on the floor and never seemed to be cleaned by the provider, Service Master[25] even after being informed of the deficiencies and the current mandates Service Master did not comply.[26] Madison did not directly recommend that since Service Master be replaced, but emphasized that the facility needed to be compliant. Madison's recommendation met with strong resistance from Walsh. It was Paula Hise who

---

[22]Respondent's Bates Stamped Documents 490-495
[23]Respondent's Bates Stamped Document 725-726 CAPA02277
[24]Service Master had reported concerns about the biohazards in the bathrooms in the May 2013 meeting, as referenced in the MOU dated May 22, 2013 page 2 ¶3 Respondents Bates Stamped Document 1611-1612. Kevin Moses, Regulatory Affairs Specialist, from corporate and Madison met with Service Master about the facility and expectations. A MOU was drafted to memorialize the meeting. Moses and Madison requested a meeting on May 23, 2013 to follow upon their review their meeting with Service Master and other issues on May 31, 2013 by phone with Walsh Respondents Bates Stamped Document 1700. Walsh was informed of this meeting and provided a copy of the MOU on about May 29, 2013 Defendants Bates Stamped Document1559-1560.
[25]Respondent's Bates Stamped Document 1611-1612
[26]Respondent's Bates Stamped Document 1207, 1676, and 1681

stated that, Madison should start taking bids in the event that they had to get rid of Service Master.[27]

To the extent that Madison commented about Service Master, she indicated that they did not seem

interested in maintain their contract, as they had not yet complied with simple requests, like dusting,

cleaning the glass or getting clean equipment to clean the facility.[28]   Even though, Madison pointed out

that the deficiency in Service Master's performance of its cleaning contract posed a serious risk to the

health and safety of the Manteno facility's employees as well as to the general public at large and

potentially exposed both Kenco and Mars, Inc. to liability under FSMA, Walsh pooh-poohed her

recommendation.  Instead, Walsh suggested that Madison should have more compassion with Service

Master and provide it with a remediation plan and give it time to improve its performance.  Walsh made

every effort to accommodate Service Master.  This was odd because the facility had terminated its

relationship with its pesticide provider and its pallet company, both whom had been long-term

providers to the facility and both of which had performed there functions without such deficiencies as

Service Master exhibited; without incident or complaints.

　　　　When Madison attempted to engage Walsh, for the purposes of being audit ready and compliant

he discounted the importance of the necessity of him meeting with her, in one particular instance he not

only disregarded properly executing the mandatory HACCP plan with Madison, but with other HACCP

team members from the facility, whose input was obligatory for the purpose of establishing the plan.

Walsh during the meeting openly humiliated, undermined, verbal abused and interfered with Madison's

job[29]; obnoxiously and rudely over talking Madison stating that there would be no further meetings;

Walsh in his ignorance believed that these requests Madison made were her trying to force her

---

[27]Sanitation was discussed with Paula Hise during the week of June 14, 2013.  Respondent's Bates Stamped Document1707
[28] Exhibit 3-Picture of Service Master dirty bucket
[29]Walsh had exhibited this same behavior in a meeting with ServiceMaster regarding their compliance.  Walsh was shouting and openly criticizing Madison in the meeting in presence of ServiceMaster and the Operations Manager, Mike Manzello. Walsh had been similarly, humiliating and openly hostile toward Madison in the HACCP meeting.  It was actually, Walsh who was hostile and combative, not Madison.  Kenco nor Walsh can point to any specific conduct or behavior of Madison that was hostile, combative, or even insubordinate.

standards upon him and the Manteno facility.  Walsh exhibited a disdain for Madison and anything related to her job functions that dealt with her attempts to bring the facility into compliance with FSMA.

After Madison reported Walsh for a number of issues that included, Service Master falsifying logs, overbilling and not rendering services; Walsh requesting her to relax her standards, in actuality, the standards implemented under FDA-ISO 22000 and FSMA; raising safety issues relative to the ammonia alarm/spills and exhaust fans; backup generator; fire drill evacuation procedures; molded pallets; security breaches; leaking dock doors and pest infestation amongst other issues, Madison suffered the following adverse employment decisions and actions in retaliation for raising the above mentioned and other issues:

1.   A Reduction in job duties;

2.  Ostracized from meetings- Audit prep, audit discussions, management meetings;

3.     Verbal abuse- by being berated in meetings/reprimanded/harassed

4.     Increased Scrutiny- by micromanaging everything from emails to communications with counterparts;

5.     Being  the subject of false information and rumors;

6.     Interference with work assignments/tasks making  her job more difficult by withholding information;

7.     Harassment- by interfering with work performance and business relationships;

8.     Management being openly hostile towards her protected rights as an employee;

9.     Unfairly Discipline-  by being subject to verbal Reprimands;

10.    Termination

KENCO'S PRETEXT FOR ACTIONS TAKEN AGAINST MADISON:

The Performance Improvement Plan (PIP)

11

Kenco makes a number of overarching claims about Madison, her behavior, her actions, and her performance or lack thereof, but fails to specifically cite specific, tangible behavioral issues that constitute being hostile, aggressive or combative.   Kenco, specifically, contrived the issue of Madison's producing inferior or inadequate work and submitted it to various regulatory agencies as its stated reason for her discharge in furtherance of its pretextual reasons for its adverse employment decisions toward her, when in fact none of these issues were listed, referenced or itemized on the Performance Improvement Plan herein referred to as PIP[30] that was given to Madison on July 8 and 9, 2013.

Furthermore, the PIP that was given to Madison does not even conform to Kenco's mandated documentation scheme[31] nor that of the Food Drug and Cosmetic Act appropriate ISO Standards[32] mandated in 21 CFR Chapter I Subchapter M.  The Codex Alimentarius is the international standard for food safety and the benchmark for food safety standards.[33]  Kenco had a Performance Management Policy[34] for exempt employees that Walsh did not use, but contrived a document that did not coincide with company policy.  Kenco did not have a policy for Performance Improvement Plans.  All of

---

[30]Respondent's Bates Stamped Document 461-465

[31]Respondent's Bates Stamped Document 1387-139.  Kenco's policy mandates that documents must follow specific guidelines according to the various document types.  This form did not have a corresponding policy nor did it follow Kenco's format modeled after ISO.  All documents are to be controlled and Kenco had a document control policy ISO.BP.4.2.3.001 this directly correlates to the ISO 22000 section 4.2.3.001and is also found on Kenco's Appendix F Respondent's Bates Stamped Evidence 1357-1386

[32]The prevailing ISO Standards are ISO 22000 was issued in 2005.  It was the relevant scheme regulated for food safety at the  time.  This ISO 22000 Standard composed is composed of several other building blocks including:

1.      Hazard Analysis and Critical Control Points (HACCP) as defined in the Codex Food Hygiene document;

2.      Prerequisite programs that define the basic conditions to maintain an hygienic environment;

3.      The components that are needed to have an effective management system;

4.      The final building block is based on ISO 9001:2000 and ISO 9001:2008 "Quality management systems – Requirements."

This is a scientific risk based auditable approach to food safety.  This food safety matrix is derived from the international standards developed by the Codex Alimentarius Commission that is governed by The WHO (The World Health Organization) and FAO (Food and Agriculture Organization of the United Nations).

[33]21 CFR Chapter I Subchapter B Part 130 Subpart A

[34]Respondent's Bate Stamp Evidence 1392-1403

12

Kenco's policies were listed on Kenco's Appendix F.[35]   The document used by Walsh was not listed as a policy or form on Kenco's Appendix F.

Moreover, according to the Society for Human Resource Management (SHRM), PIP's are part of the performance management system and do not function independently of that system.  A PIP is a sub-metric of the performance management system.[36]

SHRM states that documentation within the organization should support the use of performance improvement plans; such as, JD's (Job Descriptions), HR policies and documented performance management processes such as manager guidelines,[37] as well as, having supporting documentation.[38] Section 8.4 of the Performance Management American National Standard stipulates that:

> Documentation Support
>
> Documentation within the organization should support the use of performance improvement plans. Documentation includes job descriptions, human resource policies and documented performance management processes such as manager guidelines.

PIP's are part of a Performance Management system and are typically used in a progressive discipline process and is usually part of a (3) three part phase to correct ***persistent performance problems in accordance with a documented procedure*** according to SHRM's Performance Management Standard.[39]

Moreover, SHRM also states that PIP's are to not be subjective in nature, but be based on substantial, creditable, and tangible evidence.  The PIP in this case was riddled with subjective criteria and lacked any substantial, creditable, tangible, or quantifiable instances to legitimize its fundamental existence. Moreover, the PIP highlighted perceptions, interpretations, and inaccuracies.  To further affirm and support this subjectivity, the plan contained and cited competencies, which are not a part of a PIP, but is indicative of a Performance Management Review.  Competencies are not part of a PIP

---

[35]Respondent's Bate Stamp Evidence 1357-1386
[36]SHRM Performance Management Standard  Section 5.1 Exhibit 4
[37] Ibid. Section 8.4
[38]Ibid. Section 10
[39]Ibid. page21, section 8

13

according to SHRM. Furthermore, a significant amount of competencies cited were not relevant to the

performance requirements, duties, or execution of complainant's position as a Quality Engineer.

>  Specifically:
>
> "The PIP should identify the specific facts about performance results or behavioral issues that describe and demonstrate the performance discrepancy. The information should be specific and factual (i.e., not hear-say, opinions, generalized or vague references).
>
> A statement regarding expectations for sustained or consistent performance should be included to ensure that true performance improvement has been attained. This documentation may also prove helpful in protecting the employer should performance fail to meet expectations and further disciplinary action needs to be taken. If the PIP is part of a progressive discipline process that may eventually lead to termination of employment, language in the document should specify that termination is a possible consequence of failure to meet expectations and that it may occur with or without the employee's signature on the PIP. The employee should clearly understand the consequences of not meeting the goals outlined in the PIP. *See* How to Establish a Performance Improvement Plan. **Exhibit 2**

No previous disciplinary actions, coaching, or mentoring had occurred or been taken by

respondent nor was the PIP part of a progressive discipline process.[40] Kenco nor Walsh provided details

of how, when, and where Madison was mentored and coached or what Madison was coached or

mentored on or about.

Specifically, in an email dated May 16, 2013, Walsh states that "I think it is safe to say that our

onboarding/training process is non-existent." He goes on to say, "Our biggest issue is that we tend to

put things into place but they seem to fall apart when no-one is watching." (See, Respondent's Bate

Stamp Evidence 1557). Consequently, if on May 16, 2013, Walsh did not have an existent

onboarding/training, how is Kenco able to claim that Madison was coached and mentored for three (3)

months? Walsh nor Kenco, provided tangible evidence that supports this assertion. Tangible

---

[40]Respondent's Bates Stamped Document 466-482 outlines the comprehensive response to Walsh's PIP that states that Walsh had not mentioned any of this before, as well as, does not state the alleged training and coaching that Walsh now alleges to have given Madison.

documentation to support this allegation, should include but is not limited to SMART (Specific Measurable Attainable Relevant and Timely) Goals. Furthermore, Kenco required Complainant as a matter of law to be a subject matter expert regarding quality and the management of that system. This requirement was a requisite to Kenco's compliance to the Food Drug and Cosmetic Act under 21 CFR Chapter I Subchapter B part 121.

In addition, if Kenco's General Manager had a good grasp of the ISO scheme or an inclination to comply with it, there would be no deficiency or error in producing documentation to support their position that complies with the mandated ISO scheme. Nor would there be any misunderstanding as to the continuous improvement tools, such as SMART Goals or Performance Management, used to support the ISO scheme. Furthermore, Walsh did not possess the education[41] or professional experience to coach or mentor Madison on something that he had never been exposed to or done before.

Kenco intentionally states a falsehood that it hired Tracie Clifford specifically to assist Madison. According to some of Kenco's policies, like Respondent's Bate Stamp documents 1387-1391[42] and 1413-1417, Clifford was the Director of Quality Assurance and Regulatory Affairs in 2012 and 2011 respectively. Clearly this was before Madison's May 13, 2013 hire date. Therefore, Clifford could not have been hired to assist Madison. Moreover, one of Madison's initial interviews was with Clifford and Kevin Moses, Regulatory Affairs Specialist.[43] Furthermore, in order for Kenco to have legitimately have hired a consultant to remediate Complainant's deficiencies, it would have had to specifically identify the deficiencies; comprise a plan of action, recruit potential consultants; review potential candidates; select a candidate; outline the scope of services to be provided; provide some level of training/onboarding; review Complainant's work; make an assessment or conduct a gap

---

[41]Walsh has high school diploma and does not have work experience that would have exposed him to the ISO 22000 guidelines. Walsh Interrogatories 2014CF0475

[42]According to this policy Walsh would have needed an exception to this policy to give Madison the PIP. According, this policy says that exceptions are only given for legitimate business reasons and must be supported by a valid business case to obtain approval. There is an associated form to this policy and it is CP.BP.4.2.1.001-2. Kenco nor Walsh have been able to produce the necessary documentation to support the use of the PIP that Walsh gave Madison, including but not limited to the exception form, the business case and the corresponding log.

