No. 18-1800

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

MARY MADISON,
Petitioner,

v.

UNITED STATES DEPARTMENT OF LABOR,
Respondent.

On Petition for Review of the Final Decision and Order of the
United States Department of Labor's Administrative Review Board

SUPPLEMENTAL APPENDIX

KATE S. O'SCANNLAIN
Solicitor of Labor

JENNIFER S. BRAND
Associate Solicitor

WILLIAM C. LESSER
Deputy Associate Solicitor

MEGAN E. GUENTHER
Counsel for Whistleblower Programs

ROSEMARY ALMONTE
Attorney

U.S. Department of Labor
200 Constitution Ave, NW, N-2716
Washington, DC 20210
(646) 264-3699

## TABLE OF CONTENTS

                                                                                         **PAGE**

COMPLIANTANT'S STATEMENT OF ISSUES;
POSITIONS and AUTHORITY (Nov. 13, 2017) ................................ Suppl. App. 1

CERTIFICATE OF SERVICE

UNITED STATES
DEPARTMENT OF LABOR

In the Matter of : )
)
MARY MADISON, )
)
Complainant, )
)
v. ) Case No. 2016-FDA-4
)
KENCO LOGISTICS )
)
Respondent. )

RECEIVED
NOV 20 2017
Office of Administrative Law Judges
Cincinnati, Ohio

## COMPLAINTANT'S STATEMENT OF ISSUES; POSITION and AUTHORITY

1. The purpose of the Food Modernization and Safety Act (hereinafter "the FSMA") is to better protect human health by ensuring that the food supply is safe from contaminants. *Center for Food Safety v. Hamburg*, 954 F. Supp. 2d 965 (2013) at 968; *81 FR 90186-01.*

2. The FSMA also provides for new enforcement authorities to help achieve higher rates of compliance with risked-based, prevention oriented safety standards and to better respond and to contain problems when they do occur. *81 FR 90186.*

3. The FSMA is an amendment to the Food Drug and Cosmetics Act (hereafter, "the FD&C Act"), 21 U.S.C. §384(d) adding §808 to establish programs for third-party certification bodies to conduct food-safety audits.

4. Section 103 of the FSMA also amended the FDC&A by adding §418 (21 U.S.C. §350g). This provision added the requirement for hazard analysis and risked-based preventative controls for facilities that produce food for humans and animals (See 81FR 330219-01).

5. The FSMA was passed in response to growing levels of imports, diminishing resources to inspect, and heightened food-safety risks and adopts key "New Governance" features, i.e., third-party certifications voluntary standards and public-private partnerships. (See, New Governance Recipe for Food Safety. 47 Loy. U.L.J. At 913.)

1

6. The Mars-Manteno facility operated by KENCO at all relevant times was a facility that was required to be registered pursuant to the Bioterrorism Act of 2002 (21 C.F.R. 1.225) and was subject to the provisions of the FSMA §103(a). See also, FDC&A §418(a) and 21 U.S.C. §350(g) and (a).

7. The FSMA and the FDC&A require such facilities with oversight by the Food and Drug Administration (hereafter "the FDA") to be compliant with science based minimum standards for conducting hazard analysis, documenting hazards, implementation of preventative controls, and documentation of implementation of preventative controls. The FSMA §103. See also, FDC&A §418(b) and 21 U.S.C. §350(b).

8. Section 103 of the FSMA requires the "owner, operator or agent in charge of a facility to identify and evaluate known or reasonably foreseeable hazards that may be associated with the facility, including the following types of hazards or sources of hazards: biological, chemical, physical, radiological, natural toxins, pesticides, drug residues, decomposition, parasites, allergens, unapproved food color additives and other hazards that occur naturally or that may be intentionally introduced. 21 U.S.C. §350g(b).