[43]Exhibit 5 email regarding Tracie Clifford interview in April of 2013

analysis; construct a plan and remediate the deficiencies.   This process would have required a paper trail to which Kenco has not alluded to or produced.

**PAULA  HISE'S DECLARATION**

Paula Hise's declaration is under the penalty of perjury and is ostensibly made based upon her personal knowledge.   Hise's declaration states that she was located in Chattanooga, Tennessee and operated in the capacity of Vice President. Hise intentionally misstates that she had observed Complainant several times amongst other things.  Hise indeed was situated in Chattanooga, TN and was the Vice President; however Hise, patently false in stating that she has firsthand knowledge and that she observed Complainant on several occasions. Hise by her own declaration stated that she asked Walsh instead of investigating.

 Hise by her own tacit admission, does not have firsthand knowledge of the facts and her declaration is inadmissible because she cannot testify to the matters at hand.  Specifically, Hise does not offer any dates or supporting authenticated documentation to substantiate her statements.  The Rule 56 standard mandates that a declarant have firsthand (personal) knowledge, that the declaration must set forth admissible evidence, and it must show affirmatively that the declarant is competent to testify. Hise's location in Tennessee precludes her from having any real firsthand knowledge about any of the day to day operations or matters related to the Mars Manteno Facility.

Further, Hise fails to expressly state that she was familiar with Kenco's policies, procedures, protocols and forms and was aware of Mars, Inc. policies as well[44].  This would have included Kenco's performance management policies, incident policy, in addition to all other public policies and company polices listed on Appendix F.  More specifically, Hise violated Defendant's own policy when she failed

---

[44]Mars, Inc. Supplier Code of Conduct

to investigate according to company policy, the allegations set forth by Complainant. Kenco's incident reporting policy is hereto attached as **Exhibit 6**.

## KENCO'S FAILURE TO INVESTIGATE IN ACCORDANCE WITH ITS POLICY

Kenco's policy calls for an investigation. However, such an investigation did not take place by Hise or any person at Kenco. Such an investigation would have yielded a documented event and produced a paper trail to which Kenco has not produced and to which Hise has not acknowledged. Furthermore, Kenco knows that such an incident is deemed as a non-conformity and thus, should have been logged as such and remediated against its applicable policies.

According to Defendant's Bate Stamp documents 1586-1598 and 1682-1697, Hise only met with Complainant one (1) time, on or about June 12, 2013, since Complainant had been employed at the Mars Manteno Facility at which time, Hise gave Complainant the authority to perform contract negotiations concerning sanitation contracts reference in Respondent's Bate Stamp document 1684. In addition, sometime thereafter, Hise instructed Walsh, Defendant's General Manager and Complainant to "defer to the reg" in the event of a discrepancy hereto attached as **Exhibit 7 (Bate Stamp Document 936).**

Moreover, Defendant's Vice President, Paula Hise, stated in her correspondence that "everyone was coming from different perspectives looking for a common goal." One reasonably can infer that Hise did not have a mutually inclusive understanding of the specifics of the prevailing and newly imposed standards with regard to food safety, ISO and other mandates, as her line of governance was from an operational perspective. This is further borne out in that, Kenco had a business unit dedicated solely to compliance--that unit the  relevant time was led by Tracie Clifford.

## KENCO's CLAIM THAT MADISON was AGRRESSIVE; RUDE & COMMUNICATED INEFFECTIVELY

Kenco has not pointed to any specific instance, where, Madison was insolent, obstinate, insubordinate, rude, or confrontational despite its accusations that Madison was aggressive and combative. Kenco also claims that Madison's communication style was at issue. Defendant refers to several emails in which Madison addresses issues that are a matter of violation of company and public policy as well as a violation of food safety laws. Respondent, argues that Madison wrote long and lengthy[45] emails that referred to governmental regulations that were not simplified.

Defendant Kenco ignores that it was governed by the FD &C Act, the Bioterrorism Act of 2002, the Sanitary Food Transportation Act (SFTA) 2005, the Food Safety Modernization Act, numerous Executive Orders, OSHA, the World Health Organization (WHO), Food and Agriculture Organization of the United Nations (FAO), the Codex Alimentarius, Homeland Security, the Center for Disease Control and other regulatory agencies that have codified standards and promulgated regulations that work in tandem or in synergy regarding food safety that encompasses the entire supply chain; essentially from farm to fork.

Therefore, based upon the large number of standards and regulations, simplification is directly relative to the participants. For example, someone like Walsh, Kenco's Manager at the Manteno facility, whom had no educational background or training in science nor training in risked-based auditable schemes and techniques, the governing law and the applicable standards common to food health and safety standards in all likelihood would have not found any materials presented, even in their lowest, rudimentary and introductory form to be overly complex and needing simplification. This is the reason that as Kenco asserts that the information was not simplified.[46] Moreover, it was Defendant's responsibility as mandated by ISO 22000 Section 6.2, a requisite to the compliance of the Food Drug

---

[45]Kenco has not pointed to more than two (2) emails that had several paragraphs written in them. These emails addressed violations of company and public policy and would have to cite to the relevant authority. Defendant points to a sixteen (16) page email that does not appear to be accurate.

[46]The lexicon, terminology, and or phraseology were not Complainant's penned words, but codified promulgated regulations from a numerous sectors. Therefore, it was not Complainant's right or responsibility to alter or deviate from the intended meaning set forth by the authors of the legislation whether or not in Respondent's opinion it was simplified or in a user friendly format. Perhaps the complexity and specificity of the lexicon, terminology, and or phraseology was a reason that necessitated a person to possess the expertise for its interpretation and application.

and Cosmetic Act to ensure that Defendant provided the necessary resources to have qualified persons performing job duties/tasks that directly affect the food supply chain.

Most notably, Defendant's General Manager, Walsh, did not have the basic knowledge and , understanding or concern that human feces, was a biological hazard that was unsanitary and a threat to the health, life and well-being of the employees he managed, their families, the community at large, as well as, the consumers of the Mars, Inc. food products. If Kenco's General Manager could not place the proper value or emphasis on a commonly known hazard, such as fecal matter, it is reasonable to assert that he could not comprehend anything over or beyond the fact that the exposure to feces of any kind, human or animal, can spread bacterial, viral or pathogenic disease that cause serious illness and even death. These diseases can include but are not limited to: dysentery, E. Coli, hepatitis, and other blood borne diseases. Most notably, Walsh had allowed this type of egregious conduct to go unresolved prior to Complainant being hired at the Mars Manteno Facility.

**MADISON'S ALLEGED COMMUNICATION OUTSIDE OF THE CHAIN OF COMMAND AND WORK OUTSIDE OF HER JOB FUNCTION**

Instead of Kenco protecting the interest of the company; Mars, Inc.; its employees and the society at large, Kenco's conduct enabled Walsh in exposing its employees, their families, the community and consumers into being exposed to germs and disease that cause illness, death and adulteration of the food into the supply chain. Kenco's Vice President of Operations instructed Madison to place Service Master, the cleaning company, who was a third (3rd) party vendor on a ten (10) day remediation plan[47], because Service Master had not complied with the agreed understanding set forth in the signed Memorandum Of Understanding of May 22, 2013.

---

[47]Service Master was not placed on a performance remediation plan. Despite the fact that Service Master was found to have falsified logs, not adhered to the terms and conditions of the contractual agreement and continued to be in violation of company and public policy. Contrarily Complainant was placed on a performance remediation plan instead. Defendant's General Manager, Walsh, instructed Complainant to provide Service Master with tools and reference for compliance. Defendant's General Manager, Walsh, did not provide Complainant with tools and reference for Complainant to be compliant to the allegations set out in Defendants PIP, nor did he instruct anyone to do so as well.

Madison outlined a number of issues that needed to be remediated to bring compliance to the sanitation requirements set out in Food Drug and Cosmetic Act. For example, Complainant indicated that it was important to use a clean bucket and mop when cleaning up, as well as, not using the same bucket and mop to clean the remaining parts of the warehouse[48]. Failure to use unsanitary cleaning tools also spreads germs and diseases; in addition to the fact, using any type of cleaning agents, bactericides, disinfectants, and or antiseptics improperly and or providing a breeding ground for diseases and germs can mutate the bacteria, virus or pathogen so that it becomes resistant to commonly used antibiotics. This phenomena is more commonly known as Methicillin-resistant Staphylococcus aureus (**MRSA**). Moreover, the CDC in conjunction with local health authorities publicly proclaim that children and older persons are most susceptible to the spread of disease and germs because of a weakened immune systems.

Consequently, Defendant's willful and intentional failure to adhere to the codified standards with regards to sanitation and other company and public policy issues created an apathetic, hostile, dangerous and hazardous work environment, as well as, a public safety hazard.

To further develop Kenco's lack of understanding, Madison was the Hazard Analysis and Critical Control Point-HACCP team leader as mandated by 21 CFR Chapter I Subchapter B Part 117 Subpart C. According to FSMA §103 (a), FDCA §418(a), and 21 U.S.C. §350g(a) "Registered food facilities must evaluate hazards and implement preventive controls." The identification of the sanitation issue, Service Masters performance and all other noted and reported incidents by Complainant directly correlate to these codified standards.

Furthermore, the steps taken by Madison directly correlate to FDCA §418(b-h), and 21 U.S.C. §350g(b-h). Complainant identified and evaluated known and reasonably; foreseeable hazards. Complainant implemented preventative controls to significantly minimize or prevent the hazards.

---

[48]Walsh in a meeting on June 27, 2013 told Madison that she was breaching the terms of Service Master's agreement by forcing them to use clean cleaning equipment Defendant's Bates Stamped Document

Complainant monitored the preventive controls for effectiveness.  Complainant identified, developed and implemented procedures for addressing failures of preventive controls, as well as, the prevention of the affected food from entering commerce. Complainant, being compliant, verified that the preventive controls, monitoring and corrective actions were adequate. Complainant kept records related to FDCA §418(c-f) as mandated. Complainant also produced a written food safety plan that documented and described procedures that should be used by the facility to comply with requirements that is to be available for agency review.[49]

Therefore, based upon the outlined mandated provisions, KENCO is unreasonable asserting that Madison was outside of the scope of her job functions, as well as being outside of the chain of command when these actions were taken by her.  Furthermore, the initiation of the engagement of Service Master and the sanitation issue arose when Kevin Moses, the Regulatory Affairs Specialist for Kenco visited the facility in May of 2013 and identified a number of issues upon a walk through with Madison.  These issues included Service Master, Fred's Lawn Care, leaking dock doors, and a process an employee was using for freight picking.

## THE ALLEGATION THAT MADISON THREATENED LITIGATION AGAINST SERVICEMASTER

Failure to remediate the spread of disease is an intentional adulteration of food and is a violation of 21 U.S. Code § 342, as well as, in violation of 21 CFR Chapter I: Subchapter A General Part 2 Subpart A, Subchapter B Part 121 Subpart A & E, Subchapter A part 1 Subpart O, Subchapter B Part 117 Subpart A & B amongst a number of other regulations and laws[50].  The Codex Alimentarius also

---

[49]Agency review would be directly that of the FDA, the certified auditors on behalf of the FDA or any entity along the supply chain, or any other agency with jurisdiction of Food Safety. Kenco's Bate Stamp Document 730

[50]"The FDA has instituted Judicial Enforcement of criminal prosecution for falsifying records, lying to FDA, knowingly putting customers at risk, or in other appropriate cases or instances. "~ FDA Operational Strategy for Implementing the FDA Food Safety and Modernization Act May 2014.

have guidelines on the application of General Principles of Food Hygiene to the Control of Foodborne Parasites. CAC/GL 88-2016.

The FDA has judicial enforcement, with criminal and civil liabilities, therefore, Madison was correct in outlining a foreseeable hazard (consequence) as mandated in FDCA §418.  Furthermore, Madison's statement made concerning exposure to litigation was not directed towards the vendor, it was correlated to the codified standards that liberally applies to each and every party.  In addition, any reasonable person would have known that the first point of contact relative to any company or public safety crisis, violation or infraction would have been the manufacturer, Mars, Inc. and not some secondary or tertiary vendor or subcontractor hired by the manufacturer/Mars, Inc.