9. Hazard analysis under Section 103 of the FSMA also requires the facility to identify and evaluate hazards that may be intentionally introduced, including acts of terrorism. Additionally, Section 106 of FSMA provides among other things that FDA shall conduct vulnerability assessment and promulgate regulations to protect against intentional adulteration of food. Section 103 of the FSMA also requires that a facility develop a written analysis of the hazards. These documents are to be made available to FDA upon written request.

10. Section 103 of the FSMA (21 U.S.C. 350g(c) requires that the owner, operator, or agent in charge of a facility to identify and implement preventative controls, including critical control points as defined by 350g(o)(1), if any to provide assurances of the following: i) Unintentional hazards identified will be minimized and prevented; ii) Intentional hazards identified will be significantly minimized or prevented and addressed consistent with Section 106—Protection Against Intentional Adulteration... or misbranding; iii) Food manufactured, processed or held by such facility will not be adulterated or misbranded.

11.     Preventative controls are defined in Section 103 of the FSMA (21 U.S.C 350g(o)(3) to mean "those risk-based, reasonably appropriate procedures, practices, and processes that a person knowledgeable about the safe manufacturing, processing, packing or holding of food would employ to significantly minimize or prevent the hazards identified under the hazard analysis conducted under subsection (b) and that are consistent with the current scientific understanding of safe food manufacturing, processing, packing, or holding at the time of analysis." Examples may include:

> (a) Sanitation procedures for food contact surfaces and utensils and food-contact surfaces equipment;
>
> (b) Supervisor, manager, and employee training.
>
> (c) An environmental monitoring program to verify the effectiveness of pathogenic controls in processes where a food is exposed to a potential contaminant in the environment.
>
> (d) A food allergen control program.
>
> (e) A recall plan.
>
> (f) Current Good Manufacturing Practices (cGMP's) under part 110 of title 21, Code of Federal Regulations (or any successor regulations).
>
> (g) Supplier verification that relates to safety of food.

12.     "The owner, operator, or agent in charge of a facility" is required to "monitor the effectiveness of the preventive controls... to provide assurances that the outcomes... shall be achieved." (21 U.S.C. 350g(d)).

13.     "The owner, operator, or agent in charge of a facility" is also required under Section 103 (21 U.S.C. 350g(e)) to establish procedures to ensure that, if the preventative controls...are not properly implemented or are found ineffective- (2) all affected food is evaluated for safety; and all affected food is prevented from entering into commerce if...the facility cannot ensure that the affected food is not adulterated... or misbranded..."

14. In addition to monitoring preventive controls for effectiveness and taking appropriate corrective actions, Section 103 (21 U.S.C. 350g(f)) requires that "the owner, operator, or agent in charge of a facility" must "verify that—

"(1) the preventive controls... are adequate to control the hazards identified...;
"(2)[they are] conducting monitoring...;
"(3)[they are] making appropriate decisions about corrective actions...;
(4) the preventive controls... are effectively and significantly minimizing or preventing the occurrence of identified hazards, including through the use of environmental and product testing programs and other appropriate means; and
(5) there is documented, periodic reanalysis of the plan... to ensure that the plan is still relevant to the raw materials, conditions and processes in the facility, and new and emerging threats."

15. Section 103 (21 U.S.C. 350g (g)) requires that the "owner, operator, or agent in charge of a facility... maintain, for not less than 2 years, records documenting the monitoring of the preventive controls ..., ,instances of nonconformance material to food safety, the results of testing and other appropriate means of verification..., instances when corrective actions were implemented, and the efficacy of preventive controls and corrective actions."

16. In addition to requiring record keeping, Section 103 (21 U.S.C. 350g(h)) provides that "the owner, operator, or agent in charge of a facility" must "prepare a written plan that documents and describes the procedures used by the facility to comply with the requirements of [Section 103], including analyzing the hazards... and identifying the preventive controls..." The written plan and the other records required under Section 103 also must be "made promptly available" to FDA "upon oral or written request."