The assertion that Madison was threatening the vendor, manifests the level of ignorance and knowledge of the prevailing laws, standards and their attendant consequences.  Moreover, failure to identify, remediate and monitor would have been negligence per se and a dereliction of duty on Madison's part.

Furthermore, legislation, and regulations are usually promulgated by various sectors of people and drafted using standard and mutually accepted technical and legislative language.   Moreover, laws and regulations are mechanisms of compliance and circumscribe, in detail the consequences for failing to adhere. Therefore, it is ridiculous to infer that it was aggressive, indiscriminate or even perhaps intemperate to outline in simple terms that "litigious exchanges could or would be the result for failing to comply to the codified standards."

The essence of what this codified scheme is that it is a tool of mitigation, that creates a documented, verifiable and auditable scheme of compliance of every party's standard operating, best practices and deviations of such practices along the supply chain that conform to the outlined codified standards.  The codified standard ISO system itself is self-vetting, perpetual and flushing.

22

Ironically, Kenco's General Manager, Walsh, stated that Complainant's emails were written in a professional manner in the PIP presented by him refer to Respondent's Bate Stamped document 461-465 § 2 ¶ 3.[51]  This is in stark contrast to the statements that the communications were perceived to be aggressive. This interpretation of these emails are subjective relative to the context in which they were written and their contents and the respective knowledge of the author and recipient.

## NO SUCH ADVERSE EMPLOYMENT ACTIONS TAKEN AGAINST NON-WHISTLEBLOWERS

Furthermore, Madison believes no other unprotected class employee had been held to such a rigorous, stringent and micromanaged standard.  Specifically, Kenco's General Manager, Walsh, was not subject to these terms and conditions of his employment.

Kenco's General Manager, Walsh had not only been named in both internal and external formal discrimination and whistleblowing charges concerning Madison, but also had been named in claims of discrimination internally and in several other administrative forums by other employees.  Walsh also harassed, intimidated and retaliated against other employees of Mars Manteno.  Additionally, Walsh had over $362,000.00 worth of Mars Candy go missing.[52]  Walsh's leadership created an operations nightmare at the Mars Manteno Facility which had primarily been the number one (1) distribution center in the Mars, Inc. network since its inception in 1999 to last place.  Walsh's leadership and management style caused the Manteno facility to be out of compliance and further caused it to fail to meet the established Key Performing Indexes.   This all within a year's time under Walsh's leadership and management at the Mars Manteno faculty.   Walsh was terminated in June of 2014.  Not only was

---

[51]Madison stated for the record in her deposition that she agreed with the fact that he emails were written in a professional manner as stated in the PIP.  She also said that she agreed that everyone had different perceptions.
[52]Security was an issue that Complainant had raised during her employment.  If Respondent would have heeded to the mandates and warnings of Complainant regarding persons with accessibility to the facility, in all probability the opportunity for the candy to go missing would not have presented itself.

he terminated, but he was terminated and given a severance.  Other employees, who were terminated were not given severance packages; for example, Madison, Mike Manzello and William Schwerin[53].

Walsh, has a personal motive to lie and make misleading, disingenuous and patently false statements because of other impending litigation in other forums that include claims by Madison and other individual claimants/plaintiffs, in which Kenco is bearing the cost of Walsh's legal defense. Likewise Kenco has a similar motivation in that it is involved in litigation in other forums defending other actions brought by Madison and individual claimants/plaintiffs.  Kenco's allegiance seems quite odd and perverse in light of the fact that Defendant stated to OSHA in complaint No 897188 that Walsh who had held back employees pay in retaliation against employees who had worktime accidents/recordables under OSHA was terminated.

Kenco has failed to meet its own burden of proof to substantiate that the reason(s) that Kenco and Walsh gave were legitimate non-pretextual reasons for Madison's adverse employment actions and decisions, as Kenco nor Walsh followed the standard operating procedures of the company or the prevailing mandates.  Moreover, the reasons for the employment actions taken against Madison that Kenco and Walsh have articulated over time have differed and are inconsistent.

## STANDARD FOR MOTION FOR SUMMARY DECISION

The standard for summary decision under the Rules of Practice and Procedure for the Office of Administrative Law Judges mirrors that of summary judgment under the Federal Rules of Civil Procedure 56.  *In the Matter of Thomas B. Russell*, 2012 WL 11942719, *See also, Hasan v. Enercon Servs., Inc.*, ARB No. 04-045, ALJ No. 2003-ERA-31 (ARB May 18, 2005); 29 C.F.R. § 18.40; Fed. R. Civ. P. 56. Under 29 C.F.R § 18.40, it is appropriate to enter summary decision when "the pleadings, affidavits, [and] material obtained by discovery or otherwise . . . show that there is no genuine issue as

---

[53]William Schwerin was terminated by the Mars, Inc. 3PL Kenco.  Mars, Inc. instructed Kenco and its agents to resend its termination of employment with regards to Schwerin.

to any material fact." 29 C.F.R § 18.40(d) (2008). A "material fact" is one whose existence affects the outcome of the suit. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). A "genuine issue" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," *Id*., "drawing all reasonable inferences in favor of that party." *Williams v. Utica College of Syracuse University*, 453 F.3d 112, 115 (2d Cir. 2006) (citing *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995).

The party moving for summary decision bears the initial burden of demonstrating the absence of any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party to set forth specific facts showing there is a disputed issue that could affect the outcome of the litigation. *Anderson*, 477 U.S. at 248; 29 C.F.R § 18.40(c). The evidence presented by the non-moving party must be "more than mere speculation, conjecture, or fantasy." *Gregory v. Rogers*, 974 F.2d 1006 (8th Cir. 1992) (*quoting Barnes v. Arden Mayfair, Inc*., 759 F.2d 676, 681 (9th Cir. 1985)).

In deciding a motion for summary decision, the court must view all facts and inferences in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 249. The court is not required to make findings of fact, rather a summary decision inquiry should determine if the issue is appropriate for a hearing because it could reasonably be resolved in favor of either party. *Id*. at 250. Summary decision is appropriate when there is a "failure of proof concerning an essential element of the nonmoving party's case [which] necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991).

Summary decisions are difficult in "employment discrimination cases, where intent and credibility are crucial issues." *In the Matter of Robert Armstrong*, 2016 WL 530237. A summary decision on the issue of causation is even more difficult in whistleblowers cases where Congress made it "easier for whistleblowers to prevail in their discrimination suits," requiring only that the complainant prove that his

protected activity was "a contributory factor" rather than the more demanding causation standards like "motivating factor," "substantial factor," or "but for" (determinative factor) causation. *Id.* at 4. Because direct evidence of retaliation is rare, complainants may rely on circumstantial evidence to prove that protected activity contributed to the unfavorable employment action in question. Id. Even where a respondent asserts legitimate, non-discriminatory reasons for its actions, Kenco must point to evidence showing that Madison's conduct violated company policy and constituted a legitimate basis upon which to fire her. Rather, Kenco must show clearly and convincingly that Madison "would have" been fired— not simply that she "could have" been fired—in the absence of her protected activity.

FSMA AND MADISON'S ENGAGEMENT IN PROTECTED ACTIVITY

The FSMA provides in relevant part that:

> No entity engaged in the manufacture, processing, packing, transporting, distribution, reception, holding, or importation of food may discharge an employee or otherwise discriminate against an employee with respect to compensation, terms, conditions, or privileges of employment because the employee, whether at the employee's initiative or in the ordinary course of the employee's duties ...

> (1)      provided, caused to be provided, or is about to provide or cause to be provided to the employer, the Federal Government, or the attorney general of a State information relating to any violation of, or any act or omission the employee reasonably believes to be a violation of any provision of this chapter or any order, rule, regulation, standard, or ban under this chapter, or any order, rule, regulation, standard, or ban under this chapter;

> (4) objected to, or refused to participate in, any activity, policy, practice, or assigned task that the employee (or other such person) reasonably believed to be in violation of any provision of this chapter, or any order, rule, regulation, standard, or ban under this chapter. 21 U.S.C.A. § 399d(a).

The standard for stating a cause of action for retaliation under the FSMA can be formulated from the language of the statute combined with the well-known standard for stating a claim of retaliation under other laws such as the antidiscrimination provisions of Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act, and the Age Discrimination in Employment Act.

Generally, under those statutes, to state a claim for retaliation, a plaintiff must establish: (1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff or action that would dissuade a reasonable worker from making or supporting a charge of discrimination; and (3) a causal connection between the protected activity and adverse action. *Chase v. Brothers, International Food Corp.*, 3 F. Supp. 3D 49 at 53, Citing, *Burlington Northern & Santa Fe Railway Co. v. White,* 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006); *Holt v. KMI– Continental,* 95 F.3d 123, 130 (2d Cir.1996), *cert. denied,* 520 U.S. 1228, 117 S.Ct. 1819, 137 L.Ed.2d 1027 (1997); *Tomka v. Seiler Corp.,* 66 F.3d 1295, 66 F.3d 1295, 1308 (2nd Cir.1995) (citations omitted).

To state a claim for retaliation under the FSMA, a plaintiff must establish (1) participation in a protected activity under the FSMA known to the defendant; (2) an employment action disadvantaging the plaintiff or action that would dissuade a reasonable worker from exercising protected rights under the FSMA, and (3) a causal connection between the protected activity and adverse action. *Chase v. Brothers International Food Corp.* at 4.

The determination of whether or not an employee holds a "reasonable belief" as to whether or not an employer's conduct is prohibited by law is a question of fact that is to be determined by the trier of fact based on the "totality of the circumstances." Id., citing *Casalino v. New York State Catholic Health Plan, Inc.,* 2012 WL 1079943 (S.D.N.Y. Mar. 30, 2012) ("Whether Plaintiff's belief [that employer was violating anti-discrimination laws] was objectively reasonable ... is a decision for the trier-of-fact based on the record in the case.") (*citing Thomas v. Westchester Cnty. Health Care Corp.,* 232 F.Supp.2d 273, 279 (S.D.N.Y.2002)); *Kelly v. Howard I. Shapiro & Associates Consulting Engineers, P.C.,* 716 F.3d 10, 14– 15 (2d Cir.2013) (holding that in the Title VII context, "[t]he reasonableness of the plaintiff's belief [as to whether defendant's conduct was unlawful] is to be assessed in light of the totality of the circumstances.").

27

"An employee 'need not establish that the conduct [s]he opposed was in fact a violation of Title VII' but rather, only that she had a 'good faith, reasonable belief' that the underlying employment practice was unlawful." *Chase v. Brothers International Foods Corp.* at 55, quoting, *Reed v. A.W. Lawrence & Co.* 95 F.3d at 1178 (quoting *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons,* 842 F.2d 590, 593 (2d Cir.1988)).    The finding as to the reasonableness of an employee's belief is typically an issue of fact for the jury, and not an issue that can decided as a matter of law. *Chase* at 54, *See e.g. Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1178 (2d Cir.1996)

Evidence that the practice objected to by the plaintiff is in fact lawful will not defeat a plaintiff's claim of retaliation. *Chase* at 55. Rather, a defendant must establish that the plaintiff did not have a reasonable belief that the practice he was opposing was unlawful. Such a determination can only be made upon a review of the totality of the circumstances. *Id.*

If the complainant's protected activity was a contributing factor in the adverse action, the employer may avoid liability only if it demonstrates "by clear and convincing evidence that it would have taken the same unfavorable personnel action" in the absence of the protected activity. In the matter of *Robert M. Armstrong*, 2016 WL 5340237 at 9. 42 U.S.C.A. § 5851(b)(3)(D). The burden of proof under the "clear and convincing" standard is more rigorous than the "preponderance of the evidence" standard and denotes a conclusive demonstration, i.e., that the thing to be proved is highly probable or reasonably certain. *Id.*, quoting *Williams v. Domino's Pizza*, ARB No. 09-092, AU No. 2008-STA-052, slip op. at 5 (ARB Jan. 31,2011). The U.S. Supreme Court has observed that the clear-and-convincing standard is "reserved to protect particularly important interests in a limited number of civil cases." In the matter of *Robert M. Armstrong*, 9, quoting, *California ex rel. Cooper v. Mitch Bros. Santa Ana Theater*, 454 U.S. 90, 93 (1981). Similarly, two circuit courts have commented, "For employers, this is a tough standard, and not by accident." In the matter of *Robert M. Armstrong*, 9,

quoting, *Araujo v. N.J. Transit Rail Operations, Inc., 708 F.3d 152, 159 (3d Cir. 2013)(quoting Stone & Webster Eng'g Carp. v. Herman, 115 F.3d 1568, 1572 (11th Cir. 1997)).*