17. Section 103 (21 U.S.C. 350g(i)) requires that the "owner, operator, or agent in charge of a facility shall conduct a reanalysis... whenever a significant change is made in the activities conducted at a facility ... if the change creates a reasonable potential for a new hazard or a significant increase in a previously identified hazard..." Reanalysis is also required not less than "once every 3 years." Reanalysis must "be completed and additional

4

preventive controls implemented before [a] change in activities at the facility is operative." If it is concluded that "no additional or revised preventive controls are needed," the written plan must reflect the basis for the conclusion that no additional preventive controls are needed.

FDA also "may require a reanalysis under this section to respond to new hazards and developments in scientific understanding, including, as appropriate, results from the Department of Homeland Security biological, chemical, radiological, or other terrorism risk assessment."

18.    **Food Defense** is the effort to protect the food supply against intentional contamination due to sabotage, terrorism, counterfeiting, or other illegal, intentionally harmful means. Potential contaminants include biological, chemical and radiological hazards that are generally not found in foods or their production environment. Food Defense differs from **Food Safety,** which is the effort to prevent unintentional contamination of food products by agents reasonably likely to occur in the food supply (e.g., *E. coil, Salmonella, Listeria)."*

19.    **Food Security,** as defined by the World Health Organization (WHO), exists "when all people at all times have access to sufficient, safe, nutritious food to maintain a healthy and active life". Sections within FSMA that pertain to Food Defense are based on the FDA definition. §103(b), §105(3c), §106, §108 and §109 of the FSMA, (See also, §104(b)(2) of the FDC&A and 21 U.S.C. §350g(b)(2), §350i, §2202 and §2203.

20.    Homeland Security Presidential Directive 7 (HSPD 7), signed on 17 December 2003 was the first to establish a national policy for Federal departments and agencies to identify and prioritize U.S. critical infrastructure and key resources arid to protect them from terrorist attacks.
   FSMA delineates additional requirements to the agencies regarding Food Defense. Four main provisions under FSMA focus on Food Defense:
   1.   Requirement for facilities to identify hazards that may be intentionally introduced, including by acts of terrorism;
   2.   Requirement for FDA to conduct a vulnerability assessment of the food system and determine the types of mitigation strategies necessary to protect against intentional adulteration of food;
   3.   Requirement for FDA in coordination with United States Department of

Agriculture (USDA) and Department of Homeland Security (DHS) to make available, via Internet, a National Agriculture Food Defense Strategy;

4. Requirement for FDA in coordination with USDA and DHS to make available, via Internet, a report of activities of the Food and Agriculture Coordinating Councils.

21. Prior to the passage of FSMA, there were no requirements for food facilities under the regulatory jurisdiction of FDA to implement mitigation strategies or measures to protect against intentional contamination. Now, under FSMA Section 103 (Section 418 of the FDCA), facilities are required to conduct a hazard analysis, implement preventative controls, and have a written food safety plan for all identified hazards, including hazards that may be intentionally introduced, or for types of hazards that could be introduced through acts of terrorism. This applies to businesses that are already required to register under section 305 of the Bioterrorism Act.

22. Included under Section 103 (21 U.S.C. § 350g(i)) is the requirement to *reanalyze* processes whenever a significant change is made, particularly if the change created a "reasonable potential" for a new hazard or a "significant increase" in a previously identified hazard. This reanalysis is required to take place at least once every three years. In addition, this provision provides FDA authority to *require* reanalysis in response to new hazards and developments in scientific understanding, including, as appropriate, results of the DHS biological, chemical, radiological, or other terrorism risk assessments.

23. FSMA adds §420 to the FDC&A, which requires the FDA to conduct a vulnerability assessment of the food system and determine mitigation strategies necessary to protect against intentional adulteration of food, to include per the Department of Homeland Security ("DHS") biological, chemical, radiological or other terrorism risk assessments.