      Whether a respondent has met this high burden, consideration is required of the combined effect of at least three elements applied flexibly on a case-by-case basis: (1) the independent significance of the non-protected activity cited by the respondent in justification of the personnel action; (2) the facts that would change in the absence of the complainant's protected activity; and (3) "the evidence that proves or disproves whether the employer would have taken the same adverse actions [in the absence of protected activity]." Robert M. Armstrong at 9, quoting, *Speegle v. Stone & Webster Constr., Inc.*, ARB No. 13-074, ALJ No. 2005-ERA-006, slip op. at 11 (ARB Apr. 25,2014).  With respect to the last element, the respondent is "required to demonstrate through factors extrinsic to [complainant's] protected activity that the discipline to which [complainant] was subjected was applied consistently, within clearly-established company policy, and in a non-disparate manner consistent with discipline taken against employees who committed the same or similar violations." *Robert M. Armstrong*, quoting, *DeFrancesco v. Union R.R. Co.*, ARB No. 13-057, AU No. 2009-FRS-009, slip op. at 13-14 (ARB Sept. 30, 2015).  The Federal Circuit has developed a similar three-part test for determining whether a respondent has met its burden under the Whistleblower Protection Act. of proving, by clear and convincing evidence, that it would have taken the same personnel action in the absence of a complainant's whistleblowing: "[1] the strength of the agency's evidence in support of its personnel action; [2] the existence and strength of any motive to retaliate on the part of the agency officials who were involved in the decision; and [3] any evidence that the agency takes similar actions against employees who are not whistleblowers but who are otherwise similarly situated." *Robert M. Armstrong*, quoting, *Carr v. Social Security Admin.*, 185 F.3d 1318, 1323 (Fed. Cir. 1999). *Accord Whitmore*, 680 F.3d at 1370-1375.

**ARGUMENT**

Madison brought to Kelvin Walsh's, Kenco's General Manager at the Manteno facility's attention that due to Service Master's deficiency in cleaning that the men's bathroom consistency had urine and feces on the floor.  In addition, she brought it to his attention that this was a condition that persisted for some time and that employee's had complained about it on numerous occasions. Additionally, Madison reported to Walsh amongst others at Kenco that Service Master was using dirty or contaminated cleaning implements that was causing cross-contamination on surfaces that could lead to employees tracking microbiological pathogens into the warehouse and that this created a risk of contaminating food product or causing employees to become ill.

Additionally, Madison raised numerous issues with the management of KENCO that not only corresponded to her function as a Quality Engineer, but she also, raised the issues that failing to correct or address the issues that she raised were in violation of FMSA and the myriad of other laws and regulations that pertained to the health and safety of the food industry. Madison was uniquely qualified to perform her duties and to reasonably believe that the issues she raised were in violation of these laws.

Walsh was only concerned with moving truckloads of product out of the facility—no matter the costs to health and safety. He took over the operations of the Manteno facility during the "busy season" and was so overwhelmed and focused on attempting  to keep the trucks moving that he did not take the time to understand a critical aspect of the food industry—that being health and safety and the importance of the laws and regulations that pertained to this area.  As such he resented Madison because of her thoroughness and insistence to adhering to the various food-safety schemes.  KENCO enabled Walsh and bought in to his subterfuge concerning Madison's performance.  As a result she was subjected to retaliation and other adverse employment decisions for doing her job. The so-called deficiencies in her performance were nothing more than a pretext for such retaliation and discrimination against her for not

30

only engaging in protected activity pursuant to FSMA but also discrimination against her by Walsh and

thus, KENCO on the basis of her sex and race.

## CONCLUSION

Therefore based upon all of the foregoing reasons, Complainant, MARY MADISON request this

tribunal to enter an order denying Respondent KENCO's Motion for Summary Decision.

Respectfully submitted,
MARY MADISON


By_____

Jordan T. Hoffman, Her Attorney
ARDC# 6195896
Jordan TraVaille Hoffman, P.C.
2711 E. New York St., Suite 205
Aurora, IL 60502
(888) 958-4529 Ph & Fax
jthoffmanlaw@gmail.com

CERTIFICATE OF SERVICE

The undersigned attorney, hereby certifies that on September 28, 2017, I submitted a copy of the foregoing Complainant's Response to Respondent's Motion for Summary Decision via U.S. Mail to:

U.S. Department of Labor, Office of Administrative Law Judges
Attn: April Cook, Paralegal Specialist to Judge Sellers
36 E. 7th St., Suite 2525
Cincinnati, Ohio 45202
Fax:  (513) 684-6106
Email: cook.april@dol.gov

Jody Wilner Moran
Julia P. Argentieri
Jackson Lewis P.C.
150 N. Michigan Ave.
Suite 2500
Chicago, IL 787-4995
Julia.Argentieri@jacksonlewis.com

_____
Jordan Hoffman
Atty. #16763
**Jordan TraVaille Hoffman, P.C.**
2711 E. New York St., Suite 205
Aurora, IL 60502
(888) 958-4529

Case: 18-1800     Document: 10-2     Filed: 08/01/2018     Pages: 320



**Jordan Hoffman <jthoffmanlaw@gmail.com>**

## Madison v. Kenco - 2016-FDA-4

4 messages

---

**Argentieri, Julia P. (Chicago)** <Julia.Argentieri@jacksonlewis.com>
To: "Cook, April - OALJ" <cook.april@dol.gov>
Cc: "jthoffmanlaw@gmail.com" <jthoffmanlaw@gmail.com>, "Moran, Kathryn Montgomery (Chicago)" <Kathryn.Moran@jacksonlewis.com>, "Watkins, Brittany (Chicago)" <Brittany.Watkins@jacksonlewis.com>

Fri, Oct 20, 2017 at 3:04 PM

April:

Attached please find two witness subpoenas for our upcoming December 11-13 hearing which we are sending to Judge Sellers for his approval and signature. Please contact me with any questions.


Regards,

Julie Argentieri


**Julia P. Argentieri**

Attorney at Law

**Jackson Lewis P.C.**

150 North Michigan Avenue
Suite 2500
Chicago, IL 60601

Direct: (312) 803-2533 | Main: (312) 787-4949

Julia.Argentieri@jacksonlewis.com  |  www.jacksonlewis.com

*Jackson Lewis P.C. is included in the AmLaw 100 law firm ranking and is a proud member of the CEO Action for Diversity and Inclusion initiative*


Confidentiality Note: This e-mail, and any attachment to it, contains privileged and confidential information intended only for the use of the individual(s) or entity named on the e-mail. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that reading it is strictly prohibited. If you have received this e-mail in error, please immediately return it to the sender and delete it from your system. Thank you.

---

**2 attachments**

📄 **Subpoena_to_Appear__Testify_Hearing (Walsh).pdf**
675K

📄 **Subpoena_to_Appear__Testify_Hearing (Clifford).pdf**
675K

---

**Argentieri, Julia P. (Chicago)** <Julia.Argentieri@jacksonlewis.com>          Mon, Oct 23, 2017 at 5:06 PM

To: "Cook, April - OALJ" <cook.april@dol.gov>, "jthoffmanlaw@gmail.com" <jthoffmanlaw@gmail.com>
Cc: "Moran, Kathryn Montgomery (Chicago)" <Kathryn.Moran@jacksonlewis.com>, "Watkins, Brittany (Chicago)" <Brittany.Watkins@jacksonlewis.com>

Hi April:

Please keep us posted if this telephone conference is scheduled for tomorrow. I think you may have had an incorrect email address for Jordan Hoffman, so I've added him to this email chain. His email address is jthoffmanlaw@gmail.com.

Thanks very much.

Julie Argentieri

**Julia P. Argentieri**
Attorney at Law
**Jackson Lewis P.C.**
150 North Michigan Avenue
Suite 2500
Chicago, IL 60601
Direct: (312) 803-2533 | Main: (312) 787-4949
Julia.Argentieri@jacksonlewis.com  |  www.jacksonlewis.com
*Jackson Lewis P.C. is included in the AmLaw 100 law firm ranking and is a proud member of the CEO Action for Diversity and Inclusion initiative*

---

**From:** Argentieri, Julia P. (Chicago)
**Sent:** Monday, October 23, 2017 10:46 AM
**To:** Cook, April - OALJ <cook.april@dol.gov>; jhoffmanlaw@gmail.com
**Cc:** Moran, Kathryn Montgomery (Chicago) <Kathryn.Moran@jacksonlewis.com>; Watkins, Brittany (Chicago) <Brittany.Watkins@jacksonlewis.com>
**Subject:** RE: Madison v. Kenco - 2016-FDA-4

Good Morning April:

Our office is available tomorrow morning or early afternoon until 2:30 p.m. CST/ 3:30 p.m. EST for a call with Judge Sellers and Jordan Hoffman.

Thanks,
Julie Argentieri

**Julia P. Argentieri**

Attorney at Law

**Jackson Lewis P.C.**

150 North Michigan Avenue
Suite 2500

Chicago, IL 60601

Direct: (312) 803-2533 | Main: (312) 787-4949

Julia.Argentieri@jacksonlewis.com  |  www.jacksonlewis.com

*Jackson Lewis P.C. is included in the AmLaw 100 law firm ranking and is a proud member of the CEO Action for Diversity and Inclusion initiative*

---

**From:** Cook, April - OALJ [mailto:cook.april@dol.gov]
**Sent:** Monday, October 23, 2017 9:45 AM
**To:** Argentieri, Julia P. (Chicago) <Julia.Argentieri@jacksonlewis.com>; jhoffmanlaw@gmail.com; Cook, April - OALJ <cook.april@dol.gov>
**Cc:** Moran, Kathryn Montgomery (Chicago) <Kathryn.Moran@jacksonlewis.com>; Watkins, Brittany (Chicago) <Brittany.Watkins@Jacksonlewis.com>
**Subject:** RE: Madison v. Kenco - 2016-FDA-4

Judge Sellers would like to have a conference call tomorrow for the above case.

Please advise as to if you would be available tomorrow and at what times.

Thank you,

April Cook, Paralegal Specialist to Judge Sellers and Judge Silvain

Office of Administrative Law Judges

36 E. 7th Street, Suite 2525

Cincinnati, OH  45202

(513) 684-6016 (direct line)

(513) 684-3252 (main line)

Confidentiality Note: This e-mail, and any attachment to it, contains privileged and confidential information intended only for the use of the individual(s) or entity named on the e-mail. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that reading it is strictly prohibited. If you have received this e-mail in error, please immediately return it to the sender and delete it from your system. Thank you.

---

**Cook, April - OALJ** <cook.april@dol.gov>                    Tue, Oct 24, 2017 at 8:03 AM
To: "Argentieri, Julia P. (Chicago)" <Julia.Argentieri@jacksonlewis.com>, "jthoffmanlaw@gmail.com" <jthoffmanlaw@gmail.com>
Cc: "Moran, Kathryn Montgomery (Chicago)" <Kathryn.Moran@jacksonlewis.com>, "Watkins, Brittany (Chicago)" <Brittany.Watkins@jacksonlewis.com>

Judge Sellers said he said to hold off on the conference call today.  He has things going on today.

He may or may not reschedule it.  We will let you know.

April Cook, Paralegal Specialist to Judge Sellers and Judge Silvain

Office of Administrative Law Judges

36 E. 7th Street, Suite 2525

Cincinnati, OH  45202

(513) 684-6016 (direct line)

(513) 684-3252 (main line)

---

**From:** Argentieri, Julia P. (Chicago) [mailto:Julia.Argentieri@jacksonlewis.com]
**Sent:** Monday, October 23, 2017 6:07 PM
**To:** Cook, April - OALJ; jthoffmanlaw@gmail.com
**Cc:** Moran, Kathryn Montgomery (Chicago); Watkins, Brittany (Chicago)

[Quoted text hidden]

[Quoted text hidden]

---

**Argentieri, Julia P. (Chicago)** <Julia.Argentieri@jacksonlewis.com>        Tue, Oct 24, 2017 at 2:01
                                                                                                   PM
To: "Cook, April - OALJ" <cook.april@dol.gov>
Cc: "jthoffmanlaw@gmail.com" <jthoffmanlaw@gmail.com>, "Moran, Kathryn Montgomery (Chicago)"
<Kathryn.Moran@jacksonlewis.com>

Hi April:

I wanted to follow up about the status of issuing these non-party witness subpoenas for hearing. Please let
us know if Judge Sellers has any questions or requires any additional information.