23. Homeland Security Presidential Directive 9 (HSPD-9), issued in January 2004, established a national policy to defend the national food supply against terrorist attacks, major disasters, and other emergencies. The Food Emergency Response Network (FERN) *was* developed as a result, to integrate the nation's food testing laboratories at all levels (federal, state, local and tribal), into a network that would be able to respond to emergencies involving biological, chemical, or radiological contamination of food. FERN is coordinated by both FDA and the USDA Food Safety and Inspection Service (FSIS).

FSMA Section 202(b) requires FDA, in coordination with USDA, DHS, and state, local and tribal governments, to submit a report to Congress on the progress and implementation of FERN. The first report was to be submitted 18 months post enactment of FSMA, and biennially thereafter; these reports are to be made publicly available on the FDA Web site.

24. Madison engaged in protected activity as more fully set out in her Complaint and Amended Complaint filed with the Department of Labor, Occupational Safety and Health Administration in the matter herein as defined by the FSMA by objecting to and refusing to participate in activity and practices that reasonably believed to be in violation of the Act. *21 U.S.C.A. §399(a).*

25. Madison stated a prima facie case for a claim of retalition based upon her engagement of protected activities. *Chase v. Brothers, International Food Corp.*, 3 F. Supp. 3d 49 at 53, Citing, *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006); *Holt v. KMI–Continental*, 95 F.3d 123, 130 (2d Cir.1996), *cert. denied*, 520 U.S. 1228, 117 S.Ct. 1819, 137 L.Ed.2d 1027 (1997); *Tomka v. Seiler Corp.*, 66 F.3d 1295, 66 F.3d 1295, 1308 (2nd Cir.1995) (citations omitted).

26. Madison had a reasonable belief that the conduct of her former employer, KENCO was prohibited by law. *Chase v. Brothers, International Food Corp.*, 3 F. Supp. 3d 49 at 53, Citing, *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006); *Holt v. KMI–Continental*, 95 F.3d 123, 130 (2d Cir.1996), *cert. denied*, 520 U.S. 1228, 117 S.Ct. 1819, 137 L.Ed.2d 1027 (1997); *Tomka v. Seiler Corp.*, 66 F.3d 1295, 66 F.3d 1295, 1308 (2nd Cir.1995) (citations omitted).

27. The reasonableness of Madison's belief that KENCO's conduct was unlawful is to be assessed in light of the totality of circumstances. *Chase Brothers*, citing, *Casalino v. New York State Catholic Health Plan, Inc.*, 2012 WL 1079943 (S.D.N.Y. Mar. 30, 2012).

28. "An employee 'need not establish that the conduct [s]he opposed was in fact a violation of Title VII' but rather, only that she had a 'good faith, reasonable belief' that the underlying

employment practice was unlawful." *Chase v. Brothers International Foods Corp.* at 55, quoting, *Reed v. A.W. Lawrence & Co.* 95 F.3d at 1178 (quoting *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons,* 842 F.2d 590, 593 (2d Cir.1988)).

29. Evidence that the practice objected to by Madison is in fact lawful will not defeat a her claim of retaliation. *Chase* at 55. Rather, KENCO must establish that Madison did not have a reasonable belief that the practice she was opposing was unlawful. Such a determination can only be made upon a review of the totality of the circumstances. *Id.*

30. Madison's protected activity was a contributing factor in the adverse actions taken against her by KENCO and her former employer may avoid liability only if it demonstrates "by clear and convincing evidence that it would have taken the same unfavorable personnel action" in the absence of the protected activity. In the matter of *Robert M. Armstrong,* 2016 WL 5340237 at 9. 42 U.S.C.A. § 5851(b)(3)(D).

31. The burden of proof under the "clear and convincing" standard is more rigorous than the "preponderance of the evidence" standard and denotes a conclusive demonstration, i.e., that the thing to be proved is highly probable or reasonably certain. *Id.,* quoting *Williams v. Domino's Pizza,* ARB No. 09-092, AU No. 2008-STA-052, slip op. at 5 (ARB Jan. 31,2011).