Thanks,

Julie Argentieri



**Julia P. Argentieri**
Attorney at Law

**Jackson Lewis P.C.**

150 North Michigan Avenue
Suite 2500

Chicago, IL 60601

Direct: (312) 803-2533 | Main: (312) 787-4949

Julia.Argentieri@jacksonlewis.com | www.jacksonlewis.com

*Jackson Lewis P.C. is included in the AmLaw 100 law firm ranking and is a proud member of the CEO
Action for Diversity and Inclusion initiative*

---

**From:** Argentieri, Julia P. (Chicago)
**Sent:** Friday, October 20, 2017 3:04 PM
**To:** Cook, April - OALJ <cook.april@dol.gov>
**Cc:** jthoffmanlaw@gmail.com; Moran, Kathryn Montgomery (Chicago)
<Kathryn.Moran@jacksonlewis.com>; Watkins, Brittany (Chicago) <Brittany.Watkins@Jacksonlewis.com>
**Subject:** Madison v. Kenco - 2016-FDA-4

[Quoted text hidden]
[Quoted text hidden]

---

**2 attachments**

**Subpoena_to_Appear__Testify_Hearing (Walsh).pdf**
675K

**Subpoena_to_Appear__Testify_Hearing (Clifford).pdf**
675K

<div align="center">

**UNITED STATES**
**DEPARTMENT OF LABOR**

</div>

| | |
|---|---|
| In the Matter of: ) | |
| ) | |
| MARY MADISON, ) | |
| ) | **Case No. 2016-FDA-4** |
| Complainant, ) | |
| ) | |
| v. ) | |
| ) | |
| KENCO LOGISTICS, ) | |
| ) | |
| Respondent. ) | |

<div align="center">

**RESPONDENT'S MOTION TO STRIKE AND BAR**
**MADISON'S PROPOSED EXPERT JAMES KOLKA**

</div>

Respondent, Kenco Logistics Services, LLC, by and through its undersigned attorneys, moves to strike Complainant's proposed Expert Report and Bar Testimony[1] by James Kolka. In support thereof, Respondent states the following:

<div align="center">

**INTRODUCTION**

</div>

Madison's complaint alleges that she was disciplined and terminated by Kenco in retaliation for raising complaints under the Food Safety Modernization Act ("FSMA"). The central issue in this case, therefore, is whether Kenco terminated Madison for performance reasons, including her ineffective and inappropriate communication style, as explained in Kenco's pending Motion for Summary Decision, or for retaliatory reasons.

---

[1] The December 13, 2016 Order states that direct testimony from an expert will be permitted only if circumstances warrant. Counsel for Respondent spoke to Counsel for Complainant via telephone on October 20, 2017 to inquire about whether Complainant intended to introduce testimony from James Kolka at the hearing. Counsel for Complainant indicated that he had not made a decision on that issue. Accordingly, Respondent is moving both to bar Kolka's written report and any testimony from Kolka at hearing. Respondent requests that this issue be resolved prior to the pre-hearing submissions so Respondent can determine whether to disclose a rebuttal expert on any specific issues if Respondent's motion is denied in whole or in part.

Madison provided Respondent with a lengthy report (2,292 pages, including exhibits, attached here as *Exhibit A*)[2] from her proposed expert, James Kolka, as part of her discovery responses.[3] Respondent requests that Kolka's expert report be stricken and his testimony barred for several independent reasons. First, Kolka's opinions are irrelevant. His opinions will not assist with advancing any issue in the litigation. Kolka opines that certain Kenco policies or practices did not adhere to ISO standards, but ISO standards are not at issue in this litigation, and Kenco was not required by law to adhere to ISO standards.[4] Accordingly, Kolka's opinions will only confuse the issues in the case and will not assist with the understanding of any facts. Furthermore, many of Kolka's opinions relate to medical device regulations that have nothing to do with this lawsuit. It is not apparent why Kolka is opining about the importance of medical device regulations in a case related to logistics services at a Mars food warehouse. Such regulations will not aid the court in understanding the issues in the case or tend to prove any point advanced by Madison.

Secondly, in addition to being largely irrelevant, Kolka's purported expert opinions are unreliable and non-expert in nature. Many of Kolka's opinions are nothing more than general, non-scientific observations not founded in any methodology. For example, Madison cannot use expert testimony to argue that she should not have been terminated from Kenco, because Kenco's assessment of her performance problems, including her poor communication style, is not a

---

[2] Exhibit A is being provided on a CD due to its size. Respondent will provide a paper copy of the 2,292 page report from Madison's expert if requested.

[3] Madison also provided the same expert report in her federal lawsuit, *Mary Madison v. Kenco*, 15-cv-2290, which has since been dismissed with prejudice. Accordingly, some of Kolka's opinions actually argue that Madison was terminated for discriminatory reasons, and not for any complaints under the FSMA. This is a separate reason why the report is irrelevant.

[4] ISO, the International Organization for Standardization is an independent, non-governmental organization that provides standards for various industries. See https://www.iso.org/about-us.html (Last visited October 26, 2017). While Kenco does not dispute that these standards are useful guidance, Kolka's argument that Kenco violated a particular ISO standard is irrelevant. Even if an ISO standard was violated, which Kenco disputes, that does not prove that Madison made complaints under the FSMA or that her termination was retaliatory. Kolka is making generalized attacks against Kenco's business practices that have nothing to do with this litigation.

Case: 18-1800    Document: 10-2    Filed: 08/01/2018    Pages: 320

specialized topic for expert opinion. Some of the opinions, such as Kolka's assertion that Madison's Performance Improvement Plan did not comply with ISO and a company must comply with ISO to be FSMA compliant are objectively wrong, as the FSMA does not contain any provision relating to how a company is entitled to discipline its employees. In addition, Kolka opines regarding topics on which he has no basis to serve as an expert, such as Kenco's discovery responses being ambiguous or evasive. Finally, Kolka has not provided any explanation for the methodology used to arrive at his opinions or why they are reliable. For all of these reasons, Respondent requests that the Court strike and bar Madison's expert witness James Kolka.

## I.  STANDARD FOR EXPERTS

Consistent with Fed. R. Evidence 702, 29 CFR §18.702 provides that "if scientific, technical, or other specialized knowledge will assist the judge as trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." 29 CFR §18.702. The issues in this case are not technical or complex, and expert testimony is not necessary. Furthermore, Kolka lacks specialized knowledge and his purported "expert" opinions are largely irrelevant and will only further confuse the issues in the case. Accordingly, Kolka's written report and his testimony should be barred. Kolka's unscientific criticisms of Kenco do not tend to prove or disprove any facts in this case.

## II.  KOLKA'S OPNIONS ARE NOT RELEVANT OR RELIABLE.

Unfortunately, Kolka's expert report is extremely disorganized and lacks any coherent summary as to why he has been hired as an expert or on what topics he intends to opine. His report is a confusing conglomeration of disjointed attacks against Kenco, legal conclusions and unsupported statements.  Respondent cannot identify all of Kolka's opinions due to the

3

disorganized nature of the report, but believes Kolka intends to provide, at a minimum, the following expert opinions:[5]

- **Opinion #1:** Kenco's discovery responses are vague and ambiguous and Kolka believes a third party auditor should investigate "what is being hidden" *(Exhibit A, Page 7)*
- **Opinion #2:** Madison's PIP did not adhere to ISO standards or Kenco's policies because it was not on a company document and was too subjective in nature *(Exhibit A, Page 8)*
- **Opinion #3:** Kenco did not sufficiently investigate the health violations Madison brought to Kenco's attention such as pests/fecal matter *(Exhibit A, Page 8)*
- **Opinion #4:** Kenco also failed to properly investigate Madison's complaints, including complaints about discrimination *(Exhibit A, Page 8)*
- **Opinion #5:** Walsh intentionally withheld key information from Madison relative to Mars' audit findings *(Exhibit A, Page 17)*
- **Opinion #6:** Certain Kenco policies were not prepared in accordance with ISO standards *(Exhibit A, Page 17)*

## A. Kolka's Opinions Are Not Relevant.

Kolka's opinions do not advance any aspect of Madison's claim against Respondent. The issue in this litigation is whether Madison was terminated for legitimate performance reasons or for retaliatory reasons.[6] To put it most succinctly, Kolka's report relies on standards and regulations that do not advance Madison's claims.

First, Kolka attaches to his report as Exhibit C the QSIT guide related to inspections for medical devices. It is not clear to Respondent whether Kolka mistakenly pulled this information from another medical device litigation matter or whether he believes that medical device regulations bear upon this FSMA whistleblower complaint. In either case, the medical device information is entirely irrelevant.

---

[5] Kolka may be intending to give other "expert" opinions but due to the disorganization of the report and the number of unsupported statements in it, it is difficult to separate out which specific statements he considers his expert opinions.
[6] Madison agrees that she received a performance improvement plan, and in fact, she submitted a lengthy response to it. There is no need for an expert opinion to discuss the format of the PIP and whether it should have contained a Kenco logo or been organized in a different manner.

Case: 18-1800    Document: 10-2    Filed: 08/01/2018    Pages: 320

Case: 18-1800     Document: 10-2     Filed: 08/01/2018     Pages: 320

Kolka also attaches ISO 9001 as Exhibit B to his report.[7] Kolka claims that Madison's PIP did not adhere to ISO standards, but even if that is true, it has no bearing on this case. ISO standards do not have the force of law, and they are simply guidance for how companies may set up policies. Any alleged failure by Kenco to follow these standards is irrelevant, as the FSMA does not require adherence to ISO standards, so a violation of these standards is irrelevant to this case. Madison must prove that she was terminated for whistleblowing about food safety issues, and not for her unsatisfactory communication style. Kolka's claim that Madison's PIP (which she agrees that she received) should have been presented in a different format does not tend to prove or disprove any fact at issue in this litigation. *See Collier v. Bradley Univ.,* 113 F. Supp. 2d 1235, 1249 (C.D. Ill. 2000) (Questioning whether proffered expert testimony would be useful to a jury where opinions by social psychologist overlapped with the jury's common sense knowledge). Even if all of Kolka's proposed expert opinions were correct (and they are not), they are not relevant in any way to Madison's retaliation complaint. *Accord Durkin v. Equifax Check Servs.,* 406 F.3d 410, 420 (7th Cir. 2005). Therefore, Kolka's report and testimony should be barred from introduction or use at the hearing of this case.

## B. Kolka's Opinions Are Not Reliable.

The Federal Rules of Evidence, administrative regulations, and *Daubert* state that "[a]n expert's opinion must be reasoned and founded on data." *Bielskis v. Louisville Ladder, Inc.,* 663 F.3d 887, 894 (7th Cir. 2011). *See also,* 29 CFR §18.703. The court must evaluate the methodology used by the expert and the reliability of the opinions under the framework set forth in *Daubert.* *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 158 (1999) (affirming district court's exclusion of

---

[7] The ISO 9001 document (Exhibit B) states that it is copyrighted material, for the licensee's individual use only and copying is prohibited. Respondent is aware of this copyright restriction but is provided this exhibit in order to give the Court a complete copy of Kolka's report.

expert testimony). Kolka's expert report provides <u>no</u> supporting methodology for any of his opinions. The opinions are unscientific and unreliable. Below is a brief summary of Kolka's apparent opinions along with an explanation of the reliability problems or non-expert nature of each opinion:

*Opinion #1*. Kolka lacks expert qualifications to speak to whether Kenco's discovery responses are vague or ambiguous. Moreover, such opinions are not an appropriate topic for an expert (or for the hearing) since it is a discovery matter that will not assist the judge in gaining an understanding of the underlying facts of the case. Accordingly, Kolka should be barred from providing any expert opinions or testimony related to Kenco's discovery answers, because such an opinion is improper under FRE 702 and 29 CFR §18.702. Along the same lines, with respect to *Opinion #4* purporting to opine on whether Kenco properly investigated Madison's complaints, Kolka has no expertise in investigations or employment discrimination, and his opinion that Kenco did not properly investigate Madison's complaints of discrimination is either an irrelevant general observation, not founded on any scientific methodology, or a legal conclusion. Accordingly, it is not a proper expert opinion. *See Jones v. Nat'l Council of YMCA,* 2013 U.S. Dist. LEXIS 129236, *29-*30 (N.D. Ill. Sept. 5, 2013) (striking report and testimony of proposed expert where opinions appeared to be speculative and lack scientific basis).