32. The U.S. Supreme Court has observed that the clear-and-convincing standard is "reserved to protect particularly important interests in a limited number of civil cases." In the matter of *Robert M. Armstrong,* 9, quoting, *California ex rel. Cooper v. Mitch Bros. Santa Ana Theater,* 454 U.S. 90, 93 (1981). Similarly, two circuit courts have commented, "For employers, this is a tough standard, and not by accident." In the matter of *Robert M. Armstrong,* 9, quoting, *Araujo v. N.J. Transit Rail Operations, Inc.,* 708 F.3d 152, 159 (3d Cir. 2013)(quoting *Stone & Webster Eng'g Carp. v. Herman,* 115 F.3d 1568, 1572 (11th Cir. 1997)).

33. Whether a respondent has met this high burden, consideration is required of the combined effect of at least three elements applied flexibly on a case-by-case basis: (1) the independent significance of the non-protected activity cited by the respondent in justification of the personnel action; (2) the facts that would change in the absence of the complainant's protected activity; and (3)

"the evidence that proves or disproves whether the employer would have taken the same adverse actions [in the absence of protected activity]." *Robert M. Armstrong* at 9, quoting, *Speegle v. Stone & Webster Constr., Inc.*, ARB No. 13-074, ALJ No. 2005-ERA-006, slip op. At 11 (ARB Apr. 25, 2014).

34. With respect to the last element, the respondent is "required to demonstrate through factors extrinsic to [complainant's] protected activity that the discipline to which [complainant] was subjected was applied consistently, within clearly-established company policy, and in a non-disparate manner consistent with discipline taken against employees who committed the same or similar violations." *Robert M. Armstrong*, quoting, *DeFrancesco v. Union R.R. Co.*, ARB No. 13-057, AU No. 2009-FRS-009, slip op. at 13-14 (ARB Sept. 30, 2015).

35. The Federal Circuit has developed a similar three-part test for determining whether a respondent has met its burden under the Whistleblower Protection Act. of proving, by clear and convincing evidence, that it would have taken the same personnel action in the absence of a complainant's whistleblowing: "[1] the strength of the agency's evidence in support of its personnel action; [2] the existence and strength of any motive to retaliate on the part of the agency officials who were involved in the decision; and [3] any evidence that the agency takes similar actions against employees who are not whistleblowers but who are otherwise similarly situated." *Robert M. Armstrong*, quoting, *Carr v. Social Security Admin.*, 185 F.3d 1318, 1323 (Fed. Cir. 1999). *Accord Whitmore*, 680 F.3d at 1370-1375.

36. (a) No covered entity may discharge or otherwise retaliate against, including, but not limited to, intimidating, threatening, restraining, coercing, blacklisting or disciplining, any employee with respect to the employee's compensation, terms, conditions, or privileges of employment because the employee, whether at the employee's initiative or in the ordinary course of the employee's duties (or any person acting pursuant to a request of the employee), has engaged in any of the activities specified in paragraphs (b)(1) through (4) of this section. 28 C.F.R. §1987.102.

9

37.     (b) An employee is protected against retaliation because the employee (or any person acting pursuant to a request of the employee) has:

"(1) Provided, caused to be provided, or is about to provide or cause to be provided to the employer, the Federal Government, or the attorney general of a State information relating to any violation of, or any act or omission the employee reasonably believes to be a violation of any provision of the FD&C or any order, rule, regulation, standard, or ban under the FD&C;

"(2) Testified or is about to testify in a proceeding concerning such violation;

"(3) Assisted or participated or is about to assist or participate in such a proceeding; or

"(4) Objected to, or refused to participate in, any activity, policy, practice, or assigned task that the employee (or other such person) reasonably believed to be in violation of any provision of the FD&C, or any order, rule, regulation, standard, or ban under the FD&C. 29 C.F.R. §1987.103.