Similarly, Kolka is not qualified to testify regarding *Opinions #3* (Kenco did not sufficiently investigate health violations) or *#5* (Madison's supervisor intentionally withheld key audit findings from Madison). The sufficiency of Kenco's investigation and the intentions of Madison's supervisor are questions for the finder of fact which can be easily understood by a layperson without expert testimony. In addition, Kolka has not reviewed all of Kenco's documents, and he has no basis upon which to base his conclusions about Kenco's business practices and

Case: 18-1800     Document: 10-2     Filed: 08/01/2018     Pages: 320

Case: 18-1800     Document: 10-2     Filed: 08/01/2018     Pages: 320

intentions other than incomplete information received from Madison. Kolka further does not describe the methodology used to reach these unfounded conclusions or provide any proof that they are verifiable or accurate. These baseless criticisms are not based on scientific evidence, and they should not be introduced at the hearing of this case.

With respect to *Opinion #2*, whether a disciplinary document was written on Company letterhead or was "subjective in nature" is not a proper subject for expert testimony, and is again a general, unscientific observation. The parties to this litigation are in the best position to provide testimony about Madison's performance improvement plan; no expert testimony is needed to understand why Madison was placed on the PIP or her objections to being placed on the plan. Finally, as to *Opinion #6*, it is unclear how Kolka determined that certain Kenco policies were not in compliance with ISO standards, or how that determination advances Madison's whistleblower retaliation claim. As stated above, Kenco was never required to follow ISO standards, and even if certain Kenco policies were not in compliance with ISO standards, which has not been proven, this would in no way suggest that Kenco retaliated against Madison.

In similar situations, where expert opinions appear to consist of generalized observations that are not founded in any technical knowledge, expert testimony does not meet the requisite level of reliability in order to be admissible. The Seventh Circuit's opinion in *Naeem v. McKesson Drug Co.*, 444 F.3d 593 (7th Cir. 2006) is instructive. The court of appeals stated that "experts' work is admissible only to the extent that it is reasoned, uses the methods of the discipline, and is founded on data. Talking off the cuff – deploying neither data nor analysis – is not an acceptable methodology." *Id.* at 608. The court held that an expert's general observations regarding what is normal or usual business practice did not meet the requisite level of reliability. Relying on *Kumho Tire Co.,* the Court stated that the objective of *Daubert* is to ensure that "an expert, whether basing

testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.*

To summarize, Kolka's proffered expert testimony is not reliable, lacks intellectual rigor, and is not relevant to Madison's claim that she was retaliated against for making complaints under the FSMA. Kolka's convoluted and baseless criticisms of Kenco are not grounded in any scientific principles or reasoning. They are nothing more than speculation, and Kolka's report should not be admitted in this case.

## CONCLUSION

WHEREFORE, for all the reasons stated herein, Respondent requests that the Court strike the proposed expert report of James Kolka submitted by Madison, bar his testimony in accordance with 29 CFR §18.702 and Federal Rule of Evidence 702, and grant such further relief as this Court deems just and proper.

DATED:  November 2, 2017

Respectfully submitted,

KENCO LOGISTICS SERVICES, LLC

By: _____
One of its Attorneys

Kathryn Montgomery Moran
Julia P. Argentieri
Jackson Lewis P.C.
150 North Michigan Avenue
Suite 2500
Chicago, Illinois 60601
Telephone:     (312) 787-4949
Facsimile:     (312)787-4995

## CERTIFICATE OF SERVICE

The undersigned attorney, hereby certifies that on November 2, 2017, I submitted a copy of the foregoing ***Respondent's Motion to Strike and Bar Madison's Proposed Expert James Kolka*** via U.S. mail to:

> U.S. Department of Labor, Office of Administrative Law Judges
> Attention: April Cook, Paralegal Specialist to Judge Sellers
> 36 E. 7th Street, Suite 2525
> Cincinnati, Ohio 45202
> FAX: (513) 684-6108
> Email: cook.april@dol.gov

A copy was also sent via electronic and U.S. mail to:

> Attorney Jordan Hoffman, Counsel for Complainant
> 2711 E. New York Ave. Suite 205
> Aurora, IL 60502
> jthoffmanlaw@gmail.com

By: _____
    One of the Attorneys for Respondent

Case: 18-1800    Filed: 08/01/2018    Pages: 320    Document: 10-2

**UNITED STATES
DEPARTMENT OF LABOR**

In the Matter of:                    )
                                     )
    **MARY MADISON,**                 )
                                     )    **Case No. 2016-FDA-4**
        **Complainant,**            )
                                     )
**v.**                               )
                                     )
    **KENCO LOGISTICS,**              )
                                     )
        **Respondent.**             )

## RESPONDENT'S MOTION FOR A PRE-HEARING CONFERENCE

Respondent, Kenco Logistics Services, LLC, submits the following Motion for a Pre-Hearing Conference in advance of the hearing scheduled for December 11-13, 2017 in accordance with 29 C.F.R. §18.44:

1.    The rule on prehearing conferences, 29 C.F.R. §18.44(a), provides as follows:

    a.    *In general.* The judge, with or without a motion, may order    one or more prehearing conferences for such purposes as:

        i.    Expediting disposition of the proceeding;

        ii.    Establishing early and continuing control so that the case will not be protracted because of lack of    management;

        iii.    Discouraging wasteful prehearing activities;

        iv.    Improving the quality of the hearing through more thorough preparation; and

        v.    Facilitating settlement.

2.    This matter is scheduled for a three day hearing in Chicago, Illinois from December 11-13, 2017.

Case: 18-1800     Document: 10-2     Filed: 08/01/2018     Pages: 320

3.     There are a number of outstanding issues related to Complainant's witnesses and exhibits that require additional resolution prior to the hearing in order to promote an organized and efficient resolution of the issues in this case within the confines of the three day hearing.[1]

4.     Complainant has disclosed hundreds of exhibits, many of which are voluminous group exhibits consisting of hundreds of unrelated pages, and some of which were not produced during discovery and have not been provided to Respondent.[2] Complainant has also disclosed several fact witnesses who were not identified prior to the pre-hearing statement. It is not apparent what, if any, information these new fact witnesses possess regarding the FSMA retaliation claim at issue or Mary Madison. Respondent has requested, but has not yet received, paper copies of all of Complainant's proposed exhibits.

5.     On November 2, 2017 Respondent filed a Motion to Bar Complainant's Expert Witness, James Kolka. This motion is currently pending.[3]

6.     In the interests of judicial economy, Respondent seeks to get clarification regarding which exhibits will be admitted and which witnesses will testify prior to incurring expenses for preparation of witness examinations, objections to exhibits and other pre-hearing work. Respondent intends to move to strike and bar certain exhibits and witnesses if necessary, and also needs to evaluate whether additional discovery should be requested if new witnesses and exhibits which were not previously disclosed are admitted at hearing.

---

[1] For additional details regarding the ongoing issues related to Complainant's exhibits, please refer to the cover letter submitted with Respondent's Pre-Hearing submission on November 13, 2017.

[2] Many new documents were provided to Respondent this week, less than thirty days before hearing, via google links, but Counsel for Respondent cannot open these links because their law firm firewall is blocking the links. We are in the process of trying to resolve this issue.

[3] Respondent's Motion for Summary Decision is also pending.

2

7.     Given the voluminous and improper nature of many of Complainant's exhibits, the new witnesses that have been disclosed, and the pending motion to bar Complainant's expert, Respondent requests that the Department schedule a Pre-Hearing telephone conference at the earliest available date in order to begin to resolve the aforementioned issues, as well as any other issues that may be necessary to streamline the hearing.   Respondent further requests that the November 20, 2017 deadline for Pre-Hearing Motions/Objections be stayed and extended until Respondent received Complainant's full set of exhibits and the issues presented in this Motion are resolved.

WHEREFORE, for all the reasons stated herein, Respondent requests that the Department schedule a pre-hearing telephone conference in accordance with 29 C.F.R. §18.44 to discuss and resolve the issues identified in this Motion and any other matters that the Department deems just and proper.

DATED:  November 16, 2017                         Respectfully submitted,

                                                  KENCO LOGISTICS SERVICES, LLC

                                                  By: _____
                                                        One of its Attorneys

Kathryn Montgomery Moran
Jody Wilner Moran
Julia Pearce Argentieri
Jackson Lewis P.C.
150 North Michigan Avenue
Suite 2500
Chicago, Illinois 60601
Telephone:     (312) 787-4949
Facsimile:     (312)787-4995

Case: 18-1800     Document: 10-2     Filed: 08/01/2018     Pages: 320

## CERTIFICATE OF SERVICE

The undersigned attorney, hereby certifies that on November 16, 2017, I submitted a copy

of the foregoing ***Respondent's Pre-Hearing Statement*** via hand delivery:

U.S. Department of Labor, Office of Administrative Law Judges
Attention: April Cook, Paralegal Specialist to Judge Sellers
36 E. 7th Street, Suite 2525
Cincinnati, Ohio 45202
FAX: (513) 684-6108
Email: cook.april@dol.gov

A copy was also sent via electronic and U.S. mail to:

Attorney Jordan Hoffman, Counsel for Complainant
2711 E. New York Ave. Suite 205
Aurora, IL 60502
jthoffmanlaw@gmail.com

By: _____
       One of the Attorneys for Respondent

**UNITED STATES**
**DEPARTMENT OF LABOR**

| | | |
|---|---|---|
| In the Matter of: | ) | |
| | ) | |
| **MARY MADISON,** | ) | |
| | ) | Case No. 2016-FDA-4 |
| Complainant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **KENCO LOGISTICS,** | ) | |
| | ) | |
| Respondent. | ) | |

## RESPONDENT'S MOTION TO STRIKE AND BAR COMPLAINANT'S UNTIMELY AND IRRELEVANT EXHIBITS AND WITNESSES

Respondent, Kenco Logistics Services, LLC, submits the following Motion to Strike and Bar Complainant's Untimely and Improper Exhibits and Witnesses in advance of the hearing scheduled for December 11-13, 2017:

## INTRODUCTION

Respondent brings this Motion to bar Complainant from calling witnesses who were untimely and/or have no relevant information related to Madison's FSMA whistleblower retaliation claim. Calling witnesses who were not disclosed during the discovery period will unfairly prejudice Respondent, and furthermore, even some of the witnesses who were disclosed do not possess admissible information that will assist with a resolution of the issue in this case. Respondent additionally seeks to strike many of Complainant's exhibits for several reasons: (1) many exhibits were not provided to Respondent during discovery, and still have not been provided to Respondent; (2) some exhibits are voluminous group exhibits consisting of hundreds or thousands of pages of unrelated documents; (3) the administrative hearing cannot proceed in an

1

efficient and organized manner unless Complainant's exhibits are consolidated in a manner that greatly reduces the hundreds of duplicative, voluminous and irrelevant documents.

<div align="center">

**ARGUMENT**

</div>

### A. Complainant Should Be Barred From Calling Valerie Lilley and Tiovanni McCurry Because These Witnesses Lack Knowledge of the Claim and Were not Disclosed Prior to the Close of Discovery.

On July 3, 2017 Complainant provided answers to interrogatories to Respondent where she was asked to identify all individuals with knowledge related to the allegations at issue in this litigation. *See* Exhibit A, Complainant's Answers to Interrogatories. Nowhere in these interrogatory answers did Complainant disclose Tiovanni McCurry or Valerie Lilley. In fact, Complainant never supplemented discovery to identify these potential witnesses and did not disclose Valerie Lilley or Tiovanni McCurry as potential witnesses until after the close of fact-discovery on November 14, 2017 when a copy of Complainant's Pre-Hearing Statement was e-mailed to Counsel for Respondent at 5:08 p.m. *See* Exhibit B, Complainant's Statement of Issues.[1]

Tiovanni McCurry and Valerie Lilley should be barred as witnesses because they lack relevant information and were not timely identified as witnesses. First, Respondent disputes that these individuals actually possess relevant information about Madison's claims. Valerie Lilley did not work at Kenco until after Madison was terminated, and she has advised Kenco's Counsel that she has no information about Madison's performance, any complaints Madison made, or the reasons for her termination. Respondent does not know who Tiovanni McCurry is and Kenco has no record of an employee by that name. Even if Tiovanni McCurry does have information about the conditions of the warehouse and how clean it was (and Respondent is not aware whether that

---

[1] The Parties were required to exchange Pre-Hearing statements on November 13, 2017 but Counsel for Complainant did not send Complainant's statement to Respondent until after business hours the following day. As a result, it has been more difficult for Respondent to identify and prepare all preliminary motions and objections.

is the case or not), the conditions in the warehouse ultimately have no bearing on whether Madison was terminated for her convoluted and aggressive communication style, or for some other reason. Madison's attempts to call witnesses with no information about her work performance to apparently bad-mouth Kenco is improper and inadmissible under Fed. R. Evidence 403.