38.     If the findings are that there is reasonable cause to believe that the complaint has merit, the Assistant Secretary will order appropriate relief, including preliminary reinstatement, affirmative action to abate the violation, back pay with interest, and compensatory damages, including, costs, attorney's fees and expert witness fees reasonably incurred. 29 C.F.R. 1987.105.

39.     Under FSMA, interest on back pay is computed by compounding daily the Internal Revenue Service interest rate for the underpayment of taxes pursuant to 26 U.S.C. 6621 generally the Federal short-term rate plus three percentage points. 79 FR 8623. The Secretary has long applied the interest rate in 26 U.S.C. 6621 to calculate interest on backpay in whistleblower cases. Doyle v. Hydro Nuclear Servs., ARB Nos. 99-041, 99-042, 00-012, 2000 WL 694384, at *14-15, 17 (ARB May 17, 2000); see also Cefalu v. Roadway Express, Inc., ARB No. 09-070, 2011 WL 1247212, at *2 (ARB Mar. 17, 2011); Pollock v. Cont'l Express, ARB Nos. 07-073, 08-051, 2010 WL 1776974, at *8 (ARB Apr. 10, 2010); Murray v. Air Ride, Inc., ARB No. 00-045, slip op. at 9 (ARB Dec. 29, 2000).

40.     The goal of a suit under the Fair Labor Standards Act and the Equal Pay Act is to make whole the victims of the unlawful underpayment of wages, and since § 6621 has been adopted as a good indicator of the value of the use of money, it was well within" the district court's discretion to

calculate prejudgment interest under § 6621); New Horizons for the Retarded, 283 N.L.R.B. No. 181, 1987 WL 89652, at *2 (NLRB May 28, 1987) (observing that "the short-term Federal rate [used by § 6621] is based on average market yields on marketable Federal obligations and is influenced by private economic market forces"). Similarly, as explained in the Interim Final Rule (IFR), daily compounding of the interest award ensures that complainants are made whole for unlawful retaliation in violation of **FSMA**. 79 FR 8623.

41. Section 6621 provides the appropriate measure of compensation under **FSMA** and other DOL-administered whistleblower statutes because it ensures the complainant will be placed in the same position he or she would have been in if no unlawful retaliation occurred. See Ass't Sec'y v. Double R. Trucking, Inc., ARB No. 99-061, slip op. at 5 (ARB July 16, 1999) (interest awards pursuant to § 6621 are mandatory elements of complainant's make-whole remedy). Section 6621 provides a reasonably accurate prediction of market outcomes (which represents the loss of investment opportunity by the complainant and the employer's benefit from use of the withheld money) and thus provides the complainant with appropriate make-whole relief. See EEOC v. Erie Cnty., 751 F.2d 79, 82 (2d Cir. 1984).

42. In ordering back pay, OSHA will require the respondent to submit the appropriate documentation to the Social Security Administration (SSA) allocating the back pay to the appropriate calendar quarters. Requiring the reporting of back pay allocation to the SSA serves the remedial purposes of **FSMA** by ensuring that employees subjected to retaliation are truly made whole. See 79 FR 8623; see also Don Chavas, LLC d/b/a Tortillas Don Chavas, 361 NLRB No. 10, 2014 WL 3897178, at *4-5 (NLRB Aug. 8, 2014).

43. In limited circumstances, in lieu of preliminary reinstatement, OSHA may order that the complainant receive the same pay and benefits that he or she received prior to termination, but not actually return to work. See 79 FR 8623. Such "economic reinstatement" is akin to an order for front pay and frequently is employed in cases arising under section 105(c) of the Federal Mine Safety and Health Act of 1977, which protects miners from retaliation. 30 U.S.C. 815(c); see, e.g., Sec'y of Labor ex rel. York v. BR&D Enters., Inc., 23 FMSHRC 697, 2001 WL 1806020, at *1 (ALJ June 26, 2001).