Next, Tiovanni McCurry and Valerie Lillie should be barred as witnesses even if they possess relevant information, which they do not, because they were not timely disclosed by Madison during discovery. Madison was terminated from Kenco over four years ago, after a brief ninety days of employment, and there has not been any new information uncovered in the late stages of the discovery process that would lead to new witnesses being discovered. It is unfair and prejudicial for Madison to identify new witnesses after discovery has closed, when she has no basis for doing so, and Respondent no longer has an opportunity to decide whether to depose these individuals. Accordingly, Tiovanni McCurry and Valerie Lillie should be barred from the hearing.[2]

**B.  Complainant Should Be Barred From Calling Edith McCurry and Leonard Szplett Because They Possess Little or No Relevant Information, and Their Testimony Will be Cumulative, Prejudicial and Largely Based on Improper Hearsay.**

Edith McCurry was an HR Clerk at Kenco while Madison was employed. Leonard Szplett was McCurry's supervisor and the Office Manager. Both of these individuals submitted declarations in opposition to Respondent's Motion for Summary Decision. *See* Exhibits C, D McCurry and Szplett Declarations.[3]

---

[2] If the Department chooses to admit Tiovanni McCurry and Valerie Lilley over Respondent's objections, Respondent alternatively requests that discovery be re-opened for an additional sixty days so that Respondent can evaluate whether to take depositions of Tiovanni McCurry and Valerie Lilley. *See Holmes v. Godinez,* 2016 U.S. Dist. LEXIS 100756, *8-9 (N.D. Ill. Aug. 2, 2016) ("However, to avoid any prejudice to Plaintiffs, we reopen discovery for sixty days to permit Plaintiffs to depose any newly disclosed witnesses").

[3] Many portions of the Szplett and McCurry declarations are identical which raises some concerns about how much independent information any of these witnesses possess. *See* Exhibit C, D.

McCurry and Szplett should be barred as witnesses for three reasons. First, McCurry and Szplett did not supervise Madison or evaluate her work performance in any manner. Essentially, Madison is attempting to call these friends as cheerleader witnesses for her to say that they think Madison is great, Kenco is terrible, and everything Madison is saying is accurate. This is not admissible or useful testimony. It is improper character evidence that should be excluded from evidence under Fed. R. Evidence 404. "[I]n a civil case evidence of a person's character is never admissible to provide that the person acted in conformity with the character trait." Fed. R. Evid. 404 advisory committee's note to 2006 amendments. In other words, even if Szplett and McCurry considered Madison to be hard-working, intelligent and easy to work with, that does not matter. The relevant inquiry is how Madison's supervisors felt about her job performance and whether Kenco in fact terminated her for performance reasons. Examples of McCurry's and Szplett's improper opinions include:

- I found Mary to be very knowledgeable, well versed, competent and well spoke [*sic*].
- I never found Mary to act in an unprofessional manner no matter what the circumstances were.
- Kelvin did not appear to have the mindset or desire to engage in bringing the facility into compliance
- Mary had the right to refuse the basis of the PIP.

*See generally,* Exs. C and D.

Second, the limited value of McCurry and Szplett's opinions or testimony is outweighed by the potential for unfair prejudice. These witnesses are highly likely to prejudice Kenco with their own unrelated opinions that have no value in this litigation. McCurry has a pending employment discrimination lawsuit against Kenco (U.S. District Court for the Central District of Illinois, *Edith McCurry v. Kenco et. al.,* 16-CV-2273), and appears to be working together behind the scenes with Mary Madison to file similar documents, including even disclosing the same potential expert witness, James Kolka. A copy of the docket from McCurry's federal lawsuit is

4

attached as Exhibit E. There have been no rulings that any of McCurry's claims have merit and McCurry does not allege that she engaged in any protected activity under the Food Safety Modernization Act. Her claim is unrelated, and showing that other employees have sued Kenco, without any findings of wrongdoing, is highly prejudicial and not probative of any facts. Similarly, Szplett also previously filed two charges against Kenco and a complaint with the Illinois Department of Labor, all of which were dismissed.

Third, the only factual testimony appearing in the McCurry and Szplett[4] declarations that appears to have marginal relevance is inadmissible hearsay. McCurry and Szplett should not be permitted to testify about what Madison said to them, such as whether Madison told them that Kelvin told her to "relax her standards," whether Madison said she believed Walsh was retaliating against her, whether Madison said that the allegations in her Performance Improvement Plan were false, or any other out-of-court statements. This testimony is hearsay under Fed. R. Evidence 802 and therefore should be excluded from evidence.

### C. Reverend Thorn Should Be Barred as a Witness.

On Wednesday November 15, two days after Complainant's pre-hearing statement was due, Counsel for Respondent received an email from Counsel for Complainant stating "Also, I noticed that I had inadvertently left off Ms. Madison's emotional damage witness, Reverend J. Leon Thorn and will supplement the list accordingly. " Reverend Thorn should not be permitted to testify about Madison's emotional distress. First, although Madison listed Rev. Thorn in interrogatory answers as someone she had discussed this lawsuit with, she did not identify him as

---

[4] Szplett sat in on the meetings as a witness when Madison received her Performance Improvement Plan and also when she received notice of her termination. Respondent is not aware of any material facts in dispute about the meetings themselves that would be aided by additional testimony. However, in the event that Szplett is permitted to testify as a witness, his testimony is limited to what he observed during those meetings, rather than hearsay statements and generalized unfounded comments about how Madison is wonderful and Kenco is terrible.

5

Pages: 320    Filed: 08/01/2018    Document: 10-2    Case: 18-1800

possessing any information about the litigation in her discovery responses. *See* Exhibit A. Secondly, Madison's emotional distress does not require any additional witnesses, and testimony from her minister is more likely to be inadmissible character evidence or hearsay statements about what Madison said to Rev. Thorn, rather than any new information that Madison cannot explain herself.[5] Finally, Rev. Thorn received a subpoena to produce records related to Madison and did not comply with the subpoena.[6] He sent a letter back stating that he was out of town and therefore could not comply. Accordingly, if he treated Madison and intends to discuss the treatment he provided, he should first be required to produce relevant documents, and then Counsel for Respondent will have the opportunity to review any such documents and determine whether his deposition is necessary.

### D. Complainant's Untimely Exhibits Should Be Barred.

Pursuant to the order entered on December 13, 2016 all fact discovery closed thirty days before the hearing, or no later than November 11, 2017. Madison's pre-hearing statement contains approximately 200 exhibits. At least sixty of these exhibits do not have any reference to bates labels, and Respondent does not know whether Complainant has produced all of these documents or not, what they are, and how they relate to Complainant's whistleblower retaliation claim.[7] As

---

[5] Rev. Thorn did not provide medical treatment to Madison so that exception to hearsay does not apply under Fed. R. Evidence 803(4).

[6] Kenco sent Rev. Thorn a subpoena for documents in Madison's federal lawsuit (*Madison v. Kenco,* 15-CV-2289); discovery in the federal lawsuit took place at the same time as discovery in Madison's DOL claim, and some of the issues were intertwined. A copy of the subpoena, and Rev. Thorn's response, are attached as Group Exhibit F.

[7]*See* Complainant's Exhibits 63, 64, 65, 66, 67, 69, 70, 96, 97, 98, 99, 100, 101, 102, 103, 104, 105, 106, 107, 108, 109, 110, 111, 112, 113, 113, 115, 118, 119, 120, 121, 122, 123, 124, 125, 126, 127, 128, 129, 130, 131, 132, 133, 134, 135, 136, 137, 138, 140, 141, 144, 146, 147, 148, 149, 150, 151, 154, 155, 157, 158, 159, 168, 169, 177, 178, and 179 for examples of exhibits that lack any reference to bates labels. Respondent believes that some of these documents may have been produced by Complainant in PDF form or sent via google links after the close of discovery (but Counsel for Respondent cannot open the google document links due to its computer firewall). Since nothing was bates labeled, it has made it virtually impossible for Respondent to match up the list of exhibits Complainant is seeking to introduce to various documents. Respondent requested an exhibit binder from Counsel for Complainant, but has not received one as of the date this motion is being filed.

6

Case: 18-1800   Document: 10-2   Filed: 08/01/2018   Pages: 320

an example, Exhibit 120 is titled "Miller and Martin." Miller and Martin represented Kenco at the earlier stages of this DOL investigation. Respondent does not know what the "Miller and Martin" documents are, how voluminous they are, or whether authenticity can be stipulated. Respondent reached out to Counsel for Complainant via email on Tuesday November 15 to request copies of all exhibits, but has not received copies as of the date this motion is being filed. Furthermore, due to the huge volume of new documents being dumped on Respondent at the close of discovery, Respondent did not receive a fair opportunity to question Madison about these new documents during her deposition and is being unfairly prejudiced by potentially entering a hearing without knowing what certain documents are or why they are even listed as exhibits. Accordingly, Respondent requests that Complainant's untimely exhibits be stricken and barred.

### E. Complainant's Voluminous Exhibits Should Be Stricken to Promote Judicial Economy.

In addition to Complainant's exhibits being untimely and not labeled, Complainant's exhibits are overly voluminous and will not promote an efficient resolution of this claim within the three days allocated for hearing. Complainant has, in many instances, grouped together hundreds or thousands of pages of unrelated documents as a single exhibit. For example, Exhibit 62 appears to be Madison's entire IDHR charge file (1,664 pages) or large portions of it that have not been identified. Exhibits 96 and 106 are listed as "Group Exhibit Emails" and Respondent has no idea which emails those are, how voluminous, or why they are grouped together. Exhibit 129 is listed as Szplett's IDHR FOIA file. Respondent does not have this document, but presumably, it is also hundreds of pages that have nothing to do with Madison or her claim. Exhibit 102, labeled "Group Exhibit ISO" is another potentially voluminous exhibit and another situation where Respondent does not know what the document is, how large it is, or whether it is appropriate for the documents to be admitted into evidence all together. Exhibit 11 (Kenco 1450-1480) is likewise

7

several documents that appear to be unrelated. Respondent cannot evaluate the authenticity of exhibits and prepare stipulations when, in reality, some of these exhibits contain hundreds of separate documents, each of which should be admitted into evidence separately. Rather than list every objectionable group exhibit, which is not possible because Respondent still has not receive a complete set of Complainant's exhibits, Respondent suggests that the Parties discuss the voluminous nature of Complainant's exhibits during a Pre-Hearing conference. Respondent further requests that the Department require Complainant to revise her hearing exhibits so as to avoid exhibits that are overly voluminous, duplicative and will unnecessarily delay the efficient presentation of issues at hearing. If necessary, Respondent will supplement this Motion and specifically identify all exhibits which are overly voluminous and objectionable within 7 days of receiving a complete set of Complainant's exhibits.

## CONCLUSION

WHEREFORE, for all the reasons stated herein, Respondent requests that the Department grant the following relief, along with such further relief as it deems just and proper:

- Bar Madison's witnesses Valerie Lilley and Tiovanni McCurry because these witnesses were not timely disclosed during the course of discovery and lack relevant evidence;

- Bar Edith McCurry, Len Szplett and Rev. Thorn because these witnesses lack admissible non-hearsay testimony and cannot testify regarding generalized character evidence to support Madison;

- Strike Madison's untimely and voluminous exhibits.

DATED:  November 20, 2017                    Respectfully submitted,

                                             KENCO LOGISTICS SERVICES, LLC

                                             By: _____
                                                  One of its Attorneys

Kathryn Montgomery Moran
Jody Wilner Moran
Julia Pearce Argentieri
Jackson Lewis P.C.
150 North Michigan Avenue
Suite 2500
Chicago, Illinois 60601
Telephone:     (312) 787-4949
Facsimile:     (312)787-4995

Case: 18-1800     Document: 10-2     Filed: 08/01/2018     Pages: 320

Case: 18-1800      Document: 10-2      Filed: 08/01/2018      Pages: 320

## CERTIFICATE OF SERVICE

The undersigned attorney, hereby certifies that on November 20, 2017, I submitted a copy of the foregoing ***Respondent's Motion to Strike and Bar Complainant's Untimely and Improper Exhibits and Witnesses*** via hand delivery to:

> U.S. Department of Labor, Office of Administrative Law Judges
> Attention: April Cook, Paralegal Specialist to Judge Sellers
> 36 E. 7th Street, Suite 2525
> Cincinnati, Ohio 45202
> FAX: (513) 684-6108
> Email: cook.april@dol.gov

A copy was also sent via electronic and U.S. mail to:

> Attorney Jordan Hoffman, Counsel for Complainant
> 2711 E. New York Ave. Suite 205
> Aurora, IL 60502
> jthoffmanlaw@gmail.com

By: _____
           One of the Attorneys for Respondent

UNITED STATES
DEPARTMENT OF LABOR

| | | |
|---|---|---|
| In the Matter of : | ) | |
| | ) | |
| MARY MADISON, | ) | |
| | ) | |
| Complainant, | ) | |
| | ) | |
| v. | ) | Case No. 2016-FDA-4 |
| | ) | |
| KENCO LOGISTICS | ) | |
| | ) | |
| Respondent. | ) | |

## COMPLAINANT'S RESPONSE TO RESPONDENT'S MOTION TO STRIKE

## EXPERT WITNESS REPORT

NOW COMES, Complainant, Mary Madison and she hereby submits the following as her

Response to Respondent, Kenco Logistics' (hereafter "Kenco") Motion to Strike Expert Witness

Report.