44. Front pay has been recognized as a possible remedy in cases under the whistleblower statutes enforced by OSHA in limited circumstances where reinstatement would not be appropriate. See, e.g., Luder v. Cont'l Airlines, Inc., ARB No. 10-026, 2012 WL 376755, at *11 (ARB Jan. 31, 2012), aff'd, Cont'l Airlines, Inc. v. Admin. Rev. Bd., No. 15-60012, slip op. at 8, 2016 WL 97461, at *4 (5th Cir. Jan. 7, 2016) (unpublished) (under Wendell H. Ford Aviation Investment and Reform Act for the 21st Century, "front-pay is available when reinstatement is not possible"); Moder v. Vill. of Jackson, ARB Nos. 01-095, 02-039, 2003 WL 21499864, at *10 (ARB June 30, 2003) (under environmental whistleblower statutes, "front pay may be an appropriate substitute when the parties prove the impossibility of a productive and amicable working relationship, or the company no longer has a position for which the complainant is qualified").

See, e.g., Luder, ARB No. 10-026, slip op. at *11. (holding that front pay must be awarded according to reasonable parameters such as the amount of the proposed award, the length of time the complainant expects to be out of work, and the applicable discount rate) (internal quotation marks and citations omitted), front pay award modified, Luder v. Cont'l Airlines, Inc., ARB No. 13-009, 2014 WL 6850012 (ARB Nov. 2014), aff'd, Cont'l Airlines, Inc. v. Admin. Review Bd., No. 15-60012, slip op. at 8, 2016 WL 97461, at *4 (5th Cir. Jan. 7, 2016) (unpublished).

45. Blackburn v. Martin, 982 F.2d 125 (4th Cir. 1992) states that emotional distress damages may be awarded without the testimony of expert witnesses. A number of ARB decisions have awarded such damages without the testimony of expert witnesses in appropriate circumstances. See e.g., Lockheed Martin Corp. v. Admin. Review Bd., 717 F.3d 1121, 1138 (10th Cir. 2013) (upholding an award of $75,000 for emotional pain and suffering without requiring the testimony of expert witnesses); Menendez v. Halliburton, Inc., ARB Nos 09-002, 09-003 2013 WL 1282255, at *11-12 (ARB Mar. 15, 2013) (upholding award of $30,000 for emotional distress and reputational harm without requiring expert testimony) aff'd sub nom. Halliburton, Inc. v. Admin. Review Bd., 771 F.3d 254 (5th Cir. 2014). "OSHA believes cases adequately serve to notify the public that emotional distress damages may be awarded without the testimony of expert witnesses." 81 FR 22530-01.

46.　　Madison claims punitive or exemplary damages pursuant to Section 11(c) of the Occupational Safety and Health Act due to continuous previous and simultaneous harassment; humiliation and subsequent "blacklisting" after her discharge. Such damages are further warranted by the degree to which KENCO was aware that its conduct toward her was in reckless disregard FSMA; the egregious nature of its conduct toward Madison and its continued failure to heed her admonitions of its violations of FSMA; KENCO's response to Madison's complaint in which it seeks to justify its actions for the retaliation against Madison for engaging in "protected activity" pursuant to FSMA and its attempt to conceal or provide pretextual reasons for its adverse employment actions taken toward Madison; evidence that KENCO tolerated and or created a workplace culture that discouraged or punished whistleblowing and KENCO's financial condition in that public information indicates that it has an estimated annual revenue of one to two billion dollars (USD).

Dated: November 13, 2017

Respectfully Submitted:

**MARY D. MADISON**

By: _____
Jordan T. Hoffman, *Her Attorney*

13

CERTIFICATE OF SERVICE

I hereby certify that on October 9, 2018, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Rosemary Almonte*
ROSEMARY ALMONTE
Attorney
U.S. Department of Labor
Office of the Solicitor
200 Constitution Ave, NW, N-2716
Washington, DC 20210
Phone: (646) 264-3699
Fax: (646) 264-3660/70
E-Mail: almonte.rosemary@dol.gov