Complainant has yet to submit its expert report to Respondent.  Complainant will submit its

expert report within the outlined timeframe of the standing order.

Dated: November 22, 2017                    Respectfully Submitted:

**MARY D. MADISON**

**By:** _____

Jordan T. Hoffman, *Her Attorney*

1

<u>CERTIFICATE OF SERVICE</u>

The undersigned attorney, hereby certifies that on November 22, 2017, I submitted a copy of

the foregoing **COMPLAINANT'S RESPONSE TO RESPONDENT'S MOTION**

**TO STRIKE EXPERT WITNESS REPORT** via U.S. Mail to:

           U.S. Department of Labor, Office of Administrative Law Judges
           Attn: April Cook, Paralegal Specialist to Judge Sellers
           36 E. 7th St., Suite 2525
           Cincinnati, Ohio 45202
           Fax:  (513) 684-6106
           Email: cook.april@dol.gov

           Jody Wilner Moran
           Julia P. Argentieri
           Jackson Lewis P.C.
           150 N. Michigan Ave.
           Suite 2500
           Chicago, IL 60601
           (312) 787-4995
           Julia.Argentieri@jacksonlewis.com

                        _____

                        Jordan Hoffman
                        ARDC# 6195896
                        **Jordan TraVaille Hoffman, P.C.**
                        2711 E. New York St., Suite 205
                        Aurora, IL 60502
                        (888) 958-4529

2

GROUP EXHIBIT B

18-1800

UNITED STATES
DEPARTMENT OF LABOR

In the Matter of :               )
                                    )
      MARY MADISON,         )
                                    )
           Complainant,      )     ARB CASE NO. 18-018
                                    )
      v.                       )     Case No. 2016-FDA-4
                                    )
      KENCO LOGISTICS,     )
                                    )
         Respondent.      )

**PETITION TO SHOW CAUSE FOR FINDING PETITION FOR REVIEW TIMELY**

**NOW COMES** Complainant, Mary Madison (hereafter "Madison"), through her Attorney, Jordan T. Hoffman, and for her Petition to Show Cause as to why the Administrative Review Board should equitably toll the 14 day requirement for filing her Petition for Review herein and for her good cause shown in support of her petition, she states the following; THAT:

    1.    Madison's counsel received the Department of Labor Administrative Law Judge's Decision and Order Granting Respondent's Motion for Summary Decision in the United States mail on December 6, 2017.

    2. The service of the ALJ's Order issued on the November 22, 2017 was defective in that it was mailed to an incorrect mailing address for Madison's counsel.

    3. The Order was also sent to a former mailing address for Madison's counsel despite the ALJ's office having Madison's counsel's current address (Please see attached Exhibit "A").

    4. As a result of the ALJ's office having mailed the Order to Madison's counsel's former address in error, the ALJ's office received the initial November 22, 2017 order back in the return mail. (Please see Exhibit "A").

1

5.  Respondent's counsel in response to an email sent by the ALJ's office pointed out that the email address used by the ALJ's office for Madison's counsel was incorrect, as it was missing the letter "t" in the email address (Please see Exhibit "A").

6. The ALJ's office ostensibly upon the realization of having sent the Order to the incorrect address for Madison's counsel made the correction (Please see Exhibit "A").

7.  Accordingly, the envelope received by Madison's counsel from the ALJ's office on December 6, 2017 containing the Order was metered for postage on December 1, 2017 (Please see attached Exhibit "B").

8. The ALJ's office had Complainant's counsel's correct contact information including email and mailing address(es).

9.  Service to Madison's counsel was to have been effectuated by mail.

10. Madison's counsel timely responded by filing her Petition for Review within 14 days of receipt of the ALJ's order and decision in the U.S. Mail on December 6, 2017.

11. Madison states that she had been out of town for several weeks beginning from the middle of November with a family emergency and was unaware of any such notices mailed to her.

**WHEREFORE** Complainant, **MARY MADISON** based upon the foregoing requests that the Administrative Review Board find that good cause exists to equitably toll her Petition for Review from the date of the issuance of the Order Granting Respondent's Motion for Summary Decision before the ALJ and further that her petition filed on December 17, 2017 be found to be timely and that she be granted 30 days to file her Brief in Support of her Petition for Review.

Respectfully submitted,
**MARY MADISON**

By: _____
      Jordan T. Hoffman, Her Attorney

Jordan TraVaille Hoffman, P.C.
ARDC# 6195896
2711 E. New York St., 205
Aurora, IL 60502
(888) 958-4529 Ph. & Fax
jthoffmanlaw@gmail.com

## CERTIFICATE OF SERVICE

The undersigned attorney, hereby certifies that on January 22, 2018, I submitted a copy of

the foregoing Petition to Show Cause via U.S. Mail to:


By:
      Jordan T. Hoffman, Her Attorney
      Jordan T. Hoffman
      ARDC # 6195896
      2711 E. New York St., Suite 205
      Aurora, IL 60502
      (888) 958-4529
      jthoffmanlaw@gmail.com


Administrative Review Board
U.S. Department of Labor
Office of the Assistant Secretary
200 Constitution Avenue N.W.- Room: S5220
Washington, D.C. 20210

Hon. Stephen R. Henley
Chief Administrative Law Judge
U.S. Dept. of Labor
Office of Administrative Law Judges
800 K Street, NW, Suite 400-North
Washington, DC 20001-8002

Associate Solicitor
Division of Fair Labor Standards
Office of the Solicitor
U.S. Dept. of Labor
200 Constitution Avenue N.W. Room: N2716
Washington, D.C. 20210

Jackson and Lewis
Counsel For Defendant Kenco
150 N. Michigan Ave., Suite 2500
Chicago, IL 60601

**Exhibit A**

 **Gmail**

Jordan Hoffman <jthoffmanlaw@gmail.com>

## RE: Mary Madison case
1 message

**Argentieri, Julia P. (Chicago)** <Julia.Argentieri@jacksonlewis.com>

Fri, Dec 1, 2017 at 9:03 AM

To: "Cook, April - OALJ" <cook.april@dol.gov>
Cc: "jthoffmanlaw@gmail.com" <jthoffmanlaw@gmail.com>, "Watkins, Brittany (Chicago)" <Brittany.Watkins@jacksonlewis.com>

Hi April:
Here is Kenco's corporate address where you can send the decision, which they've already been notified about via counsel:


Kenco Logistics Services LLC

Attention: Jay Elliott, Vice President - Legal
2001 Riverside Drive ▪ Chattanooga, TN 37406


I have CCed Jordan Hoffman on this email. His email address is jthoffmanlaw@gmail.com. I think your earlier email was missing the t.



Thanks,

Julie Argentieri




**Julia P. Argentieri**
Attorney at Law
**Jackson Lewis P.C.**
150 North Michigan Avenue
Suite 2500
Chicago, IL 60601
Direct: (312) 803-2533 | Main: (312) 787-4949
Julia.Argentieri@jacksonlewis.com | www.jacksonlewis.com
*Jackson Lewis P.C. is included in the AmLaw 100 law firm ranking and is a proud member of the CEO Action for Diversity and Inclusion initiative*

 Gmail

**Jordan Hoffman <jthoffmanlaw@gmail.com>**

## RE: Mary Madison case

**Argentieri, Julia P. (Chicago)** <Julia.Argentieri@jacksonlewis.com>

Fri, Dec 1, 2017 at 9:03 AM

To: "Cook, April - OALJ" <cook.april@dol.gov>
Cc: "jthoffmanlaw@gmail.com" <jthoffmanlaw@gmail.com>, "Watkins, Brittany (Chicago)" <Brittany.Watkins@jacksonlewis.com>

Hi April:
Here is Kenco's corporate address where you can send the decision, which they've already been notified about via counsel:


Kenco Logistics Services LLC

Attention: Jay Elliott, Vice President - Legal
2001 Riverside Drive ▪ Chattanooga, TN 37406


I have CCed Jordan Hoffman on this email. His email address is jthoffmanlaw@gmail.com. I think your earlier email was missing the t.



Thanks,

Julie Argentieri



**Julia P. Argentieri**
Attorney at Law
**Jackson Lewis P.C.**
150 North Michigan Avenue
Suite 2500
Chicago, IL 60601
Direct: (312) 803-2533 | Main: (312) 787-4949
Julia.Argentieri@jacksonlewis.com | www.jacksonlewis.com
*Jackson Lewis P.C. is included in the AmLaw 100 law firm ranking and is a proud member of the CEO Action for Diversity and Inclusion initiative*

**From:** Cook, April - OALJ [mailto:cook.april@dol.gov]
**Sent:** Friday, December 01, 2017 8:58 AM
**To:** Argentieri, Julia P. (Chicago) <Julia.Argentieri@jacksonlewis.com>
**Cc:** jhoffmanlaw@gmail.com
**Subject:** Mary Madison case

I know the parties already have an electronic decision on the above matter, but we received the hard copy back for Kenco Logistics.

Could you please provide me with their new address?

I also received the hard copy back addressed to Mr. Hoffman (his old address) so I sent another hard copy to his new address.

Thank you,

April Cook, Paralegal Specialist to Judge Sellers and Judge Golden

Office of Administrative Law Judges

36 E. 7th Street, Suite 2525

Cincinnati, OH  45202

(513) 684-6016 (direct line)

(513) 684-3252 (main line)

Confidentiality Note: This e-mail, and any attachment to it, contains privileged and confidential information intended only for the use of the individual(s) or entity named on the e-mail. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that reading it is strictly prohibited. If you have received this e-mail in error, please immediately return it to the sender and delete it from your system. Thank you.

Exhibit B

U.S. DEPARTMENT OF LABOR
OFFICE OF ADMINISTRATIVE LAW JUDGES
36 7TH STREET
CINCINNATI, OHIO 45202

OFFICIAL BUSINESS

Jordan Hoffman, Esq.
2711 E. New York Ave., Suite 205
Aurora, IL 60502

UNITED STATES POSTAGE
$ 000.880
02 1P
0000890790
DEC 01 2017
MAILED FROM ZIP CODE 45202

GROUP EXHIBIT C

18-1800

**Exhibit C**

To:        Ms. Walker

From:      Jordan T. Hoffman

Fax:       8889584529

Phone:     2026936307

---

Date:      5/8/2018

Subject:   Response to Request to provide response to show cause

---

Comments:  Good day, Please find attached my response to our conversation yesterday
           regarding your May 2, 2018 request to provide a copy of complainant's
           response to show cause in ARB case no. 18-018

LAW OFFICE OF

## *Jordan TraVaille Hoffman, P.C.*
"Balancing the Scales of Justice"

May 8, 2018

Facsimile only: 202-693-6220

C/o Ms. W. Walker
Administrative Review Board
U.S. Department of Labor
200 Constitution Avenue N.W.
Washington, D.C. 20210

RE: Request for copy of response to show cause-ARB case no. 18-018

Dear Ms. Walker:

This is in follow up to your May 2, 2018, voicemail requesting a copy of the response to show cause in the matter of Mary Madison ARB case no. 18-0018 and our conversation of yesterday May 7, 2018.

As discussed, I am not certain why the response to show cause on behalf of my client is not in the file and while I do appreciate you trying to obtain a copy to complete the file, I am inclined to suggest that you file the record as is.

If it is necessary, I will file a motion to have the record supplemented to reflect any inaccuracies.

Thank you for your efforts.

Respectfully,

Jordan T. Hoffman, Esquire

Cc: Mary Madison

**2711 E. New York St., Suite 205 • Aurora, Illinois 60502 • 888.958.4529 Phone and Facsimile**
jthoffmanlaw@gmail.com